

**U.S. Department of Justice**

*United States Attorney*
*District of New Jersey*

| | | |
|---|---|---|
| *Paul A. Murphy*<br>*Chief, Economic Crimes Unit* | *970 Broad Street, 7th floor*<br>*Newark, New Jersey 07102* | *973-645-2700* |

May 30, 2018

## FILED UNDER SEAL

The Honorable Leda Dunn Wettre
United States Magistrate Judge
United States District Court
District of New Jersey
50 Walnut Street
Newark, New Jersey 07101

> Re: United States v. Parmjit "Paul" Parmar
> Mag. No. 18-8040 (LDW)

Dear Magistrate Judge Wettre:

The government submits this letter brief in lieu of a more formal submission to respond to the defendant's application for pretrial release. *See* Docket No. 10. There are no conditions of release that will reasonably assure the defendant's appearance at trial in this case, and so the Court should adhere to its original decision and reject the defendant's renewed application for pretrial release.

## BACKGROUND

The defendant was arrested on May 16, 2018 on a two-count complaint charging him with conspiracy to commit securities fraud and securities fraud. The criminal complaint charges that, between May 2015 through September 2017, the defendants, Parmjit "Paul" Parmar, Sotirios "Sam" Zaharis and Ravi Chivukula carried out an elaborate scheme to defraud a victim investor referred to in the criminal complaint as the "Private Investment Firm," and others, out of hundreds of millions of dollars in connection with the funding of a "going private" transaction (the "Go-Private Transaction") involving a publicly traded healthcare services company ("Company A"). The defendants used a variety of fraudulent methods designed to grossly inflate the value of Company A and trick the

Private Investment Firm and others into believing that Company A was worth substantially more than its actual value.

The scheme to present a materially false picture of the financial health of Company A began with several secondary offerings on the London Stock Exchange whereby the defendants sought to raise tens of millions of dollars in the public markets purportedly to fund Company A's acquisitions of various operating subsidiaries. In reality, a number of these entities either did not exist or had only a fraction of the operating income attributed to them. The co-conspirators then funneled the proceeds of these secondary offerings through bank accounts they controlled and used the money for a variety of purposes that had nothing to do with acquiring the purported acquisition targets. Rather, the money from one of the offerings was used to, among other things, make it appear as if Company A's principal operating company (the "Operating Company") had substantial customer revenue when, in fact, the funds were simply transfers of the money that had been raised in the secondary offering. The defendants went to great lengths to make it appear that these funds were revenue, concocting phony customers and altering bank statements.

As alleged in the complaint, the co-conspirators employed a variety of fraudulent techniques before and in the course of the Go-Private Transaction to induce the Private Investment Firm and others to fund the transaction. These tactics included, but were not limited to: (1) creating fictitious operating companies that Company A purportedly acquired in sham acquisitions that the co-conspirators simply made up; (2) falsifying and, in some cases, wholly fabricating, bank records of subsidiary entities in order to generate a phony picture of Company A's revenue streams; (3) generating fake income streams and, in some cases, fabricating customers of Company A and its subsidiaries; (4) and making other material misrepresentations and omissions to representatives of the Private Investment Firm and others. Through these actions, the defendants caused the Private Investment Firm and others to value Company A at over $300 million for purposes of financing the Go-Private Transaction.

Based on the criminal complaint, this Court signed arrest warrants for Parmar, Zaharis and Chivukula on May 15, 2018. The FBI arrested Parmar the following morning and he was brought before the Court that afternoon for an initial appearance and to address the question of release pending trial. After hearing arguments from counsel, including many of the same arguments defendant advances here, the Court concluded that there were no conditions or combination of conditions that would reasonably assure the defendant's appearance for trial. Accordingly, the Court ordered him remanded.

- 2 -

As the Court is aware, the FBI was unable to execute the arrest warrants for Zaharis and Chivukula. Zaharis, an Australian citizen, left the United States in early December 2017, not long after the fraud began to unravel. Chivukula, an Indian citizen, who has been living in the United States with his family for years, was scheduled to arrive in the United States the morning of May 16, 2018 on a flight from India. Chivukula did not board the plane for his return flight. He is believed to be in India.

