Jeffrey C. Hoffman
Windels Marx Lane & Mittendorf, LLP
156 West 56th Street, New York, NY 10019
Tel: 212.237.1018; Fax: 212.262.1215
jhoffman@windelsmarx.com
Attorneys for Defendant Paul Parmar

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

-----------------------------------------------x

UNITED STATES OF AMERICA,        MAG NO: 18-8040(LDW)

        v.

PAUL PARMAR,
        Defendant.
-----------------------------------------------x

## NOTICE OF MOTION AND MOTION TO
## REVIEW MAGISTRATE'S DETENTION ORDER AND TO ORDER
## RELEASE ON APPROPRIATE CONDITIONS

To: AUSA Paul Murphy
United States Attorney's Office
970 Broad Street
Newark, New Jersey 07102

US PTS Officer Elizabeth Auson
50 Walnut Street, Room 1018
Newark, New Jersey 07101-6240

**PLEASE TAKE NOTICE** that, on June 18, 2018, the undersigned attorneys for defendant Paul Parmar will move before the Honorable Kevin McNulty USDJ, at the Martin Luther King Federal Courthouse, 50 Walnut Street, Newark, New Jersey, for an Order Releasing Defendant from Pretrial Detention and setting appropriate conditions for his release.

**MOTION AND MEMORADUM OF LAW AND FACTS
TO REVIEW MAGISTRATE'S DETENTION ORDER
AND TO ORDER RELEASE DEFENDANT PAUL PARMAR
ON APPROPRIATE CONDITIONS**

## <u>INTRODUCTION</u>

Defendant Paul Parmar submits this motion for *de novo* review and reversal of the Magistrate Judge's order of detention and for pretrial release on conditions`.

The government failed to prove by a preponderance of the evidence that Mr. Parmar poses an unreasonable risk of flight (danger to the community is not in issue). The Magistrate erred in concluding otherwise, on the facts and on the law. Mr. Parmar is a United States citizen with no criminal record and all of his closest family members reside in the United States. No less than 37 members of his community have submitted letters attesting to his character and their belief that he would not avoid his obligations to the court. Evidence of family and community ties could not be stronger. In addition, as defense counsel argued before the Magistrate, Mr. Parmar's case is defensible; he believes he will be vindicated, and he has every incentive to remain in his country of citizenship, with his family, and fight the charges against him. He knew about the government's investigation and the full nature of the allegations of wrongdoing from filings in other proceedings. Five days prior to arrest, agents contacted him at his home to set up a meeting at a nearby

coffee shop.  Although he could not have failed to suspect that this was his arrest, he readily agreed to the meeting and showed up for the appointment, where he was arrested.

Both the government in its argument and the Magistrate in her ruling employed the wrong standard; instead of conditions that would alleviate an "unreasonable" risk of flight, the government argued, and the Magistrate agreed that only conditions tantamount to a guarantee against flight would suffice (an incorrect standard that can only be satisfied by detention).  The government argued, for example, that the surrender of one's passport makes crossing a border harder, but it does not prevent it.[1]  The Magistrate noted that electronic monitoring helps to prevent flight, but it is not infallible.  The Bail Reform Act does not require conditions that make exit from the United States impossible.   It requires a combination of conditions –that "will *reasonably assure* the appearance of the person as required." 18 U.S.C. §3142(c)(1)(B).  Those conditions, including a substantial bond with collateral and family member sureties, were proposed and erroneously rejected, with no other conditions suggested by the Magistrate, other than incarceration, to alleviate any unreasonable risk of flight.   The transcript of the hearing and the Magistrate's order detaining Mr. Parmar is attached as Exhibit A.  The

---

[1] Mr. Parmar does not have a passport from any country but the United States.

letters from members of the community are attached hereto as Exhibit B.

## A.   Prior Proceedings and Factual Background

On May 16, 2018, Mr. Parmar was arrested in New Jersey and charged in a complaint with Securities fraud.

At his presentment later that day, the government requested an order of detention.  After hearing argument from the parties, the Magistrate granted the government's request but invited counsel to assemble a bail package for the court's consideration.

