Jeffrey C. Hoffman, Esq.
Windels Marx Lane & Mittendorf, LLP
156 West 56th Street
New York, New York 10019
212.237.1018 |
jhoffman@windelsmarx.com

Timothy C. Parlatore, Esq.
Timothy.parlatore@parlatorelawgroup.com
Maryam N. Hadden, Esq.
Maryam.hadden@parlatorelawgroup.com
Parlatore Law Group, LLP
One World Trade Center, Suite 8500
New York, NY 10007
212.603.9918

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

-----------------------------------------------x

UNITED STATES OF AMERICA,　　　Case No.: 18-cr-00735-MCA

　　　　　v.

PAUL PARMAR,
　　　　　　　Defendant.
-----------------------------------------------x

## DEFENDANT PAUL PARMAR'S MOTION FOR RULE 17(c) PRE-TRIAL SUBPOENAS

Now comes the Defendant Paul Parmar, by and through undersigned counsel, and hereby respectfully moves this Honorable Court, pursuant to Fed. R. Crim. P. l7(c) and the Compulsory Process Clause of the Sixth Amendment, for the issuance of a subpoena *duces tecum* returnable pre-trial directed to CC Capital LLC

("CC") and seeking the production of documents listed in Exhibit 1; directed to Bank of America Merrill Lynch ("BofA") and seeking the production of documents listed in Exhibit 2; directed to Orion Healthcorp ("Orion") and seeking the production of documents listed in Exhibit 3; directed to KPMG International ("KPMG") and seeking the production of documents listed in Exhibit 4; and directed to FTI Consulting, Inc. ("FTI") and seeking the production of documents listed in Exhibit 5.

Parmar states that the issuance of the requested subpoenas and access to the listed documents are necessary to the adequate preparation of his defense to the serious charges against him. Those charges are based on allegations that Parmar and his co-defendants joined in a complex conspiracy to commit securities fraud resulting in a "go-private" transaction that, according to the Government, was fraudulently induced ("Subject Transaction"). *See* Indictment 18-735. Of central importance to the Government's proof is their claim that the companies that constituted the asset in the Subject Transaction had either no value or significantly lower value than the price paid during the Subject Transaction. For this reason, establishing an accurate valuation is equally important to the defense. The requested subpoenas seek records and information maintained by CC, KPMG and BofA in the regular course of business that relate to the Subject Transaction from the purchaser's viewpoint. The requested subpoena directed to Orion seeks corporate and revenue information maintained in the regular course of business that was provided to the alleged victims during the course

of the Subject Transaction.  The requested subpoena directed to FTI seeks information that, although generated after the Subject Transaction took place, is highly relevant to the question of value.

Each of the above-listed entities played a substantial role in the events underlying either the instant Indictment or Parmar's defense to those charges.  CC and BofA, although not specifically named in the Indictment, were involved in the Subject Transaction as buyer and financer, respectively.  KPMG performed the due diligence for the Subject Transaction at CC's specific request.  Orion's records contain significant essential information, both in that Orion was taken private during the Subject Transaction and in that Orion maintained accurate and complete financial records for the many subsidiary companies in its proprietary business management tool.  Finally, although FTI's involvement – so far as the defense is currently aware – came after the conclusion of the Subject Transaction, FTI's records are essential to forming an accurate representation for the jury of the true financial condition and value of the companies involved.

The Government relies to a substantial degree on internal CHT emails, as provided to them by CC Capital, et al.  The Government's theory is that these emails evidence a scheme that was perpetrated on the alleged victims to induce their purchase of an allegedly overvalued company.  Significantly, these emails, which were stolen by CC from a private account and then provided to the Government, only included emails with and between the charged defendants.

Emails, text messages, instant messages and the like between the alleged victims discussing the alleged fraudulent transaction, although clearly available to the alleged victims were not provided to the Government.

An element of Parmar's defense is that the so-called "victims" knew full well what they were buying, and that knowledge on their part undermines the notion that they were in fact victims and mitigates any intentionality to commit fraud on the part of the Defendants. Additionally, Parmar contends that the value of the purchased entities was in fact higher than the value imposed by the Subject Transaction. Of course, emails, instant messages and the like between and among the alleged victims and other businesses or individuals involved in the Transaction (specifically without the Defendants involved in them) will be relevant to and even critical to establishing that defense.

The evidentiary value of these communications is even more clear given some of the unique facts known in this case. First, the alleged victims went through with the allegedly fraudulent transaction *after* the Financial Times published an article essentially warning that the company to be acquired was inflated, and after a major shareholder had filed suit to stop the Subject Transaction in Delaware Chancery Court. And yet, CC and BofA went through with the purchase. Access to their internal discussions, both formal and informal, about the Financial Times article or the Delaware proceedings and what they thought of the allegations therein is essential to the defense. Second, as detailed in FBI 302s

provided in discovery, the DOJ and FBI reached out to BofA – who was the lead funder of the purchase – and warned them that the company to be acquired appeared to have an inflated value and that the transaction was setting off red flags at the government level. The defense does not currently have access to any of the internal discussions about that FBI outreach, either within BofA internally, between BofA and CC, or between BofA and the other lending entities – again, information with immense evidentiary impact for the defense.

