Jeffrey C. Hoffman
Windels Marx Lane & Mittendorf LLP
156 West 56th Street
New York, NY  10019
T. 212.237.1000
jhoffman@windelsmarx.com

Timothy C. Parlatore
Maryam N. Hadden
Parlatore Law Group LLC
One World Trade Center, Suite 8500
New York, NY  10007
Tel.: 212-679-6312 | Fax: 212-202-4787
timothy.parlatore@parlatorelawgroup.com
maryam.hadden@parlatorelawgroup.com

*Attorneys for Defendant Paul Parmar*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

-----------------------------------------------x

UNITED STATES OF AMERICA,                Case No.: 18-cr-00735-MCA

       v.

PAUL PARMAR,
         Defendant.

-----------------------------------------------x

## MEMORANDUM OF LAW IN SUPPORT OF MOTION TO DISMISS THE INDICTMENT AND MOTION TO SUPPRESS EVIDENCE

# Table of Contents

PROCEDURAL BACKGROUND............................................................1

LEGAL ARGUMENT........................................................................2

  THE INDICTMENT MUST BE DISMISSED AS VENUE DOES NOT LIE
  WITHIN THE DISTRICT OF NEW JERSEY ......................................2

  THE GOVERNMENT'S OMISSION OF EXCULPATORY EVIDENCE
  BEFORE THE GRAND JURY ROSE TO THE LEVEL OF IMPAIRMENT OF
  THE GRAND JURY'S FUNCTION AND THE INDICTMENT SHOULD BE
  DISMISSED AS A RESULT ..............................................................7

  THE CURRENT PROSECUTORIAL TEAM IS TAINTED BY ITS
  IMPROPER REVIEW OF PRIVILEGED INFORMATION ...........................15

  COUNT ONE MUST BE DISMISSED AS DUPLICITOUS BECAUSE IT
  ALLEGES MULTIPLE AND CONFLICTING CONSPIRACIES IN A SINGLE
  COUNT.......................................................................................18

  THE INDICTMENT MUST BE DISMISSED AS VIOLATIVE OF THE
  DEFENDANT'S 5TH AMENDMENT DUE PROCESS RIGHTS DUE TO THE
  OUTRAGEOUS MISCONDUCT OF THE GOVERNMENT...........................27

  THE INDICTMENT SHOULD BE DISMISSED UNDER THIS COURT'S
  SUPERVISORY POWER DUE TO THE GOVERNMENT'S PERVASIVE
  MISCONDUCT .............................................................................39

  EMAILS RELIED UPON BY THE GOVERNMENT CONSTITUTE STOLEN
  PROPERTY AND MUST BE SUPPRESSED ......................................42

  THE FORFEITURE ALLEGATION IS OVERBROAD AND ATTEMPTS TO
  SEIZE ASSETS UNCONNECTED TO THE INDICTMENT'S THEORY.......47

  LEAVE TO FILE ADDITIONAL MOTIONS AS APPROPRIATE ..................49

  CONCLUSION...............................................................................50

## PROCEDURAL BACKGROUND

On May 16, 2018, Mr. Parmar was arrested in New Jersey and charged in a complaint with Conspiracy to Commit Securities Fraud and Securities Fraud. At that time, Mr. Parmar was jointly charged with two codefendants, Sotirios Zaharis and Ravi Chivukula. The complaint relied in part upon selected emails purportedly sent amongst the co-defendants and another, unnamed individual. These emails had been taken without permission or authority from a privately held web domain, constellationhealthgroup.com, and subsequently obtained by the Government.

Several months later, on December 12, 2018, the instant Indictment was filed with this Court, charging the same individuals and a third co-defendant, Pavandeep Bakhshi, jointly with Conspiracy to Commit Securities Fraud, Securities Fraud, and Wire Fraud. Each count of the Indictment is based on substantially the same set of allegations, although with reduced detail and a slightly different set of claimed overt acts. Once again, the Indictment relies upon citations to selected emails recovered from the same privately held web domain, despite the fact that the Government had been notified months earlier that the communications in question had been illegally obtained from the privately owned domain and constituted stolen property as well as evidence of electronic theft. These stolen communications, in addition to those referenced in the instant Indictment, included several years' worth of emails and communications via text and other messenger platforms between Mr. Parmar and a

1

broad range of individuals not implicated in the charged acts, including volumes of attorney-client privileged communications.

The continued reliance of the Government on illicit evidence to maintain its case is indicative of the pattern of conduct engaged in throughout the prosecution of the instant matter.  Throughout this case, the Government has chosen to maintain a policy of willful blindness to the defects and inconsistencies in its own evidence, including the lies and illegal activities of the alleged victims discussed in detail herein, instead charging ahead with a dangerously flawed prosecution in a manner that leaves little doubt that the evidence presented to the Grand Jury in order to obtain the December Indictment must by necessity have been fatally flawed.

## LEGAL ARGUMENT

## THE INDICTMENT MUST BE DISMISSED AS VENUE DOES NOT LIE WITHIN THE DISTRICT OF NEW JERSEY

The question of proper venue lies at the heart of our Nation's jurisprudence; its importance cannot be overstated.  The Constitution of the United States "twice safeguards the defendant's venue right." *United States v. Cabrales*, 524 U.S. 1, 6 (1998).  Article III holds the requirement that "the Trial of all Crimes … shall be held in the State where the said Crimes shall have been committed," *U.S. Const. art. III, §2, cl. 3*, and the Sixth Amendment adds that in "all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the

State and district wherein the crime shall have been committed." *U.S. Const. Amend. VI.* The right to proper venue is further codified in the requirement of the Federal Rules of Criminal Procedure that "the government must prosecute an offense in a district where the offense was committed." *Fed. R. Crim. P. 18.* Moreover, in establishing the crime of securities fraud, which underlies two counts of the Indictment herein, the legislature provided guidance on the issue of venue in 15 U.S.C. § 78aa, which states that "[a]ny criminal proceeding may be brought in the district wherein any act or transaction constituting the violation occurred." It is well established that "questions of venue are more than matters of mere procedure. They raise deep issues of public policy in the light of which legislation must be construed." *Travis v. United States*, 364 U.S. 631 (1961) (quotation marks omitted).

In order for the Government to properly establish venue and bring a criminal action in a particular jurisdiction, it must establish that an "essential conduct element" of the alleged crime took place within the jurisdiction; "circumstance elements" such as the existence of criminally generated proceeds are insufficient. *Cabrales*, U.S. at 10; *United States v. Auernheimer*, 748 F.3d 525 (3d Cir. 2014); *United States v. Bowens*, 224 F.3d 302 (4th Cir. 2000). The Third Circuit has made it clear that the importance of properly establishing venue through "essential conduct" elements is no less important in the modern era of easy travel and the use of the internet than in the past, stating that:

3

> As we progress technologically, we must remain mindful that cybercrimes do not happen in some metaphysical location that justifies disregarding constitutional limits on venue. People and computers still exist in identifiable places in the physical world. When people commit crimes, we have the ability and obligation to ensure that they do not stand to account for those crimes in forums in which they performed no "essential conduct element" of the crimes charged. *Auernheimer*, 748 F.3d at 541 (*citing United States v. Rodriguez-Moreno*, 526 U.S. 275, 280 [1999]).

Venue requirements serve to ensure, among other things, that the Government is not allowed to "choose its forum free from any external constraints." *United States v. Salinas*, 373 F.3d 161, 169-70 (1st Cir. 2004) (*citing Travis v. United States*, 364 U.S. 631, 634 [1961]). *See also Auernheimer*, 748 F.3d at 541. The burden is on the Government to prove proper venue by a preponderance of the evidence. *United States v. Root*, 585 F.3d 145, 155 (3d Cir. 2009).

The instant Indictment charges Mr. Parmar with one count each of the crimes of Conspiracy to Commit Securities Fraud, Securities Fraud, and Wire Fraud. In each charged count, the Indictment reads that "in the District of New Jersey and elsewhere," Mr. Parmar and his codefendants committed the charged crimes. The Conspiracy count goes on to allege seven separate overt acts. Shockingly, only one of these overt acts is even *claimed* to have taken place in New Jersey. Fatally to the venue of the instant Indictment, however, the described meeting did not take place in the State of New Jersey on the date in question. This particular alleged overt act, enumerated in the Indictment as paragraph 5(g) of the first count, is indicative of the

outrageous conduct of the Government throughout the instant prosecution, which has veered among turning a blind eye towards inconvenient facts or to illegal activities by the purported victim, relying upon illicitly obtained emails, and perpetrating actual falsehoods upon the Grand Jury and perforce this Court.

