UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY
-----------------------------------------------------------X
ALPHA CEPHEUS, LLC
FIRST UNITED HEALTH, LLC,
CONSTELLATION HEALTH, LLC
NAYA CONSTELLATION HEALTH, LLC and
CONSTELLATION HEALTH INVESTMENT,
LLC,

          Plaintiffs,                             No.: 18-cv-14322 (MCA)

                 v.

CHINH CHU,
TRUC TO,
DOUGLAS NEWTON,
JAMES STEPIEN,
VICTOR CARDONA, and
JOHN DOE 1-10,

          Defendants.
-----------------------------------------------------------X

**DECLARATION OF CHINH CHU IN SUPPORT OF DEFENDANTS CHINH CHU AND DOUGLAS NEWTON'S OPPOSITION TO PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION**

       I, CHINH CHU, hereby affirm under penalty of perjury in accordance with the laws of the United States, that the following is true and correct:

1.     I am the founder and Senior Managing Director of CC Capital Management LLC ("CC Capital"), a private investment firm based in New York City. Prior to founding CC Capital, I worked in private equity for twenty-five years at Blackstone Group L.P., where I ultimately served as co-chairman of the firm's Private Equity Investment Committee and on the firm's Executive Committee. I submit this affidavit in support of Defendants' opposition to the October 19, 2018 Order to Show Cause (the "OSC") in the above-referenced matter. The OSC accuses me of extraordinary wrongdoing. As set forth below, these accusations are completely false.

1

Case 2:18-cv-14822-MCA-MAH  Document 20-1  Filed 10/24/18  Page 2 of 6 PageID: 195

**The CHT Transaction**

2.     Beginning in and around early 2016, CC Capital identified Constellation Healthcare Technologies, LLC ("CHT") as a potential acquisition.  At that time, I first became acquainted with Paul Parmar in his capacity as Chief Executive Officer of CHT.  CHT was a publicly traded company prior to 2016.  CC Capital and the Board of Directors of CHT negotiated a "Go-Private" transaction in which the shares of CHT common stock would be cancelled and converted into the right to receive cash and a promissory note, and the publicly traded company would be converted into a private entity.

3.     On November 24, 2016, CC Capital consummated this deal (the "Go-Private Transaction"), and the transaction closed on January 30, 2017.  At closing, CC Capital controlled 50.7% of the economic and 55% of the voting interests in CHT.  As part of the financing for the transaction, CC Capital contributed approximately $82 million in equity, most of which came from me personally.  A consortium of financial institutions including Bank of America provided another approximately $130 million in debt.  I am aware of legal filings that say that Mr. Parmar and entities he controlled stood to receive approximately $100 million in the transaction.

**Parmar's Fraud**

4.     Subsequent to closing of the CHT transaction, facts emerged indicating that Mr. Parmar had engaged in a complex and brazen fraud to induce CC Capital to acquire a controlling interest in CHT.  Mr. Parmar resigned from CHT, and an outside forensic investigation team was brought in to determine the extent of the fraudulent activity.  Declaration of Timothy J. Dragelin ("Dragelin Decl."), ¶ 88 (attached as Exhibit 1).  As this fraud unraveled, on March 16, 2018, certain affiliates of CHT (the "CHT Debtors") filed voluntary petitions for relief under Chapter 11 of the bankruptcy code in the United States Bankruptcy Court for the Eastern District of New York.  The debtors in the bankruptcy proceeding attributed CHT's bankruptcy to Mr. Parmar's fraudulent conduct.  *Id*. ¶¶ 9, 88-91, 111.

5.     Prior to bankruptcy, CHT retained a Chief Restructuring Officer ("CRO") and brought in an independent director to ensure proper corporate governance and absence of conflicts in connection with the decision about whether to file for bankruptcy and how the CHT debtors would proceed after filing bankruptcy.  Neither I, nor anyone affiliated with CC Capital, were decision makers regarding whether CHT or any of its affiliates would file for bankruptcy or any litigation or claims that the CHT debtors are pursuing against third-parties including Parmar.

