Jeffrey C. Hoffman
Windels Marx Lane & Mittendorf LLP
156 West 56th Street
New York, NY  10019
T. 212.237.1000
jhoffman@windelsmarx.com

Timothy C. Parlatore
Maryam N. Hadden
Parlatore Law Group LLC
One World Trade Center, Suite 8500
New York, NY  10007
Tel.: 212-679-6312 | Fax: 212-202-4787
timothy.parlatore@parlatorelawgroup.com
maryam.hadden@parlatorelawgroup.com

*Attorneys for Defendant Paul Parmar*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

-------------------------------------------------x

UNITED STATES OF AMERICA,          Case No.: 18-cr-00735-MCA

      v.

PAUL PARMAR,
         Defendant.

-------------------------------------------------x

## MEMORANDUM OF LAW IN SUPPORT OF REPLY TO THE GOVERNMENT'S OPPOSITION BRIEF

### PRELIMINARY STATEMENT[1]

---

[1] Mr. Parmar recognizes that Reply papers are ordinarily restricted to 15 pages in length.  Due to the complexity of this case, the Government has consented to extend the length to 22 pages.

The Government's Brief in Opposition fails to adequately address the factual allegations raised by Mr. Parmar.  Initially they argue that the issues raised should not be addressed in the pretrial stage.  The Government then shifts to pointing out that Mr. Parmar, who is constrained to make his arguments without reference to the record of the Grand Jury, is unable to cite to specific instances in the record.  Finally, in the context of both the forfeiture and the motion for disqualification, the Government side steps the issues completely.

## THE INDICTMENT MUST BE DISMISSED AS VENUE DOES NOT LIE WITHIN THE DISTRICT OF NEW JERSEY

The Government's response relies upon the pre-trial stage of the proceedings and alleges that additional evidence will be presented at trial as to venue.  Further, the Government asserts that the Indictment's allegations in their current form satisfy venue pleading standards because the Indictment uses the words "New Jersey."  The law, however, requires that there be at least one overt act alleged in order to support venue for a conspiracy. *See e.g.*, *United States v. Birks*, 2008 U.S. Dist. LEXIS 71721, *8 (N.J. Dist. Ct. 2008) (proceedings stayed for the Government to seek a superseding indictment to clarify overt acts and venue as well as dates alleged).  The Government's claims in opposition – that there is plenty of unspecified evidence to support venue and that the Hazlet, New Jersey meeting will be among the overt acts relied upon to establish venue at trial – appear to be seeking a variance from the Indictment without actually coming out and saying so.   When an amendment to an

Indictment – some change that alters the charging terms of the indictment – occurs, it is a *per se* violation of the defendant's Fifth Amendment rights; a variance, on the other hand, is where the facts at trial are materially different from those in the indictment and must be reviewed on a case-by-case basis for prejudice to the defendant. *United States v. Somers*, 496 F.2d 723, 743-44 (3d Cir.), *cert. denied*, 419 U.S. 832 (1974).

The Government's reliance upon the alleged Hazlet, New Jersey meeting as the sole pleaded overt act in support of venue, is a silent request for a variance because they are already well aware that it will be impossible for them to establish at trial that this meeting did, in fact, take place in New Jersey. The Government has produced multiple documents in discovery which conclusively establish that there was no meeting attended by Mr. Parmar as alleged in the Indictment in New Jersey on July 29, 2016; attached hereto as Exhibit A are a series of emails produced by the Government discussing the timing of a meeting with Mr. Parmar on that date *in New York*. Thus, the Government is and has been well aware that the sole overt act alleged in the Indictment to actually have taken place in New Jersey did not take place in New Jersey at all. It is clear that the allegation of an overt act that the Government knows it cannot establish at trial constitutes a variance from the indictment; it is equally clear that this variance prejudices the defense, as it is the sole allegation establishing venue in the District of New Jersey. Without that overt

act allegation, there is no evidence of venue in the Indictment.[2]   While the Government's opposition downplays the significance of venue, it is for precisely this reason that at least one overt act must be alleged to take place in a jurisdiction in order to establish venue; so that the defendant, in accord with the dictates of the Fifth Amendment, knows with what activity he is charged and what he must defend.

