UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | Hon. Madeline Cox Arleo, U.S.D.J. |
| | : | |
| v. | : | Crim. No. 18-735 |
| | : | |
| PARMJIT PARMAR, | : | |
| a/k/a "Paul Parmar" | : | |

---

## MEMORANDUM OF LAW IN SUPPORT OF
## THE GOVERNMENT'S MOTIONS *IN LIMINE*

---

VIKAS KHANNA
Acting United States Attorney
970 Broad Street, Suite 700
Newark, New Jersey 07102
(973) 645-2700

On the Memorandum:

CAROLYN A. SILANE
OLTA BEJLERI
VINAY S. LIMBACHIA
Assistant United States Attorneys

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ..................................................................................iii

PRELIMINARY STATEMENT ........................................................................... 1

STATEMENT OF FACTS ................................................................................... 3

A.    Background of the Go-Private Transaction ......................................... 3

B.    Overview of Parmar and His Co-Conspirators' Fraudulent Tactics ................ 5

C.    Procedural History ............................................................................. 10

ARGUMENT ....................................................................................................... 13

I.    THE COURT SHOULD BAR ANY REFERENCE TO THE
      CONSEQUENCES OF A CONVICTION......................................................... 13

II.   THE COURT SHOULD PRECLUDE PARMAR FROM INTRODUCING HIS
      OWN OUT-OF-COURT STATEMENTS............................................................ 14

III.  THE COURT SHOULD PRECLUDE THE USE OF REPORTS OR NOTES
      PREPARED BY LAW ENFORCEMENT AGENTS FOR IMPEACHMENT
      PURPOSES. ................................................................................................. 16

IV.   THE COURT SHOULD PRECLUDE PARMAR FROM ARGUING OR
      ELICITING TESTIMONY THAT ADDRESSES LEGAL ISSUES
      IRRELEVANT TO THE JURY'S DETERMINATIONS AND/OR INVITES
      JURY NULLIFICATION.............................................................................. 20

V.    THE COURT SHOULD ADMIT STATEMENTS MADE BY PARMAR'S CO-
      CONSPIRATORS IN FURTHERANCE OF THE CONSPIRACY................. 22

VI.   THE COURT SHOULD PERMIT THE DESIGNATION OF TWO CASE
      AGENTS AT TRIAL..................................................................................... 23

VII.  THE COURT SHOULD ALLOW THE GOVERNMENT TO CALL A
      SUMMARY WITNESS. ............................................................................... 25

VIII. IF PARMAR PRESENTS EVIDENCE INCONSISTENT WITH HIS
      PROFFERED STATEMENTS, THE COURT SHOULD PERMIT THE
      INTRODUCTION OF SUCH STATEMENTS. ............................................. 27

IX.    THE COURT SHOULD PRECLUDE EVIDENCE OR ARGUMENT THAT
       THE VICTIMS WERE NEGLIGENT OR OTHERWISE TO BLAME. .......... 29

X.     THE COURT SHOULD PERMIT THE GOVERNMENT TO USE
       HYPOTHETICAL QUESTIONS CONCERNING THE VICTIMS' RELIANCE
       ON PARMAR'S AND HIS CO-CONSPIRATORS' MISREPRESENTATIONS.
       ................................................................................................................ 30

XI.    THE COURT SHOULD ADMIT BANK RECORDS, PHONE RECORDS,
       AND IMAGES OF COMPUTERS, PHONES, AND EMAIL ACCOUNTS AS
       SELF-AUTHENTICATING UNDER FEDERAL RULE OF EVIDENCE
       902(11) AND 902(14). ....................................................................... 31

XII.   THE COURT SHOULD PERMIT THE GOVERNMENT TO FILE SUCH
       ADDITIONAL MOTIONS AS MAY BE NECESSARY. .................................. 34

CONCLUSION ............................................................................................. 35

# <u>TABLE OF AUTHORITIES</u>

**Cases**                                                                 **Page(s)**

*Bourjaily v. United States,*
    483 U.S. 171 (1987)..................................................................................... 23

*Bretti v. Wainwright,*
    439 F.2d 1042 (5th Cir. 1971)............................................................... 20, 21

*Burris v. United States,*
    192 F.2d 253 (5th Cir. 1951)..................................................................... 22

*Delaware v. Fensterer,*
    474 U.S. 15 (1985)..................................................................................... 20

*Ford v. United States,*
    273 U.S. 593 (1927)................................................................................... 20

*In re High Fructose Corn Syrup Antitrust Litig.,*
    156 F. Supp. 2d 1017 (C.D. Ill. 2001) *rev'd on other grounds*, 295 F.3d 651
    (7th Cir. 2002);.......................................................................................... 19

*Rogers v. United States,*
    422 U.S. 35 (1975)..................................................................................... 14

*Savarese v. Agriss,*
    883 F.2d 1194 (3d Cir. 1989) .................................................................. 15

*Shannon v. United States,*
    512 U.S. 573 (1994)................................................................................... 14

*Steele v. United States,*
    267 U.S. 505 (1925)................................................................................... 20

*United States v. Adames,*
    56 F.3d 737 (7th Cir. 1995).............................................................. 17, 19

*United States v. Aleli,*
    170 F.2d 18 (3d Cir. 1948) ...................................................................... 30

*United States v. Ammar,*
    714 F.2d 238 (3d Cir. 1983) .................................................................... 23

*United States v. Barile,*
    286 F.3d 749 (4th Cir. 2002).................................................................... 17

*United States v. Barrow,*
    400 F.3d 109 (2d Cir. 2005) ................................................................... 28

*United States v. Blackwell*
    954 F. Supp. 944 (D.N.J. 1997) ............................................................. 26

*United States v. Boone,*
    458 F.3d 321 (3d Cir. 2006) ................................................................... 21

*United States v. Browne,*
    834 F.3d 403 (3d Cir. 2016) ....................................................... 31, 32, 33

*United States v. Bruce,*
    109 F.3d 323 (7th Cir. 1997) .................................................................. 21

*United States v. Bush,*
    522 F.2d 641 (7th Cir. 1975) .................................................................. 30

*United States v. Chavez,*
    979 F.2d 1350 (9th Cir. 1992) ............................................................... 17

*United States v. Continental Group, Inc.,*
    603 F.2d 444 (3d Cir. 1979) ................................................................... 23

*United States v. Coyle,*
    63 F.3d 1239 (3d Cir. 1995) ................................................................... 29

*United States v. Cruz,*
    910 F.2d 1072 (3d Cir. 1990) ................................................................. 23

*United States v. DeMuro,*
    677 F.3d 550 (3d Cir. 2012) ................................................................... 21

*United States v. Dortch,*
    5 F.3d 1056 (7th Cir. 1993) .................................................................... 28

*United States v. Farnham,*
    791 F.2d 331 (4th Cir. 1986) .................................................................. 25

*United States v. Fisher,*
    10 F.3d 115 (3d Cir. 1993) ..................................................................... 14

*United States v. Gonzalez,*
    918 F.2d 1129 (3d Cir. 1990) ................................................................. 24

*United States v. Hardwick,*
    544 F.3d 565 (3d Cir. 2008) ................................................................... 28

*United States v. Hevener,*
    382 F. Supp. 2d 719 (E.D. Pa. 2005) ...................................................... 26

*United States v. Hoffecker,*
    530 F.3d 137 (3d Cir. 2008) ...................................................... 15, 16

*United States v. Isaacs,*
    493 F.2d 1124 (7th Cir. 1974) ...................................................... 30

*United States v. Kemp,*
    362 F. Supp. 2d 591 (E.D. Pa. 2005) ...................................................... 15

*United States v. Khorozian,*
    333 F.3d 498 (3d Cir. 2003) ...................................................... 32

*United States v. Kosko,*
    870 F.2d 162 (4th Cir. 1993) ...................................................... 24

*United States v. LaVergne,*
    805 F.2d 517 (5th Cir. 1986) ...................................................... 25, 27

