UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

UNITED STATES OF AMERICA          :

                                Hon. Madeline Cox Arleo

       v.          :

PARMJIT PARMAR,          :          Crim. No. 18-735 (MCA)

    Defendant.          :

**UNITED STATES' MOTION FOR
PRELIMINARY ORDER OF FORFEITURE**

Pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c), and the procedures set forth in 21 U.S.C. § 853 and Rule 32.2 of the Federal Rules of Criminal Procedure, the United States of America (the "United States"), by and through the undersigned Assistant United States Attorney, hereby moves for the entry of a Preliminary Order of Forfeiture as to Specific Property (Final as to the Defendant) against Defendant PARMJIT PARMAR (the "Defendant" or "Parmar") in the above-captioned matter. The United States seeks forfeiture of property that is traceable to the proceeds of the Defendant's securities fraud conspiracy of conviction. In support of this motion, the United States provides the attached Affidavit of Special Agent James Wolfe of the Federal Bureau of Investigation (and exhibits attached thereto) and the following factual and legal bases.

**I.    FACTUAL BACKGROUND AND PROCEDURAL HISTORY**

On December 13, 2018, a federal grand jury in the District of New Jersey returned an Indictment, charging the Defendant in Count One with conspiracy to commit securities fraud, contrary to 15 U.S.C. §§ 78j(b) and 78ff, and 17 C.F.R §

240.10b-5. Indictment, ECF No. 32. The Indictment also contained forfeiture allegations, which put the Defendant on notice that upon conviction of the conspiracy charged in Count One of the Indictment, the United States would be entitled to forfeit, pursuant to 18 U.S.C. § 981(a)(1)(C), any property, real or personal, that constitutes or is derived from proceeds traceable to the securities fraud conspiracy. *Id.* at 13. The forfeiture allegations also put the Defendant on notice that the property subject to forfeiture included several real properties and funds from approximately six financial accounts. *Id.* at 13-14.

On May 7, 2025, the Court accepted the Defendant's guilty plea to Count One of the Indictment. *See* Minute Entry, ECF No. 296. Pursuant to his plea agreement, the Defendant agreed that the following assets constituted or were derived from the proceeds of his securities fraud of conviction, and therefore agreed that the assets would be forfeited to the United States:

    i.    The real property known as 50 Riverside Boulevard, Unit 21b, New York, New York;

    ii.    The real property known as 40 Broad Street, Unit 20FG, New York, New York;

    iii.    The contents of TD Bank account number -3616, held in the name of Sunshine Star LLC;

    iv.    The contents of TD Bank account number -3418, held in the name of Aquila Alpha;

v. The contents of Wells Fargo account number -7693, held in the name of Sequoia Training and Nutrition; and

vi. The contents of Wells Fargo account number -4994, held in the name of Aquila Alpha.

*See* Plea Agreement, ECF No. 298, at 4 and 12.

Because the Defendant consents to the forfeiture of these assets as the proceeds of his securities fraud conspiracy of conviction, the United States includes the assets in the attached proposed Preliminary Order of Forfeiture as to Specific Property (Final as to the Defendant). However, in his plea agreement, the Defendant reserved the right to contest the forfeitability of the following assets, which were seized by law enforcement in or around June and July 2018, respectively: (1) the contents of TD Bank Account number 4346588861, held in the name of First Connect Center Investors Fund LP ("First Connect TD Bank Acct 8861"); and (2) the contents of Bank of America Account number 381047817218, held in the name of First Connect Center Investors Fund LP ("BoA Account -7218" and, together with "BoA Account -8861," the "Forfeitable Property" or the "Forfeitable Accounts"). *See* Plea Agreement, ECF No. 298, at 5.

As further detailed in the Affidavit of Special Agent James Wolfe (the "Wolfe Affidavit"), the Forfeitable Accounts are traceable to the Defendant's securities fraud conspiracy. Accordingly, and as further argued below, the Court should include the

Forfeitable Accounts in the proposed Preliminary Order of Forfeiture as to Specific Property (Final as to the Defendant).

