**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

STATE OF NEW JERSEY          )
                             )          **A F F I D A V I T**
COUNTY OF ESSEX              )

I, James Wolfe, being duly sworn, do depose and state:

1.      I am a Special Agent with the Federal Bureau of Investigation ("FBI"). I have been so employed since February of 2023. As a federal agent, I am authorized to investigate violations of the laws of the United States and to execute warrants under the authority of the United States. As a federal law enforcement officer, I have participated in numerous investigations, including investigations of various financial crimes.

2.      This Affidavit is made in support of the government's motion to forfeit the following properties (hereinafter referred to collectively as the "Forfeitable Property" or the "Forfeitable Accounts"):

> (i)     Approximately $4,990,871 seized from TD Bank Account number 4346588861, held in the name of First Connect Center Investors Fund LP, on or about June 27, 2018;

> (ii)    Approximately $100,000 seized from Bank of America Account 381047817218, held in the name of First Connect Center Investors Fund LP, on or about July 3, 2018.

3.      The information contained in this Affidavit is based upon my knowledge of the underlying criminal investigation, including my personal knowledge and observation, my training and experience, conversations with

other law enforcement officers and witnesses, and the review of documents and records, among other sources. Because this Affidavit is being submitted for the limited purpose of establishing probable cause, I have not included every detail of every aspect of the investigation. Rather, I have set forth only those facts that I believe are necessary to establish probable cause to support the seizure of the Forfeitable Property. Unless specifically indicated, all conversations and statements described in this Affidavit are related in substance and in part. In addition the events described in this Affidavit occurred on or about the dates provided herein. Where figures, calculation, dates and times are reported herein, they are approximate.

4.      The Forfeitable Property is subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c), as property, real or personal, that constitutes or is derived from proceeds traceable to conspiracy to commit securities fraud, which is an offense constituting specified unlawful activity, as defined in 18 U.S.C. § 1956(c)(7) and 18 U.S.C. § 1961(1)(D).

**I.    PROCEDURAL BACKGROUND**

5.      On June 27, 2018, based on much of the same information included herein, the Honorable Cathy L. Waldor, United States Magistrate Judge, issued three seizure warrants that authorized the seizing of funds in certain accounts controlled by Parmjit Parmar, a/k/a "Paul Parmar" ("Parmar") that contained proceeds of Parmar's fraud. *See* Mag. Nos. 18-7130, 7131, and 7132. Pursuant to the seizure warrants, funds in six bank accounts, including the two accounts at issue in this affidavit, were immediately seized.

6. On December 13, 2018, a grand jury in Newark, New Jersey returned a three-count Indictment against Parmar, for among other things, conspiracy to commit securities fraud, contrary to 15 U.S.C. §§ 78j(b) and 78ff, and 17 C.F.R. § 240.10b-5, in violation of 18 U.S.C. § 371 (Count One).

7. On May 7, 2025, Parmar entered a guilty plea to Count One of the Indictment pursuant to a plea agreement with the Government.

8. Pursuant to the plea agreement, Parmar agreed that the contents of certain accounts that were seized in June and July of 2018 are subject to forfeiture. These accounts include: TD Bank Account number 3616, held in the name of Sunshine Star LLC; TD Bank Account number 3418, held in the name of Aquila Alpha; Wells Fargo Account number 7693, held in the name of Sequoia Training and Case Nutrition; and Wells Fargo Account number 4994, held in the name of Aquila Alpha LLC.

9. Parmar disputes that the Forfeitable Accounts are subject to forfeiture.

10. Parmar's sentencing hearing is scheduled for October 7, 2025.

## II.  FACTUAL BACKGROUND

11. During the period relevant to this Affidavit:

a. "Company A" was a publicly-traded company that, through a web of operating subsidiaries, provided outsourced revenue cycle management ("RCM"), physician practice management, and other related services to hospitals and medical practices in the United States. Company A was incorporated in Delaware in or around September 2014 for the purpose of becoming a holding

company for the "Operating Company," which owned several subsidiary entities engaged in the businesses referenced above. In or around December 2014, Company A's securities began trading on the Alternative Investment Market ("AIM") of the London Stock Exchange ("LSE"). Company A was later taken private through a domestic merger transaction consummated in the United States and described below, which closed on or about January 30, 2017.

b.     The "Private Investment Firm" was a private investment management firm based in New York City that sought to acquire, own and operate businesses by providing long-term capital solutions.

c.     Parmar was a resident of New Jersey and was the Chief Executive Officer of Company A from its inception through in or about September 2017. Parmar also was a member of Company A's board of directors. Until in or around January 2017, Parmar, and various other entities he owned and controlled, owned the majority of Company A's shares.

d.     Sotirios Zaharis, a/k/a "Sam Zaharis" ("Zaharis"), was a resident of New Jersey and was the Chief Financial Officer of Company A. He also served on its board of directors.

e.     Ravi Chivukula ("Chivukula") was a resident of New Jersey and served as the Chief Financial Officer of the Operating Company. He also was a member of Company A's board of directors.

12.     Between in or about May 2015 through in or about September 2017, Parmar, Zaharis, and Chivukula (collectively, the "co-conspirators") orchestrated an elaborate scheme to defraud the Private Investment Firm and others out of

4

hundreds of millions of dollars in connection with the funding of a "going private" transaction whereby Company A, which was publicly traded on the LSE's AIM, was taken private through a series of transactions that will be referred to herein collectively as either the "Go-Private Transaction" or the "Merger." As part of the financing of the Go-Private Transaction, the Private Investment Firm put up approximately $82 million in equity and a consortium of financial institutions (collectively, the "Lenders") provided another approximately $130 million in debt. The co-conspirators' scheme was accomplished through a variety of fraudulent methods designed to grossly inflate the value of Company A and mislead the Private Investment Firm and others into believing that Company A was worth substantially more than its actual value.

13.     The scheme to present a materially false picture of the financial health of Company A began with several secondary offerings on the AIM whereby the co-conspirators sought to raise tens of millions of dollars in the public markets purportedly to fund Company A's acquisitions of various operating subsidiaries. In reality, a number of those entities either did not exist or had only a fraction of the operating income attributed to them. The evidence developed to date indicates that the co-conspirators then funneled the proceeds of these secondary offerings through bank accounts they controlled and used the money for a variety of purposes that had nothing to do with acquiring the purported acquisition targets. Rather, the money from one of the offerings was used to, among other things, make it appear as if the Operating Company had substantial customer revenue when, in fact, the funds were simply transfers of the money

that had been raised in the secondary offering. The co-conspirators went to great lengths to make it appear that these funds were revenue, concocting phony customers and altering bank statements to make it appear as if the funds were coming from customers. In fact, the purported revenues and, in many cases, the customers, were complete fabrications.

14.    The co-conspirators employed a variety of fraudulent techniques before and in the course of the Go-Private Transaction to induce the Private Investment Firm and others to fund the transaction. These tactics included, but were not limited to: (1) creating fictitious operating companies that Company A purportedly acquired in sham acquisitions that the co-conspirators simply made up; (2) falsifying and, in some cases, wholly fabricating, bank records of subsidiary entities in order to generate a phony picture of Company A's revenue streams; (3) generating fake income streams and, in some cases, fabricating customers of Company A and its subsidiaries; and (4) making other material misrepresentations and omissions to representatives of the Private Investment Firm and others. Through these actions, the co-conspirators caused the Private Investment Firm and others to value Company A at over $300 million for purposes of financing the Go-Private Transaction.

**A.    Background of the Go-Private Transaction**

15.    Between no later than in or around April 2016 and November 2016, the Private Investment Firm and Company A engaged in negotiations relating to the Go-Private Transaction. The Go-Private Transaction was structured so that a special purpose entity managed by the Private Investment Firm would

ultimately own a controlling interest in Company A and the balance would be owned by a Parmar-controlled entity.

16.    During the negotiations of the Go-Private Transaction and related due diligence activities by the Private Investment Firm, Parmar controlled Company A and was the key member of its senior management interfacing with the Private Investment Firm. Zaharis and Chivukula actively supported Parmar in these efforts.