## ARGUMENT

The Bail Reform Act, 18 U.S.C. §§ 3141, *et seq.*, provides that a defendant must be detained if the Court determines that "no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and community." 18 U.S.C. § 3142(e)(1). A finding of risk of flight must be supported by a preponderance of the evidence. *See United States v. Himler*, 797 F.2d 156, 161 (3d Cir. 1986).

In determining whether the defendant poses a flight risk, a court must consider several factors, including (1) the "nature and circumstances" of the charged offense, (2) the weight of the evidence against the defendant, and (3) the defendant's history and characteristics, including his character, his family and community ties, his past conduct, his criminal history, and his "record concerning appearance at court proceedings." 18 U.S.C. § 3142(g); *see United States v. Bowers*, 432 F.3d 518, 524 (3d Cir. 2005) (Section 3142(g) lists factors the court must consider when deciding whether to release a defendant). "Other factors to examine are the use of aliases, unstable residential ties, efforts to avoid arrest and hidden assets." *United States v. Vargas*, 2013 WL 3223419 at *4 (D.N.J., June 25, 2013).

At detention hearings, "[t]he rules concerning admissibility of evidence in criminal trials do not apply," 18 U.S.C. § 3142(f), and the parties may proceed solely by proffer, *United States v. Gaviria*, 828 F.2d 667, 669 (11th Cir. 1987); *see United States v. Delker*, 757 F.2d 1390, 1396 (3d Cir. 1985) (district court has discretion to proceed with bail hearing by way of testimony or proffer).

### 1. The Nature and Circumstances of the Offense

This was a serious offense that caused hundreds of millions in losses through an extended course of deceptive conduct by all the defendants. Parmar and his co-conspirators engineered and executed a brazen plot to prop up their company by lying about its revenues and claiming to have engaged in profitable acquisitions of other established companies operating in the same space in order to make their own company appear to be a more attractive target. They fabricated companies they claimed to have acquired and generated fake customers and revenues for those companies, in one instance

- 3 -

using money they had raised on the London Stock Exchange purportedly to fund the acquisition to create phony revenues for their own operating subsidiary instead. They generated fake purchase and sale agreements and dummied up entire bank accounts and the bank records supposedly corresponding to those accounts. The amount of money at stake in the Go-Private Transaction also is noteworthy to demonstrate the breadth of this fraud. As a result of their detailed execution of the fraud during the due diligence phase of the transaction, the victims overvalued the target company as being worth over $300 million.

The extent of the fraud and its sheer brazenness plainly involved massive efforts to deceive. Through their efforts, the defendants fooled sophisticated investors, lenders and experienced legal and financial due diligence experts. The highly deceptive nature of this crime, and the layers of lies and manipulation required for it to succeed, show that the defendant has the ability to thwart any effort to assure his appearance at trial. Parmar, as the leader of the group, has engaged in the type of criminal conduct that demonstrates a mentality that is willing to take extraordinary chances in high-stakes situations. The fact that he and his co-conspirators even attempted this fraud – let alone that they successfully pulled the wool over the eyes of some very sophisticated counterparties – is powerful evidence of the lengths to which they are willing to go to achieve their ends.

Moreover, the offenses at issue here expose the defendant to a lengthy prison sentence. The defendant faces a statutory maximum for the charged offenses of 25 years in prison. A preliminary analysis of the Sentencing Guidelines indicates that his sentencing range after trial would likely be no less than 168 to 210 months of imprisonment. Such a range would be based on the following calculations: The base offense level would be 7, U.S.S.G. § 2B1.1(a)(1); at least 24 points would be added for the loss calculation, U.S.S.G. § 2B1.1(b)(1)(M); 2 points would be added because the offense involved sophisticated means, U.S.S.G. § 2B1.1(b)(10); and at least 2 points would be added for the defendant's aggravating role in the offense. U.S.S.G. § 3B1.1(c). Other enhancements also could be applied here, which would only increase the sentencing exposure. It is undeniable that the exposure to such a lengthy prison terms magnifies the defendant's incentive to flee.