At the subsequent hearing before the Magistrate on May 31, 2018, after submission of a bail package that includes $3.7 Million in collateral and electronic monitoring, the Magistrate found, *inter alia,* that the alleged fraud involved sophisticated, extensive manipulation that bespeaks "extreme risk-taking and careful plans" of the type that would give him the "ability to plan a new life abroad." Tr. 5/31/18 at 43.[2]   Assessing the efficacy of a combination of conditions necessary to "reasonably assure" a defendant's appearance cannot rest on the government's allegations of an "ability" to flee.  A defendant's past conduct in *not* fleeing when he knew charges were inevitable, even assuming *arguendo* an ability to flee, provides far greater assurance.

---

[2]   The Magistrate noted that Pretrial Services' view was that the sureties and collateral should be examined prior to release. Tr. at 42.

Numerous cases of securities and wire fraud have been prosecuted across the country, and a great many, if not the majority of them involve "sophisticated, extensive manipulation."  It is rare for a United States citizen with family and community ties and no criminal history, charged with non-violent, financial crimes, to be detained on the ground that there is *no* combination of conditions that would reasonably assure his appearance,

Each of the factors specified in the bail statute are addressed below, None of the government's arguments, separately and together, should have overcome Mr. Parmar's Constitutional interest in pretrial liberty, nor can they satisfy the standard required by the Bail Reform Act, *i.e.* that there is no combination of conditions that can reasonably assure Mr. Parmar's appearance in court when required.

## B.    The Proposed Conditions of Release

In setting conditions of release, the court is bound to impose the least restrictive conditions that will reasonably assure the person's appearance and the safety of the community, considering the factors set forth in 18 U.S.C. § 3142(g).  The conditions proposed to the Magistrate were as follows

(1)    An appearance bond secured by six properties and a $500,000 brokerage account, with a total equity of $3.764 Million, and signed by five financially responsible sureties/collateral posters, including relatives who provide moral suasion as well as their financial

undertakings;

(2)     Global electronic monitoring which will record Mr. Parmar's location at all times and (at least initially) home detention.

In response to the Magistrate's concern over reliability of electronic monitoring conducted by Pretrial Services, we suggest that the Court consider, if it deems further assurance necessary, a top-of-the line GPS monitoring device administered by a reputable bonding company.  The specifications for the "SecureCuff," which is a shackle rather than a bracelet, are attached as Exhibit C, followed by the specifications for the model used by Pretrial Services.  The newer device's substantially greater bulk and stronger material address the "strap cut" possibility and it provides several levels of digital interfacing.  Also attached as part of Exhibit C is an article discussing the attributes of the newer device, that has been affixed to Harvey Weinstein's ankle.

## MR. PARMAR IS NOT A FLIGHT RISK

In ordering release or detention, courts are bound to consider the factors set forth in 18 U.S.C. § 3142(g), each of which is addressed below.

1.     The Nature and Circumstances of the Offense and whether there is a presumption in favor of detention (violent and drug crimes)

The alleged crimes do not involve violence or narcotics.    The statutory presumption, that defendants charged with violent or narcotics crimes, pose

an unreasonable risk of flight or danger to the community is not applicable and the burden of proof rests solely on the government.  The only presumption that applies in this case is the presumption of innocence.  Mr. Parmar is charged with financial crimes allegedly committed against an extremely sophisticated "victim."  The circumstances of the offense are discussed below in connection with the "weight of the evidence" factor.

> 2. <u>Criminal History and Whether Offense Committed While Under Any Criminal Justice Supervision</u>

Mr. Parmar has no criminal history and has had no prior contact with the criminal justice system

> 3. <u>Nature and Seriousness of Any Danger to any Person or the Community</u>

Mr. Parmar is not charged with a crime of violence, he has no criminal record and he has never engaged in violent conduct.  The government does not contend that he is a danger to the public.

> 4. <u>The History and Characteristics of Mr. Parmar</u>
>
> a) <u>Character, Mental and Physical Condition, Employment and</u>
>
> b) <u>Any Alcohol Abuse (none)</u>

There are no issues regarding his mental or physical condition and he does not and has not suffered from alcohol abuse.

Mr. Parmar, referred to throughout this section of the brief as "Paul," is

48 years old, he is a United States Citizen.[3] He was born in India and came to the United States in 1993, when he was 22 years old. He became a citizen about six years later and, in doing so, he gave up his Indian citizenship.