Parmar believes strongly that the fact that the alleged "victims" went through with the Subject Transaction in spite of the Financial Times article, the Chancery Court filing and the FBI warning – ignoring all of those highly unusual and glaringly apparent red flags – demonstrates that the so-called victims knew exactly what they were purchasing and used that knowledge to leverage the Transaction.  At the very least, a complete record of everyone's knowledge about the deal under these circumstances rather than the one-sided portrayal currently available has significant evidentiary value to the defense and, as set forth in further detail *infra*, would be admissible at trial.  This request is narrowly tailored, as it only seeks communications about the alleged fraudulent transaction.

## I.  **BACKGROUND**

The Indictment charges Parmar with one count of conspiracy to commit securities fraud, one count of securities fraud, and one count of wire fraud. The first count

alleges that Parmar, as the CEO of "Company A"[1], conspired with three others to "use and employ, in connection with the purchase and sale of securities, manipulative and deceptive devices and contrivances" in order to inflate the revenue, and thus the purchase price, of "Company A."  The subsequent two counts are based upon the same allegations of conduct and the same overt acts alleged in the course of pleading the first count.

The general theory pursued by the Government in the indictment is that Parmar and others took steps to artificially inflate the revenue of CHT in order to induce the victims[2] into pursuing and consummating the Subject Transaction under a mistaken belief that CHT's value was higher than it actually was.  To that end, the overt acts in the indictment focus on specific alleged emails, presentations and document exchanges.  The defense has repeatedly noted that, assuming solely for the sake of argument and without conceding intent the accuracy of the Government's factual allegations regarding the overt acts, there exists substantial evidence that the purported victims were in fact aware of the true financial

---

[1] Although unspecified in the Indictment, Parmar was the CEO of Constellation Healthcare Technologies, Inc. ("CHT"), the holding company for Orion Healthcorp. Therefore, Company A will be referred to as CHT for purposes of this motion.

[2] The Indictment identifies the victims simply as a Private Investment Firm and Lenders.  The Notice of Organizational Victims identifies these parties as follows: CHT Holdco, CC Capital CHT Holdco, Bank of America, BMO Harris Bank, KeyBank, Woodforest National Bank, and Stifel Bank and Trust.  Although CC is not named, CC and its founder Chinh Chu commenced and drove the Subject Transaction, eventually forming CC Capital CHT Holdco.

condition and value of CHT.  Indeed, it is Parmar's position that the "victims" were able to move forward with a transaction that significantly *undervalued* CHT solely because they were aware of CHT's true value and structured their actions accordingly.

Much of the discovery provided to date by the Government, including emails and documents exchanged between key players such as Chinh Chu ("Chu") and Doug Newton ("Newton")[3] at CC, Truc To ("To")[4] at KPMG, and Justin Neubauer[5] at BofA, reveals part of the picture of "victims" who knew exactly what they were purchasing.  Based on the materials provided, it appears that these parties voluntarily turned over a large selection of documents to the Government which in turn provided discovery to the defense.  However, it is Parmar's belief that substantial amounts of evidentiary material exist but have not been turned over.

Parmar was not only the CEO of CHT at the time of the Subject Transaction; he was also one of the buyers and in fact contributed a substantial portion of the purchase price while retaining a significant ownership interest – nearly half – in the

---

[3] Chu, the founder of CC Capital, was the driving force behind the Subject Transaction; Doug Newton was a Senior Managing Director working closely with Chu.

[4] To led the due diligence team at KPMG during the months leading up to the Subject Transaction, working with and for Chu.  To was hired by Chu as CFO of CHT, despite having no experience in that role, shortly after the Subject Transaction closed.

[5] Neubauer, a Director of Leveraged Finance at BofA, played an active role in financing the Subject Transaction.

resulting entity.  As such, he observed numerous occasions when the purchasers and lenders would communicate by text message or by using instant messenger services such as WhatsApp.  Moreover, it has become a truism of modern life that email, despite its speed, has become a secondary form of communication to the instant message.  This is particularly so in the workplace, where it is standard for quick exchanges of brief information to take place via instant message or text exchange with more formal documents or lengthier amounts of information being reserved for emails.  In addition, it is not uncommon for some exchanges to take place via personal email rather than between official business email addresses, particularly if an exchange takes place outside of regular business hours.  Items from these categories, however, are absent from the discovery provided by the Government.[6]

Personal emails, text messages, WhatsApp exchanges and the like provide evidentiary material that is essential to Parmar's defense.  Moreover, as their usage is standard in the industry, there is every reason to believe that they exist to be subpoenaed.   Further, it is clear that on numerous occasions there was communication going on between parties who would be necessary witnesses at the

---

[6] No implication that the Government is deliberately withholding discoverable information is intended here; rather, it is the defense's belief that the Government has not obtained text messages, WhatsApp messages, personal emails and the like from any of the witnesses mentioned herein due to the selective voluntary disclosure provided to the Government.

trial of this matter that has not been provided to the Defendant. For example, Chu publicly stated on more than one occasion that he had to "bribe" BofA to provide financing for the Subject Transaction. Chu's claim seemed to be supported by the fact that the Friday evening before the Subject Transaction was due to close, BofA personnel stated that the loan was not and would not be approved; however, the following Monday morning the loan was fully funded. Clearly, a substantial amount of "behind the scenes" communication must have taken place outside of regular business hours in order to reverse BofA's position; yet none of these documents have been provided by the Government.