Indeed, a brief review of those same illicitly obtained emails – which make up the bulk of the alleged overt acts and are thus clearly in the Government's possession – would have made it crystal clear that the purported meeting in Hazlet, New Jersey as described in the Indictment did not happen in New Jersey at all.  Yet without that meeting, the Government could not even pretend to have a chance at establishing venue in their jurisdiction of choice.  As a result, false evidence must have been presented to the Grand Jury in order to maintain venue in the District of New Jersey.[1]

The instant Indictment makes no effort whatsoever, beyond the vague language of "in the District of New Jersey and elsewhere" to establish venue for the remaining substantive counts.  The Securities Fraud allegations captured in Count Two of the Indictment lack any specificity but, assuming that they are alleged to encompass the same overt acts underlying the "conspiracy" to commit that crime,

---

[1] The ordinary presumption would be that this was inaccurate testimony presented by mistake, a result of mere careless conduct.  While careless conduct should never be an acceptable standard in a criminal prosecution, the surrounding conduct of the Government herein, set forth in further detail *infra*, raises the unfortunate but very real specter of active dishonesty.

they suffer from the same fatal defect.  Moreover, little if any effort is made to bring this Count into conformity with the dictates of 15 U.S.C. § 78aa; presumably because the State of New Jersey is in fact the improper venue. The Wire Fraud alleged in Count Three is similarly vague as to venue.  As neither "Company A" nor the "Operating Company" maintained bank accounts in New Jersey in January of 2016, it is apparent that this lack of clarity is a further effort to conceal the lack of venue in the Government's chosen forum.

As there is zero evidence that any "essential conduct element" underlying the instant Indictment took place in the District of New Jersey, particularly in light of the fact that the only overt act alleged to take place in that venue did not take place there at all, it is Mr. Parmar's position that the Indictment cannot lie in this venue and must be dismissed in its entirety.  Should this Court be inclined to defer the issue of venue pending further argument, this Court should carefully review the minutes of the Grand Jury proceeding with an eye towards the proper establishment of venue and towards potential prosecutorial misconduct, and the Defense seeks disclosure of the Grand Jury minutes for such review as well.[2]

---

[2]  A court may disclose grand jury testimony when a party has shown a particularized need for that information which outweighs the public interest in secrecy. *United States v. McDowell*, 888 F. 2d 285, 289 (3d Cir. 1989).  While Mr. Parmar believes that the Indictment is visibly defective as to venue, his interest in establishing lack of venue is a central right guaranteed by the Constitution.  As such, it would certainly qualify as a showing of particularized need outweighing the public interest in secrecy.

## THE GOVERNMENT'S OMISSION OF EXCULPATORY EVIDENCE BEFORE THE GRAND JURY ROSE TO THE LEVEL OF IMPAIRMENT OF THE GRAND JURY'S FUNCTION AND THE INDICTMENT SHOULD BE DISMISSED AS A RESULT

Federal Rule of Criminal Procedure 12(b)(3) allows a defendant to move to dismiss an indictment for error(s) in the grand jury proceeding. "As a general matter, a district court may not dismiss an indictment for errors in grand jury proceedings unless such errors prejudiced the defendants." *Bank of Nova Scotia v. United States*, 487 U.S. 250, 254 (1988). However, once a defendant demonstrates that an error has resulted from prosecutorial misconduct, the court "must then determine whether any sanction, such as the dismissal of the indictment and suppression of evidence... is appropriate." *United States v. Martino*, 825 F.2d 754, 759 (3d Cir. 1987). Dismissal is "appropriate only 'if it is established that the violation substantially influenced the grand jury's decision to indict' or if there is 'grave doubt' that the decision to indict was free from the substantial influence of such violations." *Bank of Nova Scotia*, 487 U.S. at 256 (quoting *United States v. Mechanik*, 475 U.S. 66, 106 S. Ct. 938, 89 L. Ed. 2d 50 (1986) (O'Connor, J., concurring)). *See also Martino*, 825 F.2d at 759 (holding the defendant's rights must have been "adversely affected" for dismissal to be an available remedy).

As a general rule, prosecutors are not required to present exculpatory evidence to the Grand Jury. *United States v. Williams*, 504 U.S. 36 (1992). Where, however,

7

the omission of exculpatory evidence raises a grave doubt that the Grand Jury's decision to indict was not tainted by prosecutorial misconduct, and a defendant was prejudiced thereby, dismissal may be appropriate. *Bank of Nova Scotia*, 487 U.S. at 259, 263.

Here, although the defense has not seen the minutes of the Grand Jury presentation, there is ample ground to believe that the prosecutorial misconduct went beyond the use of stolen property and that the evidence presented was so sanitized, reduced and inaccurate that it must inevitably have impaired the integrity of the Grand Jury's investigative function in that the case as presented affirmatively mislead the Grand Jury. The Grand Jury's role as referee or buffer between the Government and the people (*Williams*, 504 U.S. at 47) means that it should not be a mere rubber stamp used at prosecutorial whim. Instead, the Grand Jury should be presented with adequate facts – accurately portrayed – to make a finding that legally sufficient evidence exists to find an indictment and subject a citizen to prosecution.

The transaction that forms the base of the instant Indictment is the Go Private Transaction in which the Private Investment Firm and Defendant Parmar purchased Company A and removed it from trading on the London AIM. This transaction was a lengthy and complex process, spanning months of due diligence work involving multiple independent, highly paid professional agencies whose primary function and expertise in such a transaction is to uncover evidence of any potential fraud before

8

the transaction closes.

The Government can hardly be expected to reproduce the due diligence process in a Grand Jury setting, nor does Mr. Parmar suggest that it should have. What it must do, however, is present evidence that will not mislead the Grand Jury into reaching a conclusion that is tailored to fit a specific narrative rather than what actually took place. Here, there were several evidentiary items that, if presented, would have precluded finding an indictment in its current form; an accurate representation of the financial data presented during the due diligence process, including Pegasus and two randomly selected months of accurate revenue figures that had been provided during due diligence; two warnings from the Department of Justice to Bank of America shortly before the transaction closed; a shareholder suit filed in Delaware Chancery Court in an effort to prevent the transaction from closing; and an article published in Financial Times before the closing. Taken as a whole, these evidentiary items – which the defense believes were withheld from the Grand Jurors – would have made it crystal clear that far from relying upon any misstatements or omissions to their detriment, the purported "victims" were well aware of the accurate value of Company A and used that knowledge to their own benefit.

The significance of the first of these evidentiary items to any investigative process cannot be overstated. Pegasus, a data retention system designed for

regulatory compliance with a business intelligence overlay, contained complete *and accurate* data regarding every transaction by Company A, updated in real time.  Not only would Pegasus have answered the question of Company A's actual value – a question the Government has persistently refused to answer and presumably left unanswered in the Grand Jury as well, as discussed in further detail *infra* – but it also would have revealed to the Grand Jury the fact that the "victims" also knew the true value of Company A before its purchase.  Full access to Pegasus had been provided to the due diligence team,[3] and its existence and use later explained to the Government by Mr. Parmar's counsel,[4] but shockingly the prosecutorial team has claimed that they "don't need" Pegasus and has thus far failed to provide it to the

---

[3] For example, in addition to granting online access passwords to members of the due diligence team, members of the team and the presumptive Private Investment Firm received detailed training on the use and capabilities of Pegasus on July 21, 2016 *at their request*, and subsequent correspondence showed their understanding of Pegasus's capabilities and value.  Further, on July 27, 2016, the Private Investment Firm received an independent report that it had commissioned from McKinsey & Company that also utilized accurate valuation data.  All of this information was readily available to the purported victims and, thus, to the Government before its Grand Jury presentation.

[4] Indeed, Parmar's counsel provided information to the Government not just on the significance and use of Pegasus, but also on the independent valuation of Company A prepared by Duff & Phelps which used accurate data – and valued the company significantly higher then the Go Private Transaction price – and on the fact that two full months of accurate data were provided to the due diligence team at their request months before the transaction closed.  The prosecution's persistence in ignoring the mountain of exculpatory data provided to it before the Indictment was filed is certainly shocking to the conscience and constitutes evidence that the case presented to the Grand Jury was invalid.

defense, despite its clearly exculpatory nature.  Thus, on information and belief, it was never revealed to the Grand Jury.  It is perhaps for this reason that the prosecution has persistently refused to provide a proposed value for the company that was allegedly overvalued due to the "conspiracy", in spite of the fact that value is central to proof of the charges brought by the Government.