6.     Since the March 2018 bankruptcy filing, the CHT Debtors have continued to be managed by the CRO with the oversight of an independent director in proceedings administered by United States Bankruptcy Judge Alan Trust.  There is an active creditors' committee in these bankruptcy proceedings.  Neither I nor anyone else affiliated with CC Capital plays

any role on the creditor's committee which represents the interests of the creditors of the CHT debtors, including the consortium of lenders in the Go-Private Transaction.

### The Criminal Charges and Other Litigation against Parmar

7.  On May 16, 2018, the United States Attorney's Office for the District of New Jersey brought securities fraud charges against Mr. Parmar in connection with the Go-Private Transaction. Attached as Exhibit 2 is the Criminal Complaint filed against Mr. Parmar and several co-conspirators. CC Capital is the "Private Investment Firm" referred to in this Complaint as the victim of Mr. Parmar's alleged securities fraud.

8.  The Securities and Exchange Commission ("SEC") similarly brought a civil action against Mr. Parmar on May 16, 2018, charging Parmar with securities fraud in the Go-Private transaction. Attached as Exhibit 3 is a Complaint filed by the SEC against Paul Parmar on May 16, 2018. CC Capital is "Investor-1" referred to in this Complaint as the victim of Mr. Parmar's alleged securities fraud.

9.  In the bankruptcy proceeding, the CHT Debtors have also sued Mr. Parmar and certain of his affiliates for fraud and theft in connection in the Go-Private transaction. Attached as Exhibit 4 is the Complaint in the Adversary Proceeding against Mr Parmar and others in the bankruptcy.

10. I understand that Mr. Parmar was arrested on May 16, 2018 based on the Criminal Complaint, and then was then incarcerated for several months until he was released after posting bail in July 2018. Attached as Exhibit 5 is the Amended Order Setting Conditions of Release in Mr. Parmar's criminal case in the United States District Court for the District of New Jersey. This Order requires Mr. Parmar (i) to post bail in the amount of $3,462,911.00 as a condition of his release and (ii) to remain at his residence in New Jersey at all times, except to meet with counsel and other limited exceptions.

### Mr. Parmar's False Accusations of Harassment and Intimidation

11. Mr. Parmar's conduct has exposed me and my firm to significant financial and reputational harm. On top of that, earlier this year I became concerned that Mr. Parmar posed a potential threat to me and my children, and that he might be engaged in ongoing wrongful conduct targeting me and my firm.

12. I consulted with a security consulting firm to get recommendations about how to address these issues. Following their advice, I engaged the firm to conduct a cybersecurity analysis and determine whether my computer or phone might be bugged or otherwise monitored. The firm also conducted background checks regarding Mr. Parmar. I also used the firm to arrange for an off-duty New York City Police Officer to provide protection for my children. These protection services are ongoing.

3

13. In July, Mr. Parmar was released from jail. During the summer, he and entities associated with him began to make legal filings with extraordinary, false accusations that I was the mastermind behind a fraud involving CHT and that Mr. Parmar was the victim, rather than the culpable party. Given these developments, I became concerned that Mr. Parmar was becoming increasingly desperate and might take rash action. In light of such concerns, the security firm advising me recommended that I consider surveillance to try to assess the potential threat to me or my family from Mr. Parmar's activities. In discussing this recommendation, I told the security firm that any such activities would have to be lawful. They assured me that any activities undertaken by them, or at their direction, would be lawful.

14. Because Mr. Parmar's temporary release conditions confined him to his residence with limited exceptions, the security firm believed that he might rely on others to coordinate activities on his behalf. Thus, the security firm recommended that it arrange for surveillance of Mr. Parmar's residence and the activities of individuals who might come and go from his residence. I was told that this surveillance would be undertaken under proper lawful protocols, including notification to, and coordination with, the local police department.

15. I have been told that this surveillance occurred for four days, from September 8-11. When the surveillance concluded, I was provided a high-level summary. I did not authorize, and I am not aware of, any further surveillance activities of Mr. Parmar, people affiliated with Mr. Parmar, or any member of Mr. Parmar's family beyond these four days in September.

16. To be clear, I have never authorized or instructed any security firm or other individual to engage in activities in regards to Mr. Parmar beyond the above-described security services, nor am I aware of any conduct that occurred beyond these services.