Equally if not more significantly, in order for the Government to mention this overt act in the language of the Indictment, it had to have been established in front of the Grand Jury.  As the Government's own discovery makes it crystal clear that no such meeting happened in Hazlet, New Jersey on July 29, 2016, that means that false testimony must have been presented to the Grand Jury, either inadvertently or intentionally.  While the Government repeatedly downplays Mr. Parmar's claims of misconduct, relying upon the secrecy that understandably surrounds the Grand Jury process to shield their conduct, this example proves the point.   It is Mr. Parmar's position that without this overt act, the Indictment is deficient as to venue and must be dismissed.

## THE GOVERNMENT'S PERSISTENT MISCONDUCT AND APPARENT MISLEADING OF THE GRAND JURORS MANDATES DISMISSAL

The Government has engaged in a pattern of persistent misconduct throughout

---

[2] While the Government's response notes that several of the alleged conspirators had residences in New Jersey (Opp. at p. 67, fn. 26), mere residence in a jurisdiction is insufficient to confer venue.

these proceedings.  As discussed in further detail *supra* the Grand Jury presentation was impaired by the Government's presentation of evidence supporting venue by presenting an overt act – the meeting described as occurring in Hazlet, New Jersey – that did not in fact occur in New Jersey at all.  Significantly, the Government was well aware that the facts as presented and eventually as alleged in the Indictment were untrue.

Additionally, it is apparent from the forfeiture allegation that the Government must have presented false information concerning the alleged use of funds from the Go-Private transaction to purchase properties that were purchased long before the Go-Private transaction took place, as discussed in further detail *infra*. Further, the forfeiture allegation reveals that the Government again misinformed the Grand Jurors as to the specific bank accounts appropriately subject to forfeiture.  The misinformation as to the bank accounts, which the Government's own exhibits trace to an unrelated third party, is set forth in further detail *infra*.  Likewise, the persistent reliance upon emails stolen from a private domain – regardless of where responsibility for the theft lies – is highly disturbing evidence of misconduct.  While this point is also discussed in further detail *infra*, it is raised briefly here as part of the litany of improper acts committed by the Government.

Additionally, the Government's response makes it crystal clear that the case presented to the Grand Jury claimed that Mr. Parmar and his coconspirators

artificially inflated revenue with the goal of inflating the value of the Company in order to induce a buyer to purchase at the inflated value. In doing so, the Government misled the Grand Jury by representing that the value of the company was, in fact, inflated. However, the Government's production of documents in discovery included a Duff & Phelps report, relied upon during the months leading up to the Go Private Transaction, which shows the revenue considered by Duff & Phelps was not actually inflated. Based on this non-inflated revenue, Duff & Phelps found a value range for the company well above the actual sale price of the company, which was effectuated at 266 million. Of that 266 million, 5 million was actually paid by the company and only 50.4% of the balance was paid by the alleged victim. The remaining 49.6% was paid by Mr. Parmar at the same price. The scheme as described by the Government in its response is wholly contradicted by the Government's own document production; it is for these reasons that a review of the Government's apparent misconduct in the Grand Jury is essential and justifies piercing the veil of secrecy that ordinarily surrounds Grand Jury proceedings.

It is the cascade of activities, ranging from improprieties to actions that would constitute criminal activity in the ordinary reading of the penal law, that raises the level of misconduct to the extraordinarily high bar required to merit the extreme remedies sought by the defense herein.

## COUNT ONE DOES NOT ALLEGE A SINGLE CONSPIRACY WITH A UNIFORM GOAL

The Government's response to Mr. Parmar's argument that Count One is multiplicitous raises a confusing welter of issues surrounding the topic of value and the conspiracy alleged by the Indictment.  As an initial matter, the Government claims both that the Indictment does not allege the usage of company funds for personal gain[3] and that the actual value of the Company does not matter because they need not prove reliance.  However, the Government also says that the conspiracy "worked" because the Go Private Transaction closed at a price that "far exceeded the true value."  *See* p. 72.  Accordingly, the true value of the Company *does* matter, as the Company cannot be said to have sold at an inflated price without actual value being established.  Yet the Government persists in its resistance to recognizing the legitimacy of value as an issue[4], while simultaneously arguing that

---

[3] This claim, made by the Government at page 73, seems at variance with the Indictment's description of the goal of the conspiracy as being "for the defendants to enrich themselves" and the inclusion in the forfeiture allegation of real properties purchased before the Go Private Transaction concluded.