*United States v. Leadbeater,*
    No. 13-121, 2015 WL 567025 (D.N.J. Feb. 10, 2015) ............................................ 29

*United States v. Lemire,*
    720 F.2d 1327 (D.C. Cir. 1983) ...................................................... 26, 27

*United States v. Lopez,*
    743 F. App'x 489 (3d Cir. 2018) ...................................................... 23

*United States v. Marks,*
    816 F.2d 1207 (7th Cir. 1987) ...................................................... 18, 19

*United States v. McGlory,*
    968 F.2d 309 (3d Cir. 1992) ...................................................... 15, 31

*United States v. Mohney,*
    949 F.2d 1397 (6th Cir. 1991) ...................................................... 26

*United States v. Moreno,*
    809 F.3d 766 (3d Cir. 2016) ...................................................... 19

*United States v. Nguyen,*
    344 F. App'x 821 (3d Cir. 2009) ...................................................... 14

*United States v. Osum,*
    943 F.2d 1394 (5th Cir. 1991) ...................................................... 25

*United States v. Paulino,*
  935 F.2d 739 (6th Cir. 1991)................................................................. 26, 27

*United States v. Perez,*
  86 F.3d 735 (7th Cir. 1996) ...................................................................... 21

*United States v. Phibbs,*
  999 F.2d 1053 (6th Cir. 1993) .................................................................. 25

*United States v. Radseck,*
  718 F.2d 233 (7th Cir. 1983)..................................................................... 26

*United States v. Ranney,*
  719 F.2d 1183 (1st Cir. 1983) ................................................................... 30

*United States v. Reilly,*
  33 F.3d 1396 (3d Cir. 1994) ...................................................................... 31

*United States v. Sabino,*
  274 F.3d 1053 (6th Cir. 2001) .................................................................. 25

*United States v. Saget,*
  991 F.2d 702 (11th Cir. 1993).............................................................. 17, 19

*United States v. Salzano,*
  Crim. No. 22-690, 2024 U.S. Dist. LEXIS 35677 (D.N.J. Feb. 26, 2024)................ 30

*United States v. Santos,*
  2022 WL 1698171 (D.N.J. Mar. 22, 2022)................................................. 29

*United States v. Scales,*
  594 F.2d 558 (6th Cir. 1979) .................................................................... 25

*United States v. Schoenborn,*
  4 F.3d 1424 (7th Cir. 1993)....................................................................... 17

*United States v. Sepulveda,*
  15 F.3d 1161 (1st Cir. 1993) ..................................................................... 22

*United States v. Strauss,*
  473 F.2d 1262 (3d Cir. 1973) .................................................................... 26

*United States v. Turner,*
  718 F.3d 226 (3rd Cir. 2013).............................................................. 22, 23

*United States v. Vaughn,*
  Crim. No. 14-23, 2016 WL 3406228 (D.N.J. June 14, 2016) .................................. 24

*United States v. Vaughn,*
   Crim. No. 14-23, 2016 WL 450163 (D.N.J. Feb. 4, 2016) ........................................ 24

*United States v. Wheeler,*
   172 F. Supp. 278 (W.D. Pa. 1959) *aff'd,* 275 F.2d 94 (3d Cir. 1960) ...................... 21

*United States v. Wilkerson,*
   84 F.3d 692 (4th Cir. 1996) .............................................................................. 15, 16

*United States v. Winn,*
   948 F.2d 145 (5th Cir. 1991) .................................................................................... 25

*United States v. Zaccaria,*
   240 F.3d 75 (1st Cir. 2001) ...................................................................................... 19

*Williamson v. United States,*
   512 U.S. 594 (1994) ................................................................................................. 15

## Rules

Fed. R. Evid. 106 ........................................................................................................... 16

Fed. R. Evid. 401 ..................................................................................................... 20, 21

Fed. R. Evid. 403 ..................................................................................................... 18, 20

Fed. R. Evid. 613 ............................................................................................... 16, 17, 19

Fed. R. Evid. 613(a) ..................................................................................................... 17

Fed. R. Evid. 613(b) ..................................................................................................... 17

Fed. R. Evid. 615 ........................................................................................................... 24

Fed. R. Evid. 801 ........................................................................................................... 19

Fed. R. Evid. 801(c) ...................................................................................................... 19

Fed. R. Evid. 801(d)(2) ................................................................................................. 22

Fed. R. Evid. 801(d)(2)(A) ........................................................................................... 15

Fed. R. Evid. 803(6) ................................................................................................ 32, 33

Fed. R. Evid. 901(a) ...................................................................................................... 31

Fed. R. Evid. 901(b)(1) ................................................................................................. 31

Fed. R. Evid. 901(b)(4) ................................................................................................ 34

Fed. R. Evid. 902 ........................................................................................................ 31

Fed. R. Evid. 902(11) ................................................................................ 2, 31, 32, 33

Fed. R. Evid. 902(12) ................................................................................................ 32

Fed. R. Evid. 902(14) ................................................................................ 2, 31, 33, 34

## <u>PRELIMINARY STATEMENT</u>

Between May 2015 and September 2017, Defendant Parmjit Parmar, a/k/a "Paul Parmar" and several co-conspirators orchestrated and carried out an elaborate scheme to defraud a private investment firm and a group of lenders out of hundreds of millions of dollars in connection with a domestic merger transaction that converted a publicly traded health care services company ("Company A") into a private entity (the "Go Private Transaction").  This brazen and multi-layered fraud involved a variety of deceptive tactics designed to artificially inflate Company A's value and dupe the investors and lenders, including purported acquisitions by Company A of non-existent companies or corporate shells portrayed as profitable enterprises, fabricated accounting records and fake financial statements, and phony customers and related revenue streams.  The scheme generated tens of millions of dollars in illicit profits and caused substantial losses to the victim investors and lenders.  For his role, Parmar is charged in a three-count Indictment with conspiracy to commit securities fraud, securities fraud, and wire fraud.  Parmar's trial is scheduled for March 10, 2025.

In anticipation of trial and consistent with the Court's order, the Government respectfully submits this memorandum in support of its motions *in limine* and summarizes below the relief sought:

- The Court should bar any reference to the consequences of a conviction;

- The Court should preclude Parmar from introducing his own out-of-court statements;

1

- The Court should preclude the use of reports or notes prepared by law enforcement agents for impeachment purposes;

- The Court should preclude Parmar from arguing or eliciting testimony that addresses legal issues irrelevant to the jury's determinations and/or invites jury nullification;

- The Court should admit statements made by Parmar's co-conspirators in furtherance of the conspiracy;

- The Court should permit the designation of two case agents at trial;

- The Court should allow the Government to call a summary witness;

- If Parmar presents evidence inconsistent with his proffered statements, the Court should permit the introduction of such statements;

- The Court should preclude evidence or argument that the victims were negligent or otherwise to blame;

- The Court should permit the Government to use hypothetical questions concerning the victims' reliance on Parmar's and his co-conspirator's misrepresentations;

- The Court should admit bank records, phone records, and images of computers, phones, and email accounts as self-authenticating under federal rule of evidence 902(11) and 902(14); and

- The Court should permit the Government to file such additional motions as may be necessary.

For the reasons discussed below, the Court should grant the Government's motions *in limine*.

**STATEMENT OF FACTS**[1]

**A.    Background of the Go-Private Transaction**

Parmar controlled Company A[2], a publicly traded company that provided outsourced revenue cycle management ("RCM"), physician practice management, and other related services to hospitals and medical practices in the United States.[3]  In or around December 2014, Company A's securities began trading on the Alternative Investment Market ("AIM") of the London Stock Exchange ("LSE").

Between in or around April 2016 and November 2016, a private investment management firm (the "Private Investment Firm") and Company A engaged in negotiations relating to the Go-Private Transaction.  The Go-Private Transaction was structured so that a special purpose entity managed by the Private Investment Firm would ultimately own a controlling interest in Company A and the balance would be owned by a Parmar-controlled entity.