## II.   MEMORANDUM OF LAW

### A. Directly Forfeitable Property

"Any property, real or personal, which constitutes or is derived from proceeds traceable to" conspiracy to commit securities fraud is subject to forfeiture. 18 U.S.C. § 981(a)(1)(C); *see also* 18 U.S.C. § 1956(c)(7) (defining offenses that constitute "specified unlawful activity" to include those offenses listed in 18 U.S.C. § 1961(1)); 18 U.S.C. § 1961(1)(D) (listing fraud in the sale of securities). The Defendant has been convicted of Count One, charging him with conspiracy to commit securities fraud.

If a defendant is convicted of a conspiracy to commit securities fraud, the Court "shall order" the forfeiture of property as part of the sentence and, therefore, forfeiture is mandatory. *See* 18 U.S.C. § 981(a)(1)(C); 28 U.S.C. § 2461(c); *see also United States v. Monsanto*, 491 U.S. 600, 607 (1989) ("Congress could not have chosen stronger words to express its intent that forfeiture be mandatory in cases where the statute applied.").

Because criminal forfeiture is "an aspect of sentencing," *Libretti v. United States*, 516 U.S. 29, 49 (1995), and sentencing courts determine facts based upon a preponderance of the evidence, the preponderance standard applies to criminal forfeiture. *United States v. Sandini*, 816 F.2d 869, 875-76 (3d Cir. 1987); *see also, e.g., United States v. Sheley,* 998 F.3d 349, 351 (8th Cir. 2021); *United States v. Cox*, 851

F.3d 113, 120 (1st Cir. 2017); *United States v. Bader*, 678 F.3d 858, 893-94 (10th Cir. 2012) ("a forfeiture judgment must be supported by a preponderance of the evidence").

Federal Rule of Criminal Procedure 32.2(b)(1)(A) states that "[i]f the government seeks forfeiture of specific property, the court must determine whether the government has established the requisite nexus between the property and the offense." Fed. R. Crim. Pro. 32.2(b)(1)(A). A court may base its determination on whether property identified for forfeiture is subject to forfeiture on "evidence already in the record," and "any additional record or information submitted by the parties and accepted by the court as relevant and reliable." Fed. R. Crim P. 32.2(b)(1)(B). In that regard, the Court may also consider hearsay when making its forfeiture determinations, as long as the hearsay bears "indicia of reliability." *E.g.*, *United States v. Dermen*, 143 F.4th 1148, 1228 (10th Cir. 2025); *accord United States v. Kenner*, 443 F. Supp. 3d 354, 361 n.6 (E.D.N.Y. 2020) ("Moreover, because criminal forfeiture is 'viewed as part of the sentencing process,' . . . the Federal Rules of Evidence do not apply. . . . Accordingly, courts may consider hearsay evidence if the evidence is sufficiently reliable.") *see also* Fed. R. Evid. 1101(d)(3) (the Federal Rules of Evidence to not apply to sentencing).

Upon finding that property is subject to forfeiture by a preponderance, the Court "must promptly enter a preliminary order of forfeiture setting forth the amount of any money judgment, directing the forfeiture of specific property, and directing the

5

forfeiture of any substitute property if the government has met the statutory criteria."
*See* Fed. R. Crim. P. 32.2(b)(2)(A).

### B. Forfeiture *In Personam* Judgments

A forfeiture order in a fraud case can take the form of an *in personam* judgment for the amount of proceeds the defendant obtained from the fraud offense, even if the defendant is insolvent at the time the forfeiture order is imposed. *United States v. Vampire Nation*, 451 F.3d 189, 202 (3d Cir. 2006) (*en banc*). Mandatory forfeiture "is concerned not with how much an individual has but how much he received in connection with the commission of the crime." *Id.* at 202 (quoting *United States v. Casey*, 444 F.3d 1071, 1077 (9th Cir. 2006)). If the proceeds of the crime are not available for forfeiture, a money judgment allows the Court to "direct forfeiture of 'substitute property' subject to the conditions set out in 21 U.S.C. § 853(p)." *Vampire Nation*, 451 F.3d at 202.