17.    In or around June 2016, the co-conspirators made a presentation to the Private Investment Firm during which they portrayed Company A as a growing force in the medical billing industry, touting the company's expansion of operations into over twenty states through its organic growth and numerous acquisitions, including the following three separate purported medical billing and/or RCM businesses:  MDRX Medical Billing ("MDRX"); Phoenix Health, LLC ("Phoenix"); and Northstar First Health, LLC ("Northstar").

18.    Pointing to organic growth and Company A's acquisitions, Parmar represented to the Private Investment Firm that Company A's EBIDTA[1] and revenue were growing rapidly and exceeded expectations in the fifteen months following its listing on the AIM.

19.    Additionally, during the negotiations, the co-conspirators provided extensive documents to the Private Investment Firm regarding Company A's

---

[1] "EBIDTA" refers to a company's earnings before interest, taxes, depreciation, and amortization and is a measure commonly used to evaluate a company's financial performance in a given period of time.

purported financial condition, performance, and business operations. These documents included Company A's public filings on the AIM, presentations that the co-conspirators made to the Private Investment Firm, financial statements for certain of Company A's subsidiary companies, information about numerous purported customers of Company A and its subsidiaries, bank records, and customer contracts. The co-conspirators represented to the Private Investment Firm that the information in these materials was true and accurate, and the Private Investment Firm relied on these representations in deciding to pursue the Go-Private Transaction. As explained further below, however, many of these documents contained material misrepresentations or omissions, or were completely fabricated by the co-conspirators, in furtherance of the scheme.

20.    Based upon the information provided by the co-conspirators, the Private Investment Firm valued Company A at more than $300 million.

21.    In furtherance of the Go-Private Transaction, Company A, through Parmar, made specific representations and warranties in the merger agreement and subscription agreement (collectively, the "Merger Documents") that the Private Investment Firm ultimately signed. Specifically, Company A represented in the merger agreement that its financial statements were truthful and accurate, that there were no false entries in Company A's accounting records, that Company A's accounts receivable were the result of legitimate transactions, and that its material contracts were real and enforceable. Notably, Parmar and certain of his controlled entities also agreed in the subscription agreement to

indemnify the Private Investment Firm for "any intentional misrepresentations and fraud on the part of [Company A] or any seller."

22.    In reliance on the co-conspirators' material misrepresentations and omissions, on or about November 24, 2016, the Private Investment Firm signed the Merger Documents to consummate the Go-Private Transaction. Pursuant to the terms of the Merger Documents, the Private Investment Firm agreed to pay approximately $88 million in cash for a 50.7% economic interest in Company A after its conversion to a private entity following the transaction. As set forth in the subscription agreement, the Private Investment Firm received approximately 30,268,763 Class A Units of the newly formed entity. Additionally, the Lenders agreed to lend up to approximately $145 million to finance the Merger. Company A issued unsecured promissory notes to its shareholders to generate the remaining approximately $40 million. Parmar, as Company A's largest shareholder, received the majority of the proceeds from the Go-Private transaction, and an approximately 49.3% economic interest in the new private company. The Go-Private Transaction closed on or about January 30, 2017, with the Private Investment Firm contributing approximately $82.5 million in equity and the Lenders providing approximately $130 million in debt financing.

23.    As set forth in greater detail below and as included in the charged conduct in this case, the co-conspirators engaged in several categories of fraudulent conduct in connection with the Go-Private Transaction.

**B.    Fake Operating Companies and Sham Acquisitions**

24.    Between in or around May 2015 and February 2016, the co-conspirators orchestrated sham acquisitions by Company A of MDRX, Phoenix, and Northstar to inflate Company A's revenues, EBIDTA, and overall value. Each of the three transactions followed a similar pattern:  Company A raised money for the purported acquisition through a secondary stock offering on the AIM; the target or acquired company was formed only shortly before the announced acquisition; and the funds raised for the acquisition appear to have been used for other purposes. The co-conspirators nevertheless falsified the books and records of Company A to cause its general ledger to appear as though the funds raised during the secondary offerings had been used for the acquisition. Two of the three acquired companies, MDRX and Phoenix, were fictitious entities that the co-conspirators created in connection with the scheme. The other company, Northstar, had at least one real asset, but the co-conspirators grossly inflated the value of the company in furtherance of the scheme.

**1.    Company A's Sham Acquisition of MDRX (Announced on or about December 11, 2015)**

25.    One of the co-conspirators' fraudulent acquisitions involved the purported purchase of MDRX. The FBI has reviewed a regulatory release Company A issued and filed with the LSE on or about December 11, 2015, concerning the secondary offering of shares by Company A and the purported use of a substantial portion of the proceeds to acquire MDRX. In particular, in a Regulatory News Service ("RNS") announcement issued on December 11, 2015,

entitled "Proposed Placing & Conditional Acquisition," Company A announced its intention to raise approximately £30 million (approximately $45.5 million) (before expenses) through a secondary offering on the AIM. The December 11, 2015 RNS also announced that Company A "had entered into a conditional share purchase agreement to acquire MDRX for up to $30.0 million." Parmar is quoted in the December 11, 2015 RNS as stating that "[t]he acquisition of MDRX will be our fourth acquisition since IPO last year and we are very excited about its prospects in the context of the Group."

26.    As noted in greater detail below, the investigation has revealed that, in reality, MDRX did not exist. Not only did the co-conspirators fabricate this company, but documents and witness statements reflect that they also stole the description of MDRX that they used in the December 11, 2015 RNS from pitch materials Parmar and Zaharis had previously received relating to the possible recapitalization of a real company operating in the RCM space (hereafter referred to as "Company M").

27.    In or about October 2015, financial advisors for Company M, who were seeking to recapitalize it, sent a confidential information memorandum ("CIM") to Company A for review by Parmar and Zaharis. The CIM shows that it was furnished to potential investors on the understanding that it would be used only to evaluate whether to invest in Company M.

28.    Documents nevertheless show that the co-conspirators used the description of Company M in the CIM to generate the phony description of MDRX that they used in the December 11, 2015 RNS, in many cases lifting the

description word for word from the CIM. The remarkable similarities included the following:

a.    The CIM listed Company M as being based in Akron, Ohio, and contained references to Chicago, Cincinnati, Cleveland, Columbus and Wheeling. The co-conspirators wrote in the RNS that MDRX was "based in Akron, Ohio and has offices in Chicago, Cincinnati, Cleveland, Columbus and Wheeling."

b.    The CIM described Company M as "a leading national provider of outsourced healthcare practice management and consulting services, including outsourced billing, collections operations and financial management primarily to both independent and health system-based physician groups." The co-conspirators largely copied this description when writing about MDRX in the RNS:  "MDRX is a national provider of outsourced hospital practice management, private practice management and consulting services (including outsourced billing, collections, operations and financial management) to both independent and health system-based physician groups in the US."

c.    The CIM also contained a "Practice Overview" section which had as a subheading the following description:  "[Company M] offers a uniquely comprehensive set of turnkey healthcare management services, which allow medical practices to improve their profitability, cash cycle management and operations workflow." The co-conspirators lifted this description almost verbatim and included it in the December 11, 2015 RNS, noting, "MDRX offers a comprehensive set of turnkey healthcare management services which allow

12

medical practices to improve their profitability, cash cycle management and operations workflow."

29.    The same day that Company A issued the December 11, 2015 RNS announcing the secondary offering and the agreement to acquire MDRX, Zaharis received an email from one of the individuals who had served as a financial advisor for Company M in connection with its efforts to recapitalize (the "financial advisor," or the "Company M Financial Advisor"). The financial advisor wrote: "Sam, I just left you a voicemail on an important matter concerning [Company A's] announcement of the MDRX acquisition. In reading the press release we noticed that the company description appears nearly identical to the [Company M] description in our Confidential Information Memorandum (e.g., based in Akron, the last sentence is verbatim from our subheader on page 7). As we are not familiar with MDRX, we wanted to confirm with you which of these facts are in fact correct and which may have been clerical errors. Please advise." Zaharis promptly forwarded this email to others, including Parmar.  In one such email to an individual who will be referred to as "Co-conspirator 1," Zaharis wrote, "Not good...." Co-conspirator 1 replied simply, "Oh fuck." When Zaharis replied that he would call Co-conspirator 1, the latter responded, "Pls. We need to be ready for this."