The nature of the crime also was such that it provided the defendant with access to large amounts of cash with which to restart his life elsewhere. He poured millions of dollars of ill-gotten gains into real estate, but there also appears to be millions more in cash that he continues to control, albeit through others. This is detailed further below.

- 4 -

## 2. **The Evidence of the Defendant's Guilt**

The weight of the evidence against the defendant is overwhelming. The criminal complaint alone delineates the extensive written record of the defendant and his co-conspirators executing the plan to deceive their victims in connection with their fraudulent equity raises on the London Stock Exchange and in the Go-Private Transaction. The co-conspirators communicated regularly among themselves about the efforts to falsify documents, fabricate acquisition targets, create and alter bank records, falsify the books and records of their company's operating subsidiaries, among other things. Their email communications alone are a clear trail of admissions by the various co-conspirators, including defendant Parmar. Moreover, the money trail leads directly to the defendant, providing an unmistakable motive for the crimes.

There is no question that the evidence of the defendant's guilt is overwhelming here. That fact adds to the incentive to flee. Where, as here, a defendant's chances of prevailing at trial are slim to none, his motive to flee increases dramatically.

## 3. **The History and Characteristics of the Defendant**

The history and characteristics of the defendant further demonstrate that he is a risk of flight.

The defendant's overseas connections and access to funds: In judging whether the defendant poses a risk of flight that cannot be addressed by any combination of conditions, the Court should consider his overseas connections and his access to large amounts of cash. In *Vargas*, the district court ordered a defendant in a government fraud case detained based largely on the fact that he had substantial overseas contacts in the Dominican Republic and access to sizeable amounts of money. *See* 2013 WL 3223419 at *4-7. This case poses an even greater risk of flight.

While the defendant has been a U.S. citizen for almost 20 years, he has deep ties to India. He was born there and lived there until his early twenties, when he came to the United States. Although his immediate family members appear to be here, the government is aware that he maintains numerous contacts in India and has claimed to know high-level persons connected with the Indian government. As an initial matter, it is worth mentioning that his co-conspirator Ravi Chivukula is an Indian citizen and is believed to be there now.

Case 2:18-cr-00735-MCA   Document 19   Filed 06/07/18   Page 6 of 21 PageID: 32



Even if the defendant decided he did not want to go to India because of the issues brought to the Court's attention on May 16, 2018, he appears to have plenty of contacts in other countries.

Second, travel records show that the defendant has traveled internationally on numerous occasions apparently to a variety of destinations. In the last year and a half, he has flown to Dubai several times.[1]  For instance, travel records show that, on or about December 23, 2016, the defendant flew from the United States to Dubai and then returned to the United States from Dubai on or about January 9, 2017.  They also show that, on or about February 6, 2018, he flew from the United States to Dubai and flew back to the United States from Dubai on or about February 22, 2018.  Similarly, records show that, on or about March 24, 2018, the defendant flew from the United States to Dubai and returned to the United States from Dubai on or about April 4, 2018.  The defendant's international travel records further show a number of additional trips where he flew from the United States to Dubai and back over the last five years.  *See* Exhibit A.

As the Court also is aware, the defendant has engaged in substantial additional international travel.  Exhibit A reflects his U.S. border crossings going back to January 2013, and shows travel to (or possibly through) a variety of places, including England, France, Italy, Japan, Israel, Hong Kong, Sweden, Iceland, Spain, Canada, Costa Rica and Amsterdam.  Moreover, a review of his expired U.S. Passport shows travel to the following destinations between April 2007 and May 2011: India (multiple trips), Pakistan (at least one trip, although two visas were issued by Pakistan), the United Arab Emirates (multiple trips), Thailand (two trips), Cambodia, Ireland (two trips), Barbados, St. Maarten, Anguilla, Bermuda and the Bahamas.

The investigation to date does reveal a significant amount of money flowing through various accounts ultimately controlled by Parmar, showing that he still appears to have access to millions of dollars in cash.  And there is

at least one highly suspicious transfer of funds overseas to an account in Dubai.