During his early education, through high school and then University in India, Paul was a star student, majoring in computer sciences.  Not surprisingly, in the United States, he went to work for a series of major companies, including one of the top five financial institutions, a major consumer products company, and one of the top five defense contractors, where he was granted security clearance by the Department of Defense. He worked for two other major corporations, tasked with centralizing and integrating their numerous subsidiaries, and also a top five pharmaceutical company, designing a structure for their sales force and compensation scales. For each he was engaged as an advisor or consultant for periods of time ranging from two to seven years.  For the last year or so, he has owned and worked for a company that provides consulting services in the health care industry.

Paul's character is also discussed in the section about his ties to the community, and evidenced by the 37 letters of support attached to this memorandum.

---

[3]     We refer to our client as "Paul," not to engender familiarity, but because a narrative of his life would sound stilted if we constantly referred to him as "Mr. Parmar."

c)   His Extensive Family Ties in the United States

In arguing for detention, the government focused on his Indian heritage and the fact that he travelled to India twice in the last year. Although, like many Americans, Mr. Parmar was born elsewhere, virtually all of his extended family lives here, having either preceded, accompanied or followed him to the United States.  Paul took one of his two trips this year to India in order to attend a ceremony when his last grandparent died.  He has no close family members left in India.

Mr. Parmar's family in the United States is large by any measure (for a citizen or naturalized citizen):

- His father is here and lives with Paul;

- His brother and sister and his sister's two children live here.  The family of Paul's sister-in-law are all naturalized United States citizens (born in India);

- He has 4 or 5 cousins on his father's side, all of whom reside in the United States.

- He has four cousins on his mother's side (his mother is deceased) who live here, and a few younger ones will come to the US after they graduate.

- Paul has been seeing his girlfriend now for about two years, and is deeply attached to her.  He dated a previous girlfriend for about

seven years, and they remain close friends.

From childhood, Paul idolized his father, who was an aeronautical engineer and a Commodore (equivalent to a one-star admiral) in the Indian Navy, following in the footsteps of Paul's grandfather, who was a Colonel. When Paul came to the United States in 1993, his father's health was in decline. Paul insisted that his father retire and come to the United States with him. Paul's father has lived with him since 1993, and he is now 76 years old. His father has a myriad of health issues, including hypertension and high cholesterol, which have required the placement of ten stents. For 25 years, Paul has made sure that his father's needs have been met. They have been each other's closest friend and companion. His relationship with his father has given him a lifelong admiration for soldiers and law enforcement officers who put themselves in harm's warm in order to protect people.

d)   <u>Length of Residence in the Community and Community Ties</u>

Paul has resided in the New York/New Jersey area for 25 years. Letters from 37 of friends and family demonstrate an extraordinary level of community ties, people who were willing to write letters to the court and show their support and offer their beliefs that Paul would not abandon his father and divorce himself from his family in the United States by fleeing.

e)      <u>Financial Resources</u>

For the last year, Paul has been earning a salary from his company of approximately $250,000.  In connection with the transactions described in the complaint, the government has seized somewhere around $100 million, another $90 million at least was previously paid out to shareholders.  The government has not identified any funds that Paul has transferred overseas. As the forfeiture complaint demonstrates, the trail is there to be followed.

In the criminal and forfeiture complaints that have been filed, the government details the seizure of many millions of dollars, which Paul obviously does not have access to them. The related forfeiture complaint, 18-cv-09293, describes at length and traces the proceeds generated from the "scheme" alleged in the criminal complaint.  It identifies the bank accounts that were allegedly used "to facilitate the fraud."  Nowhere does the forfeiture complaint allege that any particular funds could not be traced.  Millions of dollars from the alleged "equity raises" and the "go private" transactions have been seized, including approximately $20 million from a law firm/escrow agent's account, another $56 million restrained and seized through Bankruptcy Court in Delaware**,** and real properties purchased for $5,450,000 and $15,074,100 (condominiums in NYC), $1,745,000 and $1,150,000 (land subsequently developed in New Jersey and increased in value).  Other funds, over $90 million, were paid out to third-party shareholders who are not

alleged to have been involved in the "scheme," and who were owed funds for their shares as part of the go-private transaction.

    f)    <u>Record Concerning Appearance in Court</u>

Paul has never been called to and therefore has never failed to appear in court. He was arrested near his home with knowledge of the pending investigation of these charges.

    g)    <u>Other Factors Demonstrating a Lack of any Inclination to Flee and the Absence of Risk of Flight</u>