In addition to the communications and documents sought that lead up to the Subject Transaction, the requested subpoenas focus on material that goes to the heart of the question of value. First, CHT/Orion maintained a repository of all accounts receivable and collections data referred to as "Pegasus."[7] Pegasus contained accurate data for all of the subsidiary businesses of CHT going back to approximately 2000 (several years before Parmar's original purchase of Orion). Pegasus consisted of a data retention system designed for regulatory compliance, with a business intelligence overlay that permitted the user to engage in analytics with ease. Access to Pegasus and all of its data was provided to members of CC

---

[7] Pegasus in its earlier incarnation as solely a data entry system was known as PARCS – Physicians Accounts Receivable Collections System – and is sometimes referred to in documents by that moniker.

and KPMG during the due diligence process, including training sessions on its usage, yet despite repeated demands by the defense from the inception of this case it has never been obtained by the Government or provided to the defense. This is so in spite of the fact that the data contained within Pegasus would provide a near-instantaneous answer to the essential question of value.

Next, shortly after the Subject Transaction closed, Chu contracted with FTI to provide financial advisory and restructuring services that shortly thereafter resulted in a formerly profitable company entering bankruptcy and being auctioned off in pieces. Much of the information surrounding the bankruptcy and auction process has not been provided during the discovery process, yet is directly relevant to the question of value. Valuation is essential to a fraud case, making the documents sought from FTI and the other parties that were generated after the Subject Transaction closed as integral to the defense as those documents and communications generated during the preceding period.

Parmar's defense is highly fact-specific, and the evidentiary material sought in the requested subpoenas is essential. Without the ability to introduce evidence regarding what the purported victims knew and when they knew it, as well as evidence regarding the accurate value of CHT at the time of the Subject Transaction, the defense will be placed at a significant disadvantage and vital evidence will be kept from the jury. Granting the subpoenas requested by defendant herein prevents both of these undesirable and unconstitutional evils from

occurring.

## II.   <u>LEGAL STANDARD</u>

"Rule 17(c) implements the Sixth Amendment guarantee that an accused

have compulsory process to secure evidence in his favor." *United States v.*

*Beckford,* 964 F. Supp. 1010, 1019 (E.D. Va. 1997) (quoting *In re Martin*

*Marietta Corp.,* 856 F.2d 619,621 (4th Cir. 1988)). Indeed, the Supreme Court

has expressly acknowledged that "[t]he right to the production of all evidence

at a criminal trial ... has constitutional dimensions." *United States v. Nixon,*

418 U.S. 683, 711 (1974). The Court explained:

> The Sixth Amendment explicitly confers upon every
> defendant in a criminal trial the right "to be confronted
> with the witnesses against him" and "to have
> compulsory process for obtaining witnesses in his
> favor." Moreover, the Fifth Amendment also
> guarantees that no person shall be deprived of liberty
> without due process of law. It is the manifest duty of
> the courts to vindicate those guarantees, and to
> accomplish that it is essential that *all* relevant and
> admissible evidence be produced. [emphasis supplied]

*Id.* To effectuate these fundamental guarantees, Rule 17(c) permits

defendants, like the government, to subpoena evidentiary materials for use in

their defense, and district courts have the discretion to order that Rule l7(c)

subpoenas be returnable prior to trial. *See id.* at 698-99 (the "chief innovation

[of Rule l7(c)] was to expedite trial by providing a time and place before trial

for the inspection of subpoenaed materials").

Under *Nixon,* in order to obtain production of subpoenaed documents prior to trial, the moving party must show: "(1) that the documents are evidentiary and relevant; (2) that they are not otherwise procurable reasonably in advance of trial by exercise of due diligence; (3) that the party cannot properly prepare for trial without such production and inspection in advance of trial and that the failure to obtain such inspection may tend unreasonably to delay the trial; and (4) that the application is made in good faith and is not intended as a general 'fishing expedition.'" *Id.* at 699-700 (internal footnote omitted). In short, a party seeking a pre-trial Rule 17(c) subpoena "must clear three hurdles: (1) relevancy; (2) admissibility; (3) specificity." *Id.* at 700; *see also, e.g., United States v. LaRouche Campaign,* 841 F.2d 1176, 1180 (1st Cir. 1988) (referring to "threshold showing of admissibility, relevancy, and specificity").

Ultimately, all that is required is a likelihood that the subpoenaed materials will reveal "relevant evidence, admissible at trial." *LaRouche,* 841 F.2d at 1180. This threshold inquiry simply "requires the Court to assess whether the documents sought have 'any tendency to make the existence of any fact that is of consequence to the determination of the action more

probable or less probable than it would be without the evidence.'" *United States v. Libby,* 432 F. Supp. 2d 26, 31 (D.D.C. 2006) (quoting Fed. R. Evid. 401).  It is not required that the subpoenaed materials actually be introduced into evidence, so long as the motion represents "a good-faith effort ...  to obtain evidence." *Bowman Dairy Co. v. United States,* 341 U.S. 214, 220 (1951); *see also United States v. Rajaratnam,* 753 F. Supp. 2d 317, 320 n.1 (S.D.N.Y. 2011) ("[T]he *Bowman Dairy* court interpreted Rule 17 as neither a discovery device to examine documents for whatever might turn up, nor as a mechanism to obtain documents that a defendant can identify in advance, but rather a way for a defendant to examine documents he believes to exist that would be relevant to, and therefore presumptively admissible in, his defense.").