Pegasus is the clearest example of accurate data that was affirmatively provided to the purchasers and to the due diligence team throughout the months leading up to the Go Private Transaction, but it was not the only example available to the Government during the investigative process.    Another example was the valuation performed for Company A's Independent Committee by Duff & Phelps, an unrelated outside agency.  Duff & Phelps did use data supplied by Company A, but did *not* rely on the marketing spreadsheet relied upon by the Government in its list of overt acts.  Indeed, the data used by Duff & Phelps in producing their valuation of Company A contained accurate numbers that were millions of dollars below the marketing spreadsheet figures.  However, the actual price paid for the company was the fair market value for  a company whose value would have been substantially less than the actual accurate value of the company purchased.[5]  Moreover, two months of complete and accurate financial data was provided to the due diligence review

---

[5] And of course, as set forth in further detail *infra*, the Bankruptcy auction revenue figures provided yet another avenue towards valuation that the Government ignored.

team during the process – months that were randomly selected and requested by the reviewers, not by anyone at Company A, much less any of the supposed conspirators. It seems incomprehensible that this information could have been provided to the Grand Jury and still resulted in an Indictment charging the listed overt acts; had these events been accurately presented and the Grand Jury not been affirmatively misled by the Government's misconduct, the instant Indictment could not have been the result.

In addition to essential valuation evidence being withheld, it is the belief of Mr. Parmar that the warnings received by the purported victims before the transaction took place were also concealed from the Grand Jury. Bank of America, one of the banks making up the Lenders, received two separate warning phone calls from Department of Justice representatives telling them that the transaction was raising red flags and caution would be appropriate before the Go Private Transaction took place.[6]  As these calls were made by members of the Government, it is abundantly clear that they were within the prosecution's knowledge and control prior

---

[6] It is beyond question, of course, that one of the necessary elements of securities fraud is reliance upon the alleged misrepresentation or omission by the victim. Therefore, evidence of the direct warnings on *two separate occasions* from the Department of Justice to Bank of America, one of the identified victims, which took place before the transaction closed, would have been central to the issue before the Grand Jury and its exclusion by the Government certainly impaired the integrity of the Grand Jury process.  Evidence of these two warnings were previously submitted to the Court as exhibits to the motion to modify the conditions of release and are under seal at Docket 62-2 and 62-3.

to the Grand Jury presentation.   Yet there is every reason to believe that the Government intentionally misled the Grand Jury by concealing this directly exculpatory information from them, just as it was concealed from the Court and counsel during Mr. Parmar's bail hearing.

There were additional factors that weigh against any possible claim that the "victims" were "misled" into believing that Company A had a higher value than it actually did.   Before the Go Private Transaction took place, a lawsuit was filed by one of the shareholders of Company A in Delaware Chancery Court making several of the same allegations relied on by the Government.   Not only was this a publicly filed proceeding, but it formed part of the basis for the warning calls to Bank of America by the Department of Justice.   Representatives of the Private Investment Firm (again, to the extent that this victim can be identified) actually attended Delaware court proceedings before the Transaction closed and thus were very familiar with their contents.   Further, an article criticizing Company A and raising concerns about the Go Private Transaction was published by Financial Times, an internationally respected source of financial information, before the closing took place, naming both Mr. Parmar and the head of the (presumed) Private Investment Firm.[7] The reporter working on the article contacted both Company A and the Private Investment Firm *before* publishing the piece, seeking comments.   All of these

---

[7] A copy of this article is attached hereto as Exhibit A.

factors render any claim that any of the "victims" were misled or defrauded in any way completely implausible.[8]  Yet an indictment was still voted, leading to the conclusion that the Grand Jury was not informed of any of this exculpatory evidence (or, if they were, they were not properly instructed on the law as it relates to securities fraud, which also would have impaired the integrity of the Grand Jury proceeding).  Indeed, as at least one of the items of evidence presented to the Grand Jury was demonstrably false – the alleged overt act discussed in detail *supra* – it is apparent that not only was directly exculpatory evidence withheld, but actively inaccurate information was presented in its place.[9]

Although a rare sanction for prosecutorial misconduct and the concealing of exculpatory evidence, dismissal is an available sanction.  In light of the glaring evidence of prosecutorial misconduct and the extreme likelihood that the Grand Jury

---

[8] The mere existence of the Financial Times article makes the untenable nature of the Government's theory as presented to the Grand Jury obvious – in order to accept the Government's view of events, one must assume that the "conspirators" were somehow able to fool all of the firms spending months of effort and millions of dollars on due diligence, yet unable to fool a reporter who did not have the same time, access, or presumably funding that those same firms experienced in due diligence work all had.  Similarly, both the Department of Justice and the shareholder suit in Delaware had no trouble evaluating any risks in the transaction, again without access to the level of accurate financial information enjoyed by the "victims."

[9] In this light, as discussed in further detail *infra*, it is interesting to note that the primary victim in the Indictment appears to be the Private Investment Firm – a creature which does not exist in the Government's Notice of Organizational Victims and thus appears to have been abandoned as a victim by the Government, presumably changing the entire tenor of the Indictment in an impermissible manner.

14

was affirmatively misled by that misconduct, it is an appropriate sanction here. There can be no doubt that Mr. Parmar was prejudiced by the voting of an Indictment based on the wholesale concealment of evidence.  Mr. Parmar has faced years of legal difficulties, been fully deprived of his freedom when he was initially denied bail and subsequently placed under house arrest on substantial bail, and has had his assets seized and reputation ruined.  Dismissal of the Indictment with prejudice is the appropriate sanction here.

## THE CURRENT PROSECUTORIAL TEAM IS TAINTED BY ITS IMPROPER REVIEW OF PRIVILEGED INFORMATION

There can be no doubt that an attorney's client is the sole holder of attorney-client privilege and that only he or she can waive the privilege – the Government cannot waive the privilege on a client's behalf.  *United States v. Fishoff*, 2016 U.S. Dist. LEXIS 108301 (N.J. Dist. Ct. Aug. 16, 2016).  Attorney-client privilege works in tandem with the privilege protecting attorney work-product from disclosure.  *See In re Grand Jury Matter*, 847 F.3d 157 (3d Cir. 2017).  Moreover, it is clear that communications between a corporation's counsel and the employees of the corporation are covered by the attorney-client privilege.  *Upjohn Co. v. United States*, 449 U.S. 383, 397 (1981).

These privileges are not absolute and can in certain circumstances be pierced by exceptions such as the crime-fraud exception. A party seeking to apply the crime-fraud exception, however, must make a *prima facie* showing that there is a

reasonable basis to suspect (1) that the client or the attorney was committing or intending to commit a crime or fraud, and (2) that the work product in question was used in furtherance of that alleged crime or fraud. *In re Grand Jury Matter*, 847 F.3d at 165; *In re Grand Jury (ABC Corp.)*, 705 F.3d 133, 155 (3d Cir. 2012). Because the question of violations of privilege is a highly fact-specific and sensitive arena, a party receiving or reviewing potentially privileged information must have provisions in place to protect the privilege.

Here, the Government obtained access to the emails stored on the private constellationhealthgroup.com domain. That domain contained email exchanges between Mr. Parmar and his legal counsel, not just during the period of time alleged by the Government in Count One of the instant Indictment, but over several years prior to that. Indeed, attorney-client privileged emails involving multiple attorneys and matters having nothing to do with Company A, dating back to the inception of the domain, were stored on that server. Yet there is no indication that the material obtained by the Government was handled with the appropriate level of sensitivity to questions of either attorney-client or work-product privilege, or any other privilege that might apply. Instead, it would appear that the Government simply reviewed the stolen material, selected the items they wished to present to the Grand Jury, and held the remainder. As a result, the prosecutorial team at bar is irredeemably tainted.

There can, of course, be no justification for the knowing solicitation by the

Government of stolen private property.  Assuming for the moment that this trove of email and electronic information was simply handed over to the Government without any agreement or grant of immunity, despite John Altorelli's promise to freeze the domain discussed in further detail *infra*, the only appropriate way for that information to be handled would have been for the Government to establish a taint team to review the emails, maintain a privilege log, and to release to the assigned prosecution team only a small and relevant portion to which an exception such as the crime-fraud exception might arguably apply.  Then the proper next step would have been for the Government to obtain a ruling from the Court supporting the use of an exception.  It appears instead, as multiple emails have been relied upon by the Government throughout this and related civil proceedings, that the Government simply ignored the concept of attorney-client privilege and decided to run rough-shod over Mr. Parmar's rights.

Prosecutorial conduct must remain above reproach.  Because a prosecutor's misconduct can violate a defendant's Sixth Amendment rights (*see United States v. Molina-Guevara*, 96 F.3d 698 [3d Cir. 1996]), and there is every indication that such violations have occurred in the proceedings herein to date, Mr. Parmar urges this Court to find that the current prosecution team is irrevocably tainted by their misconduct to date and must be replaced.