17. To that end, I can unambiguously attest that:

   a. I have never authorized or instructed anyone to threaten or harass Mr. Parmar or his family in connection with this litigation, his criminal proceeding, or otherwise. To my knowledge, no such threats or harassment have ever occurred, and the security firm told me that nothing that they did in the course of performing security services involved threatening or harassing Mr. Parmar or his family.

   b. I have never authorized, instructed, or known about any "hacking" or other interception of Mr. Parmar's wireless network, or any other of Mr. Parmar's telephonic or digital communications. To my knowledge, no such "hacking" occurred, and the security firm has expressly told me that nothing that they did in the course of performing security services involved "hacking" or otherwise

4

Case 2:18-cv-14922 MCA-MAH Document 20-1 Filed 10/24/18 Page 5 of 6 PageID: 198

monitoring or misappropriating the electronic communications of Mr. Parmar or his family or anyone else.

      c.      Contrary to Mr. Parmar's claim, I have never suggested to Mr. Parmar that I worked with either the "Chinese Mafia" or "ex-NSA agents" who could kidnap, interrogate, or otherwise threaten Parmar or hack into his network, laptop or phone. Nor have I personally threatened the safety or interests of Mr. Parmar or his family in any other way.

18.      To be absolutely clear, I have reviewed Mr. Parmar's October 19, 2018 affidavit and his description of an event that he says occurred on October 10, 2018 in the train station parking lot in Hazlet, New Jersey. I have no knowledge of this incident and, again, I specifically and unequivocally deny that either I or anyone acting at my direction threatened Mr. Parmar or anyone in his family on that day (or ever).

19.      Finally, I want to be absolutely transparent about two issues relating to the aforementioned surveillance, including to clear up any misimpressions.

20.      First, the Complaint in this action names as defendants two individuals, James Stepien and Victor Cardona, who I understand were retained by a subcontracted security firm to conduct the four days of surveillance referred to above. The Complaint calls these individuals "thugs" and says that Mr. Stepien is a convicted felon. Complaint ¶ 22.

21.      Until I saw the Complaint in this action, I had never heard of, and had no knowledge of, either Mr. Stepien or Mr. Cardona. More generally, I had no contact with or knowledge of the individuals that were engaged to undertake the surveillance on September 8-11, 2018.

22.      After receiving the Complaint, I contacted the security firm to investigate the issues it raised regarding Mr. Stepien's criminal record.

23.      I have since learned that Mr. Cardona is an active member of the New York Police Department and is also the Director of Operations for the security firm engaged as a subcontractor to undertake the surveillance services in September 2018. Mr. Cardona apparently hired Mr. Stepien on the recommendation of officers in the local police department in the town where Mr. Parmar lives, without knowledge of the fact that Mr. Stepien has criminal record.

24.      I have been told that Mr. Cardona's and Mr. Stepien's employment by the private security service has been terminated in light of these issues. To be absolutely clear, I had no prior knowledge of Mr. Stepien's criminal history. Indeed, I was furious when I found out, because I never would have authorized having a convicted criminal perform any

5

security services or surveillance on my behalf no matter what precautions might have been in place to ensure he acted appropriately.

25.    Second, Mr. Parmar submitted two photographs with his affidavit that he says shows automobiles belonging to Mr. Cardona and Mr. Stepien on private property. The first photograph, attached as Exhibit "A", shows a car on what appears to be the front part of a driveway adjacent to a gate that prevents access to the rest of the driveway and the private residence that is some ways behind the gate. The car in the photograph is pointed away from the gate and towards the street, not towards the residence. The second photograph, attached as Exhibit "B", shows an automobile on pavement in an open space with trucks, a shed, construction vehicles, and various other structures in the background. Mr. Parmar says this picture shows a horse farm, and has submitted a form from the Marlboro Township Police Department describing a September 11, 2018 incident when a car registered to Mr. Stepien apparently entered the property of "Baymar Farms."

26.    I cannot say whether the incident described in this form, or either or both of these pictures submitted by Mr. Parmar, reflect some form of trespass or other wrongful conduct by Mr. Cardona or Mr. Stepien. To the extent there was such misconduct in the course of their surveillance activities I certainly did not authorize it, desire it, know about it, or approve of it.

Dated: October 24, 2018
       Atlanta, Georgia

_____
Chinh Chu