[4] Where the Government does address arguments relating to value, it is frequently only to misunderstand them, as is the case with Mr. Parmar's reference to the Bankruptcy proceedings as a way to establish baseline value.  The Government comments on the *sale* price of the subsidiaries at auction which was, as is always the case in bankruptcy auctions, quite low.  Although the fact that a "pennies on the dollar" price still led to assets valued at several million dollars may have some use, what Mr. Parmar's initial point actually referred to was the revenue representations made in the auction *materials* – the Debtors' own representation of their value at the time of sale – not the amount fetched at auction in a proceeding at which no one expects to either pay or receive full price.

the conspirators were enriching themselves by inflating the company's value. The value of the company on Jan 30th, 2017, is essential not just to the defense, but to the Government's efforts to prove its case as well, as no allegations of fraud can truly be made without making a genuine effort to assess the true value of the company as of the day of the Go Private. It defies belief that the Government asserts that it can prove that the purported victims purchased their 50.4% interest in the company at an inflated value without knowing, or even trying to assess, the real value.

Further, while the Government goes on to claim that the conflicting date ranges in the Indictment actually make sense because, for example, the conspiracy was purportedly ongoing until September of 2017 so that the co-conspirators could "conceal the fraud and continue to reap the benefits" (p. 75), they utterly fail to address exactly how the separately situated conspirators were, in fact, "reaping benefits" either before or after the January 2017 closing of the Go Private Transaction.  Mr. Parmar had paid the same allegedly inflated price per share as the "victims," which does not sound like a benefit.  Chivukula and Zaharis were continuing in their corporate roles but, other than continuing to collect the same salaries that they drew before the Go Private Transaction closed, it is unclear how they were part of this unified front to conceal and benefit from the alleged fraud. Nor is there any specific allegation as to Bakhshi's conduct as part of this "conspiracy" after January of 2017, despite the majority of the Government's joint

response being addressed to Bakhshi's claims.  Indeed, this claim as to ongoing concealment in the Government's response appears to be directed solely at Mr. Parmar's alleged actions.  Clearly, a single person cannot conspire with himself.

Similarly, the Government claims that the May 2015 start date for the conspiracy count is reasonable because "[t]he principal goal of the scheme was to artificially and fraudulently inflate Company A's value to make it a more attractive acquisition or investment target; the defendants' unlawful actions in 2015 (including the sham acquisitions) helped them achieve that goal, which they realized later in time in 2016 and 2017 through the Go-Private Transaction." (p. 74). If there was a conspiracy in 2015 to raise money for acquisitions of companies that turned out to be fictitious, as the Government seems to allege, that would have been a separate conspiracy from the one alleged to have begun with the introduction of the very different go private deal in 2016.  Nowhere in the Indictment (or in the opposition papers) is there any indication that any action taken in 2015 was taken with the goal stapled onto it by the Government; indeed, nothing in the Indictment or in any of the thousands of pages of discovery that purportedly inform the defense of what is being alleged indicates that a sale of the company was even a consideration by any of the "conspirators" before  Chinh Chu and his firm appeared and began making bids – nearly a year after the conspiracy "began."

Thus, although the Government pays lip service to the elements required to

prove a single conspiracy with a unified goal, the majority of the points raised by the defense remain unaddressed.  At best, the Government's response simply repeats the still unsupported allegation that there was a unified conspiracy without considering the inherent conflicts raised by their own claims and their own evidence.  While the Government will eventually be required to address the tremendous holes in its case at trial, it seems remarkably irresponsible to clog the judicial system with matters that could and should be addressed now.