---

[1]    These facts are drawn from two criminal complaints and the Indictment charging Parmar, Sotirios Zaharis, a/k/a "Sam Zaharis," Ravi Chivukula, and Pavandeep Bakhshi with various criminal offenses in connection with the Go-Private Transaction.  *See* Mag No. 18-8040, Dkt. No. 1; Mag. No. 18-8177, Dkt. No. 1; Crim. No. 18-735, Dkt. No. 32.

[2]    During the scheme, Zaharis was the Chief Financial Officer of Company A, and Chivukula was on the board of directors and worked closely with Parmar and his co-conspirators in carrying out the fraud.  Bakhshi pleaded guilty and was sentenced on August 2, 2023.  Zaharis and Chivukula have been fugitives since the case was initially charged by complaint in May 2018.  Parmar is the only defendant expected to proceed to trial at this time.

[3]    Company A was incorporated in Delaware in or around September 2014 for the purpose of becoming a holding company for the "Operating Company," which owned several subsidiary entities engaged in the businesses referenced above.

In or around June 2016, Parmar delivered a presentation to the Private Investment Firm during which he portrayed Company A as a growing force in the medical billing industry, touting the company's expansion of operations into over twenty states through its organic growth and numerous acquisitions, including acquisitions of the following three separate purported medical billing and/or RCM businesses: MDRX Medical Billing ("MDRX"); Phoenix Health, LLC ("Phoenix"); and Northstar First Health, LLC ("Northstar"). Pointing to organic growth and Company A's acquisitions, Parmar represented to the Private Investment Firm that Company A's earnings and revenue were growing rapidly and exceeded expectations in the fifteen months following its listing on the AIM.

Additionally, during the negotiations, the co-conspirators provided extensive documents to the Private Investment Firm regarding Company A's purported financial condition, performance, and business operations. These documents included Company A's public filings on the AIM, presentations that the co-conspirators made to the Private Investment Firm, financial statements for certain of Company A's subsidiary companies, information about numerous purported customers of Company A and its subsidiaries, bank records, and customer contracts. The co-conspirators, including Parmar, represented to the Private Investment Firm that the information in these materials was true and accurate, and the Private Investment Firm relied on these representations in deciding to pursue the Go-Private Transaction. However, many of these documents contained material

misrepresentations or omissions, or were completely fabricated by Parmar, in furtherance of the scheme.

Based upon the information provided by the co-conspirators, the Private Investment Firm valued Company A at more than $300 million. The transaction closed in January 2017. As part of the financing, the Private Investment Firm put up approximately $82 million in equity and a consortium of financial institutions (the "Lenders") provided another approximately $130 million in debt.

**B.    Overview of Parmar and His Co-Conspirators' Fraudulent Tactics**

Parmar and the other co-conspirators employed a variety of fraudulent techniques to induce the Private Investment Firm and the Lenders to fund the transaction. These tactics included, but were not limited to: (1) falsifying and, in some cases, wholly fabricating, bank and accounting records of subsidiary entities, including the Operating Company, in order to generate a phony picture of Company A's revenue streams; (2) generating fake income streams and, in some cases, fabricating customers of Company A and its subsidiaries; and (3) creating fictitious operating companies that Company A purportedly acquired in sham acquisitions.

*False Accounting Entries and Fabricated/Altered Bank Statements*

Parmar and his co-conspirators inflated Company A's revenue and overall value by fabricating transfers, customer receipts, and other purported income to Company A and its subsidiaries, including the Operating Company. For example, they created false entries in the Operating Company's accounting records to create the appearance of customer revenue. These entries either reflected transactions that

never occurred or represented transfers into the Operating Company's bank accounts from related companies, rather than revenue from third-party customers. The Operating Company's revenue, as Company A's primary subsidiary, had a significant impact on Company A's overall financial performance.

The co-conspirators also created fake or altered bank statements to match the fraudulent and mischaracterized transactions set forth in the Operating Company's accounting records and to further create the impression of real revenue to the Operating Company. And they created fake bank statements for other purported subsidiaries of Company A, including a fictitious entity Parmar and his co-conspirators created as a part of the scheme.

***Bogus Customers and Customer Contracts***

Parmar and his co-conspirators fabricated customers and associated revenue of certain of Company A's subsidiaries, including the Operating Company. During the due diligence period of the Go-Private Transaction, the co-conspirators sent the Private Investment Firm information concerning customers that either did not exist or had no relationship with the Operating Company.

In or around late January 2016, Zaharis leased temporary office space throughout the country for numerous companies that the co-conspirators claimed were real customers of the Operating Company. The fake office locations were designed to further create the appearance that these entities were legitimate clients of the Operating Company. Zaharis sought Parmar's assistance in concealing the scheme even after the Go-Private transaction closed. For instance, on or about

February 22, 2017, Zaharis emailed Parmar seeking a telephone number to use on certain purported customer invoices.  The email stated, "If you have [a] spare parked T-Mobile number . . . can we change it to Ohio centric so we can use it on the invoices we send from Apex Healthcare Systems[?]  Then we put it in a phone and record a suitable message as well[.]  We say Apex was in Dayton so it should be a Dayton area code which is 934[.]"

### *Fake Operating Companies and Sham Acquisitions*

To further inflate Company A's revenues and overall value, Parmar and his co-conspirators orchestrated sham acquisitions by Company A of three separate purported medical billing and/or RCM businesses: Northstar; Phoenix; and MDRX.

Each of the three transactions followed a similar pattern: Company A raised money for the purported acquisition through a secondary stock offering on the AIM; the target or acquired company was formed shortly before the announced acquisition; and the funds raised for the acquisition were used for other purposes. In all three transactions, the co-conspirators made numerous false and misleading statements about the assets, operations, and value of the acquired companies.  In reality, Phoenix and MDRX had no real assets or revenues, and Northstar had one asset that was worth substantially less than the amount Company A claimed to have used to acquire it.

As for MDRX, not only did Parmar and his co-conspirators fabricate this company, but they also stole the description of MDRX that they used in press releases announcing the acquisition from pitch materials Parmar had previously received

relating to the possible recapitalization of a real company operating in the RCM space. After Company A publicly announced the purported acquisition of MDRX in December 2015, a financial advisor familiar with the real company Parmar and his co-conspirators used as the model for MDRX inquired about the announcement. The financial advisor emailed Zaharis: "Sam, I just left you a voicemail on an important matter concerning [Company A's] announcement of the MDRX acquisition. In reading the press release we noticed that the company description appears nearly identical to the … description in our Confidential Information Memorandum … As we are not familiar with MDRX, we wanted to confirm with you which of these facts are in fact correct and which may have been clerical errors. Please advise." Zaharis promptly forwarded this email to Parmar and others. In one such email to Bakhshi, Zaharis wrote, "Not good…………………" Bakhshi replied simply, "Oh fuck." When Zaharis replied that he would call Bakhshi, Bakhshi responded, "Pls. We need to be ready for this."

Parmar and his co-conspirators used the money raised from the sham secondary stock offerings for other purposes. For example, the funds from one such secondary offering were used to, among other things, make it falsely appear as though the Operating Company had substantial customer revenue when, in fact, the customer revenue was simply comprised of transfers of the money that had been raised in the secondary offering. To make it appear as though the funds were revenue, the co-conspirators created phony customers and altered bank statements to create the illusion that the funds had originated with the phony customers.

As noted above, during the due diligence period of the Go-Private Transaction, Parmar provided the Private Investment Firm and others extensive information that was false, fraudulent, and misleading. For example, on or about October 14, 2016, Parmar sent an email to a representative of the Private Investment Firm who was responsible for much of the financial due diligence and to Zaharis with the subject: "Updated financials." Parmar attached to the email a spreadsheet purporting to be Company A's "Consolidated Financial Model," which included a tab that purported to show MDRX's consolidated statement of operations. Despite the fact that MDRX was not even formed as a corporate entity until December 7, 2015, this consolidated statement of operations falsely showed positive earnings information dating as far back as January 2015.