### C. Substitute Property

If directly forfeitable property is not available, the Court may order the forfeiture of substitute assets to satisfy a forfeiture money judgment. *See* 21 U.S.C. § 853(p); Fed. R. Crim. P. 32.2(e); *United States v. Saunders*, 789 F. App'x 358, 359 (3d Cir. 2020) ("Under 21 U.S.C. § 853(p), the Government may seize any property of the defendant even if it is not tainted, i.e., derived from the offense."); *United States v. Fleet*, 498 F.3d 1225, 1227-31 (11th Cir. 2007) (any property of the defendant may

6

be forfeited as a substitute asset). Substitute assets are available for forfeiture upon a showing that one or more of the conditions set forth in 21 U.S.C. § 853(p) exists.

### D. The Forfeitable Accounts Are Traceable to the Proceeds of the Defendant's Securities Fraud Conspiracy

As alleged in the Wolfe Affidavit, Parmar controlled Company A, which "raised approximately $15.8 million in a 2015 secondary stock offering on the AIM for its purported acquisition of NorthStar and $36 million from its 2016 secondary stock offering on the AIM for its purported acquisition of MDRX." Wolfe Affidavit, ¶ 72. Parmar raised these funds through fraudulent means, as he has admitted by pleading guilty to the securities fraud conspiracy charged in Count One. The Wolfe Affidavit details how the proceeds from these fraudulently induced capital-raises are traceable to the two Forfeitable Accounts.

In or around June 2015, Constellation M&T Acct 5647 received approximately $15,779,897 as a result of the fraudulently-induced secondary offering related to NorthStar, and then within days, those funds were transferred to Constellation M&T Acct 8132. *Id.* at ¶ 73. In or around July 2015, approximately $7 million was transferred from Constellation M&T Acct 8132 to an account ending in 3309 at SunTrust Bank held in the name of Constellation Health Technologies ("Constellation SunTrust Acct 3309"). *Id.* at ¶ 74. In or around February 2016, approximately $7 million was transferred from the Constellation SunTrust Acct 3309 to an account ending in 3881 at M&T Bank, held in the name of First United Health LLC ("First United M&T Acct 3881"). *Id.*

7

Then, on or about August 9, 2016, approximately $12,220,000 was transferred from First United M&T Acct 3881 to Constellation M&T Acct 5647. *Id.* That same day, approximately $12,740,000 was transferred from Constellation M&T Acct 5647 to "Robinson Brog, the law firm that held funds in escrow for its client, Company A, and also received and disbursed funds from the escrow accounts it held on behalf of Company A." *Id.* As further described in the Wolfe Affidavit, the majority of the $12,740,000 that was transferred into the Robinson Brog account is traceable to the fraudulently induced secondary offering related to the NorthStar acquisition.

The $12,740,000 that was transferred to Robison Brog was held in the "Ranga Bhoomi Escrow Account." Wolfe Affidavit, ¶ 77. Between August 2016 and April 2017, approximately $7,322,512.77 was dissipated from the Ranga Bhoomi Escrow Account, leaving an approximate balance of $5,417,487.23, as of April 27, 2017. *Id.* "On October 2, 2017, approximately $5,417,487.23 was wired from the Ranga Bhoomi Escrow Account to," an account held in "the name of Ranga Bhoomi LLC . . . ('Ranga Bhoomi M&T Acct 1472')." *Id.* at ¶¶ 78-79. The "$5,417,487.23 was comprised of funds from the secondary offerings." *Id.* at ¶ 79. The only other significant deposits into the Ranga Bhoomi M&T Acct 1472 included approximately $4,025,000 that was transferred from an account held in the name of Anil Sharma at TD Bank (the "Anil Sharma TD Acct") between January 30, 2017, and June 7, 2017.

On or about October 11, 2017, approximately $10,166,000 was transferred from Ranga Bhoomi M&T Acct 1472 to an account at JPMorgan Chase ("Sequoia

JPMC Acct 2989") held in the name of Sequoia Training and Nutrition Consultants LLC, an entity purportedly belonging to Elena Sartison. *Id.* at ¶¶ 83-87. As further detailed in the Wolfe Affidavit, information derived from a civil lawsuit – *Ranga Bhoomi, LLC v. Sequioa Training and Nutrition Consultants, LLC, et al.*, Docket No. Mon-L-002754-20 (CBL) (Superior Court of New Jersey, Monmouth County,) – "established that Parmar opened Sequoia in Sartison's name, directed Sartison to open bank accounts in Sequoia's name at different banks, and controlled all funds moving in and out of the accounts, essentially opening shell companies and accounts through which to move money." *Id.* at ¶ 84.