30.    Zaharis and Parmar had an upcoming scheduled call with the financial advisor for several days later. On December 14, 2015, Zaharis sent Parmar an email entitled, "Speech for the Broker of [Company M]." Parmar

replied by asking Zaharis to have the document printed so Parmar would have it in front of him when he spoke with Company M's financial advisor.

31.    The FBI interviewed the Company M financial advisor about his interactions with Zaharis and Parmar. The financial advisor stated that he had several calls with Zaharis and a call with Parmar about the possibility of Company A buying Company M. The financial advisor said that Zaharis had submitted an indication of interest on behalf of Company A, but that Company M had decided not to proceed with a sale from any of its potential buyers. The financial advisor added that sometime later, he saw a press release from Company A describing the purchase of a company that engaged in the same business activity as Company M. The financial advisor noted that the press release used either the exact language or language that was very similar to that used by Company M in its CIM. The financial advisor said he contacted Zaharis about the similarities, and Zaharis claimed he would look into it. Zaharis then called back several days later and told the financial advisor that his public relations firm had two books and had mistakenly taken language from the wrong book.

32.    The explanation given by Zaharis to the financial advisor that there was a mix-up by Company A's public relations firm is belied by other documents showing that Zaharis, Parmar, and Chivukula knowingly stole the description of MDRX directly from Company M's CIM. In a series of emails Chivukula sent to Parmar and Zaharis on October 22, 2015, Chivukula made clear that he was creating, among other documents, a document entitled, "MDRX Medical Billing

LLC Due Diligence Findings" (hereinafter, the "MDRX Due Diligence Findings"). The document contains nearly identical sections to the Company M CIM. Chivukula's emails make clear that he was using the Company M CIM to create the purported MDRX Due Diligence Findings. For instance, when he circulated the draft to Parmar and Zaharis, Chivukula noted that he was "not able to edit the name of [Company M] in the header." He also noted that he was "not able to remove the background image of [Company M] in the presentation."

33.     Having stolen the corporate identity of Company M and fabricated a company that they called, "MDRX Medical Billing LLC," the co-conspirators proceeded to falsely represent that MDRX was a real, viable company with a substantial customer base and significant revenues.

34.     On or about February 10, 2016, Company A issued a press release announcing its acquisition of MDRX for $28 million, stating that MDRX had "a nationwide presence and brings approximately 3,500 more physicians on the [Company A] platform." In the announcement, Parmar made the following statement:

> The closing of the MDRX transaction will further increase [Company A's] revenue and significant cost savings will be borne out by MDRX being part of the [Company A] platform. MDRX will be our fourth acquisition since our IPO. We continue to evaluate a pipeline of acquisition opportunities which meet our strict criteria of being able to generate recurring revenue while generating significant profitability. MDRX augments the existing Physicians on the [Company A] platform in States such as California, Florida and New York and adds new geographies such as Alabama, Louisiana, New Mexico and Utah. With this transaction completed [Company A] will collect approximately $2

billion annually for physicians across the US and will increase our footprint in new territories.

35.    Numerous documents obtained during the investigation demonstrate that MDRX did not exist prior to this transaction. According to the Certificate of Formation for MDRX, the company was formed on December 7, 2015, right before the December 11, 2015 RNS announcing the secondary offering and the purported MDRX transaction, and approximately two months before the acquisition purported to close. Moreover, the stock purchase agreement between MDRX and Company A was a 58-page, detailed contract, the likes of which typically would be heavily negotiated over the course of time between the parties to the contract. Here, however, the stock purchase agreement was dated December 7, 2015—the very day on which MDRX purportedly was formed. The signature block corresponding to MDRX on page 58 of the stock purchase agreement reflected that it was signed by "Jack White," purportedly the CEO of MDRX. In addition, the stock purchase agreement reflected that MDRX's address was "166 High Street" in Akron, Ohio. The FBI has confirmed through various investigative steps that there is no "166 High Street" in Akron, Ohio. Although there is a 166 "S. High Street," that address is occupied by the City of Akron's government offices.  No entity with MDRX's name has operated there.

36.    Email communications reviewed in the investigation further demonstrate the fraudulent nature of Company A's purported acquisition of MDRX. For instance, on or about September 23, 2016, Zaharis sent Chivukula

16

an email with the subject line, "who did we say we acquired MDRX from." Zaharis went on to write the following in the body of the email:  "My hard drive with the info is upstairs in the bed room [sic] and they are all sleeping." Chivukula responded by writing simply, "APEX healthcare systems[.]"

37.    In an earlier email dated March 11, 2016, Zaharis sent Chivukula a copy of a notice to MDRX from the Internal Revenue Service ("IRS") advising MDRX that the IRS had assigned it an employer identification number ("EIN"). The date of the notice was March 11, 2016. This document reflected that MDRX did not have an EIN, a basic identifier used by companies doing business in the United States, until over a month after the announcement of its acquisition by Company A.

38.    The co-conspirators not only fabricated MDRX, but they misrepresented to the Private Investment Firm during the due diligence phase of the Go-Private transaction that it had substantial earnings prior to its purported acquisition by Company A. For instance, on or about October 14, 2016, Parmar sent an email to a representative of the Private Investment Firm who was responsible for much of the financial due diligence and to Zaharis. The subject of the email was "Updated financials." Parmar attached to the email a spreadsheet purporting to be Company A's "Consolidated Financial Model." The model contained a tab that purported to show MDRX's consolidated statements of operations. Despite the fact that MDRX was not even formed as a corporate entity until December 7, 2015, this consolidated statement of operations falsely showed positive earnings information dating as far back as January 2015.

17

39.    Bank records and other documents also have shown that, in connection with the secondary offering announced on December 11, 2015, which supposedly was going towards funding the (bogus) acquisition of MDRX, the co-conspirators diverted those funds to other uses, and falsified the books and records of Company A. A comparison of Company A's general ledger and its associated bank accounts reflected efforts by the co-conspirators to conceal the fraud. Specifically, Company A's general ledger showed that Company A received approximately $36.8 million on or about January 8, 2016 from the capital raise in the secondary stock offering on the AIM. The general ledger further shows disbursements of approximately $35 million on or about February 9, 2016, which were described as payment for the acquisition of MDRX.

40.    While the bank records confirmed Company A's receipt of the approximately $36 million in January 2016, the transactions in the account in or around February 2016 and over the next several months established that the funds were not used for an acquisition. Rather, the bank records showed numerous transfers to other accounts affiliated with Company A and/or other entities, including the Operating Company, Parmar, a law firm, and others. Approximately $7 million of the funds was transferred to the Operating Company in a series of smaller transfers and recorded in the Operating Company's general ledger as "AR payments" from specific customers, many of which appeared to be fake. In reality, the co-conspirators simply funneled some of the proceeds from the stock offering to the Operating Company to create fictitious customer income and to fraudulently inflate the company's revenue streams.

41.    For instance, on January 27, 2016, approximately $102,753 was sent from Company A's bank account to the Operating Company's bank account in four separate transfers. Each incoming bank transfer supported a phony entry in the Operating Company's general ledger purporting to show that the money was a receivable from a medical practice customer of the Operating Company. Law enforcement's investigation shows that, in reality, these transfers were simply inter-company transfers and that the medical practices that were supposedly paying the money to the Operating Company either did not exist or did not have a relationship with the Operating Company. This is demonstrated by the co-conspirators' efforts to lease temporary office space in the names of these and other purported customers of the Operating Company, as explained further below.

42.    This pattern of transfers designed to support false general ledger entries continued on numerous dates between January and July 2016 and resulted in millions of dollars in manufactured revenue to the Operating Company.

### 2.    Company A's Sham Acquisition of Northstar (Announced on or about September 16, 2015)

43.    Prior to the purported acquisition of MDRX, on or about September 16, 2015, Company A announced its acquisition of Northstar for approximately $18 million. Company A's bank account statements reflected that, in May 2015, Company A had raised approximately $15.8 million through a secondary stock offering on the AIM. Company A's press release announcing the

acquisition described Northstar as having a "stable client base of healthcare providers under recurring revenue contracts[,]" particularly 77 retained clients, as well as 233 employees (125 of which the release claimed were in the United States, with the remaining employees in India). The release also stated that Northstar had year-end revenue in 2014 of approximately $7.9 million and EBITDA of $1.9 million.