On or about October 2, 2017, approximately $5.4 million that traces back to the June 2015 equity raise on the London Stock Exchange was transferred from a law firm escrow account into an account controlled by Parmar in the name of an entity called "Ranga Bhoomi," which is referenced in detail in the civil forfeiture complaint. That money was then included in a transfer on or about October 11, 2017 of over $10.1 million from the Ranga Bhoomi account to an account at J.P. Morgan Chase in the name of a company called

The defendant's family ties to the United States:  The defendant is a single man who lives in his Colts Neck estate with [redacted] [2] According to the defendant, his father also lives with him and he has other close family members who live in the United States and are willing to co-sign a bond for him and put up property.  However, "the mere presence of defendant's immediate family in New Jersey" is not sufficient "to assure his presence at trial."  *United States v. Abdullahu*, 488 F. Supp.2d 433, 442 (D.N.J. 2007) (noting that the defendant had the "motive and means to flee if he is released").



Likewise, the fact that the defendant is willing to submit to electronic
monitoring does not avoid the flight risk. "Electronic monitoring impedes but

- 10 -

does not prevent a defendant from fleeing." *Abdullahu*, 488 F.Supp.2d at 444; *see United States v. Orena*, 986 F.2d 628, 632-33 (2d Cir.1993). When considering the effectiveness of electronic monitoring as a condition of release, the Second Circuit held that "the electronic surveillance systems can be circumvented by the 'wonders of science and of sophisticated electronic technology,' and that the monitoring equipment can be rendered inoperative." *Orena*, 986 F.2d at 632 (quoting *United States v. Gotti*, 776 F.Supp. 666, 672-73 (E.D.N.Y.1991)); *see United States v. Benevolence Int'l Foundation, Inc.*, 222 F. Supp.2d 1005, 1007 (N.D. Il. 2002).

Nor does the fact that the defendant has relinquished his passports and travel documents guarantee his presence at trial. *See Vargas*, 2013 WL 3223419 at *5; *see United States v. Alvarez*, 1987 WL 27696 at *3 (S.D.N.Y., Dec. 10, 1987) ("[s]imply relinquishing their passports will not reasonably assure that the defendant and his family will not flee"; noting that the defendant had "significant business and family contacts outside the United States and could easily re-establish himself elsewhere"); *United States v. Diaz*, 1998 WL 915896 at *2 (S.D.N.Y., Dec. 30, 1998) (surrendering passport "does not furnish a guarantee against travel on false or unauthorized documents").

In short, the Court should find that, despite the bail package the defendant has offered here, that there is no combination of conditions that would assure his attendance at trial. The motive and opportunity for flight are too strong here. ██████████████████████████████

The co-defendants by all accounts have fled from justice. ████████████████████

██████████████████████████████████████ The other, Ravi Chivukula, appears to have no intention of returning to the United States voluntarily ████████████████████████████████████

████████████████████ And if the defendant chooses to follow suit, there is little chance of getting him back to the United States for prosecution any time soon. If he goes to India, extradition can often take many years. And if he were to go to Dubai, the United States does not have a bilateral extradition treaty with the United Arab Emirates.

Accordingly, the government requests that the Court order the defendant detained pending trial.

Finally, if the Court disagrees and concludes that there may be some combination of conditions that that would assure the defendant's appearance at trial, then the government requests that the Court first hold a *Nebbia* hearing to examine the sureties and the collateral to determine whether they

- 11 -

will, in fact, assure the defendant's presence at trial. *See United States v. Nebbia*, 357 F.2d 303, 304-05 (2d Cir. 1966).

## CONCLUSION

For the foregoing reasons, and for all the reasons addressed with the Court on May 16, 2018 in connection with the defendant's initial appearance, the government requests that the Court adhere to its initial conclusion and order that the defendant be detained pending the trial of this matter.

Respectfully submitted,

CRAIG CARPENITO
United States Attorney

*Paul A. Murphy*
By:  Paul A. Murphy
Nicholas P. Grippo
Assistant United States Attorneys

Leslie Lehnert
Trial Attorney, Criminal Division
U.S. Department of Justice

cc:   Jeffrey Hoffman, Esq. (by email)
Elizabeth Auson, Pretrial Services Officer (by email)

- 12 -

# EXHIBIT A