Paul was aware of the likelihood of these charges well before his arrest. For many months prior, he was aware that the Department of Justice was investigating him for the conduct alleged in the complaint.  He was aware that the government seized funds related to the charges in March 2017. Almost a year ago, he received a grand jury subpoena related to the charges in the complaint.  In addition, in mid-2017, his attorney met with prosecutors in Washington, D.C., who outlined the allegations.   With this knowledge, Paul travelled outside of the country, and each time he returned.  In order to arrest him, the agents requested that he meet with them near his home, and he complied.  The U.S. Attorney's Office in Newark was aware of all this, and could have called for Paul's surrender at any time

At the hearing, the government argued that Paul is also a flight risk because his two co-defendants left the country not long after the allegations,

now in the criminal complaint, were aired in other proceedings.  Tr. 26-27.

The opposite inference is the only credible one under the same circumstances;

Paul remained available to be apprehended, demonstrating that he is not a

flight risk.  Moreover, Paul is a US citizen, whereas his co-defendants are

citizens of India and Australia. *Id.*

Finally, in a sworn declaration attached as Exhibit D, Paul offered his

solemn assurances that he would abide by his obligations to the court and to

his family members who would sign the bond.  He also provides a vivid

example of why, even if he had any inclination to leave, he would have

nowhere to go.  In 2010 he travelled to watch the world cup final in Mumbai

and did not have the proper permit on his visa.  He was denied entry and

sent back on a return flight to the United States, and none of his reputed

contacts in India intervened.  Because he is not an Indian citizen without

legal standing, it would be difficult if not impossible for him to transact

business there or even open a bank account.

Paul is not inclined to flee and he knows full well that it would get him

nowhere.

h)   Weight of the Evidence

Without discovery, *Brady* and *Giglio* material and without an adequate

opportunity to discuss the dense complaint with his attorney at this early

stage, a defendant cannot be expected to adequately address the weight of the

government's evidence at this time. Mr. Parmar is presumed innocent, and there has not as of yet been a grand jury finding (he is held on a complaint) of probable cause to believe he committed the alleged offenses.

While the government typically relies heavily on this factor,18 USC 3142(g)(2), the weight of the evidence is the least important consideration. *United States v. Gebro*, 948 F.2d 1118 (9th Cir. 1991). This is so because of the presumption of innocence and the lack discovery at the bail/detention phase of the process. The Bail Reform Act specifically states that "[n]othing in this section [3142] shall be construed as modifying or limiting the presumption of innocence." 18 U.S.C. §3142(j).

That said, defense counsel addressed at length at the hearing the evidence countervailing the allegations of fraud. Tr. 5/11/18 at 36 - 40. The Magistrate did not mention these arguments in her decision, but did take into consideration that "the government *represents* it has extensive documentary and electronic." *Id.* at 43.

The government's opening salvo at the hearing was that this case is about deception (as are all fraud cases), "remarkable" deception of "incredibly sophisticated counterparties" -- a Private Investment Firm and major accounting firms. There is substantial evidence that these firms were *not* deceived; they were not and could not have been deceived by something they already knew, affirmatively knew, prior to making any

business commitments.

While the Private Investment Firm was doing its due diligence through a well-known accounting firm, KPMG, a reporter from the Financial Times contacted Chinh Chu, the moving force behind his company's purchase (take private action) of a public company ("Company A," as per the complaint). Three months before the closing, the reporter informed Chu and Parmar that, although she's no KPMG, she was able to discover that a few of the companies that were alleged assets of the public company, were not real (these are the companies that the complaint alleges were not real and did not have real assets). She was curious as to why the deal was still going forward. Mr. Chu reacted by hiring a PR firm to spin the deal and told Paul to hire another firm to coordinate responses. Mr. Parmar reacted by suggesting that the closing be delayed about three or four months. Chu wanted the deal to go forward, and it did. In fact, it was reported in the Financial Times Alphaville on January 30, 2017 that, despite the questions raised about "Company A" (Constellation), Chu said he was "comfortable" proceeding. A copy of the article is attached as part of Exhibit E.

In its arguments, the government conflated a complex business transaction with uncomplicated and obvious, allegedly fraudulent records, that were immaterial to the transaction. The Private Investor knew the operative facts, not only through its own due diligence and its discovery of

15

the obvious, but also because a reporter was looking into the transaction and asked pointed questions about it.