## III. THE DOCUMENTS AND INFORMATION SOUGHT ARE RELEVANT, EVIDENTIARY, AND MATERIAL TO PARMAR'S DEFENSE

Here, as reflected in Exhibit 1, Parmar seeks the following from CC:

    a.  All communications, documents or files, including all forms of personal messaging including personal emails, text messages, WhatsApp messages or any other forms of instant messages between members or representatives of CC, KPMG, and BofA regarding CHT and/or its subsidiaries or Paul Parmar and/or Parmar-managed entities between the dates of October 2015 to December 2018;

    b.  All communications, documents or files, including all forms of personal messaging including personal emails, text messages,

WhatsApp messages or any other forms of instant messages between members or representatives of CC and Truc To individually regarding CHT and/or its subsidiaries or regarding Paul Parmar and/or Parmar-managed entities between the dates of October 2015 to December 2018;

c. All communications, documents or files, including all forms of personal messaging including personal emails, text messages, WhatsApp messages or any other forms of instant messages between members or representatives of CC and Bank of Montreal, KeyBank, Woodforest National Bank, Stifel Bank, or other lending entities[8] regarding CHT and/or its subsidiaries or regarding Paul Parmar and/or Parmar-managed entities between the dates of October 2015 to December 2018;

d. All internal communications, documents or files, including all forms of personal messaging including personal emails, text messages, WhatsApp messages or any other forms of instant messages among members or representatives of CC regarding CHT and/or its subsidiaries or regarding Paul Parmar and/or Parmar-managed entities, and/or regarding any of the following individuals or entities: BofA, Bank of Montreal, Sam a/k/a Sotirios Zaharis, Pavan Bakshi[9], Tom Califano, Paul Amato or Howard Ehrenberg[10] between the dates of October 2015 to December 2018;

e. All communications, documents or files, including all forms of

---

[8] Although BofA was the primary lender financing the Subject Transaction, BofA had reduced its financial exposure by joining with a consortium of banks to finance the overall loan package.  It is the defense's belief that BofA, CC and the other players provided minimal information to the consortium banks.

[9] Bakshi, who is charged jointly with Parmar under the instant Indictment, did not have an official role at CHT/Orion, but was involved throughout its history and played an intermediary role in the Subject Transaction as well.

[10] All of these individuals – Califano, Amato and Ehrenberg – trace their involvement to the bankruptcy proceedings filed in the Eastern District of New York by CHT/Orion and its subsidiaries.  Califano represented the debtors, Ehrenberg was appointed Liquidating Trustee, and Amato represents Ehrenberg.

personal messaging including personal emails, text messages, WhatsApp messages or any other forms of instant messages between members or representatives of CC and FTI regarding CHT and/or its subsidiaries or regarding Paul Parmar and/or Parmar-managed entities between the dates of October 2015 to December 2018;

f.   All communications, documents or files, including all forms of personal messaging including personal emails, text messages, WhatsApp messages or any other forms of instant messages between members or representatives of CC and Eric Edel[11] individually regarding CHT and/or its subsidiaries or regarding Paul Parmar and/or Parmar-managed entities between the dates of October 2015 to December 2018;

g.   All communications, documents or files, including all forms of personal messaging including personal emails, text messages, WhatsApp messages or any other forms of instant messages between members or representatives of CC and Arvind Walia, Melanie Kraljev, or Elizabeth Kelly[12] individually regarding CHT and/or its subsidiaries or regarding Paul Parmar and/or Parmar-managed entities between the dates of October 2015 to December 2018;

h.   All communications, documents or files, including all forms of personal messaging including personal emails, text messages, WhatsApp messages or any other forms of instant messages between members or representatives of CC and members or representatives of Destra Trust[13] regarding CHT and/or its

---

[11] Edel had a very brief stay as CEO of CHT after Parmar had been forced out following the Subject Transaction.

[12] Walia was the CEO of Orion before and after the Subject Transaction; Kraljev was Orion's COO and was heavily involved in the due diligence process; and Kelly headed up NYNM, the most valuable subsidiary.