17

## COUNT ONE MUST BE DISMISSED AS DUPLICITOUS BECAUSE IT ALLEGES MULTIPLE AND CONFLICTING CONSPIRACIES IN A SINGLE COUNT

A count in an indictment is duplicitous where it combines two or more distinct and separate offenses in a single count, so that a general verdict does not reveal exactly which crimes the jury found that the defendant had committed.  *United States v. Haddy*, 134 F.3d 542, 548 (3d Cir. 1998); *United States v. Gomberg*, 715 F.3d 843, 845 (3d Cir. 1983).   Prejudice results to the defendant in many ways: 1) duplicitous counts may conceal the specific charges faced by each defendant; 2) they prevent the jury from unanimously deciding guilt or innocence with respect to a particular offense and particular defendant, *United States v. Schurr*, 775 F.2d 549, 553 (3d Cir. 1985) ("the rule protects the right of each defendant 'not to be tried *en masse* for the conglomeration of distinct and separate offenses committed by others,'" *quoting Kotteakos v. United States*, 328 U.S. 752, 775 [1946]); 3) they increase the risk of prejudicial evidentiary rulings and evidentiary spillover, *United States v. Perez*, 280 F.3d 318, 346 (3d Cir. 2002) (jury should not be permitted to transfer "guilt from one alleged co-schemer to another," *quoting United States v. Barr*, 963 F.2d 641, 648 [3d Cir. 1992]); and 4) in the event of conviction, they endanger fair sentencing. *Haddy*, 134 F.3d at 548 (citation omitted).

In addition, duplicitous counts may also violate the defendant's constitutional right to notice of the charges or hinder his ability to argue double jeopardy in a

subsequent prosecution. *United States v. Rigas*, 605 F.3d 194, 212 (3d Cir. 2010) ("duplicity does have constitutional dimensions," including protecting against double jeopardy; rejecting Government argument that duplicity is a mere pleading issue).

The instant Indictment does not involve a case where a conspiracy count simply charges multiple objectives, which is recognized to be permissible. *See United States v. Reyes*, 930 F.2d 310, 312 (3d Cir. 1991) (because "the conspiracy count… does not charge three separate offenses but a single offense, i.e. a conspiracy having multiple objectives[,] … [t]he allegation in a single count of a conspiracy to commit several crimes is not duplicitous" *quoting Braverman v. United States*, 317 U.S. 49, 54 [1942]).  On the contrary, in a case such as the matter at bar, where a single count appears to encompass multiple different conspiracies, the Third Circuit has held that the court is to consider three factors to determine whether a group of individuals is alleged to be engaged in a single conspiracy or multiple conspiracies: 1) whether there was a common goal among the conspirators; 2) whether the agreement contemplated a result dependent on the continuous cooperation of all the conspirators; and 3) the extent to which the participants overlapped in the various dealings. *Kemp*, 500 F.3d at 287 (citations omitted).  The Government may not charge "multiple unrelated conspiracies" in a single count. *United States v. Kenny*, 462 F.2d 1205, 1216 (3d Cir. 1972).  To prove a valid conspiracy, the government

must establish a unity of purpose between the alleged conspirators, an intent to achieve a common goal, and an agreement to work together toward that goal. *See United States v. Robinson*, 167 F.3d 824, 829 (3d Cir. 1999).

Here, the very language selected by the Government in drafting the Indictment demonstrates the absence of evidence of a unity of purpose between the alleged conspirators. As an initial matter, the Indictment sets out the identity and corporate roles of the defendants. The purported victims are described as a "Private Investment Firm" and a consortium of financial institutions ("Lenders"). The Indictment specifies that the Private Investment Firm is "a private investment management firm based in New York City that sought to acquire, own and operate businesses by providing long-term capital solutions." Although the Indictment does not name any of these victims, it was supplemented on February 4, 2019, by a Notice of Organizational Victims submitted by the Government pursuant to Fed. R. Crim. P. 12.4(a)(2). Oddly enough, that Notice does not contain a single corporate entity that matches the definition in the Indictment of the "Private Investment Firm,"[10] although the Notice does identify the Lenders.

Similarly, the Indictment – and the theory espoused by the Government within it – sets forth internally contradictory and inconsistent goals for the supposed single

---

[10] Neither CHT Holdco, LLC, nor CC Capital CHT Holdco, LLC, the only two identified entities that fall outside the category of Lender, could be described as a private investment management firm based in New York City.

20

purpose of the conspiracy.  The "Goal of the Conspiracy" is described as follows: "for the defendants to enrich themselves by falsely inflating the value of Company A … through various fraudulent means to make Company A an attractive investment or acquisition target at prices that far exceeded Company A's true value."  The Indictment goes on to describe the manner and means of the conspiracy, including identifying specifically the Private Investment Firm and Lenders as its intended victims.

Significantly, the Indictment further seeks forfeiture of several assets, including four real properties[11] and the contents of several specific bank accounts held by various corporate entities, none of which were affiliates or subsidiaries of Company A.  What the Indictment utterly fails to make clear is how any of these assets could possibly fulfill the claimed goal of the conspiracy set forth in the Indictment to falsely inflate the value of the company, particularly in the eyes of either the Private Investment Firm or the Lenders.[12]  This is an especially glaring contradiction to the goal plead by the Government when one considers that not *one*

---

[11] Two of these properties are the subjects of a separately filed *in rem* proceeding captioned *United States v. 50 Riverside Boulevard, Unit 21B, New York, New York et. al.*, 18-cv-09293-MCA-LDW.  The remaining two properties were originally part of the *in rem* proceeding as well, but were dropped by the Government's filing of an Amended Complaint on June 5, 2020.

[12] Equally significantly, and as will be set forth in further detail *infra*, some of these assets are not even traceable to any of the alleged fraudulent conduct, at any point in time, and as such should be removed from the Forfeiture Allegation in their entirety.

21

of the real properties or designated bank accounts constituted an asset of the company or could have in any way falsely inflated its value.  The properties and bank accounts are described as being "property, real and personal, that constitutes or is derived from proceeds traceable to the commission of the charged wire fraud and securities fraud offenses." *See* Forfeiture Allegation par. 1.  If that were the case, these assets might conceivably constitute evidence that the Defendants were engaged in an effort to enrich themselves, or at least that they were for some reason conspiring to enrich Mr. Parmar, but the listed assets could not possibly support the theory plead in the Indictment that there was a scheme afoot to inflate the value of Company A in anyone's eyes, much less the eyes of the purported victims.

The inescapable conclusion is that the Government is attempting to hedge its bets in a single duplicitous conspiracy count: claiming that there was a unified goal to inflate the value of the company in the eyes of the Lenders and the Private Investment Firm, yet seeking to simultaneously argue that the defendants were using the company's funds for personal gain and actually *decreasing* Company A's value both in reality and on paper.  This hardly shows a "unity of purpose" amongst the alleged conspirators (if anything, the "purposes" themselves are directly contradictory) and is precisely the reason that duplicitous counts are impermissible.

The dates alleged in the Indictment for this "unified" conspiracy call the Government's theory further into question.  Count One ranges between May 2015

and September 2017.  Yet the first overt act alleged supposedly takes place on January 27, 2016, almost eight months after the "conspiracy" began.  No allegedly conspiratorial activity before that date is identified in any way.  Moreover, the Private Investment Firm – to the extent that such a creature is identifiable, as none has been named by the Government more than two years after the filing of the Indictment – had no contact with or interest in the subject company until "early 2016."  *See* Declaration of Chinh Chu, attached hereto as Exhibit B.  Thus, by its own terms, the Indictment alleges a group of individuals sharing a unified purpose to mislead and defraud an organization with which it had no prior relationship and of which the group had no reason to even be aware.  Even if the selection of a random "victim" instead of the Private Investment Firm was consistent with the language of the Indictment (which it is not), this theory is wildly irrational in a case involving hundreds of millions of dollars and claiming to describe a complex and nefarious scheme.  The type of crime posited by the prosecution necessarily requires a carefully selected victim, not just hoping that someone perfect will fall into the hitherto non-existent net.  The Government's selected start date of May 2015 is therefore completely inconsistent with its own description of the conspiracy's goal, coming as it does almost a year before any contact with the presumed Private Investment Firm and eight months before the first overt act.

Similarly, the Lenders had no direct contact with the company until January

of 2017, immediately before closing.  Indeed, some of the Lenders *never* had any direct contact with the company but were simply recruited as loan contributors by Bank of America.  This is so in spite of the fact that the operating entity of Company A took on all of the debt and should therefore have been the Lenders' customer throughout the course of the "conspiracy" if the Government's theory held any validity.  Indeed, it is hard to imagine how the Defendants could have jointly conspired to defraud a specific consortium of entities with whom they had no interaction for the first year and a half of their dastardly plot and over whose composition they had no influence or control.  Again, the Government's stated timeline is inconsistent with the Goal specified in the Indictment.