## THE FORFEITURE PROVISION MUST BE STRUCK

The Government relies upon a series of dissimilar cases from other jurisdictions to support its argument that the forfeiture allegation is immune from pre-trial dismissal and is, instead, solely a trial issue.  In the course of making this argument, the Government ignores the fact that a forfeiture allegation, as part of an indictment, must be presented to the Grand Jury according to Department of Justice guidelines. *JM § 9-113.420*.  Moreover, the settlement of any forfeiture issues as part of a plea-bargaining process is not only contemplated by Department of Justice procedures (*JM § 9-113.100 et seq,*) but encouraged[5] – which argues against the theory that forfeiture is to be determined only after the trial process has concluded and is thus not ripe for consideration in a pre-trial motion.

_____

[5] Indeed, JM § 9-113.106 specifically notes that "[d]elaying forfeiture considerations until after the conclusion of the criminal case unnecessarily extends the government's involvement with the defendant and diminishes its effectiveness."

Most interestingly, the Government included a footnote reference to the purported reasoning behind the May 12, 2021, Forfeiture Bill of Particulars which released from consideration two of the four real properties listed in the Indictment. *See* Opp. at fn. 37.  This footnote claims that the release was not connected to the undeniable fact that one of the properties was purchased years before the allegedly fraudulent scheme to defraud and the second property's February 2016 purchase could contradict the Government's claim that the "conspirators" were attempting to inflate the value[6] of the Company.  Instead, the Government now claims that "due to concerns regarding their value" the properties were not being pursued.  As an initial matter, this reasoning is patently incredible.  One of the properties – which has currently been seized by the Bankruptcy Debtors' estate with the Government's cooperation – has a current buyer willing to pay 4.8 million dollars, which may well be below its actual value.  The other property is a 17,510 square foot home on several acres of property which is also valued in the area of several million dollars.

Further, the Government is presumed to have followed its own guidelines, set forth by the Department of Justice under Justice Manual Title 9 § 9.111 *et seq.*,

---

[6] The contradiction between the timing of this property's purchase and the Government's claimed theory as to the unified goal of the conspiracy is clear; if the defendants were conspiring to artificially inflate the value of the Company in 2015 and 2016, the use of millions of dollars to purchase an apartment that was not a corporate asset would deflate rather than inflate value, thus frustrating the purported goal.  In pointing this flaw in the Government's theories out, Mr. Parmar does not in any way concede any impropriety in the purchase of 2 River Terrace Apartment 12J.

before pursuing forfeiture of these properties in the first place; guidelines which include a mandatory pre-forfeiture net equity assessment. *JM § 9-111.120.* The release of properties designated for forfeiture more than two years after their designation on the basis of value would indicate that either the Government failed to follow the proper procedures and simply named everything that they could think of and are now required to backtrack, or that they are using the issue of value "concerns" as a smokescreen for the lack of traceability to any purportedly criminal conduct.

The forfeiture question and the grounds for the release of the properties becomes most significant in light of the actual language of the Indictment. The language of the Indictment – and, accordingly, the evidentiary theory that was presented to the Grand Jury – seeks the forfeiture of property "that constitutes or is derived from proceeds traceable to the commission of the charged wire fraud and securities fraud offenses," then goes on to list the two released real properties as well as other real property and several third-party bank accounts.[7] This language makes it clear that, whatever their current position as to the value of these real properties may be, the Government at the time of the Grand Jury presentment was describing

_____

[7] As the Government relies heavily upon Mr. Parmar's lack of standing to challenge the seizure of bank account assets traceable to third parties, one can only hope that the Government has actually provided those third parties with the appropriate notice so that they may assert their own property rights, particularly since Mr. Parmar cannot forfeit an interest that he does not hold.

these assets to the Grand Jurors as proceeds of the charged crimes. This is significant because it is clearly untrue, thus impairing the integrity of the Grand Jury proceedings. Moreover, the inclusion of these million dollar properties as proceeds of the alleged fraud would have had the effect of magnifying the Grand Jury's perception of the depth and breadth of the purportedly fraudulent conduct.