***Impact of the Fraud on Company A's Financial Statements***

This elaborate criminal scheme had a substantial impact on Company A's financial statements and resulted in grossly inflated revenue, income, and earnings figures for the time period the Private Investment Firm evaluated in determining to pursue to the Go-Private Transaction.

The scheme to defraud was uncovered in or around September 2017, around the time certain of the co-conspirators resigned from their positions with Company A or were terminated. On March 16, 2018, Company A and numerous of its affiliated entities filed a petition for Chapter 11 relief in the United States Bankruptcy Court, Eastern District of New York (the "Bankruptcy Proceedings"). The petition attributes

Company A's financial demise, in large part, to Parmar and his co-conspirators' scheme.

In February 2019, the court in the Bankruptcy Proceedings entered an order confirming a plan of liquidation pursuant to Chapter 11 of the Bankruptcy Code. *See In re: Orion Healthcorp Inc., et. al*, No. 18-71748 (AST) (EDNY). According to a liquidation analysis filed in the Bankruptcy Proceedings on January 6, 2019, the debtors' assets (which include funds held by the federal government and real estate properties) under the Chapter 11 plan were valued at approximately $150 million, with the total amount of claims from secured lenders, general unsecured creditors, subordinated creditors, and interest holders exceeding that amount by more than $100 million (approximately $267 million). *Id.*, Dkt. No. 644-3.

## C.    Procedural History

Parmar was initially charged by criminal complaint on May 15, 2018 and arrested the following day. Dkt. No. 1. On December 13, 2018, a grand jury returned a three-count Indictment charging Parmar with conspiracy to commit securities fraud (Count One), securities fraud (Count Two), and wire fraud (Count Three). Dkt. No. 32.

Since then, Parmar has repeatedly sought to delay court proceedings and the trial in this case. To do so, he has routinely relied on health-related excuses, the veracity of which is questionable. For example, defense pretrial motions in Parmar's pending fraud case were briefed since June 2021. *See* Dkt. Nos. 115-17. The Court set oral argument on those motions for January 13, 2022, and trial for February 15,

10

2022.  *See* Dkt. No. 125.  The week before the oral argument, on January 3, 2022, Parmar's counsel represented to the Government that Parmar had severe health conditions that would require a six-month adjournment of the trial date.  Two days later, on January 5, 2022, Parmar's counsel submitted a letter to the Court asking for a one-month adjournment of the oral argument and a four-month adjournment of the trial date on the grounds that Parmar was undergoing medical tests and had contracted COVID-19.  *See* Dkt. No. 132.  The Government consented, and the Court rescheduled oral argument for February 15, 2022, and adjourned the trial until the motions were decided.  *See* Dkt. No. 133.

On February 4, 2022, Parmar sought another adjournment of the oral argument due to medical issues.  The Government again consented, and the Court rescheduled the oral argument for March 28, 2022.  *See* Feb. 8, 2022 Entry.  The week before the March 2022 oral argument, Parmar moved for an additional adjournment based on his ongoing medical circumstances.  *See* Dkt. No. 140.  In that submission, Parmar further stated that he had been unable to meet with his legal team to prepare for the oral argument and submitted a letter from Samul Raval, M.D., of Garden State Neurology & Neuro-Oncology, P.C., in support of his adjournment request.  *See id.* (attaching letter from Dr. Raval).  The Government did not object but expressed concerns to the Court regarding the repeated delays.  *See* Dkt. No. 141.  The Court again accommodated Paramar's request and adjourned the oral argument to May 5, 2022 in a text order.  *See* Dkt. No. 143.  In doing so, however, the Court noted, "[n]o further adjournments."  *Id.*

Consistent with his pattern, just two days before the May 5, 2022 oral argument, Parmar again moved for an adjournment until mid-July 2022. In support of the motion, Parmar submitted another letter from Dr. Raval and cited the fact that defense counsel was recently diagnosed with COVID-19, as well as Parmar's own ongoing medical tests and potential medical challenges. *Id.* (attaching letter from Dr. Raval). The Government consented to a two-week adjournment to allow counsel to recover from COVID-19 but opposed any further adjournments based on Parmar's personal health circumstances without a sufficiently detailed, documented reason for why Parmar was unable to attend the oral argument. *See* Dkt. No. 146. Despite the Government's opposition, the Court nevertheless gave Parmar the benefit of the doubt and adjourned oral argument to July 12 and 18, 2022. *See* Dkt. Nos. 152 & 160. The Court held oral argument on those dates and denied Parmar's motions.

On September 26, 2022, the Court directed the parties to submit a joint letter with availability for possible trial dates in early 2023. *See* Dkt. No. 169. Despite the availability of his counsel for trial, Parmar took the position that "*due to his medical condition*, it is unrealistic to set a trial date at this time." *See* Dkt. No. 172 (emphasis added). Parmar then continued to seek adjournments and cause delays, including by firing his attorneys mere days before a scheduled plea hearing, for the next 28 months.[4] As of the date of the Government's submission, Parmar has still not

---

[4]    On August 22, 2024, the Court held a bail-review hearing and addressed Parmar's trial delays, including those related to his health. In light of Parmar's repeated representations of various ailments, including his alleged brain cancer and open-heart surgery, the Court ordered independent neurological and cardiological examinations at Parmar's expense to be conducted by doctors selected by the Government. The Government selected a cardiologist and neurologist to conduct the independent evaluations. Since then,

retained counsel and trial has been scheduled for March 10, 2025. The parties' motions *in limine* are due on February 3, oppositions to those motions are due on February 17, and oral argument will be scheduled for the end of February.

## ARGUMENT

## I. THE COURT SHOULD BAR ANY REFERENCE TO THE CONSEQUENCES OF A CONVICTION.

The Government moves to preclude Parmar from referencing the consequences of conviction, including any reference to potential incarceration. The statutory maximum for the charges set forth in the Indictment is 20 years' imprisonment and, based on Parmar's criminal history, he likely faces a Sentencing Guidelines range of 262-to-327-months' imprisonment if convicted at trial—which, even at the low end of the range, is greater than the statutory maximum term of incarceration. As set forth below, the Government seeks a ruling prohibiting Parmar from mentioning potential consequences of a conviction in any manner during the trial.

It is well-established that a criminal defendant is not entitled to have the jury informed of the sentencing consequences of its decisions. According to the Third Circuit:

> In the federal courts, the role of the jury in a non-capital case is to determine whether the defendant is guilty or not guilty based on the evidence and the applicable rules of law. The jury is supposed to perform this role without being influenced in any way by what the consequences of its verdict might be.

---

however, Parmar has represented that he is healthy and will seek no additional trial delays. Given Parmar's declaration that he is now healthy and will no longer seek to delay trial, the Court held the independent evaluations in abeyance. In the event that Parmar's health becomes an issue, independent doctors are available to evaluate Parmar and produce a report on an expedited basis.

*United States v. Fisher*, 10 F.3d 115, 121 (3d Cir. 1993); *see also United States v. Nguyen*, 344 F. App'x 821, 824 (3d Cir. 2009) ("[T]he jury ha[s] no sentencing function and should reach its verdict without regard to what sentence might be imposed.") (quoting *Rogers v. United States*, 422 U.S. 35, 40 (1975)).

The Supreme Court has observed that:

> It is well established that when a jury has no sentencing function, it should be admonished to reach its verdict without regard to what sentence might be imposed. The principle that juries are not to consider the consequences of their verdicts is a reflection of the basic division of labor in our legal system between judge and jury. The jury's function is to find the facts and to decide whether, on those facts, the defendant is guilty of the crime charged. The trial judge, by contrast, imposes sentence on the defendant after the jury has arrived at a guilty verdict. Information regarding the consequences of a verdict is therefore irrelevant to the jury's task. Moreover, providing jurors sentencing information invites them to ponder matters that are not within their province, distracts them from their fact finding responsibilities, and creates a strong possibility of confusion.

*Shannon v. United States*, 512 U.S. 573, 579 (1994) (quotation omitted).

Accordingly, the Court should preclude Parmar from invading the province of the Court by referencing before the jury the potential punishment he faces.