Between in or around October 2017 and March 2018, the $10,166,000 that was deposited into Sequoia JPMC Acct 2989 was funneled through *three* different bank accounts at different financial institutions that were held in the name of Sequoia, until approximately $6,253,218.00 were deposited into an account ending in 6365 was opened at Columbia Bank on or about March 16, 2018, in the name Sequoia Training & Nutrition ("Sequoia Columbia Bank Acct 6365"). Wolfe Affidavit, ¶¶ 87-99. As the funds were being transferred through various Sequoia bank accounts, the approximately $10,166,000 that had been deposited in October 2017 was partially dissipated by Parmar on various personal expenses, including: (1) $2 million he paid for his attorney's fees in November 2017; (2) $250,000 he paid to Sartison in November 2017 to compensate her for physically assaulting her and causing facial

9

injuries; and (3) approximately $192,095 paid to American Express. *See id.* at ¶ 95, 106, and 119-124.

Attached to the Wolfe Affidavit as Exhibit A is a chart illustrating how funds derived from the fraudulently induced secondary offerings were deposited into Ranga Bhoomi M&T Acct 1472, and from there transferred through *five* different Sequoia bank accounts until $5,000,000 was deposited into First Connect TD Bank Acct 8861, one of the Forfeitable Accounts. *Id.* at ¶ 111. As asserted in the Wolfe Affidavit, "it is more likely than not that the vast majority of the funds seized from First Connect TD Bank Acct 8861 are traceable to the proceeds of the fraudulently induced secondary offerings, which were laundered through various accounts." *Id.* at ¶ 112.

Additionally, Exhibit A shows how in or around December 2017 funds were transferred from one of the Sequoia bank accounts to an account ending in 6448 that was opened at Columbia Bank on October 5, 2017 ("Van Cleef Columbia Acct 6448"), in the name of Van Cleef Property and Financials LLC ("Van Cleef"). *Id.* at ¶¶ 100-101. From the Van Cleef Columbia Acct 6448, approximately $100,000 was transferred in March 2018 to the First Connect BOA Acct 7218. *Id.* at ¶¶ 113-114; Exhibit A. "First Connect BOA Acct 7218 was funded by the proceeds of the fraudulently induced secondary offerings, which were laundered through various accounts." Wolfe Affidavit, ¶ 114.

As summarized in the Wolfe Affidavit:

> [T]he manner in which funds were transferred from one Sequoia account to another, sometimes within days of the accounts being

10

opened – as well as the fact that Sequoia was a sham entity used as Parmar's nominee – is consistent with an effort to launder the proceeds of Parmar's conspiracy to commit securities fraud, or some other criminal activity. Based on law enforcement's investigation into Parmar's banking activity and underlying fraudulent conduct, it seems implausible that Parmar would have transferred funds derived from any legitimate business activities through various accounts set up in the name of a shell entity, all while dissipating the funds for personal use, including paying $250,000 to Sartison in compensation for having assaulted her and $192,095 in credit card payments.

Accordingly, the Government respectfully requests that the Court find that the Forfeitable Accounts are traceable to Parmar's securities fraud conspiracy of conviction and order them forfeited, pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c). A proposed Preliminary Order of Forfeiture that forfeits the accounts, as well as the other assets that Parmar has already agreed are subject to forfeiture, is included for the Court's consideration.

### E. Alternatively, the Forfeitable Accounts Are Subject to Forfeiture as Substitute Assets

Alternatively, the Forfeitable Accounts are subject to forfeiture as substitute assets under 21 U.S.C. § 853(p).

The undersigned counsel for the United States has conferred with counsel for the Defendant and, based on those discussions, it is our understanding that the Defendant is not disputing that the $5,417,487 transferred from the Ranga Bhoomi Escrow Account at law firm Robinson Brog to Ranga Bhoomi M&T Acct 1472 is comprised of fraud proceeds. *See for reference* Exhibit A. Rather, it seems that the Defendant's position is that the $4,025,000 transferred from the Anil Sharma TD Acct

into the Ranga Bhoomi M&T Acct 1472 is not strictly traceable to the Defendant's fraud, and that therefore the Court should consider the $5.1 million seized the Forfeitable Accounts as the Defendant's property rather than traceable to the proceeds of his securities fraud. *See for reference id.* In other words, the Defendant's position, as counsel for the United States understands it, is that when the Defendant dissipated approximately $5 million by laundering funds through nearly a dozen different bank accounts, and spending the funds on personal expenses, he was dissipating ***fraud proceeds rather than his personal funds***.