44.     According to Northstar's Certificate of Formation, it was formed on or about June 12, 2015, just a few months before Company A's claimed acquisition of Northstar.  Moreover, according to a copy of a purchase agreement, on or about September 2, 2015, Northstar purchased a business (the "Business Asset") for approximately $2,785,000. Further, based on a review of Company A's bank records, it does not appear that the approximately $15 million that it received from the secondary offering was used for an acquisition, other than the Business Asset. Rather, the bank records show numerous transfers to other individuals and entities over the course of several months following the deposit of the offering proceeds.

### 3.      Company A's Sham Acquisition of Phoenix (Announced on or about September 18, 2015)

45.     Lastly, on or about September 18, 2015, two days after Company A announced the Northstar transaction, Company A announced its acquisition of Phoenix, which it described as a company employing 138 people with revenue of $9.8 million as of the end of 2014. According to the press release announcing the acquisition, Company A acquired Phoenix for approximately $14 million.

46.    Notably, according to a Certificate of Formation obtained in the investigation, Phoenix was formed on September 11, 2015, just one week prior to the announcement of the acquisition. Further, October 2015 email communications between Chivukula, Zaharis, and others indicated that Phoenix did not have an EIN as of that time (over one month after the acquisition announcement). Specifically, on or about October 28, 2015, Chivukula emailed one of Company A's outside attorneys (copying Zaharis) and asked, "Can you please send the incorporation documents for Phoenix. We need to open a bank account and need these documents to get it going." The attorney replied and attached certain documents and, in response, Chivukula stated, "Do you also have the EIN letter for Phoenix?" The attorney responded, "No," and then Chivukula forwarded the attorney's response to Zaharis and stated, "Sam, we cannot open a bank account without an EIN number. Normally, [the attorney's] office applies for these. I can do this online too, but I need [Parmar's] SSN number." After a few additional emails back and forth regarding the information needed to apply for an EIN, Chivukula emailed Zaharis and stated, "I am mentioning the location of the business as Houston, Texas. Let me know if you think otherwise." Zaharis responded, "Ok.  You can see from the rns where we say they are located." Chivukula replied, "I need a physical address, and I am using the Houston office address."

47.    The Government has obtained a copy of a notice from the IRS to Phoenix dated November 27, 2015—months after the purported acquisition—advising Phoenix of its EIN. The notice was issued to Phoenix at the address of

Company A's principal place of business in Houston, Texas, as reflected in Company A's consolidated financial statements for 2014 and 2015.

48.    Several weeks after the above-referenced October 2015 emails, and approximately two months after the announcement of the purported acquisition of Phoenix, Zaharis emailed Parmar about creating a "sale agreement" for Phoenix and modeling it on a Northstar sale agreement that was purportedly signed on behalf of Northstar by "Bobby Kumar." Specifically, on or about November 18, 2015, Zaharis emailed Parmar and stated, "PP, [w]e have to create a Phoenix sale agreement much like the Northstar one that we had RAI's lawyer approve. The actual Northstar contract shared with RAI is attached.  I need your help to fill out the following for Phoenix … For Northstar, we had 'Bobby Kumar' ….. *who will we have for Phoenix*?" (emphasis in original). It is worth noting that a contract the defendants ended up drafting to document the purported Phoenix transaction used the name "Vijay Kumar," and the signature block at the end of the document listed Northstar in place of Phoenix.

## C.    Bogus Customers and Customer Contracts

49.    In addition to evidence of the fraudulent acquisitions described above, the investigation has revealed that many of the purported customers and the associated revenue of certain Company A subsidiaries, including the Operating Company, are fictitious.

50.    During the due diligence phase of the Go-Private Transaction, the Private Investment Firm was interested in seeing revenue and earnings data supporting Company A's organic growth rate. In this regard, during the due

diligence, the co-conspirators sent the Private Investment Firm information concerning customer revenue for the Operating Company, among other entities. For instance, on July 22, 2016, Chivukula sent an email to representatives of the Private Investment Firm copying Parmar and Zaharis. The email attached an Excel spreadsheet entitled "[Company A] Client – State – Fee – Tenure – Speciality collections and transactions.xlsx." The body of the email stated:  Attached is the collections and # of transactions data from 2013 to 2016." The spreadsheet included revenue figures for 2015 for approximately 33 purported customers of the Operating Company. The investigation has revealed that these customers either did not exist or had no relationship with the Operating Company. Indeed, the FBI has obtained records from a company providing temporary office space in the United States and elsewhere, and virtual office space, which records indicated that, in or around late January 2016, Zaharis leased temporary office space at various locations throughout the country for these same 33 companies. This evidence suggests that the co-conspirators simply made up these customers (and the associated revenue) and then attempted to create real addresses for them by leasing office space in their names.

51.     The co-conspirators employed similar tactics to fabricate customers of MDRX. Specifically, there were approximately 44 customers associated with MDRX in Company A's accounting records and in some of the financial records that the co-conspirators provided the Private Investment Firm during its due diligence. Law enforcement reviewed nine customer contracts between a medical billing entity that MDRX claimed to have acquired and purported medical

providers. These medical providers were listed in certain financial records of MDRX as its customers. Open source searches revealed that the addresses for the medical providers as set forth in the contracts were temporary office addresses. Representatives of these office locations have confirmed with law enforcement that they have no record of the purported MDRX customers doing business or occupying space there. Additional open source searches regarding the names of the individuals who purportedly signed these contracts on behalf of the medical providers revealed no affiliations between the names in the contract and the entity for which that person signed. This further demonstrates the fraudulent nature of these contracts, and MDRX more generally. Further, law enforcement has been unable to confirm through open source searches the existence of the remaining 35 MDRX customers at the addresses listed for the customers in Company A's records.

52.    These findings are corroborated by email communications between the co-conspirators. For example, on or about July 22, 2016 (more than five months after Company A announced its acquisition of MDRX), and the same day the co-conspirators sent the Private Investment Firm the spreadsheet of customer revenue figures discussed above, Zaharis sent Parmar an email that stated:

> Paul,
>
> For the audit we will need to prepare client contracts for MDRX physicians that we now have on our books. We have to create 60+ agreements that we inherited as part of the acquisition.  We need these for [the Accounting

Firm] plus maybe also for the legal due diligence schedule for [the Private Investment Firm].

I need your help on the following:

- I need to know the name of the entity we should say is signing the agreements. I don't think we should use MDRX as per the Asset Sale Agreement but another name .....can you suggest one to use? It will be the same name that we will use for the company wide expenses we are going to create for their P&L.

53. On or about November 16, 2016, Zaharis sent an email to Company A's outside counsel requesting that counsel create several "Delaware LLC's," including "Apex Healthcare LLC[.]" As noted above in paragraph 36, on or about September 23, 2016, Zaharis told Chivukula that they had previously said they had acquired MDRX from "APEX healthcare systems."

54. The co-conspirators' creation of false records to conceal their scheme continued even after the Go-Private Transaction closed. For instance, on or about February 22, 2017, Zaharis emailed Parmar seeking a telephone number to use on certain purported customer invoices. The email stated, "If you have [a] spare parked T-Mobile number ....can we change it to Ohio centric so we can use it on the invoices we send from Apex Healthcare Systems[?] Then we put it in a phone and record a suitable message as well[.] We say Apex was in Dayton so it should be a Dayton area code which is 937[.]" This email, and others collected in the investigation, suggests that the co-conspirators simply fabricated customer invoices to create the appearance of real customers that generated revenue to Company A.

**D.      Fabricated and Altered Bank Statements**

55.     In addition to the above, the co-conspirators also altered records relating to the Operating Company's bank accounts to create fictitious revenue to the Operating Company. The Operating Company's revenue, as Company A's primary subsidiary, had a significant impact on Company A's overall financial performance.