Irrefutable evidence will show that nobody was fooled, nor was there an intent to defraud anyone. A reporter, by herself, brought the information alleged in the complaint to the attention of the parties. After Mr. Parmar's arrest, she wrote in an article that "... the filings give us the impression the alleged fraud was less "large, complex and brazen" than the bankruptcy declaration[4] makes it sound, and rather more maladroit and hapless." *https://ftalphaville.ft.com/2018/05/17/1526551440000/Criminal-charges-filed-against-former-Constellation-Health-execs/*

The simplicity and transparency of what the government alleges as a fraud bespeaks an absence of an intent to defraud, an essential element of the alleged crime. The alleged "victim"/Private Investor was not deceived and he pursued the transaction with full knowledge of the Company's condition. Under those circumstances, the allegedly fraudulent statements outlined in the complaint could not have been material, another element of the offense. While these arguments involve issues of fact for the jury, they serve to demonstrate that the evidence is not so overwhelming that it should be viewed as an incitement to flee.

---

[4]   **The reporter is referring to a filing in the** Chancery Court in Delaware **that looks like the playbook for the criminal complaint.**

Moreover, it shows that, long before Mr. Parmar was arrested, all the allegations made in the complaint were out there and he knew it. He did not flee then and the Court can have every confidence that he will not flee now or in the future.

## APPLYING THE STATUTORY FACTORS, PAUL IS NOT A FLIGHT RISK

Paul is not a risk of flight. He has extensive familial ties to the United States, and he does not have close family anywhere else. This is not a "presumption" case and Paul is presumed innocent of the alleged charges.

At the hearing, the government produced an "anonymous tip" claiming that Paul had intentions to flee. The Magistrate relied on the "tip" even though the government conceded that "we just don't know what it is, if anything" and there are details in it that are wrong. (Tr. 5/31/18 at 29). This kind of "evidence," which was likely sent by someone with an axe to grind and which a defendant cannot even confront, is worthless and should have had no place in the Magistrate's determination.

The government does not claim that Paul is a danger to the community, nor would there be any basis for doing so. The issue under the Bail Reform Act is whether there is a combination of pretrial release conditions that will reasonably assure his appearance in court when required. It cannot be said that there are none. The proposed conditions will assure

Paul's appearance.

## A.   The Proposed Conditions of Release Will Reasonably Assure Mr. Parmar's Appearance

Under 18 U.S.C. § 3142(c), a court "shall order" pretrial release, unless if finds, after a hearing, that "no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community."  The proposed conditions of release, including property posted by family members and close supervision and/or electronic monitoring, are sufficient to ensure Mr. Parmar's appearance and alleviate any potential risk of flight.  Sections 3142(b) and (c) of Title 18 speak of "reasonable assurance" of a defendant's appearance; it does not and could not require the court to reject all conditions short of ones that would "guarantee" the defendant's appearance.  *See United States v. Orta,* 760 F.2d 887, 891 (8th Cir. 1985); *United States v. Szott*, 768 F.2d 159 (7th Cir. 1985).

The district judge reviews a magistrate judge's decision regarding bail *de novo. See United States v. Delker.* 757 F.2d 1390, 1394-95 (3d Cir. 1985). "While the district court may find it useful to consider the decision and reasoning of the magistrate judge, the Court must make an independent determination regarding a defendant's eligibility for release on bail." *Id. United States v. Livingston*, No. 15-CR-627, 2016 WL 1261464, at *1 (D.N.J. Mar. 31, 2016), citing *United States v. Delker.* 757 F.2d at 1394-95.

Each bail decision "is *sui generis*, and must be decided on the basis of the particular record adduced." *United States v. Traitz*, 807 F.2d 322, 325 (3d Cir. 1986). The Bail Reform Act "establishes a right to liberty that is not simply discretionary but mandatory . . ." *United States v. Abuhamra,* 389 F.3d 309, 319 (2d Cir. 2004). There is a substantive liberty interest in freedom from confinement" under the Eighth Amendment *United States v. Perry*, 788 F. 2d 100, 112 (3d Cir. 1986). Even in the context of bail pending sentencing, and even after a guilty verdict that greatly reduces a defendant's expectation in continued liberty, it does not extinguish that interest." *Id.* at 309. As the Second Circuit has stated, "the court should bear in mind that it is only a 'limited group of offenders' who should be denied bail pending trial." *United States v. Shakur*, 817 F.2d 189 (2d Cir. 1987) (quoting S. Rep. No. 225, 98th Cong., 2nd Sess. 7, reprinted at 1984 U.S.C.C.A.N. 3182, 3189).