[13] The Destra Trust filed a proceeding in Delaware Chancery Court attempting to stop the Subject Transaction from proceeding. Chu's representatives followed the proceedings, which made allegations similar to those underlying the instant Indictment.

subsidiaries or regarding Paul Parmar and/or Parmar-managed entities between the dates of November 2016 to October 2020;

i.  All communications, documents or files, including all forms of personal messaging including personal emails, text messages, WhatsApp messages or any other forms of instant messages between members or representatives of CC and members or representatives of Duff & Phelps[14] regarding CHT and/or its subsidiaries or regarding Paul Parmar and/or Parmar-managed entities between the dates of October 2015 to December 2018;

j.  All communications, documents or files, including all forms of personal messaging including personal emails, text messages, WhatsApp messages or any other forms of instant messages between members or representatives of CC and members or representatives of Duff & Phelps, KPMG, BofA, FTI or any other entity regarding Pegasus/PARCS between the dates of October 2015 to December 2018;

k.  All communications, documents or files, including all forms of personal or instant messaging between members or representatives of CC and Governmental employees, John Altorelli, or any other individual regarding emails taken from the Constellation Health Group domain, including any grant of immunity for the taking or possession of such emails, between the dates of October 2017 to March 2018;

l.  All Dropboxes or similar repositories used to share data, files or information between and among CC, FTI, KPMG, BofA, Duff & Phelps, DLA Piper, and Hahn Hessen[15] regarding CHT and/or its subsidiaries or regarding Paul Parmar and/or Parmar-managed entities between the dates of October 2015 t0 December 2018;

---

[14] Duff & Phelps provided the only pre-Subject Transaction complete valuation of CHT/Orion of which the defense is aware.  Based on their findings, CC's purchase price significantly undervalued CHT/Orion.

[15] DLA Piper and Hahn Hessen are Califano and Amato's firms, respectively.

m. All minutes or recordings of CC Board meetings held between September 2016 to December 2018 as they relate CHT and/or its subsidiaries, the Subject Transaction, or Paul Parmar and/or Parmar-managed entities.

The documents sought are clearly relevant to one of the central issues at trial; whether the purported victims here were aware of the irregularities in some of CHT's documentation and whether they used that awareness to manipulate the Subject Transaction to their advantage. Moreover, it is the belief of the defense that there is a substantial amount of documentation favorable to the defense that the Government chose not to subpoena or obtain. These items, which could have a significant evidentiary impact, should not be kept from the factfinder by allowing the Government to effectively place a stranglehold on the flow of information through the discovery process.

The records sought would reveal several things of evidentiary value, such as when Chu first became determined to press forward with the Subject Transaction regardless of the time and cost involved, how much the purported victims knew and when, whether there was an exchange of inside information beyond that already revealed by the discovery provided by the Government, and whether and to what extent the supposed victims were engaged in fraudulent activity. It is important to note that although some of

these materials may incidentally have an impeaching effect on witnesses expected to be called for the Government, that is not the goal of Parmar's subpoena request.  Rather, the goal is to obtain further evidentiary material in support of Parmar's position that he was a victim rather than a perpetrator and that the purported victims were very well aware of the exact nature of what they were purchasing or reviewing.

Further, the majority of the documents sought are highly likely to satisfy the business records exception to the rule against hearsay and failure to obtain access to the potentially voluminous records before trial may tend to cause unreasonable delay. *See* Fed. R. Evid. 803(6); *United States v. Nachamie,* 91 F. Supp. 2d 552, 564 (S.D.N.Y. 2000). ("'Because the documents primarily seek business records, they are at this early stage likely to be admissible at trial.").  This is so in spite of the fact that the request seeks material from personal emails and instant messages, in that the messages sought would be part of the complex negotiation and transaction process underlying the Subject Transaction.  Each of the individuals named in the request had either a formal or informal business role in one of the corporate entities involved in the Subject Transaction.

The one request in Exhibit 1 that might not be a business records exception category is the request for documents concerning the

taking of emails from the Constellation Health Group domain (letter "k" on Exhibit 1).   Parmar was the owner of the Constellation Health Group domain, which was not part of the assets of CHT and was not transferred during the Subject Transaction, at all times in 2017 and 2018.  In October of 2017, Parmar notified CC, both individually and through counsel, that the domain belonged to him and that he did not consent to its being accessed.  In spite of this clear assertion of ownership, certain of the alleged victims removed emails from the domain and provided them to the Government; indeed, these stolen emails make up part of the Government's evidence.  The evidence requested in Exhibit 1 "k" will reveal whether or not a suppression hearing must be held before trial on the question of the Government's knowing possession of, or potentially the solicitation of, stolen property in the form of emails and/or other documentation taken from the Constellation Health Group domain between October 2017 and March 2018.

Similarly, as reflected in Exhibit 2, Parmar seeks the following from BofA:

a. All communications, documents or files, including all forms of personal messaging including personal emails, text messages, WhatsApp messages or any other forms of instant messages between members or representatives of BofA, CC, and KPMG regarding CHT and/or its subsidiaries or Paul Parmar and/or Parmar-managed entities between the dates of October 2015 to

December 2018;

b.

c.   All communications, documents or files, including all forms of personal messaging including personal emails, text messages, WhatsApp messages or any other forms of instant messages between members or representatives of BofA and BMO Harris Bank, KeyBank, Woodforest National Bank, Stifel Bank and Trust, or other lending entity regarding CHT and/or its subsidiaries or Paul Parmar and/or Parmar-managed entities between the dates of October 2015 to December 2018;

d.   All communications, documents or files, including all forms of personal messaging including personal emails, text messages, WhatsApp messages or any other forms of instant messages between and among members or representatives of BofA and BMO Harris Bank, KeyBank, Woodforest National Bank, Stifel Bank and Trust, or any other lending entity regarding either the Financial Times article or Department of Justice communications relating to the Subject Transaction between the dates of August 2016 to February 2017;

e.   All internal communications, documents or files, including all forms of personal messaging including personal emails, text messages, WhatsApp messages or any other forms of instant messages among members or representatives of BofA regarding any of the following individuals or entities: CHT and/or its subsidiaries, Paul Parmar and/or Parmar-managed entities, Pegasus and/or PARCS, CC and/or CC managed entities, Chinh Chu, Doug Newton, John Altorelli,[16] Tom Califano or Paul Amato between the dates of October 2015 to December 2018.