Moreover, the final overt act, which as set forth in detail *supra* is either fabricated or the result of significant confusion and error, allegedly takes place on July 29, 2016, although the "conspiracy" purportedly continues for more than a year, ending in September of 2017.[13]   Count Two, the Securities Fraud that was

---

[13] This end date is as random and internally illogical as the remainder of Count One. The Go Private Transaction cited in the Indictment closed on or about January 30, 2017.  The Indictment is devoid of any alleged conduct taking place after that date, and if the purpose of the conspiracy was supposedly to entice the Private Investment Firm into overpaying for Company A it is difficult to imagine how any activity taking place after that date could have been intended by the conspirators to achieve a goal that was theoretically already accomplished.  Indeed, if the Government's stated theory had any validity, one would expect the successful co-conspirators to have scattered and run with their ill-gotten gains after January 30, 2017, not sat peacefully doing their jobs after the "goal" had been reached.

supposedly the crime the conspiracy sought to commit, is alleged to occur between April 2016 and January 30, 2017, so that the Defendants are alleged to be conspiring to commit a specific crime not only long before they are alleged to have committed it, but long afterwards as well.  Simply put, the apparently arbitrary dates attached to the conspiracy count reveal that the Government cannot possibly be relying upon a non-duplicitous theory of prosecution.  This is particularly clear in light of the very different dates alleged for the Securities Fraud count.  Multiple and diverging interests and goals would *have* to be involved in Count One for the date structure to make anything resembling sense.  A unified goal within the alleged dates is a logical impossibility.

Finally, the theory that the Government frames as the conspiracy's goal utterly ignores the actual varied situations of the alleged conspirators.  Defendants Zaharis and Chivukula were employees of Company A with minimal, if any, ownership interest.  Defendant Bakhshi had an ownership interest but held no formal employment role with the company.  Defendant Parmar was a majority owner of Company A's shares and perhaps the conspiracy theory as pleaded could have applied to him (although of course one cannot conspire with oneself) – *if* he had taken his "ill gotten gains" and exited stage right.  Instead, *Mr. Parmar purchased nearly half of the newly private entity for the exact same "inflated" price paid by*

*the "victims".*[14]    Thus, following the Government's own claimed rationale, Defendant Parmar created a grand conspiracy so that he could pay a fraudulently inflated price for an ownership stake in a company that he already owned a larger majority interest in. And then, he continued to work for the company as its CEO. Once again, the Government cannot have it both ways – Mr. Parmar cannot be both an evil mastermind capable of pulling the wool over the eyes of a bevy of sophisticated and experienced investors and at the same time be the village idiot who defrauded himself and failed to notice.[15] In fact, none of the four defendants was similarly situated and it is preposterous to argue that they could have shared and worked cooperatively toward the specific common goal set forth by the Government.

---

[14] Indeed, Parmar paid nearly the same amount as the Private Investment Firm, although for a lesser ownership. The final Sources and Uses document reveals that CC Capital sources paid $88,687,476.20 for 50.7% of the shares and Defendant Parmar paid $86,174,551.70 for a total ownership by Parmar or Parmar entities of 49.3% of the newly private company. Under the Government's theory, Parmar apparently conspired to defraud himself. Moreover, the only money that went to Parmar from the transaction consisted of a deal fee in an amount that was entirely separate from and unaffected by the company's valuation.

[15] Mr. Parmar's role in the Go Private Transaction is also worth clarifying here. As both a majority shareholder and one of the buyers in the transaction, Mr. Parmar was not allowed to sit on or participate in the deliberations of Company A's Special Committee. It was the Special Committee that was responsible for obtaining bids or negotiating a sale price with the so-called Private Investment Firm. Although for different reasons, none of the remaining co-Defendants were on that Committee either. The existence of this independent group of Committee members, presumably outside of the "conspiracy" as none of them have been pursued by the Government, would have made successful execution of the conspiracy posited by the Government in Count One not just improbable, but nearly impossible.

In sum, reading the Indictment as a whole, it is clear that Count One contains multiple contradictory and divergent conspiracy theories and utterly fails to provide either the defense or a jury with sufficient guidance to determine what crime is charged and what theory actually underlies it. Count One must be dismissed as duplicitous.

## THE INDICTMENT MUST BE DISMISSED AS VIOLATIVE OF THE DEFENDANT'S 5TH AMENDMENT DUE PROCESS RIGHTS DUE TO THE OUTRAGEOUS MISCONDUCT OF THE GOVERNMENT

The Fifth Amendment to the United States Constitution provides that "[n]o person shall be ... deprived of life, liberty, or property, without due process of law." The United States Supreme Court has described due process as a "summarized constitutional guarantee of respect for those personal immunities which ... are 'so rooted in the traditions and conscience of our people as to be ranked as fundamental," and has held that due process safeguards against government action which violates "fundamental fairness" and is "shocking to the conscience." *Kinsella v. United States,* 361 U.S. 234, 246 (1960) (prosecution of civil dependent by court martial found to be unconstitutional as impermissible extension of Article I, Section 8, Clause 14 of Congressional regulation of Land and Naval Forces) (citing *Betts v. Brady,* 316 U.S. 455, 462 [1942] [overruled on other grounds]); *Rochin v. California,* 342 U.S. 165, 169 [1952] [citing *Snyder v. Massachusetts,* 291 U.S. 97, 105 [1934] [overruled on other grounds]).

27

The Supreme Court has further recognized that techniques employed by the Government during criminal investigations or prosecutions may violate the Due Process Clause where the governmental conduct "shocks the conscience." *Rochin,* 342 U.S. at 169; *see also United States v. Russell,* 411 U.S. 423, 431-32 (1973) ("[W]e may someday be presented with a situation in which the conduct of law enforcement agents is so outrageous that due process principles would absolutely bar the Government from invoking judicial processes to obtain a conviction.").   The Third Circuit has recognized this principle as well, stating that "[i]t is well settled in this Circuit that 'a criminal defendant may raise a due process challenge to an indictment against him based on a claim that the government employed outrageous law enforcement investigative techniques'" and has in fact reversed a conviction on such grounds. *United States v. Barbosa,* 271 F.3d 438,469 (3d Cir. 2001) (citing *United States v. Nolan-Cooper,* 155 F.3d 221, 229 [3d Cir. 1998]); *see also United States v. Twigg,* 588 F.2d 373, 378 (3d Cir. 1978) (reversing a conviction on due process grounds where the government provided the necessary chemicals and location for an informant to construct a methamphetamine laboratory, which the defendant was enticed by the informant to join to repay a debt); *United States v. Voigt,* 89 F.3d 1050, 1064 (3d Cir. 1996) (noting that while it is a difficult standard to meet, the "outrageous misconduct by law enforcement officers in detecting and obtaining incriminating evidence could rise to the level of a due process violation.")

28

(citing *Rochin,* 342 U.S. at 169).

Both the Supreme Court and the Third Circuit have recognized that governmental misconduct in violation of the Due Process Clause may be so "outrageous" as to warrant the dismissal of an indictment or the reversal of a conviction. *See Russell,* 411 U.S. at 431- 32; *Twigg,* 588 F.2d at 378-79 (noting that "fundamental fairness will not permit any defendant to be convicted of a crime in which police conduct was 'outrageous'").

More than half of the overt acts charged in the First and Second Counts of the Indictment – four out of seven – are based on emails sent between some combination of the defendants.  These emails, sent between constellationhealthgroup.com email addresses rather than the email addresses used for and owned by Company A, were stored on a private domain server, constellationhealthgroup.com, which had been established by Defendant Parmar on July 5, 2013 and which was neither owned nor used by Company A.  In fact, all Company A employees, including management and the defendants charged herein, used email addresses at the domain name of orionhealthcorp.com for work-related activity.  The constellationhealthgroup.com domain was solely privately owned and used.  Indeed, of the handful of people with constellationhealthgroup.com email addresses, the vast majority were outsiders to Company A, and instead were friends or associates of Mr. Parmar.  The only time that email addresses were granted to people with a connection to Company A was

29

for the purposes of the Go Private Transaction itself, as the early negotiations were private and not known at a company-wide level.  The only mode of access to the electronic storage of constellationhealthgroup.com emails was through the use of login information and passwords belonging to Parmar, use of which permitted access to the Microsoft storage facility of the service provider.

18 U.S.C. §2701 makes it a crime to either access without authorization, or exceed an authorization to access stored communications, such as emails.  Here, Chinh Chu, Truc To,[16] and others at CHT and CC Capital violated this provision by illegally accessing the email communications stored at the domain of constellationhealthgroup.com.   These individuals were fully aware that their access and use of these stored communications was unlawful.  Even if it had not been patently obvious, this was communicated to them, through counsel, after it was discovered that they had misappropriated the domain for themselves.  On October 12, 2017, John Altorelli, attorney for Chinh Chu and CC Capital responded to a cease and desist letter by stating that the domain and emails would "remain in a 'frozen' state until an appropriate determination can be made as to the history, ownership, custody and the like."  Altorelli further promised that, if the parties couldn't agree

---

[16] Indeed, Truc To was so brazen in his use of this private domain that he gave himself an email address on it and then used that address to respond to an email sent to Mr. Parmar by Parmar's attorney.