The Colts Neck location was purchased in 2000, well over a decade before the alleged wire fraud or securities fraud. The River Terrace location was purchased in February of 2016, almost a year before the closing of the Go Private Transaction that supposedly led to the enrichment of the conspirators and before Chinh Chu and his company had made their first offer to bring the company private. Each of these transactions was a matter of public record well known to the Government at the time of the Grand Jury presentation.

Throughout their response to Mr. Parmar's motions, the Government has relied heavily upon the fact that Mr. Parmar, who does not have access to the Grand Jury minutes, is forced to rely upon speculation in making his claims that the presentation of the case constituted governmental misconduct which rose to the level of impairing the integrity of the Grand Jury's proceedings. While the Government is quite correct that these allegations perforce rely on some level of speculation, that speculation is founded on a common sense analysis of the evidence as revealed by the Government's own disclosures. The forfeiture provision in the Indictment is a

case in point.  In order to pursue assets that were clearly *not* traceable as the proceeds of charged criminal activity for the purpose of forfeiture on the grounds of traceability, the Government must have presented willfully false testimony regarding those properties to the Grand Jury – in essence, perjurious testimony in violation of 18 U.S.C. § 1623.  The Government then goes on to compound this blatantly improper conduct by averring to this Court that the properties really just raise "concerns" about their value despite each property being valued in the range of millions of dollars.  Thus, while the forfeiture allegation may be the most minimal aspect of the Indictment in the ordinary course of business, in this particular case it becomes a poster child example of the Government's blatant misconduct.  Indeed, by placing federal liens on the above-described properties and preventing Mr. Parmar from enjoying their full use, the Government team themselves potentially violated the New Jersey Code of Criminal Justice, Section 2C:20-3(b) ("A person is guilty of theft if he unlawfully transfers any interest in immovable property of another with purpose to benefit himself or another not entitled thereto").

Similarly, and equally disturbingly, the Government listed two bank accounts held in the name of First Connect Center Investors Fund LP in the same forfeiture allegation, again describing them as proceeds traceable to the commission of the charged offenses.  Yet the Government was well aware – having itself produced a

funds flow chart to that effect both in discovery and in court filings[8] – that the funds in these accounts originated from Anil Sharma, who is not alleged to be a conspirator or aid to the conspiracy.  The Government's response to this is to note that Mr. Parmar does not have standing to protest the improper seizure of funds from a third party.  While an accurate point, the question of standing is one that simply leads the Court down a side path of diversion away from the misconduct involved in the seizure of funds from an unrelated third party in the first place.  Mr. Parmar's point in protesting the seizure is not an effort to step into another's shoes for standing purposes but, rather, is yet another example of the irredeemable taint that has permeated the Grand Jury and prosecutorial proceedings in this case.

Therefore, it is clear that the forfeiture allegation, like the remainder of the Indictment, suffers from a number of fatal flaws.

## THE GOVERNMENT'S ONGOING RELIANCE ON STOLEN EMAILS OBTAINED BOTH BEFORE AND AFTER THEIR SUBPOENA VIOLATES THE FOURTH AMENDMENT

The Government claims that any reasonable expectation of privacy in the constellationhealthgroup.com domain was forfeited by Mr. Parmar's use of the domain during the Go Private Transaction, drawing an analogy to a case arising in the Eastern District of New York, *United States v. Shkreli*, Crim. No. 15-637, 2017

---

[8] The Government's fund flow chart showing Anil Sharma as the funds' originator is attached hereto as Exhibit B.

WL 3608252, at *2 (E.D.N.Y. May 16, 2017).   This non-binding opinion is distinguishable on several fronts.  In *Shkreli*, the defendant attempting to assert his privacy interest had held multiple corporate email addresses which, it appears from the decision, he used interchangeably and then abandoned when he left his position with the company in issue.  Here, the usage of the constellationhealthgroup.com domain was not used interchangeably; on the contrary, the orionhealthcorp.com domain was used for all general company purposes by both Mr. Parmar and by other employees and managers of the company, including Zaharis and Chivukula.  The constellationhealthgroup.com domain was primarily used for private purposes by Mr. Parmar and his friends.