## II. THE COURT SHOULD PRECLUDE PARMAR FROM INTRODUCING HIS OWN OUT-OF-COURT STATEMENTS.

The Court should preclude Parmar from offering his own self-serving, out-of-court statements in his case or through cross examination of other witnesses. That evidence may include reports relaying Parmar's statements, email communications involving Parmar, as well as any statements made to his co-conspirators. Ordinarily, an out-of-court statement offered for its truth is hearsay and inadmissible absent an

exception. *United States v. McGlory,* 968 F.2d 309, 331, 333 (3d Cir. 1992). Rule 801(d)(2)(A) carves out an exception for statements offered against the party that made the statement. *See, e.g.*, *Savarese v. Agriss*, 883 F.2d 1194, 1201 (3d Cir. 1989) ("Since the statement is that of the party himself, he can hardly be heard to complain that he cannot cross-examine himself as to his own utterances."). Thus, the Government may introduce Parmar's statements as the admissions of a party-opponent, under Rule 801(d)(2)(A). However, the hearsay rule precludes Parmar from introducing his own statements for their truth. *United States v. Hoffecker*, 530 F.3d 137, 191 (3d Cir. 2008) (defendant's out-of-court recorded exculpatory statements are inadmissible hearsay); *United States v. Wilkerson*, 84 F.3d 692, 696 (4th Cir. 1996) (same).

Similarly, Parmar's own assertions of innocence or other exculpatory statements through third-party witnesses are "self-serving, hearsay, and not admissible." *United States v. Kemp*, 362 F. Supp. 2d 591, 594 (E.D. Pa. 2005). The reason for prohibiting a defendant from introducing his out-of-court self-serving statements through the testimony of others is simple: allowing such testimony "would be tantamount to allowing [the defendant] to testify without being subject to cross examination." *Hoffecker*, 530 F.3d at 192; *see also Williamson v. United States*, 512 U.S. 594, 598 (1994). Of course, Parmar has the right not to testify at trial. But, to the extent he wishes to put exculpatory statements before the jury, then he must subject himself to cross-examination on them.

Moreover, Parmar should not be permitted to circumvent the general prohibition on introducing self-serving, out-of-court statements by leaning on the rule of completeness. Rule 106 provides "if a party introduces all or part of a writing or recorded statement, an adverse party may require the introduction, at that time, of any other part . . . that in fairness ought to be considered at the same time." Fed. R. Evid. 106. An additional portion of a statement may be introduced under Rule 106 "if it is necessary to (1) explain the admitted portion, (2) place the admitted portion in context, (3) avoid misleading the trier of fact, or (4) insure a fair and impartial understanding." *Hoffecker*, 530 F.3d at 192. The rule does not, however, require the admission of other portions of a statement that "are neither explanatory of nor relevant to the passages that have been admitted." *Id.* Nor does Rule 106 render admissible evidence that is otherwise inadmissible under the hearsay rules—such as a defendant's self-serving exculpatory statements. *Wilkerson*, 84 F.3d at 696; *see also Hoffecker*, 530 F.3d at 192 (finding defendant's out-of-court exculpatory statements to be inadmissible hearsay).

## III. THE COURT SHOULD PRECLUDE THE USE OF REPORTS OR NOTES PREPARED BY LAW ENFORCEMENT AGENTS FOR IMPEACHMENT PURPOSES.

Many of the witnesses who may testify at trial were interviewed by law enforcement agents, who prepared memoranda summarizing the interviews. The Court should preclude Parmar from misusing memoranda of these interviews during cross-examination by requiring compliance with Federal Rule of Evidence 613.

Rule 613 governs the examination of witnesses with respect to prior statements. Rule 613(a) permits a party to examine "a witness about *the witness's* prior statement." (Emphasis added.) Rule 613(b) permits a party to introduce "[e]xtrinsic evidence of" such a statement but "only if the witness is given an opportunity to explain or deny the statement." The language of Rule 613(a) confirms that the statement must, in fact, be a prior statement of the witness before it may be used for impeachment purposes. Thus, "a witness may not be impeached with a third party's characterization or interpretation of a prior oral statement unless the witness has subscribed to or otherwise adopted the statement as his own." *United States v. Saget*, 991 F.2d 702, 710 (11th Cir. 1993); *see also United States v. Adames*, 56 F.3d 737, 744-45 (7th Cir. 1995) (noting that the "district court did not abuse its discretion by insisting that impeachment be in accordance with the Federal Rules of Evidence" after witness refused to adopt statements contained in FBI summary); *United States v. Schoenborn*, 4 F.3d 1424, 1429 n.3 (7th Cir. 1993); *United States v. Chavez*, 979 F.2d 1350, 1355 (9th Cir. 1992); *United States v. Barile*, 286 F.3d 749, 757-58 (4th Cir. 2002). A memorandum summarizing an interview does not qualify as the witness's statement, and an attorney's out-loud quotation of the contents of an interview memorandum is not the "extrinsic evidence" to which Rule 613(b) refers.

Rule 613 precludes parties from confusing witnesses and misleading juries. As the Seventh Circuit has explained:

> the prosecution was concerned that the jury, seeing Marks' lawyer reading from [an FBI 302], would infer that if the witness denied having made the statement read by the lawyer, the witness must be lying, though in fact the FBI

17

> agent who had made the report might have gotten the
> witness's story down wrong and might have failed to ask
> the witness to read and sign the statement. . . . [S]ince a
> statement appearing in an interview report could easily be
> garbled, yet seem authoritative when read from a paper
> that the jury would infer was an official FBI document, the
> judge was reasonable in insisting that the witness be
> allowed to examine his purported statement before being
> impeached by it.

*United States v. Marks*, 816 F.2d 1207, 1211 (7th Cir. 1987).

This Court should preclude Parmar from suggesting to the jury that a witness made statements attributed to him or her in a report of the witness's earlier interview when questioning the witness about potentially contradictory statements in the report. Parmar can ask the witness whether he or she was interviewed on a particular day, and, assuming an affirmative response, whether the witness told the interviewer "X." In so doing, Parmar can frame the question using the exact wording of the report without saying that he or she is reading from a particular report. If the witness denies making the statement or fails to recall making it, Parmar may show the witness the report without indicating to the jury that he is showing the witness a report that purports to summarize the interview. If the witness ultimately answers "no" or fails to recall, Parmar should be precluded from asking, "Then why does it say X [or why isn't X contained] in this report." Parmar similarly should be precluded from suggesting in any way that the statement is contained in the memorandum. Instead, subject to relevance and Rule 403 considerations, Parmar can call the author of the memorandum to complete the impeachment. Policing compliance with Rule

18

613 will prevent Parmar from reading the contents of reports into the record through the examination of witnesses.

In addition, an interview report is hearsay under Federal Rule of Evidence 801(c) because it is an out-of-court assertion by the author of the report to the effect that "this is what the witness told me." *See In re High Fructose Corn Syrup Antitrust Litig.*, 156 F. Supp. 2d 1017, 1027 (C.D. Ill. 2001) ("The FBI 302 reports are clearly hearsay under Rule 801 of the Federal Rules of Evidence since they are out-of-court assertions."), *rev'd on other grounds*, 295 F.3d 651 (7th Cir. 2002); *see also United States v. Moreno*, 809 F.3d 766, 774 (3d Cir. 2016) (finding a violation of Confrontation Clause where witness read to jury excerpts from memoranda written by a law enforcement agent memorializing that agent's interviews of the witness, which were hearsay).

Requiring compliance with Rule 613 in no way deprives a defendant of a meaningful opportunity to confront and cross-examine witnesses. Where a witness has not adopted as his or her own statements contained in a law enforcement report and refuses to do so when confronted with them at trial, "the matter could then be resolved," not by reading the report aloud, but "by calling the FBI agent who had compiled the report." *Marks*, 816 F.2d at 1211; *accord Adames*, 56 F.3d at 744-45; *Page*, 991 F.2d at 710-11. And, even if complying with Rule 613 would make it more difficult for Parmar to impeach witnesses, "cross-examination is not a freestyle exercise, but, rather, must be conducted within reasonable limits." *United States v. Zaccaria*, 240 F.3d 75, 80 (1st Cir. 2001). In short, "the Confrontation Clause

guarantees an opportunity for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." *Delaware v. Fensterer*, 474 U.S. 15, 20 (1985) (per curiam).