Crediting the Defendant's argument would mean, for example, that when the Defendant paid Sartison $250,000 to compensate her for assaulting her and damaging her face – purportedly in a violent, drunken incident – that the Defendant was using ***fraud victim money*** rather than his own purportedly un-traceable funds to pay Sartison. *See* Exhibit B, Trial Decision, at p. 11-12 ("On June 8, 2017, while vacationing in Hawaii, Parmar, after extensive drinking, called Sartison an 'ungrateful bitch' and smashed a champagne glass on her face because she refused to have a sexual threesome with Parmar and his girlfriend Dasha from Russia. Her facial injuries and bloody dress are depicted in photos. . . . [] Sartison underwent approximately 15 medical procedures to treat her facial injuries. Parmar directed Sartison to falsely say her facial injuries were caused by a diving accident. Parmar later paid Sartison $250,000 to compensate her for the facial injuries.").

The Court must not endorse this argument, which would incentivize every

white collar criminal to commingle fraud proceeds with other funds, dissipate such commingled funds on personal expenses, and then later claim that any funds remaining cannot be traced to his crimes.

In any event, even if the Court is persuaded by the Defendant's position that the funds seized from the Forfeitable Accounts are traceable to the $4,025,000, the Government would request that the Court issue a forfeiture money judgment in the amount of $4,025,000, representing the amount of fraud proceeds that the Defendant dissipated on personal expenses and which are no longer available, and forfeit the Forfeitable Accounts as substitute assets. *See* 21 U.S.C. § 853(p)(1)(D) (directing the forfeiture of substitute assets for any forfeitable property that "has been substantially diminished in value . . . as a result of any act or omission of the defendant").

Furthermore, the Defendant engaged in multiple, complex transactions of his securities fraud proceeds between different accounts, commingling different funds between many bank accounts, as further described in the Wolfe Affidavit. Accordingly, the proceeds of the Defendant's securities fraud conspiracy have "been commingled with other property which cannot be divided without difficulty," meeting the factor set forth in 21 U.S.C. § 853(p)(1)(E). This is a separate basis on which the Court could also order the forfeiture of substitute assets.

If the Court finds that the Forfeitable Accounts are instead subject to forfeiture as substitute assets rather than because they are directly traceable to the Defendant's fraud, the Government can submit a proposed forfeiture order to that

13

effect.[1]

## III. CONCLUSION

For the foregoing reasons, the Government respectfully requests that the Court enter the proposed Preliminary Order of Forfeiture as to Specific Property (Final as to the Defendant), forfeiting to the United States all of the Defendant's right, title, and interest in the Forfeitable Accounts, as well as the remainder of the assets that the Defendant has agreed are subject to forfeiture.

Dated:      October 6, 2025
            Newark, New Jersey

                                        Respectfully submitted,

                                        TODD BLANCHE
                                        U.S. Deputy Attorney General

                                        ALINA HABBA
                                        Acting United States Attorney
                                        Special Attorney

                                        _/s/ Peter A. Laserna_
                              By:       Peter A. Laserna
                                        Kelly M. Lyons
                                        George M. Barchini
                                        Assistant U.S. Attorneys

---

[1] The Government respectfully submits that the Court should not order the return of the funds from the Forfeitable Accounts, even if the Court believes the Government has not proven by a preponderance that the accounts are subject to forfeiture. The Government anticipates that an order of restitution to compensate the Defendant's fraud victims will be imposed by the Court. Such a restitution order, once entered on the docket, creates "a lien in favor of the United States on all property and rights to property of the" Defendant. 18 U.S.C. § 3613(c). Accordingly, there is essentially no path for the funds from the Forfeitable Accounts to be returned to the Defendant. The undersigned counsel for the Government has explained this fact to counsel for the Defendant in an effort to avoid litigating these forfeiture issues, but the Defendant has not agreed to withdraw his objection to the forfeiture of the Forfeitable Accounts.