56.     Email correspondence among the co-conspirators demonstrates their efforts to alter bank records and, in some instances, to create them from scratch. With some of the emails, the co-conspirators attached the phony bank statements in Microsoft Word or Excel form. For example, on or about February 20, 2016, Chivukula emailed Parmar and Zaharis and attached numerous documents. The body of the email stated, "Paul[,] attached are the bank statements in excel and pdf. I am not able to get the bar code for Nov and December in the right format in word. Thanks, Ravi." Similarly, on or about January 25, 2017, Zaharis emailed Parmar and discussed the placement of a wire transfer into a bank statement. The email stated, "I don't think we make it on page 1 … I think we have it as the 1st one on page 2[.]  We will need to change the complete description … we can cut and paste the one from page 97 that you did … where you made it $1.1m[.]  We will need to tweak [a] few things from the one wire to the new one ..the TFN and the month/date."

57.     Additionally, a comparison of some of the bank account statements that the co-conspirators created in Excel form and the real bank records from the bank revealed substantial discrepancies. As just one example, the Operating

Company's January 2016 account statement that the Government obtained directly from the bank reflected an incoming wire transfer on January 29, 2016 in the amount of $43,673. The source of the wire transfer was Company A. Company A's bank records also showed the corresponding outbound wire to the Operating Company. However, a fabricated bank statement that the co-conspirators created for the same account during the same time period attributed this incoming wire transfer to an account belonging to "Chiropractic Care," a purported customer entity that law enforcement has confirmed to be fictitious. The Operating Company's general ledger also claimed that this transfer was for a receivable from "Chiropractic Care." The phony entries in the fake bank statement and the general ledger made a simple transfer of funds from Company A to the Operating Company appear to be revenue from a legitimate, third-party source.

58.    The co-conspirators also generated fake bank account statements for MDRX which, as explained above, was a bogus entity that the co-conspirators created in furtherance of the scheme. In or around March 2017, Zaharis and Chivukula discussed the details of various debits and credits in the purported bank account of MDRX.  In the email, Zaharis wrote, "Need to clean this up and to also include amount less bank charges transferred to main account [of the Operating Company] which will then mean a deposit entry in the main chase account on the same day." The email attached a purported MDRX bank statement constructed in Microsoft Excel. Law enforcement confirmed with the

bank reflected on these statements that it has no record of any accounts associated with MDRX.

59.    The scheme had a substantial impact on Company A's financial statements and resulted in grossly inflated revenue, income, and EBIDTA figures for the time period that the Private Investment Firm evaluated in determining to pursue to the Go-Private Transaction.

**E.    Impact of the Fraud on Company A's Financial Statements**

60.    The co-conspirators' scheme to defraud was uncovered in or around September 2017, at or around the time the co-conspirators resigned from their positions with Company A or were terminated. On or about March 16, 2018, Company A and numerous of its affiliated entities filed a petition for Chapter 11 relief in the United States Bankruptcy Court, in the Eastern District of New York. The petition attributed Company A's financial demise, in large part, to the fraudulent scheme described above.

**III.    ANALYSIS OF BANK RECORDS**

61.    The Forfeitable Property identified in this Affidavit includes the contents of bank accounts controlled by Parmar. The Forfeitable Accounts were funded by the fraudulently-induced proceeds of the secondary offerings on the AIM in 2015 and 2016, referred to in paragraphs 39 and 43 above.

**A.    Overview of the Transfers of Fraudulently Obtained Funds Through Accounts Controlled by Parmar**

62.    Based on a review and analysis of bank account records, email correspondence, business records, and publicly available documents pertaining

28

to Parmar's use of the funds fraudulently obtained through the aforementioned secondary offerings, Parmar diverted the funds to various bank accounts he controlled. Although Parmar controlled these bank accounts, the accounts were held in the names of other individuals and companies in order to conceal the true source of funds. While such bank accounts were not held in Parmar's name, the accounts listed Parmar's home address and phone number as the contact information for the accounts.

63.    Additionally, Parmar used several bank accounts under his control to receive and disburse proceeds of the fraudulent scheme. Parmar's movement of proceeds of the secondary offerings between bank accounts appears to have been meant to conceal the nature, source, location and ownership or control of the proceeds, as none of the Forfeitable Accounts are held in Parmar's name.

64.    Parmar transferred illegal proceeds of the fraudulently-induced secondary offerings from one bank account to another. The numerous transactions between and among the accounts, which had no apparent business purpose, were conducted in an effort to further conceal and disguise the nature, location, source, ownership and control of the proceeds of the fraudulent scheme.

65.    Examples of such transactions will be detailed later in this Affidavit. To that end, Parmar sometimes transferred identical amounts of money from one account he controlled to another account he controlled only a day or a few days after having transferred the identical amount of money out of another account that he controlled. Such transactions had no apparent purpose other than to

conceal or disguise the nature, location, source, ownership or control of the proceeds of the scheme to defraud.

**B.    The Accounts Used to Receive Proceeds of the Fraudulently-Induced Secondary Offerings**

66.    The primary accounts through which Parmar funneled proceeds obtained from the fraudulently-induced secondary offerings included an account at M&T Bank ending in 5647 in the name of Constellation Healthcare Technologies, Inc. (the "Constellation M&T Acct 5647"); and an account at M&T Bank ending in 8132 in the name of Constellation Healthcare Technologies Inc. (the "Constellation M&T Acct 8132").

### 1.    Constellation M&T Acct 5647

67.    M&T Bank records show that Constellation M&T Acct 5647 was opened on December 19, 2014. The authorized persons on the account were Paul Parmjit Parmar, 19 Colts Gait Lane, Colts Neck, New Jersey, as Chief Exective Officer ("CEO") of Constellation Healthcare Technologies, Inc., and Ravi S. Chivuklua, 24333 Cinco Terrace Drive, Katy, Texas, as Chief Financial Officer ("CFO") of that company.

68.    This account was used to receive approximately $50 million in proceeds from the secondary stock offerings referenced in paragraphs 39 and 43 above, between on or about June 11, 2015 and January 8, 2016. As alleged in said paragraphs, in furtherance of their scheme to defraud, the co-conspirators falsely conveyed that the secondary stock offerings were used to raise money for purported acquisitions by Company A of MDRX, Phoenix, and Northstar, when,

in reality, the capital raised was used for other purposes, including to create a false picture of Company A's financial health.

69.     Prior to the transfers of approximately $50 million in proceeds from the fraudulently induced secondary stock offerings to Constellation M&T Acct 5647, the account had a balance of zero, as of January 1, 2015. These funds were subsequently transferred to Constellation M&T Acct 8132. There were then a series of transfers from Constellation M&T Acct 8132 back to Constellation M&T Acct 5647.

### 2.     Constellation M&T Acct 8132

70.     M&T Bank records show that Constellation M&T Acct 8132 was opened on December 19, 2014. The authorized persons on the account were Parmar, 19 Colts Gait Lane, Colts Neck, New Jersey, as CEO of Constellation Healthcare Technologies, Inc., and Chivukula, 24333 Cinco Terrace Drive, Katy, Texas, as CFO of that company.

71.     Approximately $50 million in proceeds from the fraudulent secondary stock offerings employed in furtherance of the scheme to defraud were transferred into this account from Constellation M&T Acct 5647.

### C.     Tracing the Proceeds of the Fraudulently Induced Capital Infusion and Secondary Offerings

72.     As described above, Company A raised approximately $15.8 million in a 2015 secondary stock offering on the AIM for its purported acquisition of Northstar and $36 million from its 2016 secondary stock offering on the AIM for its purported acquisition of MDRX.

**1. The Fraudulently Induced Capital Infusions for the Purported Acquisitions of Northstar and MDRX**

73.    M&T Bank records show Constellation M&T Acct 5647 received two June 2015 wire transfers from Finncap Limited, a British investment banking firm that, among other things, helped companies listed on the AIM raise funds. On June 11, 2015, approximately $12,739,017.94 was transferred from Finncap to Constellation M&T Acct 5647, and on June 16, 2015, approximately $3,040,879.49 was transferred from Finncap to Constellation M&T Acct 5647. The balance in Constellation M&T Acct 5647 immediately prior to the June 11, 2015 transfer from Finncap was zero. Then, on June 26, 2015, approximately $15,779,897—all of the funds Constellation M&T Acct 5647 received from Finncap on June 11, 2015 and June 16, 2015—was transferred from Constellation M&T Acct 5647 to Constellation M&T Acct 8132. The balance in Constellation M&T Acct 8132 immediately prior to the June 26, 2015 transfer was approximately $80,000.