Under 18 U.S.C. §3142(c)(B), the court must consider all reasonable, less-restrictive alternatives to detention. *See, e.g. United States v. lnfelise*, 934 F.2d 103, 105 (7th Cir.) (remanding because trial court failed to consider electronic monitoring as a reasonable alternative to detention). Pretrial detention is an "exceptional step" that should only be taken in "rare cases." *See United States v. Torres*, 929 F.2d 291, 292 (7th Cir. 1991); *United States v. Townsend,* 897 F.2d 989, 994 (9th Cir. 1990); *United States v. Orta*, 760 F.2d at 891-92 (court's role is to "reasonably assure" the defendant's return to

court, not "guarantee" it).  Whenever a court can fashion the conditions of an

applicant's release in such a manner that the risk may be alleviated, "it must

do so and grant the motion for release." *United States v. Carolina*, No. CR 17

MJ 3021 (JAD), 2017 WL 2426866, at *1 (D.N.J. June 5, 2017), *quoting*

*United States v. Provenzano*, 605 F.2d 85, 93-94 (3d Cir. 1979).   Pretrial

release may be denied only as a matter of last resort. *Id.*

In numerous cases involving defendants with greater ties overseas and

fewer ties to the United States, judges have recognized that pretrial

detention is an exception and a last resort.  For example, in *USA v. Ashe, et.*

*al.*, 15-cr-706 (SDNY), Ng Lap Seng, a Chinese billionaire, was indicted for

bribing the former president of the United Nations General Assembly. The

government described him as a Chinese real estate magnate worth about $1.8

billion, who owned private airplanes and had passports from at least three

countries. [5]   He had no family or other ties in the United States and,

according to the prosecutor, "there is no reason for him to remain."

Nevertheless, the court found that a combination of conditions would assure

his appearance and he was released on a bond ($50 million, secured by $20

million cash and a Midtown apartment where he would be confined with GPS

---

[5] The government has argued that Paul is a risk of flight because he knows how to fly one.
He does not own a plane and he does not have a pilot's license. Growing up with a father
who was an aeronautical engineer, Paul developed an interest in airplanes and he learned
how to fly when he was younger.  It was not an interest he pursued as an adult.

monitoring and guards he could afford to pay at his own expense).

In New Jersey in 2015, several men were charged with participating in a scheme that enabled securities traders to benefit from confidential corporate information stolen by hackers in Ukraine before it was made public.  According to prosecutors, the five-year scheme generated at least $30 million in trading profits for them and the overseas hackers.  The government contended that the defendants had "strong overseas ties, and the means to escape to non-extradition countries," including Ukraine.  Father and son defendants, Arkadiy Dubovoy and Igor Dubovoy, were citizens of Ukraine, with permanent resident status in the United States.  The indictment alleged that the Dubovoys made more than $11 million from the scheme.  They were released on $4.5 million and $3 million bonds, respectively, with electronic monitoring.  *USA v. Turchynov,* 15-cr-390 (DNJ); ECF #27, 36.  In a related case in the Eastern District of New York, Vitaly Korchevsky, 15-cr-381 (EDNY), earned over $17M from the same scheme, and was released on a $2 million bond with conditions.  *ECF* #33.

In case after case, including presumption cases, courts have rejected detention where the circumstances were far more suggestive of flight than it is here.

Starting with the Supreme Court, in *Truong Dinh Hung v. United States*, 439 U.S. 1326 (1978), the defendant was a Vietnamese citizen

convicted of exchanging classified information with the Vietnamese Ambassador in Paris. Truong had lived continuously in the United States for thirteen years and had a close relationship with his sister who also lived in the United States.  In denying bail pending appeal, the Fourth Circuit relied on the fact that he had never established permanent residence in the United States and that the US did not have an extradition treaty with Vietnam. Justice Brennan, who heard the application on appeal from the Circuit, concluded that, "if these considerations suggest opportunities for flight, they hardly establish any inclination on the part of applicant to flee," especially when there was "evidence support[ing] the inference that he is not so inclined."  *See United States v. Motamedi*, 767 F.2d 1403 (9th Cir. 1985)(Iranian citizen and a green card holder charged with conspiracy to export items without a license; detention order reversed on appeal; defendant [like Parmar] knew of the federal investigation for a year before his arrest and had numerous relatives in the area).