---

[16] John Altorelli is one of Chu's personal attorneys.  Although he was paid for the Subject Transaction at the time of closing he played no official role in it but, rather, played a significant role in ousting Parmar after the Transaction closed.

The arguments in favor of issuing the requested subpoena to BofA are similar to those set forth above, including the applicability of the business records exemption. BofA set itself up as the primary lender for the Subject Transaction and, although several other banks were involved in financing the transaction, it is Defendant's belief that BofA controlled the flow of information to those other facilities. It is anticipated that the subpoenaed records, if granted, will show that BofA was aware of the accurate financial condition of CHT and that not only did BofA use that awareness to leverage future, more lucrative business deals with Chu and CC[17] but that BofA also withheld knowledge from the rest of the banks in the lending consortium.[18]

Next, as reflected in Exhibit 3, Parmar seeks the following from Orion[19]:

    a. All communications, documents or files, including all forms of personal messaging including personal emails, text messages,

---

[17] BofA subsequently financed several major deals for Chu and CC, including the Fidelity and Dun & Bradstreet going private transactions. Each of these deals netted hundreds of millions of dollars in fees for BofA. The defense believes that Chu used the carrot of these future deals to persuade BofA to finance the Subject Transaction.

[18] Indeed, although BofA received specific warnings from members of the Department of Justice that "red flags" were being set off by the contemplated Subject Transaction, it is Defendant's belief that these warnings were intentionally withheld from the other lending facilities to ensure that BofA was able to maintain its relationship with Chu and CC.

[19] Orion itself has effectively been dissipated through the bankruptcy process instigated by FTI and CC/CC Capital CHT Holdco that is still ongoing in the Eastern District of New York. Thus, although the subpoena is addressed to Orion, the documents referenced may instead be held by CC Capital CHT Holdco or by CC itself.

WhatsApp messages or any other forms of instant messages between members or representatives of Orion/CHT and KPMG regarding CHT and/or its subsidiaries or Paul Parmar and/or Parmar-managed entities between the dates of October 2015 to December 2018;

b. All communications, documents or files, including all forms of personal messaging including personal emails, text messages, WhatsApp messages or any other forms of instant messages between members or representatives of Orion/CHT and Truc To individually regarding CHT and/or its subsidiaries or Paul Parmar and/or Parmar-managed entities between the dates of October 2015 to December 2018;

c. All communications, documents or files, including all forms of personal messaging including personal emails, text messages, WhatsApp messages or any other forms of instant messages between members or representatives of Orion/CHT and BofA, BMO Harris Bank, KeyBank, Woodforest National Bank, Stifel Bank and Trust, or any other lender regarding CHT and/or its subsidiaries or Paul Parmar and/or Parmar-managed entities between the dates of October 2015 to December 2018;

d. All communications, documents or files, including all forms of personal messaging including personal emails, text messages, WhatsApp messages or any other forms of instant messages between members or representatives of Orion/CHT and CC regarding any of the following individuals or entities: Paul Parmar and/or Parmar-managed entities, Pegasus/PARCS, FTI, BofA, BMO Harris Bank, Chinh Chu, Doug Newton, Truc To, MTBC, Arvind Walia, Elizabeth Kelly, Sam a/k/a Sotirios Zaharis, Pavan Bakshi, Tom Califano, Paul Amato or Howard Ehrenberg between the dates of October 2015 to December 2018;

e. All communications, documents or files, including all forms of personal messaging including personal emails, text messages, WhatsApp messages or any other forms of instant messages between members or representatives of Orion/CHT and FTI

regarding CHT and/or its subsidiaries or Paul Parmar and/or Parmar-managed entities between the dates of October 2015 to December 2018;

f.  All communications, documents or files, including all forms of personal messaging including personal emails, text messages, WhatsApp messages or any other forms of instant messages between members or representatives of Orion/CHT and CHT Board Members, including the Special Committee,[20] regarding CHT and/or its subsidiaries or Paul Parmar and/or Parmar-managed entities between the dates of September 2017 to December 2018;

g.  All communications, documents or files, including all forms of personal messaging including personal emails, text messages, WhatsApp messages or any other forms of instant messages between members or representatives of Orion/CHT and Eric Edel individually regarding CHT and/or its subsidiaries or Paul Parmar and/or Parmar-managed entities between the dates of September 2017 to December 2018;

h.  A complete copy of the Pegasus database, as well as any and all references to Pegasus/PARCS in internal communications or external communications with any party or parties involved in the Subject Transaction;

i.  Contents of the due diligence Dropbox supplied by Orion for use by CC, KPMG and BofA;

j.  Contents of the due diligence Dropbox supplied by Orion for use by FTI;

k.  Contents of the due diligence Dropbox supplied by Orion for use by

---

[20] The Special Committee acted on CHT/Orion's behalf leading up to the Subject Transaction.  As a member of the buying group, Parmar had no role on the Special Committee and was barred from meetings unless briefly present to report or answer questions from Committee members.