30

on the legalities, they would "seek judicial assistance."[17]

Rather than seeking "judicial assistance" or leaving the domain frozen, it is clear that the stolen emails, and potentially other information stored at the constellationhealthgroup.com domain, was then provided to the Government. Whether this was done voluntarily or in exchange for some grant of prosecutorial immunity or other incentive is not known to the defense, but no such agreement has been furnished to date as *Brady* material.[18]  A similar situation was discussed by the Court in *United States v. Christie*, 2009 U.S. Dist. LEXIS 21747 (N.J. Dist. Ct. March 17, 2009), exemplifying proper prosecutorial conduct in a scenario involving improperly obtained emails.  In *Christie*, the prosecutor received an email proffering private email communications for Governmental use; he immediately rebuked the sender, informed him that the Government was not permitted to receive such communications, and instructed him not to collect any such emails on the Government's behalf.  *Id.* at *12-13.  Here, the Government has had no such qualms

---

[17] The email exchange between Mr. Parmar's counsel and Altorelli on this issue is attached hereto as Exhibit C.

[18] It is, of course, possible that the fact that these emails were illegally obtained was concealed from the Government when they were first provided.  However, once emails from the constellationhealthgroup.com domain were cited in the Complaint, Mr. Parmar's counsel repeatedly informed the Government that the emails constituted stolen property.  It appears that the possession and use of stolen property is not a concern for the representatives of the Government here, in that stolen emails are again cited in the Indictment and therefore presumably must also have been presented to the Grand Jury, particularly as they form the basis of several of the overt acts enumerated in Count One.

31

Case 2:18-cr-00735-MCA   Document 107-1   Filed 04/15/21   Page 34 of 52 PageID: 898

and has instead intentionally and repeatedly used stolen property in the course of its prosecution of the instant matter.

Some or all of the stolen emails must necessarily have been presented to the Grand Jury as evidence underlying the Indictment, in order to constitute overt acts in furtherance of Counts One and Two. It is impossible to know how thoroughly the presentation of these emails tainted the Grand Jury's decision, but it is clear that their use by the Government, particularly after having been informed that the emails not only constituted stolen property but that the "victims" *knew* that their possession of the emails was illegal should certainly qualify as outrageous misconduct by the Government. Moreover, the Government chose to embark on this course in the face of overwhelming evidence that the purported victims possessed ample information regarding the accurate financial condition of Company A, as set forth in further detail *supra*, and that it was the "victims" who pushed the transaction through while the defendants were attempting to delay or cancel the transaction.[19] Were the average citizen to learn that stolen property could be possessed and used by the Government with impunity, particularly in a situation in which there was no clear harm to any victim, confidence in the criminal justice system would be gravely damaged.

---

[19] There is ample evidence of the defendants' efforts to cancel or delay the transaction and the insistence of the purported "victims" on proceeding in the stolen emails, as well as in other discovery provided by the Government, including an FBI interview of Truc To in which he revealed that Chinh Chu was dedicated to the transaction proceeding regardless of any evidence of fraud.

Shocking to the conscience as it is, the Government's use of emails blatantly stolen from a privately owned domain is not the extent of the outrageous misconduct permeating the prosecution of this case from its inception.  From its earliest interactions with the defense, the Government has shown a marked disinterest in either investigating any potential deficiencies in its evidence or confronting the sometimes inconsistent and sometimes actively illegal actions of the purported victim.  For example, at the bail hearing held on May 31, 2018, the Government chose to rely on an anonymous tip in the course of arguing that Mr. Parmar was a flight risk.  Yet, despite having had over a week to investigate the tip – which contained claims that would have been simple to verify and thus show the tip was reliable – the Government utterly failed to in any way investigate the tip and instead simply offered it as "proof" of their position.  The tip, of course, had no basis in reality.

At that same bail hearing, then-AUSA Paul Murphy argued to the Court that the "victims" had been completely fooled by the alleged value inflation (*see* Bail Tr. 40) and maintained this representation in the face of the points raised by the defense regarding both the Financial Times article that had come out before the transaction closed and the Delaware Chancery Court filings which made claims of fraud similar to those herein.  Significantly, what neither the Court nor defense counsel knew at the time of this bail argument was that the Department of Justice had actually warned

33

one of the "victims" – Bank of America – on two separate occasions before the transaction closed.  This information, which went to the heart of the Government's claim that Mr. Parmar was a wily trickster whose skills at deception made him a flight risk, was deliberately withheld[20] from the Court and the defense as it would have detracted from the Government's chosen narrative.

The Government's misconduct has extended beyond misrepresentation and has gone so far as to sanction criminal conduct by the head of the most likely candidate for the entity referred to as the Private Investment Firm, Chinh Chu.  In September of 2018, Chu hired MOSAIC, a military contracting covert surveillance company, to follow and harass Mr. Parmar as part of an ongoing campaign to pressure him to plead guilty.[21]  The surveillance conducted by MOSAIC operatives – all of whom were unlicensed in the State of New Jersey and one of whom was a convicted felon – involved not just "open tail" following of Mr. Parmar and people close to him, but also hacking into his home security system and computer network.

---

[20] It would, at best, strain credulity to argue that the Government, having spent months putting this "complex" fraud scheme together, would have neglected to familiarize themselves with the activities of their coworkers on that very same case.
[21] "Campaign" is used advisedly here, as Chu or other individuals acting on his behalf, most notably his personal counsel John Altorelli, have alternated between repeated threats and offers of "sympathy letters" to be drafted for the Government in an effort to persuade Mr. Parmar to enter a plea of guilty and end the case before Chu could potentially face a witness stand.  Not only has the Government allowed this to go on, and from the context of some of the threats, leaked at least some information to Chu or his colleagues, but the Government has repeatedly stated that they have no interest in hearing anything negative about Chu or his conduct.

Mr. Parmar's emails and other electronic data were again stolen and compromised, in addition to the electronic theft that had already taken place from the constellationhealthgroup.com domain. Chu then arranged for one of the MOSAIC employees, who was about to enter into an agreement with Mr. Parmar's counsel regarding what he had been hired to do, to be intimidated. The employee withdrew his cooperation and Chu, shockingly, submitted an affidavit that admitted to having hired MOSAIC.[22] The affidavit admitted only to the dates when the MOSAIC operatives had been seen, but it was a clear admission, nonetheless. Stunningly, when this criminal conduct was brought to the attention of the Government by Mr. Parmar's counsel, along with a request that an investigation into the matter be opened, not only did the Government fail to investigate – they failed to respond at all.

This refusal to investigate and pursue illegal conduct by Chu extended beyond Chu personally and to others within his organization, as is clear from the scenario of the stolen emails. Whoever accessed and downloaded the contents of private emails stored on the constellationhealthgroup.com domain on behalf of Chu and his associates had unquestionably committed violations of both federal and state penal code provisions. Yet no criminal prosecution of the responsible party or parties has

---

[22] The affidavit submitted by Chu admitting to the retention of MOSAIC is attached hereto as Exhibit B.

taken place to date, despite the clearly illegal nature of the conduct in question. Apparently, in the eyes of the Government, so long as a crime is committed against Mr. Parmar, the Government will extend *carte blanche* to the perpetrator(s).

Then, of course, the Grand Jury presentation that presumably took place late in 2018 was rife with errors and omissions. As noted *supra*, the single overt act alleged to have taken place in New Jersey – a July 29, 2016 meeting between Mr. Parmar, Zaharis, and a representative of the mysterious Private Investment Firm – indisputably did not take place in the State of New Jersey at all. Thus, in order to have voted on the Indictment as it stands, the Grand Jury must have been presented with testimony that was either carelessly or deliberately false. A deliberate falsehood seems more likely as there is no other act that ties this purported conspiracy to the District of New Jersey.[23] The Grand Jury presentation similarly depended on the usage of the stolen emails provided in some way to the Government in spite of the express promise of John Altorelli to leave the emails and the domain in a "frozen" state unless there was some judicial intervention. Again, if such a judicial intervention occurred, the defense remains unaware of it.

Moreover, as the Government has steadfastly refused to provide a valuation for Company A, it seems highly unlikely, if not impossible, that any valuation was

---

[23] No one disputes that Mr. Parmar owns a residence in New Jersey, but that is hardly a conspiratorial act.

provided to the Grand Jury.  While a prosecutor generally has extremely broad latitude in determining what evidence to present to a Grand Jury, one cannot present false evidence and evidence that would directly exculpate a defendant should be presented as well to preserve the integrity of the Grand Jury proceeding.[24]  Here, valuation goes to the heart of the theory plead by the Government's conspiracy count; that the goal of the conspiracy was to falsely inflate the value of Company A. It is impossible to adequately argue that the value was falsely inflated without also stating what the true value was.  Yet there is no reason to believe that this essential evidence was presented to the deliberating Grand Jurors and every reason to believe that it was omitted.