It is also significant that Mr. Parmar did not abandon the domain when he was forced out of his position at CHT, as evidenced by the fact that his own legal counsel was still utilizing that email address to reach him in October of 2017 – indeed, it was this communication that uncovered the theft of the domain and started the discussion between Mr. Parmar's counsel and John Altorelli, counsel for CC Capital and Chinh Chu, to begin with.[9]  In addition, the description of the emails at issue in *Shkreli* at least implies that when the second domain was abandoned, it was abandoned without any effort to maintain privacy or control over the domain.  Here, on the contrary, the

---

[9] Attached hereto as Exhibit C is Mr. Parmar's Declaration regarding this email exchange and the origin and usage of the domain.

Government's own response notes that the Private Investment Firm utilized computer forensics professionals to recover emails from the system – a clear indication that the emails were not simply "lying around" open to access.  Moreover, in *Shkreli* it was clear from the Court's decision that one of the factors weighing against an expectation of privacy was the existence of a written corporate policy governing usage of the email system, to which the defendant had agreed.[10]  No such written policy existed in this case.

Finally, the Government attempts to avoid the issue of the provenance of the emails with a two-pronged approach: first, that the Private Investment Firm voluntarily provided them and second, that because the Government's subsequent subpoena did not specify the constellationhealthgroup.com domain as a desired source for production, they can't be accountable for what they received.  Each of these arguments mirrors the Government's central theme of maintaining a hands-off approach to misconduct in any form.    Having been notified that the constellationhealthgroup.com domain was private property early in their investigation (as, indeed, John Altorelli had been notified in October of 2017) the Government cannot now claim to have been unaware of the unsavory provenance of

---

[10] The existence of such a policy is frequently pointed to as an indicator as to whether an expectation of privacy in email contents is reasonable.  *See e.g.*, *Kaufman v. SunGard Invest. Sys.*, 2006 U.S. Dist. LEXIS 28149 (N.J. Dist. Ct. 2006).

this line of evidence. Nor do they make any effort to make such a claim,[11] simply shrugging their shoulders and asserting that as long as the Government was not the initial thief, the status of the emails is irrelevant.

Similarly, the argument that because the Government did not single out the constellationhealthgroup.com emails as a source of material in their subpoena, any such emails that the subpoena unearthed were not really the result of Government action is one that disclaims responsibility while ignoring reality. The Government does not provide the language of the subpoena that gave rise to emails from the stolen domain, but it is quite clear that there was no instruction attached to respect the privacy of the pirated emails or to remove them from disclosures. On the contrary, the Government continued to willingly accept and rely upon stolen property in violation of N.J. Stat. § 2C:20-7. No matter how often the Government repeats its "hands in the air" claim that they didn't *tell* the "Private Investment Firm" to mine a private domain for emails and therefore cannot be held accountable, the

_____

[11] The Government does claim that their investigation commenced "months" after the theft of the emails, alleging that it began in December of 2017 (*see* p. 83). This timeline is belied by both the Department of Justice warnings to Bank of America on January 27, 2017, before the Go Private Transaction closed and, more significantly, by the fact that Department of Justice personnel met with Mr. Parmar about the Go Private in Manhattan on April 14, 2017. As it is clear that the Government was investigating the Go Private Transaction well in advance of the October 2017 email exchange between counsel – and equally clear that the Government is attempting to shift the timeline in its favor – this allegation in the Opposition Brief provides further grounds for an evidentiary hearing surrounding the theft of the emails and the Government's involvement or lack thereof.

Court cannot ignore apparent violations of the law.[12]   Similar to the situation involving potential false testimony proffered to the Grand Jury, the only appropriate course of action if the Court remains in doubt regarding the emails would be to hold a suppression hearing to determine whether Mr. Parmar's rights were indeed violated by the Government's actions relating to the Private Investment Firm and the stolen emails.