## IV. THE COURT SHOULD PRECLUDE PARMAR FROM ARGUING OR ELICITING TESTIMONY THAT ADDRESSES LEGAL ISSUES IRRELEVANT TO THE JURY'S DETERMINATIONS AND/OR INVITES JURY NULLIFICATION.

The Government moves, pursuant to Federal Rules of Evidence 401 and 403, to preclude Parmar from arguing or eliciting testimony regarding legal issues not properly before the jury. Specifically, the Court should preclude any argument or testimony regarding the legality of evidence obtained during the investigation, including to challenge evidence obtained from cellular providers. Exclusion of such argument and/or testimony is appropriate because these topics: (i) should have been raised in pretrial motions for the Court's determination, not the jury's; (ii) are not relevant to the questions the jurors will be asked to determine in this case; (iii) are unduly prejudicial, in that they have a substantial likelihood of wasting time and will confuse the jury; and (iv) improperly promote jury nullification.

It has long been the case that "the question of the competency of the evidence . . . by reason of the legality or otherwise of its seizure [is] a question of fact and law for the court and not for the jury." *Steele v. United States*, 267 U.S. 505, 511 (1925); *see also Ford v. United States*, 273 U.S. 593, 606 (1927) (observing that "[t]he issue whether the ship [carrying contraband liquor] was seized [improperly] did not affect the question of the defendants' guilt or innocence," and was therefore not a question for the jury); *Bretti v. Wainwright*, 439 F.2d 1042, 1047 (5th Cir. 1971) (recognizing

the "well-established rule" that "it is for the court, not the jury, to decide whether evidence has been illegally obtained"); *United States v. Wheeler*, 172 F. Supp. 278, 281 (W.D. Pa. 1959), *aff'd*, 275 F.2d 94 (3d Cir. 1960) ("Universally the competency of evidence is a question of law for the court and not for a jury.").

Similarly, jury nullification—asking the jury to decide a case on extraneous matters—is "an aberration under our system." *United States v. Bruce*, 109 F.3d 323, 327 (7th Cir. 1997) (quotation omitted); *see also United States v. DeMuro*, 677 F.3d 550, 565 (3d Cir. 2012) (holding that district court properly excluded evidence that would have invited jury nullification).  Because "jury nullification violates the sworn jury oath and prevents the jury from fulfilling its constitutional role," *United States v. Boone*, 458 F.3d 321, 329 (3d Cir. 2006), any appeal to jury nullification is effectively "invit[ing] the jury to act lawlessly," *United States v. Perez*, 86 F.3d 735, 736 (7th Cir. 1996).  Moreover, evidence and argument directed toward jury nullification has no tendency to make the existence of any fact that is of consequence to the determination of the action more or less probable than it would be without the evidence, and, therefore, is irrelevant under Rule 401.  Thus, when the only purpose of evidence or argument is to encourage jury nullification, it should be excluded.

In this case, the jury will be asked to decide whether the Government has proven beyond a reasonable doubt each of the essential elements of the three counts against Parmar in the Indictment.  Those determinations are separate from the legality of the Government's investigation and collection of evidence in this case, which are matters for the Court.

21

By contrast, injecting into the jurors' minds even a suggestion that the Government's evidence was not lawfully obtained is highly prejudicial, will confuse the jury, will needlessly take the trial down irrelevant, time-consuming rabbit-holes, and will most certainly invite jury nullification. Accordingly, the Government respectfully requests that the Court prohibit any such arguments or questions designed to suggest the same. *Accord Burris v. United States*, 192 F.2d 253, 255 (5th Cir. 1951) (it is "entirely proper" for a court to "prohibit cross-examination of the witness upon [legal issues] when before the jury, and likewise refuse to permit argument to the jury by counsel" on the subject); *United States v. Sepulveda*, 15 F.3d 1161, 1190 (1st Cir. 1993) ("A trial judge [] may block defense attorneys' attempts to serenade a jury with the siren song of nullification.").

## V.    THE COURT SHOULD ADMIT STATEMENTS MADE BY PARMAR'S CO-CONSPIRATORS IN FURTHERANCE OF THE CONSPIRACY.

During the trial, the Government will present statements and messages made by Parmar's co-conspirators. These statements, made in furtherance of the conspiracy, are all plainly admissible as non-hearsay. Under Federal Rule of Evidence 801(d)(2), statements by "the party's coconspirator during and in furtherance of the conspiracy" are admissible against the defendant and are "not hearsay." In order for a statement to be admitted as a co-conspirator statement, "the Government must prove by a preponderance of the evidence that: (1) a conspiracy existed; (2) the declarant and the party against whom the statement is offered were members of the conspiracy; (3) the statement was made in the course of the conspiracy; and (4) the statement was made in furtherance of the conspiracy." *United*

*States v. Turner*, 718 F.3d 226, 231 (3rd Cir. 2013). "To prove these elements, the Government may rely on the co-conspirator's statements themselves, if they are corroborated by independent evidence." *Id.*; *see Bourjaily v. United States*, 483 U.S. 171, 180-81 (1987). Because these are "preliminary questions of fact" to be decided by the district court, *Bourjaily*, 483 U.S. at 175-76, and "the control of the order of proof at trial is a matter committed to the discretion of the trial judge," *United States v. Continental Group, Inc.*, 603 F.2d 444, 456 (3d Cir. 1979), the Third Circuit has explained that co-conspirator statements may be introduced at trial "without a prior showing of a conspiracy based on independent evidence, subject to the requirement that the government make such a showing by the close of its case," *United States v. Ammar*, 714 F.2d 238, 246 (3d Cir. 1983).[5] The evidence at trial will easily satisfy this standard, and therefore the statements by Parmar's co-conspirators should be admitted as non-hearsay.

## VI. THE COURT SHOULD PERMIT THE DESIGNATION OF TWO CASE AGENTS AT TRIAL.

In light of the voluminous evidence pertaining to Parmar's involvement in the conspiracy, including at least tens of thousands of records the Government received from third parties (including email communications and financial records), data from Bakhshi's personal email account, and data from a cell phone law enforcement seized

---

[5]     Statements by an "un-charged member" of a conspiracy can qualify under the co-conspirator hearsay exception as well, *United States v. Lopez*, 743 F. App'x 489, 493 (3d Cir. 2018), and these uncharged co-conspirator statements are admissible against Parmar even where Parmar was not involved in the conversation, *United States v. Cruz*, 910 F.2d 1072, 1082 (3d Cir. 1990) (district court properly admitted statements made by two uncharged and unidentified co-conspirators whose conversation was overheard by a law enforcement agent).

from Parmar at the time of his arrest, the Government requests permission for two case agents to remain in the courtroom during the trial.

Under Rule 615, at the request of any party, "the court must order witnesses excluded so that they cannot hear other witnesses' testimony."  Rule 615, however, does "not authorize excluding . . . an officer or employee of a party that is not a natural person, after being designated as the party's representative by its attorney" or "a person whose presence a party shows to be essential to presenting the party's claim or defense." Fed. R. Evid. 615; *see also United States v. Gonzalez*, 918 F.2d 1129, 1138 (3d Cir. 1990) ("[T]he government case agent responsible for a particular investigation should be permitted to remain in the courtroom, even though the agent will often testify later on behalf of the government.").