74.    Approximately $3.1 million was withdrawn from Constellation M&T Acct 8132 over the next 10 days and then, on July 13, 2015, approximately $7,000,000 was transferred from Constellation M&T Acct 8132 to an account ending in 3309 at Suntrust Bank held in the name of Constellation Health Technologies ("Constellation Suntrust Acct 3309"). Constellation Suntrust Acct 3309 was opened on or about July 10, 2015, and the authorized signatories on the account were Parmar and Chivukula. The balance in Constellation Suntrust 3309 prior to the $7,000,000 transfer was zero. There was no activity in

Constellation Suntrust Acct 3309—aside from interest earned—until February 10, 2016, when approximately $7,000,000 was transferred to an account ending in 3881 at M&T Bank, held in the name of First United Health LLC ("First United M&T Acct 3881"). The balance in First United M&T Acct 3881 prior to the February 10, 2016 transfer was approximately $2,000,000.

75.    Bank records indicate that First United M&T Acct 3881 was opened on or about August 2013 by Sarah Reinsch ("Reinsch"), who was listed on bank documents as the treasurer of First United. The address listed on account opening documents for Reinsch was 19 Colts Gate Lane, Colts Neck, New Jersey, which was Parmar's personal residence at the time ("Parmar's Colts Neck residence"). On June 11, 2015, Parmar, who was listed on bank documents as the manager of First United, was added as an authorized signatory on the account.

76.    Over the six months after February 10, 2016, approximately $4.7 million was deposited into First United Health M&T Acct 3881, and approximately $1 million was withdrawn from the account. The deposits into First United Health M&T Acct 3881 included $2.6 million deposited from Orion Health, which acquired Company A in the Go-Private Transaction. On August 9, 2016, approximately $12,220,000 was transferred from First United M&T Acct 3881 to Constellation M&T Acct 5647. Then on the same day, August 9, 2016, approximately $12,740,000 was transferred from Constellation M&T Acct 5647 to Robinson Brog, the law firm that held funds in escrow for its client, Company

A, and also received and disbursed funds from the escrow accounts it held on behalf of Company A.

77.    An attachment to a July 28, 2017 email sent from an employee of Robinson Brog to Zaharis and Parmar contained a ledger of the activity in the escrow accounts that Robinson Brog held on behalf of Company A. The ledger contained several sub-headings for various sub-accounts that Robinson Brog held on behalf of Company A, including one that read, "Constellation Hlth/Ranga Bhoomi" (the "Ranga Bhoomi Escrow Account"). The first entry in the sub-ledger for the Ranga Bhoomi Escrow Account showed a $12,740,000 deposit into the Ranga Bhoomi Escrow Account on August 10, 2016 from Constellation M&T Acct 5647. The ledger showed a series of disbursements out of the Ranga Bhoomi Escrow Account and, as of April 27, 2017, approximately $5,417,487.23 remained in the Ranga Bhoomi Escrow Account. There are no other entries in the ledger for the Ranga Bhoomi Escrow Account after April 27, 2017, signaling no other deposits or withdrawal activity in the Ranga Bhoomi Escrow Account.

78.    An account ending in 1472 was opened on February 1, 2016 in the name of Ranga Bhoomi LLC with a listed address of 3400 Route 35 South, Suite 9, Hazlet, NJ, 07730 ("Ranga Bhoomi M&T Acct 1472"). A Delaware Certificate of Formation for Ranga Bhoomi indicated that Ranga Bhoomi was formed on January 25, 2016. Salil Sharma ("Sharma") was listed as an authorized user of the account. The authorized signers for Ranga Bhoomi M&T Acct 1472 were (1) Sharma; (2) Parmar; (3) Dana Lord ("Lord"), whose address was listed as Parmar's Colts Neck residence; and (4) Zaharis. The primary phone listed for the

account was Parmar's phone number. A check of credit agency database information revealed that Lord has been associated with addresses in New York and California, but not in New Jersey.

79.    On October 2, 2017, approximately $5,417,487.23 was wired from the Ranga Bhoomi Escrow Account to Ranga Bhoomi M&T Acct 1472. As discussed above, the $5,417,487.23 was comprised of funds from the secondary offerings.

80.    Between January 30, 2017, and June 7, 2017, ten deposits totaling $4,025,000 were made from an account held in the name of Anil Sharma at TD Bank into the Ranga Bhoomi M&T Acct 1472.

81.    The only other deposits in the Rhanga Bhoomi M&T Acct 1472 were 74 deposits from ADP Total Source totaling $15,238 and one deposit from Kriss & Feuerstein LLP in the amount of $3,895 on April 7, 2017.

82.    On April 10, 2017, $22,211.11 was sent from the Ranga Bhoomi M&T Acct 1472 to Anil Sharma.

83.    An account ending in 2989, held in the name of Sequoia Training and Nutrition Consultants LLC ("Sequoia JPMC Acct 2989") was opened at JP Morgan Chase Bank one week after the October 2, 2017 transfer from the Robinson Brog law firm to Ranga Bhoomi M&T Acct 1472 on October 9, 2017. The address for Sequoia JPMC Acct 2989 was listed as 7004 Kennedy Boulevard East, Guttenberg, New Jersey. The account was opened by Elena Sartison ("Sartison"), who was in a personal relationship with Parmar.

84.     Sartison is listed on bank records as the owner of Sequoia Training and Nutrition Consultants. A New Jersey Certificate of Formation indicated that Sequoia Training and Nutrition Consultants LLC was formed on or about October 4, 2017, with Sartison listed as the registered agent and manager. After a bench trial that took place in Ranga Bhooomi, LLC v. Sequioa Training and Nutrition Consultants, LLC, et al., a civil action in the Superior Court of New Jersey, Monmouth County, Docket No. Mon-L-002754-20 (CBL), which is discussed in more detail below, Sartison's testimony established that Parmar opened Sequoia in Sartison's name, directed Sartison to open bank accounts in Sequoia's name at different banks, and controlled all funds moving in and out of the accounts, essentially opening shell companies and accounts through which to move money. *See* Ex. B. at 12.

85.     On October 10, 2017, a check for $10,166,000.00 – written on Ranga Bhoomi M&T Acct 1472 – was deposited into Sequoia JPMC Acct 2989.

86.     The next day, on October 11, 2017, a wire transfer was sent to the law firm Windels Marx Lanex Mittendorf LLP from the Ranga Bhoomi M&T Acct 1472 in the amount of $400,000.

87.     On October 5, 2017, an account ending in 5914, in the name of Sequoia Training & Nutrition Consultants LLC ("Sequoia"), was opened at Santander Bank ("Sequoia Santander Acct 5914"). The address for Sequoia Santander Acct 5914 was 7004 Boulevard East, Apartment 6B, Guttenberg, New Jersey. The account was opened by Sartison, who was listed on bank records as the owner of Sequoia.

88.    Sartison opened three additional accounts at Santander Bank on October 5, 2017. Santander Bank records show an account ending in 5558 in the name of Aquila Alpha LLC ("Aquila Alpha") with Parmar's Colts Neck residence as the address. Sartison was listed on Santander Bank records as the owner of Aquila Alpha. A New Jersey Certificate of Formation indicated that Aquila Alpha was formed on October 3, 2017, with Sartison listed as the registered Agent and Manager.[2]

### 2.    Accounts Opened by Sartison as a Nominee for Parmar

89.    Parmar used the accounts opened by Sartison to launder proceeds from the fraudulently induced capital infusions and secondary offerings, and Parmar used Sartison to open accounts in the names of companies that he actually controlled.

90.    In addition to the $10,166,000 deposit on October 10, 2017 from the Ranga Bhoomi M&T Acct 1472 discussed above, the only other deposits in the Sequoia JPMC Acct 2989 were an October 10, 2017 deposit from an account in the name of Aquila Alpha LLC at M&T Bank in the amount of $46,000, and an October 11, 2017 deposit from account in the name of Sunshine Star at M&T Bank in the amount of $234,000 on October 11, 2017.