In *United States v. Day,* 2017 WL 5457983 (D. NJ, 11/13/2017), the defendant was charged with bank fraud and filing false tax returns.  He had previously been arrested for providing false information to the police and convicted of wire fraud and false tax returns and he had a separate conviction for failing to appear in court and violating the terms of his supervised release. *Id* at 3.  Nevertheless, Magistrate Judge Mannion fashioned a set of

conditions that he concluded would reasonably assure the defendant's appearance, including a fully secured $500,000 bond and home detention with electronic monitoring. *Id.* at *7-8. This defendant displayed all the hallmarks of someone who would evade justice, yet the Magistrate determined that there were conditions that would reasonably assure his appearance.

Also in the Third Circuit, in *United States v. Hernandez-Bourdier,* 2017 WL 56033 (W.D.Pa. 1/5/2017), the district judge granted bail where the defendant was charged with distributing a kilogram or more of heroin (evoking the presumption), the defendant was an illegal alien from the Dominican Republic, his children were there, and he had lived in the U.S. for just two years. *Id.* at *3, *7. Despite this quartet of the high risk factors and the presumption, the court found that the government had not proven that the defendant was a risk of flight. The court noted specifically that the defendant had surrendered his passport and had no plans to leave the country. *Id.* at *10-11. *See United States v. Baez,* 2017 WL 528316 (E.D.Pa, 2/9/2017) (defendant charged with trafficking in 4 kilograms of cocaine; evidence included surveillance footage and search warrant seizures; court granted release based on his lack of criminal history, his family ties, and the availability of sufficient conditions).

In *United States v. Jones*, 143 F. Supp. 3d 78, 85–86 (W.D.N.Y. 2015), aff'd (Feb. 11, 2016), the defendant was charged with a multi-million dollar wire and money laundering scheme with hundreds of victims, in which he was a key player, and the government estimated that he was facing sentencing range of 292 to 365 months, even with acceptance of responsibility.  He was a UK citizen who had opposed extradition to the United States and with no familial or community ties.  He had allegedly jumped bail from a criminal prosecution in the United Kingdom in connection with a nearly identical scheme; he had previously used aliases, and he had possible access to funds to evade capture if he fled. *Id.* at 85.  Nevertheless, the court found that there were conditions sufficient to reasonably assure his appearance when required. *Id.* at 88.  The case demonstrates the principle, in action, that pretrial detention is a measure of last resort. *See United States v. Ocasio*, No. CR 15-83-05, 2016 WL 215230, at *1 (E.D. Pa. Jan. 19, 2016) (release on conditions in presumption case); *United States v. Aslam*, No. 13-250-M-1, 2013 WL 842714, at *1 (E.D. Pa. Mar. 7, 2013); *United States v. Digiacomo*, 746 F.Supp. 1176 (D. Mass. 1990) (defendant released where he had family ties and knew for three years before that the government had evidence, including tapes, relating to his membership in the Mafia and trafficking in narcotics).

In *United States v. Giordano*, 370 F. Supp. 2d 1256 (S.D. Fla. 2005), the

government alleged that the defendant, charged with a $4.5 million fraud, had access to offshore funds, had traveled abroad extensively in the years leading up to the arrest, and had substantial real estate holdings. The court denied detention because, *inter alia*, his house was subject to forfeiture and it could not have been sold to free up funds to escape the country.  Rather than accepting the typical government argument that a defendant subject to forfeiture will flee because he has nothing left to lose, the court viewed forfeiture as a factor mitigating the risk of flight.   The court imposed conditions of a $1 million bond, consisting of a $500,000 personal surety bond, with his brother's Staten Island home as collateral, and a $500,000 corporate surety bond, that would further tie up his assets and facilitate recapture if he fled, and house arrest with electronic monitoring.[6]

In *United States v. Manafort*, No. 17-Cr-201-ABJ (D.D.C.), Paul Manafort, the disgraced ex-lobbyist and former presidential campaign manager for Donald Trump, was arrested last year for, *inter alia*, conspiracy to defraud the United States, money laundering, bank fraud and lying to federal investigators related to his lobbying work for the Ukrainian

---

[6]      Although it would not constitute "the least restrictive" measure necessary to assure Paul's appearance, the Court might consider the possibility that a bonding company secure some portion of the bond, a portion that does not entail prohibitive premium payments, putting Paul essentially in the custody of a bail bondsman who has an enormous financial incentive to prevent his flight and who would serve as a "bounty hunter" if Paul flees.