Duff & Phelps;

l.   All board minutes or recordings, including any minutes or recordings of Special Committee meetings, taking place between September 2016 to December 2018.

The documents requested from Orion are relevant, evidentiary, and material to the defense.  Orion became the borrower in the Subject Transaction and has since been forced into bankruptcy.  What was a profitable and growing company before the Subject Transaction has since had its assets looted and is no longer a functioning business.  The records sought, however, will establish a number of key facts.  Perhaps the most central of those facts – of great significance to both the defense and the Government – is the Pegasus system sought as part of this request.  Pegasus contained entirely true and accurate data, presenting a real time snapshot of the entire financial condition of CHT and its subsidiaries.  The data maintained in Pegasus was complete and accurate for the entire history of the subsidiary companies; it was also used on a regular basis as an analytical tool for management of the CHT subsidiaries and was thus not merely accurate but also designed for information to be easily accessible.  Moreover, the requested documents will show not just the existence and accuracy of Pegasus, but that CC and KPMG were granted unfettered access as part of the due diligence process and received training on the usage of the system.  Thus, the subpoenaed material

can conclusively establish that the "victims" knew precisely what they were buying and used any irregularities in the documents referenced in the overt acts to force the Subject Transaction forward.

Next, and similarly to the data sought from CC, as reflected in Exhibit 4, Parmar seeks the following from KPMG:

a. All communications, documents or files, including all forms of personal messaging including personal emails, text messages, WhatsApp messages or any other forms of instant messages between members or representatives of CC, KPMG, and BofA regarding CHT and/or its subsidiaries or Paul Parmar and/or Parmar-managed entities between the dates of October 2015 to December 2018;

b. All communications, documents or files, including all forms of personal messaging including personal emails, text messages, WhatsApp messages or any other forms of instant messages between members or representatives of KPMG and Chinh Chu individually regarding CHT and/or its subsidiaries or regarding Paul Parmar and/or Parmar-managed entities between the dates of October 2015 to December 2018;

c. All communications, documents or files, including all forms of personal messaging including personal emails, text messages, WhatsApp messages or any other forms of instant messages between members or representatives of KPMG and Bank of Montreal, KeyBank, Woodforest National Bank, Stifel Bank, or other lending entities regarding CHT and/or its subsidiaries or regarding Paul Parmar and/or Parmar-managed entities between the dates of October 2015 to December 2018;

d. All internal communications, documents or files, including all forms of personal messaging including personal emails, text messages, WhatsApp messages or any other forms of instant messages among

members or representatives of KPMG regarding CHT and/or its subsidiaries or regarding Paul Parmar and/or Parmar-managed entities, and/or regarding any of the following individuals or entities: BofA, Bank of Montreal, Sam a/k/a Sotirios Zaharis, Pavan Bakshi, Melodie Kraljev, Elizabeth Kelly, Arvind Walia, or Tom Califano between the dates of October 2015 to December 2018;

e.    All communications, documents or files, including all forms of personal messaging including personal emails, text messages, WhatsApp messages or any other forms of instant messages between members or representatives of KPMG and FTI regarding CHT and/or its subsidiaries or regarding Paul Parmar and/or Parmar-managed entities between the dates of October 2015 to December 2018;

f.    All communications, documents or files, including all forms of personal messaging including personal emails, text messages, WhatsApp messages or any other forms of instant messages between members or representatives of KPMG and Arvind Walia, Melanie Kraljev, or Elizabeth Kelly individually regarding CHT and/or its subsidiaries or regarding Paul Parmar and/or Parmar-managed entities between the dates of October 2015 to December 2018;

h.    All communications, documents or files, including all forms of personal messaging including personal emails, text messages, WhatsApp messages or any other forms of instant messages between members or representatives of KPMG and members or representatives of Destra Trust regarding CHT and/or its subsidiaries or regarding Paul Parmar and/or Parmar-managed entities between the dates of November 2016 to October 2020;

i.    All communications, documents or files, including all forms of personal messaging including personal emails, text messages, WhatsApp messages or any other forms of instant messages between members or representatives of KPMG and members or representatives of Duff & Phelps regarding CHT and/or its subsidiaries or regarding Paul Parmar and/or Parmar-managed entities between the dates of October 2015 to December 2018;

j.      All communications, documents or files, including all forms of personal messaging including personal emails, text messages, WhatsApp messages or any other forms of instant messages between members or representatives of KPMG and members or representatives of Duff & Phelps, CC, BofA, FTI or any other entity regarding Pegasus/PARCS between the dates of October 2015 to December 2018;

k.      All Dropboxes or similar repositories used to share data, files or information between and among CC, FTI, KPMG, BofA, Duff & Phelps, DLA Piper, and Hahn Hessen regarding CHT and/or its subsidiaries or regarding Paul Parmar and/or Parmar-managed entities between the dates of October 2015 t0 December 2018;

The arguments in favor of issuing the requested subpoena to KPMG are similar to those set forth above surrounding the subpoenaed information sought from CC and BofA, including the applicability of the business records exemption. KPMG conducted the due diligence for the Subject Transaction after being hand-selected by Chinh Chu and CC. It is Defendant's belief based on the discovery received to date that although KPMG was nominally in control of the due diligence process, the gathering of information was in reality being controlled by CC rather than internal directives at KPMG. It is anticipated that the subpoenaed records, if granted, will reveal – and will be introduced at trial to establish – that KPMG deliberately conducted a due diligence investigation that actively avoided asking routine and standard questions in an effort to support the result being sought by Chu and CC.