Fascinatingly, even if one were to accept that the Government was somehow unable to develop a value for Company A before filing the Complaint in this matter, a clear and simple route to determining baseline revenue existed well before the instant Indictment was filed and thus could have been brought before the Grand Jury. Company A and its subsidiaries were dismantled and sold at two separate auctions overseen by the Bankruptcy Court in the Eastern District of New York, with the

---

[24] There can be no question that evidence that the purported victim was well aware of the actual value of Company A, even if discerning that value was apparently more difficult for the Government than for a Financial Times reporter, would negate any prosecution for securities fraud. *See, e.g.*, *Straub v. Vaisman & Co.*, 540 F.2d 591 (3d Cir. 1976) (if plaintiff has actual knowledge of material facts, defendant's failure to disclose that information will not create a cause of action).

latest such auction taking place in the summer of 2018. The Government was involved in and actively engaged in the Bankruptcy Court proceedings almost from the inception and thus privy to all of the filings therein. A necessary part of the sale of each asset at auction was a representation of then-current *actual revenue* of the entities being auctioned off. As these revenue figures were for entities that had at that point entered Chapter 11 bankruptcy and suffered the attendant revenue fall-off that such an action necessarily entails, they can reasonably form a simple – and easily accessible – base figure for valuation. Indeed, any valuation based off of these figures would necessarily fall on the low end of Company A's actual value a year and a half earlier, when it was not under the cloud of bankruptcy. Yet the Government has persisted throughout these proceedings in claiming that valuation is impossible to determine, while simultaneously also claiming that the alleged conspirators inflated the Company's value and defrauded the victims. Presumably, as the Government has been unwavering in this response to Mr. Parmar's enquiries, a similarly incomplete and misleading view of the evidence was presented to the Grand Jury in order to obtain the instant Indictment.

It is unclear what lies behind the Government's blatant and outrageous misconduct throughout this prosecution. What is clear is that it exists. Because the Government's continued and persistent use of stolen personal property in the course of pursuing the instant prosecution, presentation of false evidence and refusal to

present necessary evidence, and refusal to investigate or even consider the repeated

criminal conduct of one of the purported victims constitutes outrageous misconduct

and is violative of due process, dismissal of the Indictment is the appropriate remedy.

## THE INDICTMENT SHOULD BE DISMISSED UNDER THIS COURT'S SUPERVISORY POWER DUE TO THE GOVERNMENT'S PERVASIVE MISCONDUCT

The federal courts have long recognized that they possess a "supervisory

power" distinct from any other powers granted by the Constitution, statute, or federal

rules of procedure. The United States Supreme Court described this power as follows

in *McNabb v. United States,* 318 U.S. 332 (1943):

> The civilized conduct of criminal trial cannot be confined within mechanical rules. It necessarily demands the authority of limited direction entrusted to the judge presiding in federal trials, including a well-established range of judicial discretion, subject to appropriate review on appeal, in ruling upon preliminary questions of facts.

*Id.* (citing *Nardone v. United States,* 308 U.S. 338, 342 [1939]). The Supreme Court

has noted that the purpose of the supervisory power is to: (1) implement a remedy

for violation of recognized rights; (2) preserve judicial integrity by ensuring that a

conviction rests on appropriate considerations validly before the jury; and (3) deter

illegal conduct. *United States v. Hasting,* 461 U.S. 499, 505 (1983).

This power has been held to permit the courts to dismiss an indictment where

appropriate. *See United States v. Watkins,* 339 F.3d 167, 180 (3d Cir. 2003)

39

(Nygaard, J. concurring) ("[T]he court's supervisory powers provide authority to dismiss indictments, and when warranted, to dismiss with prejudice."); *see also United States v. Serubo,* 604 F.2d 807, 817 (3d Cir. 1979) (holding that "federal courts have an institutional interest, independent of their concern for the rights of a particular defendant in preserving and protecting the appearance and the reality of fair practice before the grand jury" which may justify dismissal of an indictment); *United States v. Flores-Rivera,* 56 F.3d 319, n.7 (1st Cir. 1995) (noting the court's ability under its supervisory power to dismiss an indictment due to government misconduct) (citing *United States v. Santana,* 6 F.3d 1, 11[1st Cir. 1993]); *United States v. Estepa,* 471 F.2d 1132 (2d Cir. 1972) (reversing a conviction and dismissing the indictment under the supervisory power as a result of government misconduct).

Dismissal pursuant to a court's supervisory power may be appropriate on the basis of, among other things, government misconduct or a violation of *Brady v. Maryland*. *See Virgin Islands v. Fahie,* 419 F.3d 249, 258-59 (3d Cir. 2005); *United States v. Santana,* 6 F.3d 1, 11 (1st Cir. 1993); *United States v. Darui,* 614 F. Supp. 2d 25, 39 (D. D.C. 2009); *United States v. Kabinto,* 2009 U.S. Dist. LEXIS 66610, at *3 (D. Ariz. 2009) (citing *United States v. Fernandez,* 388 F.3d 1199, 1238-39 (9th Cir. 2004); *United States v. Kearns,* 5 F.3d 1251, 1253 (9th Cir. 1993); *United States v. McLaughlin,* 910 F. Supp. 1054, 1057 (E.D. Pa. 1995) (citing *United States*

*v. Isgro,* 974 F.2d 1091, 1097 [9th Cir. 1992]).

In the Third Circuit, dismissal for government misconduct under the supervisory power must meet the same standard as dismissal for a *Brady* violation - namely, the defendant must establish that the misconduct was willful and that it resulted in prejudice to the defendant. *Virgin Islands v. Fahie,* 419 F.3d 249, 258-59 (3d Cir. 2005). Mr. Parmar contends that both of these prongs have been established here.

First, the Government's misconduct in the course of this prosecution has clearly been willful. The Government has been repeatedly informed, both informally and via court filings, that the emails upon which it relies for the majority of its overt acts were stolen from a private server in violation of United States law. Other overt acts, such as the presentation and spreadsheet quoted in the instant Indictment, were marketing materials directly contradicted by the volume of accurate valuation data contained in Pegasus and in monthly data provided to the due diligence team. Further, the Government has been informed in detail about the existence and nature of Pegasus, as well as the fact that Pegasus was a literal open book during the due diligence process. Having issued the warnings to Bank of America themselves, the Government can hardly claim to be unaware that one of its primary "victims" chose to proceed with the Go Private Transaction despite ample warning and without delay – a choice that only makes sense if the "victim" was

41

already well aware of the true value of Company A.  The Government has persisted in its refusal to place any kind of valuation on Company A and has deliberately produced a duplicative and internally contradictory charging instrument based in part upon falsified evidence.  Finally, the Government has made it abundantly clear that the purported "victim" Chinh Chu has a free license to commit or order the commission of harassment, intimidation, computer crimes and potentially other criminal acts without needing to fear that that any prosecutorial action will be taken. In short, as it is unlikely that multiple AUSAs are spectacularly incompetent, the inevitable conclusion is that the Government's conduct here must be willful.

Further, as set forth in more detail *supra*, the Government's misconduct has resulted in substantial prejudice to Mr. Parmar.  A full and accurate presentation of evidence to the Grand Jury, without the use of stolen property or falsehoods and with appropriately delineated theories of prosecution, could not result in an indictment. Mr. Parmar's life has been gravely impacted by living under the shadow of criminal prosecution for more than two and a half years, not to mention the immense financial and reputational damage that he has suffered.

In sum, this case cries out for the use of the Court's supervisory power, and the Indictment should be dismissed.

## EMAILS RELIED UPON BY THE GOVERNMENT CONSTITUTE STOLEN PROPERTY AND MUST BE SUPPRESSED

18 U.S.C. §2701 makes it a crime to either access without authorization, or

exceed an authorization to access stored communications, such as emails.  As the Court in *Lynn v. Gateway Unified Sch. Dist*., 2011 U.S. Dist. LEXIS 143282, *14, 2011 WL 6182348 (E.D.C.A. 2011) explained:

> When a party wrongfully obtains documents outside the normal discovery process, a number of different types of sanctions are available. These include dismissal of the action, the compelled return of all documents, restrictions regarding the use of the documents at trial, disqualification of counsel and monetary sanctions. Courts have considerable discretion in choosing the appropriate sanction under its inherent authority and may, for example, dismiss claims, enter default judgment, and award attorney's fees and costs.

*Id.* At *14, *citing United States v. Shaffer Equip. Co*., 11 F.3d 450, 461-62 (4th Cir. 1993); *Fayemi v. Hambrecht & Quist, Inc*., 174 F.R.D. 319, 324-27 (S.D.N.Y. 1997); *Glynn v. EDO Corp*., 2010 U.S. Dist. LEXIS 86013, 2010 WL 3294347 (D. Md. 2010).

The Court in *Lynn* examined a very similar situation to the case at bar, where Plaintiff's counsel was in receipt of 39,312 emails, which were illegally stolen from the defendant.  The Court reasoned that Plaintiff's counsel was in possession of stolen property, in violation of California Penal Code 496 and 502, in disqualifying counsel and prohibiting Plaintiff from introducing "any evidence, including cross-examining any witnesses, about the contents of these emails."