## THE CURRENT PROSECUTORIAL TEAM IS IRREDEEMABLY TAINTED

The shortest shrift in the entire opposition brief is given to Mr. Parmar's motion to disqualify the current prosecutorial team, which is addressed by little more than dismissive language and the implication that Mr. Parmar is making it all up. Although the Government does briefly point out that their investigative process, such

---

[12] It is clear from the Government's description of their receipt of the emails from private parties that they were unconcerned with how the emails were obtained. Despite having been informed of both the initial hacking into and unauthorized access of Mr. Parmar's documents and communications from the constellationhealthgroup.com domain and the hacking and theft later done by MOSAIC under direction from Chinh Chu, the Government did not act to enforce 18 U.S.C. § 2701 or any of the other laws broken by the conduct reported to them. A hearing is therefore necessary to determine whether the Government extended immunity or otherwise agreed not to charge their potential witnesses with these serious violations of the law in exchange for their cooperation with the Government. Mr. Parmar asks the Court to order the Government to inform the defense of any such written or oral agreements or grants of immunity that may exist. The existence of any such agreement, even the existence of any act encouraging or willful blindness towards the potential witnesses to break the law, whether formal or otherwise, between the Government and the purported victims could establish a potential constructive agency relationship directly affecting the admissibility of evidence at trial.

as it may be, is not out in the open and thus it is theoretically possible that they did do or are doing an investigation into Chinh Chu's illegal conduct, the barely concealed ridicule with which the threats to Mr. Parmar are addressed belies any such possibility.  The Government dismisses Mr. Parmar's concerns, not to mention the threats and the provable cyber-attacks, as being "baseless", "frivolous" and "self-serving."  *See* p. 99.  It is abundantly clear that no serious investigation into Chinh Chu's conduct has been done and seems likely that not even a cursory inquiry has taken place.  This is so despite the extraordinarily grave implications stemming from Chu's conduct and that of his employees and the potential impact on the Government's case.

On the contrary, the Government's dismissive response simply proves Mr. Parmar's point – that the current prosecutorial team, rather than being the guardian of the laws and rights of the American people envisaged by the justice system, has become irredeemably prejudiced in their handling of this matter and must be replaced.  A prosecutor's duty is to seek justice, regardless of the identities and backgrounds of the victims and perpetrators of the crimes at issue; it is not to play favorites and close one's eyes to a possibility that one might find distasteful.  Here, by refusing to even contemplate the possibility that Mr. Parmar has been threatened and been the victim of cyber-hacking not once, but repeatedly over the course of these proceedings, the current prosecutorial team has abdicated their

responsibilities.[13]    As a result, they must be disqualified and replaced with representatives with a more comprehensive understanding of the ethical obligations and nuances of representing the Government of the United States.

## CONCLUSION

For all the reasons stated herein, Mr. Parmar respectfully requests that this Court issue an Order dismissing the Indictment, or disqualifying the current prosecution team and directing the Government to assign new, untainted personnel to the prosecution of the instant Indictment, or ordering evidentiary hearings to further develop the record, and for such other and further relief as this Court deems appropriate.

---

[13] Equally if not more disturbing is the Government's effort to imply this Court's support for their willful blindness.  The Government cites to this Court's decision in *Alpha Cepheus, LLC, et al. v. Chinh Chu et al.*, 18-cv-14322 as if the Court had previously considered the early threats to Mr. Parmar and dismissed them on their merits.  However, as this Court is well aware, a significant basis of that early order – which came years before some of the conduct referenced in the Motion to Disqualify and in the context of a civil proceeding and application for a temporary restraining order – was the lack of standing of the individuals seeking the order in a case in which the plaintiffs were corporate entities.  The Court's letter Order was not and did not pretend to be a determination on the merits.

Dated:      June 17, 2021
            New York, New York

                    Respectfully submitted,


                            */s/ Jeffrey C. Hoffman*

                            Jeffrey C. Hoffman
                            Windels Marx Lane & Mittendorf LLP
                            156 West 56th Street
                            New York, NY  10019
                            T. 212.237.1000
                            jhoffman@windelsmarx.com

                            Timothy C. Parlatore
                            Maryam N. Hadden
                            Parlatore Law Group LLC
                            One World Trade Center, Suite 8500
                            New York, NY  10007
                            Tel.: 212-679-6312 | Fax: 212-202-4787
                            timothy.parlatore@parlatorelawgroup.com
                            maryam.hadden@parlatorelawgroup.com

                            *Attorneys for Defendant Paul Parmar*