While typically Rule 615 is used to exempt one case agent from sequestration, where "different agents were responsible for different parts of the case," courts will typically grant an exception.  *United States v. Vaughn*, Crim. No. 14-23, 2016 WL 450163, at *3 (D.N.J. Feb. 4, 2016) (Linares, J.).[6]  Indeed, there is little or no concern about agents tailoring their testimony where, as here, the expected testimony of each agent will be to their separate roles in the investigation.  *See United States v. Kosko*, 870 F.2d 162, 164 (4th Cir. 1993) ("The testimony of the two agents d[o] not overlap as to any matter on which they had personal knowledge, and therefore their mutual presence during trial could not have undermined the integrity of the fact-finding

---

[6]      Under the "atypical facts" of *Vaughn*, Judge Linares ruled that a "very limited sequestration" of one FBI agent was appropriate.  *See United States v. Vaughn*, Crim. No. 14-23, 2016 WL 3406228, at *6 (D.N.J. June 14, 2016).

process."); *United States v. Phibbs*, 999 F.2d 1053, 1072 (6th Cir. 1993) (finding same). However, the Government will agree to sequester each case agent during the testimony of the co-case agent. *See United States v. Farnham*, 791 F.2d 331, 335-36 (4th Cir. 1986) ("[W]e hold that the district court erred in refusing to sequester Agent Martin, if not during the entire trial, at least during the testimony of his colleague. As the Advisory Committee noted, the sequestration of witnesses effectively discourages and exposes fabrication, inaccuracy, and collusion.").

## VII.   THE COURT SHOULD ALLOW THE GOVERNMENT TO CALL A SUMMARY WITNESS.

In a case involving voluminous records, summary witnesses may testify at trial and summarize the testimony of other witnesses as well as the documents or charts admitted into evidence. *See United States v. Sabino*, 274 F.3d 1053, 1066-68 (6th Cir. 2001); *United States v. Osum*, 943 F.2d 1394, 1405 (5th Cir. 1991) (summary witness "synthesized" and "categorized" evidence for the jury); *United States v. LaVergne*, 805 F.2d 517, 521 (5th Cir. 1986) ("[O]ne witness's summary of evidence already presented by prior witnesses' is admissible to aid the jury"). Here, the Government anticipates introducing voluminous documentary evidence—including doctored and true bank records as well as presentations—that a summary witness may be able to synthesize in order to aid the jury.

The purpose of a summary witness "is simply to aid the jury in its examination of the evidence already admitted." *United States v. Scales*, 594 F.2d 558, 563 (6th Cir. 1979); *accord United States v. Winn*, 948 F.2d 145, 158 (5th Cir. 1991). Just as an expert can assist a jury by imparting special knowledge that helps the jury to

understand technical evidence, a non-expert summary witness can help the jury organize and evaluate evidence that is complex and is presented at various times through many witnesses at trial.[7]  *United States v. Lemire*, 720 F.2d 1327, 1348 (D.C. Cir. 1983).

"Moreover, many courts have found that 'the nature of a summary witness's testimony requires that he [or she] draw conclusions based upon the evidence presented at trial."  *United States v. Hevener*, 382 F. Supp. 2d 719, 730 (E.D. Pa. 2005) (quoting *United States v. Radseck*, 718 F.2d 233, 239 (7th Cir. 1983)).  In *United States v. Blackwell*, a court in this District permitted the Government to call a summary witness, over the defendant's objection that the testimony was "not necessary," because "[i]n a case that involves the consideration of numerous records, summary witnesses may testify at trial to summarize the testimony of other witnesses and the documents or charts admitted into evidence," the "instant case involved numerous financial transactions," and therefore "the use of a summary witness to assist the jury in its understanding of the evidence was appropriate."  954 F. Supp. 944, 973 (D.N.J. 1997).

For these reasons, it is well-established that the summary witness need not be sequestered during trial.  *See United States v. Mohney*, 949 F.2d 1397, 1404-05 (6th Cir. 1991), *cert. denied*, 504 U.S. 910 (1992); *United States v. Strauss*, 473 F.2d 1262 (3d Cir. 1973).

---

[7]    In *Lemire*, the District of Columbia Circuit rejected the defendant's argument that a non-expert summary witness was improper under Rule 602. 720 F.2d at 1347; *see also Paulino*, 935 F.2d at 752-54.

Finally, when a summary witness testifies, an appropriate limiting instruction should be given to the jury, noting that the testimony is explanatory and is not itself substantive evidence. *See Lemire*, 720 F.2d at 1347; *Paulino*, 935 F.2d at 753; *LaVergne*, 805 F.2d at 521-22.

## VIII. IF PARMAR PRESENTS EVIDENCE INCONSISTENT WITH HIS PROFFERED STATEMENTS, THE COURT SHOULD PERMIT THE INTRODUCTION OF SUCH STATEMENTS.

Should Parmar testify or otherwise elicit statements that are inconsistent with his statements during his prior interview, the Government intends to introduce his proffered statements. As background, on May 22, 2019, Parmar provided information to the Government pursuant to a proffer agreement executed by Parmar, his counsel, and the Government. The proffer agreement provided that if Parmar was prosecuted, "no statements made by [Parmar] during the interview will be used against [Parmar] in the government's case-in-chief at trial or for purposes of sentencing, except as provided below." The proffer agreement provided several important exceptions, among them: "The government may use [Parmar]'s statements and any information provided by [Parmar] to cross-examine [Parmar] and to rebut any evidence or arguments offered on [Parmar]'s behalf." Thus, under the plain language of the proffer agreement, Parmar's proffer statements are admissible as substantive evidence if: (1) he testifies at trial in a manner inconsistent with the proffer statements; (2) he presents any exhibits, witnesses, or other evidence that are inconsistent with the proffer statements; (3) Parmar's or defense counsel's cross-examination of Government witnesses attempts to elicit testimony that is

inconsistent with the proffer statements; and (4) Parmar or defense counsel makes any statement in the opening statement that is inconsistent with the proffer statements.

Courts have regularly found that proffer agreements with similar language are enforceable and allow the Government to rebut evidence and argument offered by a defendant, including assertions made during opening statements. *See, e.g.*, *United States v. Hardwick*, 544 F.3d 565, 570 (3d Cir. 2008) (allowing proffer statements where defendant's counsel attempted to elicit testimony on cross-examination that was inconsistent with the proffer statement) (collecting cases); *United States v. Barrow*, 400 F.3d 109, 118-20 (2d Cir. 2005) (holding "[f]actual assertions made by a defendant's counsel in an opening argument or on cross-examination plainly fall within [the agreement's] broad language"); *United States v. Dortch*, 5 F.3d 1056, 1068 (7th Cir. 1993) (allowing proffer statement to impeach a defense witness).

During his proffer, Parmar made several acknowledgements that may be relevant for this trial, including but not limited to: (1) Company A's press releases contained false and misleading information regarding its purported acquisitions; (2) MDRX was a fictitious company with no real assets or operations; (3) Company A's 2015 financial statements contained false information that resulted in Company A being overvalued; and (4) Parmar and his co-conspirators created fake bank statements and falsified some of Company A's financial records. If Parmar or his counsel make any argument or elicit any statement that is inconsistent with his

statements during his prior interview, the Court should permit the use of Parmar's proffer statements to rebut any evidence or arguments offered on his behalf.

## IX. THE COURT SHOULD PRECLUDE EVIDENCE OR ARGUMENT THAT THE VICTIMS WERE NEGLIGENT OR OTHERWISE TO BLAME.

The Indictment alleges that Parmar employed a variety of fraudulent techniques to induce the Private Investment Firm, the Lenders, and others to fund the Go-Private Transaction. At trial, the Government plans to call witnesses from the Private Investment Firm and the Lenders who will testify that if they had known about any aspects of Parmar's fraud, they would not have participated in the Go-Private Transaction. Parmar should be precluded from arguing or eliciting evidence that would seek to "blame" these victims for participating in that transaction or for failing to discover his fraudulent scheme.