91.    On October 30, 2017, a $10,445,988.00 check from Sequoia JPMC Acct 2989 was deposited into Sequoia Santander Acct 5914.

---

[2] On October 5, 2017, Sartison also opened bank accounts at Santander Bank in the names of Sunshine Star LLC and Van Cleef Property and Financials LLC. The address listed for both accounts was Sartison's Guttenberg personal residence.

92.    Four days later, on November 3, 2017, a $10,445,988.00 check payable to Sequoia Training & Nutrition was drawn on Sequoia Santander Acct 5914 and the account was closed.

93.    Four days after $10,445,988.00 was deposited into Sequoia Santander Acct 5914—on November 4, 2017—an account ending in 8588 was opened at M&T Bank, in the name of Sequoia Training & Nutrition ("Sequoia M&T Acct 8588"). The address for the account was 7004 Boulevard East, Apartment 6B, Guttenberg, New Jersey. An M&T bank form for Sequoia Training & Nutrition listed Sartison as a member of Sequoia Training & Nutrition with authorization to open accounts, and listed Sartison's address as Parmar's Colts Neck address.

94.    On November 8, 2017, the $10,445,988.00 check drawn on Sequoia Santander Acct 5914 was deposited into Sequoia M&T Acct 8588.

95.    Sequoia M&T Acct 8588 was opened on November 7, 2017, and was closed 13 days later, on November 20, 2017. During the thirteen days during which the account was open, approximately $8,195,671.96 in checks from Sequoia M&T Acct 8588 were issued to Sequoia Training & Nutrition, as discussed below. The only other transactions in the Sequioa M&T Acct 8588 were two checks issued on November 16, 2017 to law firm Windels Marx Lane & Mittendorf LLP in the amount of $1,000,000 each, for a total of $2,000,000, and a $250,000 payment to Elena Sartison on November 16, 2017.

96.    Bank records show an account ending 1295 was opened on November 17, 2017 at First Republic Bank, in the name of Sequoia Training &

Nutrition ("Sequoia First Republic Acct 1295"). The address listed for the account was 7004 Boulevard East, Apartment 6B, Guttenberg, New Jersey. Sartison is listed as the president and managing member of Sequoia Training & Nutrition on bank documents. A non-signer authorization form dated November 30, 2017 listed Zaharis as an authorized user of Sequoia First Republic 1295. The non-signer authorization form was signed by both Zaharais and Sartison, and conferred upon Zaharis authorization to send wires from Sequoia First Republic Acct 1295.

97.    On November 20, 2017, multiple checks totaling approximately $8,195,571.96 drawn on Sequoia M&T Acct 8588 were deposited into Sequoia First Republic Acct 1295.

98.    Bank records show an account ending in 6365 was opened at Columbia Bank on October 5, 2017, in the name Sequoia Training & Nutrition ("Sequoia Columbia Bank Acct 6365"). The address for the account was 7004 Boulevard East, Guttenberg, New Jersey. Sartison is listed as the primary account holder owner and managing member of Sequoia Training & Nutrition.

99.    On March 16, 2018, two cashier's checks drawn on Sequoia First Republic Acct 1295 totaling approximately $6,253,218.00 were deposited into Sequoia Columbia Bank Acct 6365.

100.    Bank records show an account ending in 6448 was opened at Columbia Bank on October 5, 2017 ("Van Cleef Columbia Acct 6448"), in the name of Van Cleef Property and Financials LLC ("Van Cleef"). The address for the accountholder was listed as 7004 Boulevard East, Guttenberg, New Jersey, and

Sartison is listed as the primary account holder, and managing member of Van Cleef.

101.  On December 4, 2017, approximately $235,000.00 was sent from Sequoia First Republic Acct 1295 to Van Cleef Columbia Acct 6448.

102.  An account ending in 6315 was opened at Columbia Bank on October 5, 2017, in the name Aquila Alpha ("Aquila Alpha Columbia Acct 6315") with Parmar's Colts Neck residence listed as the address. Sartison is listed as the primary account holder, and managing member on the account.

103.  On December 4, 2017, approximately $192,000.00 was sent from Sequoia First Republic Acct 1295 to Aquila Alpha Columbia Acct 6315. The balance in Aquila Alpha Columbia Acct 6315 immediately prior to the December 4, 2017 transfer was $50.

104.  An account ending in 6464 was opened at Columbia Bank on October 5, 2017 ("Sunshine Star Columbia Acct 6464"), in the name Sunshine Star LLC ("Sunshine Star"). The address for the account is listed as 3400 Highway 35, Suite 9A, Hazlet, New Jersey. Sartison is listed as the primary account holder, and managing member of Sunshine Star.

105.  On December 4, 2017, approximately $165,750.00 was sent from Sequoia First Republic Acct 1295 to Sunshine Star Columbia Acct 6464.

106.  There were several additional withdrawals from the Sequoia First Republic Acct 1295, including a December 5, 2017 withdrawal in the amount of $863,150 to MSMD LLC, and several payments in January and February 2018 to American Express totaling $192,095.

### D.    The Forfeitable Accounts

#### 1.    First Connect Center Investors Fund LP TD Bank Acct 8861

107.    An account ending in 8861 was opened at TD Bank on March 20, 2018.  The account was opened in the name of First Connect Center Investors Fund LP ("First Connect TD Bank Acct 8861"), and listed an address of 24 Commerce Street, Newark, New Jersey. The authorized signer for the account was Bhargava Marepally ("Marepally"), and Nanditha Marepally was added as a signer for the account on April 13, 2018.

108.    On March 26, 2018, three cashier's checks totaling $3,000,000.00 ($1,000,000 each) drawn on Sequoia Columbia Bank Acct 6365 were deposited into First Connect TD Bank Acct 8861, which, prior to the deposits, had a balance of zero.

109.    Three weeks later, on April 13, 2018, two cashier's checks totaling $2,000,000.00 ($1,000,000 each) drawn on Sequoia Columbia Bank Acct 6365 were deposited into First Connect TD Bank Acct 8861. The deposits into the First Connect TD Bank Acct 8861 totaled $5,000,000, including the aforementioned deposits. There were no other transactions in First Connect TD Bank Acct 8861. On July 3, 2018, pursuant to the judicially-authorized seizure warrant, the government seized the account balance in First Connect TD Bank Acct 8861, which was $4,999,998.00.[3]

---

[3] The bank deducted $2.00 from the account for a paper statement fee.

110.   Public records have revealed that Marepally was the CEO of GSS Infotech Ltd. ("GSS Infotech"), headquartered in Hyderabad, India. Publicly available annual reports of GSS Infotech show that Chivukula is the CFO of GSS Infotech. GSS Infotech also has offices at 2050 State Highway 27, Suite 201, New Brunswick, New Jersey, and 41B New London Turnpike, Glastonbury, Connecticut.

111.   Attached hereto as Exhibit A is a chart illustrating how funds derived from the fraudulently induced secondary offerings were deposited into Ranga Bhoomi M&T Acct 1472, and from there transferred through *five* different Sequoia bank accounts until $5,000,000 was deposited into First Connect TD Bank Acct 8861, one of the Forfeitable Accounts.

112.   Based on the above analysis, I submit it is more likely than not that the vast majority of the funds seized from First Connect TD Bank Acct 8861 are traceable to the proceeds of the fraudulently induced secondary offerings, which were laundered through various accounts. As discussed in paragraph 109, supra, First Connect TD Bank Acct 8861 was fully funded by Sequoia Columbia Bank Acct 6365, which in turn was fully funded by Sequoia First Republic Acct 1295. Sequoia First Republic Acct 1295 received funds derived from the fraudulently induced secondary offerings, which were originally disbursed from the Ranga Bhoomi Escrow Account, after they had been laundered through various accounts as discussed above.