Government.  Prosecutors told the court that he is also suspected of serving as a "back channel" between the campaign and Russia during the election. Manafort is released on an unsecured $10 million bond and home confinement.  Manafort's conditions of confinement have been modified, sometimes unopposed, several times.[7]

Finally, even after WorldCom CEO Bernard Ebbers was convicted and sentenced to 25 years in prison, his bail was continued pending his appeal.

With respect to the government's argument about sentencing exposure, statutory or under the guidelines, it is an unreliable marker for risk of flight. For every 25-year sentence given to a WorldCom executive, there are as many or more cases where the actual sentence bore little if any relation to the defendant's "exposure," such as the 42-month sentence given to a CEO who participated in the cover up of a $50-100 million fraud and who was deemed a "leader" of the scheme, *United States v. Adelson*, F. Supp.2d 506, 513-514 (S.D.N.Y. 2006), and a two-year sentence given to a top corporate executive, convicted of securities fraud and making false statements to the

---

[7]     Last week, the government moved to revoke or revise Manafort's order of pretrial release on the ground that he attempted to tamper with witnesses.  The government alleges that, after the unsealing of new charges, Manafort and an associate reached out to two people who had knowledges of the facts underlying those charges and tried to convince them to lie to investigators and in court. Gov't's Mot. to Revoke, No. 17-CR-201-ABJ (D.D.C. June 4, 2018), ECF No. 315. A hearing on the motion will be heard on June 15th and has remained on bail in the interim.

SEC, and held responsible for a $544 Million loss, *United States v. Ferguson*, 584 F. Supp.2d 247 (D. Conn. 2008). *See United States v. Collins*, 07 CR1170 (RPP) (outside counsel to Refco, involved in a $1.1 billion fraud, received a seven year sentence); *United States v. Parris*, 573 F. Supp. 2d 744 (E.D.N.Y. 2008) (defendant convicted at trial of securities fraud conspiracy and witness tampering, with a guideline range of 360 months to life; sentenced to 60 months); *United States v. Witkowski*, No. 17-1628, 2017 WL 6048827, at *1 (3d Cir. Dec. 7, 2017) (New Jersey lawyer sentenced to 48 months for conspiracy that caused lenders $40.8 million in losses through a mortgage loan fraud scheme and laundering the proceeds); *United States v. Kohler*, Case No. 1:07-cr-20446, Docket Entry 84 (S.D. Fla. Oct. 10, 2007) (Amended Judgment) (defendant pled guilty to securities fraud; losses of $471 million; guideline range was 324-405; sentenced to 5 years).

Finally, preparing for motions and trial with a client who is incarcerated is difficult under any circumstances, but it will be especially so in a case that will include a massive amount of discovery (with the pertinent evidence often buried amidst all the other evidence the government is required to produce).  It is questionable, in a case like this, whether any defendant similarly situated would be able to participate meaningfully in his defense when the evidence is in digital form and his access to a computer in jail is very limited.  In addition, other than onsite meetings, Mr. Parmar will

only be able to communicate with counsel through monitored telephone calls, forcing a choice between his attorney-client privilege and his ability to maintain the frequency of contact with counsel that will be necessary. Moreover, given the likely volume of discovery and the amount of work the defense will need to do to collect evidence from other sources, the case will take longer than most to go to trial.  *See United States v. Digiacomo*, 746 F.Supp. 1176 at 1182 (court may consider prospect of protracted pretrial detention).  Not only is his liberty interest at stake, but his Fifth and Sixth Amendment rights to Due Process and counsel will be compromised.

## CONCLUSION

As demonstrated above, this is far from a case where it can be said that *no* combinations of conditions can reasonably assure the accused's appearance when required.  Mr. Parmar should be released on the conditions proposed above.

_____S/_____

Jeffrey C. Hoffman
Windels Marx Lane & Mittendorf, LLP
156 West 56th Street, New York, New
York 10019
Tel: 212.237.1018 | Fax: 212.262.1215
jhoffman@windelsmarx.com |

Cc: AUSA Paul Murphy

Elizabeth Auson,
Pretrial Services Officer
Elizabeth_Auson@njpt.uscourts.gov