Finally, as reflected in Exhibit 5, Parmar seeks the following documents from FTI, the firm retained after the Subject Transaction for restructuring purposes:

a.     All communications, documents or files, including all forms of personal messaging including personal emails, text messages, WhatsApp messages or any other forms of instant messages between members or representatives of FTI and CC, KPMG, and BofA regarding CHT and/or its subsidiaries or Paul Parmar and/or Parmar-managed entities between the dates of January 2017 to December 2018;

b.     All communications, documents or files, including all forms of personal messaging including personal emails, text messages, WhatsApp messages or any other forms of instant messages between members or representatives of FTI and CC Capital CHT Holdco, CC or BofA regarding the Pegasus/PARCS system between January 2017 and December 2018;

c.     All communications, documents or files, including all forms of personal messaging including personal emails, text messages, WhatsApp messages or other forms of instant messages between members or representatives of FTI and CC, BofA, Melodie Kraljev, Arvind Walia, Elizabeth Kelly, Truc To or Chinh Chu regarding filing bankruptcy on behalf of CC Capital CHT Holdco, in particular any communications regarding venue, timing, and order of subsidiaries/business entities filing or joining in Chapter 11 bankruptcy between January 2017 and December 2018;

d.     All communications, documents or files, including all forms of personal messaging including personal emails, text messages, WhatsApp messages or any other forms of instant messages between members or representatives of FTI whether internally or with any other individual or entity regarding financial information or other information or presentations distributed to potential bidders leading

up to or during the bankruptcy auction process, regardless of whether the receiving entity ever placed a bid;

e. All communications, documents or files, including all forms of personal messaging including personal emails, text messages, WhatsApp messages or any other forms of instant messages between members or representatives of FTI whether internally or with any other individual or entity regarding any bids or offers, formal or informal, received during the bankruptcy auction process, regardless of whether the entity's bid or offer was successful;

f. All communications, documents or files, including all forms of personal messaging including personal emails, text messages, WhatsApp messages or any other forms of instant messages between members or representatives of FTI and CC, KPMG, BofA, Tom Califano, Paul Amato, Howard Ehrenberg, or Chinh Chu regarding any adversary proceedings, whether formal or informal, that have been instituted since the filing of Chapter 11 bankruptcy in 2018, including any settlements and the amounts involved;

g. All communications, documents or files, including all forms of personal messaging including personal emails, text messages, WhatsApp messages or any other forms of instant messages between members or representatives of FTI and CC, KPMG, BofA, Tom Califano, Paul Amato, Howard Ehrenberg, or Chinh Chu regarding any claims on liability or malpractice insurance carriers, whether formal or informal, that have been instituted since the filing of Chapter 11 bankruptcy in 2018, including any settlements and the amounts involved.

The information sought from FTI, which once again is likely to be covered in whole or in substantial part by the business records exception, is sought for the purpose of establishing value. The Government has chosen to argue that CHT, at the time of the Subject Transaction, had either no actual

value or a value substantially lower than that paid by the "victims." It is the position of the defense that the value of CHT and its subsidiaries was in fact much higher than the price paid during the Subject Transaction and that a successful and viable business was forced into bankruptcy in a successful move to loot its assets by Chu and CC.

Although the records generated by FTI and sought by the subpoena to that entity were generated after the closing of the Subject Transaction, they are still highly relevant on the question of value.  Questions surrounding the bankruptcy filing, auctions, adversary proceedings and process overall all contribute to a complete evidentiary picture of the value of CHT and its subsidiaries at the time of the Subject Transaction.   Moreover, it is anticipated that the Government and/or its witnesses will attempt to rely on the filing of the bankruptcy proceedings as evidence that CHT's value was minimal at best.  Allowing this evidence to go forward without enabling Parmar to counter it using the materials sought from FTI would both present an inaccurate picture at trial and would unfairly hamper the defense from proceeding with essential and admissible proof on a central issue.

## IV.    **<u>CONCLUSION</u>**

For the foregoing reasons, Parmar respectfully requests that this Honorable Court grant his motion and issue the requested subpoenas in the form attached hereto.


Respectfully Submitted,


Jeffrey C. Hoffman
Windels Marx Lane & Mittendorf, LLP
156 West 56th Street
New York, New York 10019
Tel.: 212.237.1018
jhoffman@windelsmarx.com


Timothy C. Parlatore, Esq.
Timothy.parlatore@parlatorelawgroup.com
Maryam N. Hadden, Esq.
Maryam.hadden@parlatorelawgroup.com
Parlatore Law Group, LLP
One World Trade Center, Suite 8500
New York, NY 10007
Tel: 212.603.9918

*Attorneys for Defendant Paul Parmar*