"A court must be able to sanction a party that seeks to introduce improperly obtained evidence; otherwise the court, by allowing the wrongdoer to utilize the

43

information in litigation before it, becomes complicit in the misconduct." *Am. Unites for Kids v. Lyon*, 2015 U.S. Dist. LEXIS 171614, *26, *quoting Fayemi v. Hambrecht & Quist, Inc*., 174 F.R.D. 319, 324 (S.D.N.Y. 1997).  This principle should be most carefully adhered to when the conduct of the prosecution is at issue.   The U.S. Supreme Court has recognized the obligation of a prosecutor to conduct a criminal prosecution with propriety and fairness.

> "He may prosecute with earnestness and vigor - indeed, he should do so. But, while he may strike hard blows, he is not at liberty to strike foul ones. It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one. . ."

*Berger v. United States*, 295 U.S. 78, 88 (1935).

Moreover, while the Fourth Amendment's protections against the improper search and seizure of private property ordinarily applies only to shield a citizen from Governmental activity, it is well-established that if a private party acts as an instrument or agent of the Government then the Fourth Amendment protections extend to that private party's actions.  *See United States v. Jacobsen*, 466 U.S. 109, 113-14 (1984); *United States v. Archibald*, 2017 U.S. Dist. LEXIS 63392 (N.J. Dist. Ct. April 17, 2017).  Although the Third Circuit has yet to explicitly set forth a test for establishing when a private actor can be viewed as an agent of the Government for a Fourth Amendment analysis, it has tacitly approved of the test common to the majority of the other Circuits; 1) whether the government knew of

44

and acquiesced in the intrusive conduct, and 2) whether the party performing the search intended to assist law enforcement efforts or to further his own ends. *See United States v. Mitchell*, 625 F. App'x 113, 117 (3d Cir. 2015); *Archibald, id.* at *4.

As set forth in further detail *supra*, the emails relied upon by the Government in many of the alleged overt acts were taken without permission or authority by a private actor and provided to the Government. The fact that the Government was not involved in the initial illicit access, at least insofar as Mr. Parmar is aware, does not absolve the evidence itself of taint. This is particularly so where it was made clear to both the takers and the Government that the emails constituted stolen property illegally taken from a privately owned email domain in clear violation of United States law. The importance of the Government's knowledge on this issue is heightened by both their use of evidence obtained from the emails and by the ongoing resistance by the Government to curtailing the surveillance and hacking activities of the purported "victims" through MOSAIC and/or other agents.[25] The evidence involved here remains stolen property and its use should be suppressed.

---

[25] The Government was informed of both the status of the constellationhealthgroup.com server and of the hacking and surveillance activities MOSAIC operatives were undertaking and chose not to take action – unless, of course, one counts the receipt and ongoing usage of stolen property as taking action. *See* October 29, 2018 Letter, attached hereto as Exhibit D.
.

In the alternative, a hearing should be held regarding the exact circumstances surrounding the retrieval of the emails and the manner in which they were obtained by the Government.[26]  Particularly in light of the ongoing surveillance and hacking activity undertaken by the same set of actors who had stolen the initial set of emails and electronic files, with the addition of MOSAIC, the question of when and how the Government became involved in this ongoing activity is of grave importance. The question of whether or not the Government was complicit in the recovery and distribution of these emails, or in the hacking that later took place, again without penalty, certainly calls for a hearing in the event that the Court is not inclined to suppress the emails and preclude their usage at trial on papers.  The very real probability that the Government's knowledge of the stolen nature of the emails in question, coupled with their subsequent tolerance of ongoing illegal conduct, has acted to convert the private actors who committed the thefts into agents of the Government who are subject to Fourth Amendment restrictions demands a hearing. Without taking sworn testimony, and potentially additional discovery, on the topic of the recovery of the emails in question – and any other emails or documents that the Government intends to use that were taken from the private

---

[26] It is perhaps significant that no cooperation agreement or issuance of clemency to the thieves has been produced by the Government, yet no prosecution of the takers has commenced, thus leaving open ample ground for examination of witnesses if a hearing is ordered.

constellationhealthgroup.com domain or from Mr. Parmar's private servers – the question of whether the Government either knowingly supported or actually requested the private theft of this property for their use will remain open, as will the status of the private actor thieves as agents of the Government. In order for the Court to effectively rule on Mr. Parmar's motion to suppress the stolen emails and preclude their use at trial, the record should be fully developed by a hearing to explore this issue.

## THE FORFEITURE ALLEGATION IS OVERBROAD AND ATTEMPTS TO SEIZE ASSETS UNCONNECTED TO THE INDICTMENT'S THEORY

The instant Indictment contains a forfeiture allegation which seeks the seizure of "a sum of money equal to the amount of proceeds traceable to the offenses charged" AND multiple additional assets, which it describes as "property, real and personal, that constitutes or is derived from proceeds traceable to the commission of the charged wire fraud and securities fraud offenses." The forfeiture allegation seeks the seizure of four parcels of real property and the contents of six separate designated bank accounts. The assets thus sought to be forfeited go well beyond the securities fraud and wire fraud acts alleged by the Government in the instant Indictment.

As an initial matter, as briefly noted *supra*, the real properties designated in the forfeiture allegation have separately been the subject of an *in rem* proceeding filed by the Government in New Jersey District Court. The Government's conduct of that proceeding is somewhat instructive here, as all four properties were initially

47

named as defendants in the *in rem* proceeding.  However, on June 5, 2020, the Government tacitly acknowledged its inability to trace two of these real properties to the allegations of fraudulent activity that underlay both the *in rem* action and the instant Indictment by filing an Amended Complaint dropping two of the properties from the proceeding and removing all references to them from the Amended Complaint.  Those two properties, located at 18 and 19 Colts Gait Lane and 2 River Terrace Unit 12J, should likewise be removed from the forfeiture allegation[27] in the instant proceeding, as the same theories and allegations underlie both the *in rem* action and the Indictment.

Further, the multiple bank accounts whose forfeiture is sought herein by the Government were held in the name of various entities not alleged to be affiliates or subsidiaries of Company A.  Perhaps most significantly, charts separately prepared by the Government to demonstrate the Government's own view of the funds flow into these accounts show that they are commingling funds from different sources, including funds that did not under any theory of events originate in the activity alleged by the Indictment.  For example, according to the Government, just over 4 million dollars was deposited by Anil Sharma, who is not a defendant herein, nor

---

[27] Indeed, neither of the properties described fit within either the time frame or the plead allegations in Counts Two and Three of the Indictment.  The Colts Neck property was purchased by Mr. Parmar in 2000, decades before the alleged fraudulent conduct, and the apartment at 2 River Terrace was purchased on February 19, 2016.

was he connected in any way to Company A, into an account held by Ranga Bhoomi at M&T Bank.  Ranga Bhoomi is a business entity unrelated to Company A or its subsidiaries.  In Ranga Bhoomi's account, Mr. Sharma's funds were commingled with funds from a law firm, and later transferred to another entity's account. Although this flow of funds did, in some form, eventually land in one or more of the accounts designated in the forfeiture allegation, the instant Indictment and the Government's underlying theories are devoid of any justification for seizing or continuing to hold funds that did not originate with any of the defendants and were not part of the Go Private Transaction or, indeed, part of any asset deriving from Company A.

Thus, the overbroad forfeiture allegation must be stricken from the Indictment and any improperly seized funds, such as those originating from a non-party, non-witness, non-actor in the alleged events such as Anil Sharma, must be unfrozen and immediately released.

### LEAVE TO FILE ADDITIONAL MOTIONS AS APPROPRIATE

Mr. Parmar hereby respectfully reserves the right to file further motions not yet contemplated, including the right to move to suppress evidence offered by the Government, that may arise due to discovery not yet provided or as other legal issues arise.

## CONCLUSION

For all the reasons stated herein, Mr. Parmar respectfully requests that this Court issue an Order dismissing the instant Indictment or, in the alternative, suppressing the use of the stolen emails or ordering that a hearing be held regarding their recovery, and for such other and further relief as this Court deems appropriate.

Dated:      April 15, 2021
            New York, New York

Respectfully submitted,

Jeffrey C. Hoffman
Windels Marx Lane & Mittendorf LLP
*Attorneys for Defendant Paul Parmar*
156 West 56th Street
New York, NY  10019
T. 212.237.1000
jhoffman@windelsmarx.com

Timothy Parlatore and Maryam Hadden
Parlatore Law Group LLP
*Attorneys for Defendant Paul Parmar*
One World Trade Center, Suite 8500
New York, NY  10007
T: 212.603.9918
Timothy.parlatore@parlatorelawgroup.com
Maryam.hadden@parlatorelawgroup.com