It is well established that "[t]he negligence of the victim in failing to discover a fraudulent scheme is not a defense to criminal conduct." *United States v. Coyle*, 63 F.3d 1239, 1244 (3d Cir. 1995); *see also United States v. Leadbeater*, No. 13-121, 2015 WL 567025, at *8-9 (D.N.J. Feb. 10, 2015) (precluding defendant from arguing that lenders "were not sufficiently careful or prudent in protecting themselves from fraud"); *United States v. Santos*, 2022 WL 1698171, at *3-4, 11 (D.N.J. Mar. 22, 2022) (finding that it was appropriate to exclude evidence of lender misconduct in bank fraud case as victim negligence or other misconduct is not a defense to fraud) (citing *Coyle*, 63 F.3d at 1244). As in these previous cases, the Court should preclude Parmar from advancing any such arguments or evidence at trial.

## X.   THE COURT SHOULD PERMIT THE GOVERNMENT TO USE HYPOTHETICAL QUESTIONS CONCERNING THE VICTIMS' RELIANCE ON PARMAR'S AND HIS CO-CONSPIRATORS' MISREPRESENTATIONS.

The Government seeks approval to examine certain of its witnesses through hypothetical questions, which courts permit in fraud prosecutions. *See United States v. Salzano*, Crim. No. 22-690, 2024 U.S. Dist. LEXIS 35677, at *47 (D.N.J. Feb. 26, 2024) (allowing government to ask hypothetical questions concerning the materiality of a defendant's actions and characterizing such questions as "plainly relevant and probative" because "[t]he government would be hard pressed to prove this element without asking whether the undisclosed information would have affected the decision maker's analysis" (cleaned up)); *see also United States v. Bush*, 522 F.2d 641, 650 (7th Cir. 1975) (hypothetical questions are normally improper "unless they are used to show that a defendant's active misrepresentations or active concealment were materially relied upon by a victim of the fraud"); *United States v. Ranney*, 719 F.2d 1183, 1187-89 (1st Cir. 1983) (approving use of hypothetical questions in mail fraud prosecution); *United States v. Isaacs*, 493 F.2d 1124, 1162 (7th Cir. 1974) ("what if" questions were proper in honest-services/corruption prosecution) (citing, *inter alia*, *United States v. Aleli*, 170 F.2d 18, 20 (3d Cir. 1948). Because the charges central to this case concern a securities fraud conspiracy and substantive securities and wire fraud based on Parmar's and co-conspirators' alleged misrepresentations, the Government intends to conduct similar questioning here. Hypothetical questions aimed at the materiality of

Parmar's and co-conspirators' alleged misrepresentations and omissions are relevant and should be permitted.

## XI.    THE COURT SHOULD ADMIT BANK RECORDS, PHONE RECORDS, AND IMAGES OF COMPUTERS, PHONES, AND EMAIL ACCOUNTS AS SELF-AUTHENTICATING UNDER FEDERAL RULE OF EVIDENCE 902(11) AND 902(14).

The Government anticipates introducing into evidence at trial bank records, phone records, and images of computers, phones, and email accounts. These records by and large are self-authenticating under the Federal Rules of Evidence and should be admitted without further testimony about their authenticity.

Federal Rule of Evidence 901(a) requires "that all evidence be authenticated or identified prior to admission." *United States v. Browne*, 834 F.3d 403, 408 (3d Cir. 2016). To satisfy that requirement, "the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is." Fed. R. Evid. 901(a). A witness with knowledge may authenticate an item by testifying that "an item is what it is claimed to be." Fed. R. Evid. 901(b)(1). However, certain items, listed in Rule 902, are "self-authenticating." Fed. R. Evid. 902(1)-(12).

"The burden of proof for authentication is slight." *United States v. Reilly*, 33 F.3d 1396, 1404 (3d Cir. 1994). The "showing of authenticity is not on a par with more technical evidentiary rules. . . . [r]ather, there need be only a prima facie showing, to the court, of authenticity." *McGlory*, 968 F.2d at 328-29. After "a prima facie case is made, the evidence goes to the jury and it is the jury who will ultimately determine the authenticity of the evidence, not the court." *Id.* "Authentication does

not conclusively establish the genuineness of an item; it is a foundation that a jury may reject." *Khorozian*, 333 F.3d at 506.

**Certified Business Records.** Rule 902(11) provides that "records of a regularly conducted activity," which fall into the "business records exception" to hearsay in Rule 803(6), "may be authenticated by way of a certificate from the records custodian, as long as the proponent of the evidence gives the adverse party reasonable notice and makes the record and certificate available for inspection in advance of trial." Fed. R. Evid. 902(11); *Browne*, 834 F.3d at 409. By virtue of this rule, "records of regularly conducted activity" may be authenticated by certificate rather than by live testimony." *Id.*

The Government will introduce business records at trial pursuant to Rule 803(6), including from cellular telephone service providers (e.g., T-Mobile); electronic service providers (e.g., Google); and financial institutions (e.g., Wells Fargo, Citibank, TD Bank, First Republic Bank, Bank of America, etc.). Rule 803(6) excludes records of regularly conducted activities from the hearsay rule if:

> (A) the record was made at or near the time by--or from information transmitted by--someone with knowledge; (B) the record was kept in the course of a regularly conducted activity of a business, organization, occupation, or calling, whether or not for profit; (C) making the record was a regular practice of that activity; (D) all these conditions are shown by the testimony of the custodian or another qualified witness, or by a certification that complies with Rule 902(11) or (12) or with a statute permitting certification; and (E) the opponent does not show that the source of information or the method or circumstances of preparation indicate a lack of trustworthiness.

"Rule 803(6) is designed to capture records that are likely accurate and reliable in content, as demonstrated by the trustworthiness of the underlying sources of information and the process by which and purposes for which that information is recorded." *Browne*, 834 F.3d at 410.

Here, the Rule 803(6) foundational requirements are set forth in the Rule 902(11) certifications assembled from the various record providers.

***Certified Images of Digital Devices.*** The Government also seeks an Order that the images of digital drives certified pursuant to 902(14) are *prima facie* authentic so that multiple forensic experts need not appear at trial. To date, the Government has not obtained such certifications, but it expects to do so very soon.

Under Federal Rule of Evidence 902(14), "[d]ata copied from an electronic device, storage medium, or file, if authenticated by a process of digital identification, as shown by a certification of a qualified person" constitutes self-authenticating evidence. "A proponent establishing authenticity under this Rule must present a certification containing information that would be sufficient to establish authenticity were that information provided by a witness at trial." Fed. R. Evid. 902(14), Advisory Committee's Note (2017).

In general, the certifications establish that (1) the certifiers were present when each device was obtained; (2) that the certifiers made a complete and accurate image of the device; and (3) that the certifier was qualified to do so. In each case, the certifier confirmed that the hash of the original device matched the hash of the image copy, as contemplated by the Rules Committee. For cellphones, forensic experts rely

primarily on specialized software, like Cellebrite, to confirm an accurate image was made.  *See* Fed. R. Evid. 902(14), Advisory Committee's Note (2017) ("The rule is flexible enough to allow certifications through processes other than comparison of hash value").

Whether any particular device belonged to Parmar or to someone else will be established at trial, not simply by evidence that they were obtained from a particular person or residence but based on the contents of the devices and other evidence.  *See* Fed. R. Evid. 901(b)(4) (noting that evidence may be authenticated based on "[t]he appearance, contents, substance, internal patterns, or other distinctive characteristics of the item, taken together with all the circumstances.").

## XII.  THE COURT SHOULD PERMIT THE GOVERNMENT TO FILE SUCH ADDITIONAL MOTIONS AS MAY BE NECESSARY.

As trial preparation progresses and Parmar retains counsel or elects to proceed *pro se*, additional evidentiary issues may surface.  In that event, the Government respectfully requests leave to file additional *in limine* motions addressing those issues rather than delay their resolution to trial, which could inconvenience the Court and the jury.

## <u>CONCLUSION</u>

In sum, the Government respectfully asks the Court to grant its various motions *in limine* for the reasons stated in each individual section above.


                                    Respectfully submitted,

                                    VIKAS KHANNA
                                    Acting United States Attorney


                        By:   CAROLYN A. SILANE
                              OLTA BEJLERI
                              VINAY S. LIMBACHIA
                              Assistant United States Attorneys


Dated:  February 3, 2025

35