### 2. First Connect Center Investors Fund Bank of America Acct 7218

113. After the December 4, 2017 wire transfer from Sequoia First Republic Acct 1295 into Van Cleef Columbia Acct 6448, there were no further deposits to Van Cleef Columbia Acct 6448. The balance in Van Cleef Columbia Acct 6448 at the time of the December 4, 2017 deposit was less than $100. From December 5, 2017 through April 2018 (when Van Cleef Columbia Acct 6448 was closed), there were a series of transfers out of Van Cleef Columbia Acct 6448, including a $100,000 wire transfer on March 19, 2018 to an account at Bank of America ending in 7218 held in the name of First Connect Center Investors Fund ("First Connect BOA Acct 7218").

114. First Connect BOA Acct 7218 was funded by the proceeds of the fraudulently induced secondary offerings, which were laundered through various accounts. As discussed in paragraph 113, First Connect BOA Acct 7218 was fully funded by Van Cleef Columbia Acct 6448, which in turn was fully funded by Sequoia First Republic Acct 1295. Sequoia First Republic Acct 1295 received funds derived from the fraudulently induced secondary offerings, which were originally disbursed from the Ranga Bhoomi Escrow Account, after they had been laundered through various accounts as discussed above.

### E. Parmar Admits in Testimony Under Oath that He Used the Funds in the Accounts Discussed Above for Personal Expenses

115. On September 1, 2020, Parmar filed a complaint in the Superior Court of New Jersey, Monmouth County, on behalf of Ranga Bhoomi against defendants Sequioa Training and Nutrition Consultants LLC; Sunshine Star,

LLC; Van Cleef Property & Financials LLC, Golden Star House LLC; Elena Sartison Inc., Emerald Pegasus, Aquila Alpha LLC, Elena Sartison, Nazareth Darakjian, Ivan Sartison, Galina Sartison, and John Does 1-3 (the "Monmouth County case"). Parmar sought recovery of the $10,166,000 transferred on October 10, 2017, from the Ranga Bhoomi M&T Acct 1472 into Sequoia JPMC Acct 2989, which as discussed above, was funded in part by the approximately $5.4 million in fraudulent proceeds from the secondary offerings.

116.   The Monmouth County case eventually proceeded to a bench trial before the Honorable Chad N. Cagan, which was conducted in October and November of 2024. Parmar testified over the course of three days during the trial.

117.   Parmar admitted at several points during his testimony that he used the approximately $10 million from the Sequioa JMPC Acct 2889 for personal expenses. Parmar testified that money from the Sequoia First Republic Acct 1295 was used to pay for "own his personal expenses," including, for example, attorney's fees. *See* Tr. of Parmar Testimony, Ex. C. at 15:16-16:3. Parmar also testified that approximately $2,110,000 of those funds were used to pay various attorneys and law firms, including $2 million paid to Wendels Marx Lane and Mittendorf LLP. *Id.* at 16:8-17:6; 17:15-18:15; 19:4-21:16; 22:15-23:17. At one point during his testimony, Parmar indicated that the "remainder of the monies" in the Sequioa account were intended to be used for the purchase of a horse farm. *Id.* at 23:18-24:5.

118.   Parmar also testified that the Van Cleef Account was established for a subsidiary of Sequioa and an investment vehicle for diamonds, gold, and

44

esoteric assets. *Id.* at 38:17-41:3. Parmar also testified that $1,200,000 from the Ranga Bhoomi M&T Acct 1472 was used to pay a diamond dealer. *Id.* at 39-41.

119.   The Court issued findings of fact after the bench trial, which included the testimony of both Parmar and Sartison. As noted extensively in the Court's opinion, Parmar set up the Sequioa JPMC Acct 2889 in Sartison's name, but prohibited Sartison from using the assets therein, and as noted above, he admitted that he used the over $10 million in funds in the Sequioa JMPC Acct 2889, to pay millions of dollars of his personal expenses. *See* Ex. B at 4.

120.   The Court found that in 2017, Parmar opened several corporations in Sartison's name, controlled all of the numerous bank accounts for these entities, and prohibited Sartison from moving any funds unless directed by Parmar. These accounts included the Aquila Alpha, Sequioa, Sunshine, and Van Cleef accounts discussed above. Parmar maintained "full control of the[] bank accounts." *Id.* at 17.

121.   The Court notably found that Parmar used the approximately $10,166,000 transferred to the Sequoia M&T Acct 8588 to "pay his personal expenses, including his lawyers." *Id.* Specifically, Parmar directed Sartison to pay the law firm Wendels Marx Lane and Mittendorf LLP a total of $2,000,000 from the Sequioa M&T Acct 8588 on November 16, 2017. *Id.* at 18. Indeed, Parmar admitted that he withdrew millions of dollars from the Sequioa accounts to pay his expenses. *Id.* at 20.

122.   The Court also found based on the evidence presented at trial that Parmar used the approximately $8.1 million that was transferred from the

Sequoia M&T Acct 8588 to the Sequioa Sequoia First Republic Acct 1295 to pay his personal expenses, including "millions of dollars for Parmar's credit card debt, real estate taxes, personal drivers, motor vehicles, and housekeepers." *Id.* at 19. This information was corroborated by Sartison's testimony as well as documentary evidence, including hundreds of thousands of dollars in payments to American Express, a one million dollar payment to the law firm Fisher Broyles LLP on June 4, 2018, and approximately $16,000 paid to BMW financial services. *Id.* at 19-20.

123.    Although Parmar testified that the $10,166,000 payment to Sequioa was a loan to Sartison, the Court found this testimony to be "unsupported, refuted by record evidence, and is not inherently believable." *Id.* at 6. Rather, the record at trial demonstrated that Parmar created the Sequioa entity under Sartison's name, used the funds deposited into the Sequioa JPMC Acct 2889 "for his personal benefit," and that Sartison was prohibited from using the funds. *Id.*

124.    The Court also found, based on finding Sartison's testimony credible, that Parmar physically assaulted Sartison, leaving her with facial injuries. *Id.* at 11. Parmar compensated Sartison $250,000 for her facial injuries, which was corroborated by the check from the Sequioa M&T account issued to Elena Sartison, as discussed in paragraph 95 above. *Id.* at 12.

125.    Regarding the three cashier's checks totaling $3,000,000 ($1,000,000 each) drawn on Sequoia Columbia Bank Acct 6365 and deposited into First Connect TD Bank Acct 8861 on March 26, 2018, as discussed in paragraph 108 above, Parmar's testimony during the trial disclaimed any

connection to those accounts and any knowledge regarding the source of those funds. Parmar testified that "First Connect has nothing to do with me." Ex. D at 109:14-17. The Court, however, noted that during this line of questioning, "Parmar became evasive and failed to provide a straight answer as to whether he knew why $3,000,000 was sent to First Connect." Ex. B at 5-6. The Court also found that "Parmar directed Sartison to pay an entity named First Connect as a total of $3,000,000 which was paid in three $1,000,000 checks on March 20, 2018." *Id.* at 19.

126.    In sum, the Court's opinion in the Monmouth County case confirms, in part through Parmar's own admissions under oath, that the approximately $10,166,000 that was transferred through the various Sequioa accounts, including the approximately $8,195,671 that was transferred to the Sequoia First Republic Acct 1295, from which the Forfeitable Property was fully funded, was used for Parmar's own personal benefit, including the payment of millions of dollars for his criminal defense lawyers and the payment of certain personal expenses. *Id.* at 26-27.

127.    Based on my training and experience, the manner in which funds were transferred from one Sequoia account to another, sometimes within days of the accounts being opened – as well as the fact that Sequoia was a sham entity used as Parmar's nominee – is consistent with an effort to launder the proceeds of Parmar's conspiracy to commit securities fraud, or some other criminal activity. Based on law enforcement's investigation into Parmar's banking activity and underlying fraudulent conduct, it seems implausible that Parmar would

47

have transferred funds derived from any legitimate business activities through various accounts set up in the name of a shell entity, all while dissipating the funds for personal use, including paying $250,000 to Sartison in compensation for having assaulted her and $192,095 in credit card payments.

## IV.    CONCLUSION

128.    Based upon the foregoing, I submit that it is more likely than not that the Forfeitable Property constitutes proceeds traceable to the conspiracy to commit securities fraud for which Parmar was convicted.

/s/ James Wolfe

_____

James Wolfe
Special Agent
Federal Bureau of Investigation