# Exhibit B

ORDER PREPARED BY THE COURT

| | |
|---|---|
| RANGA BHOOMI, LLC : | SUPERIOR COURT OF NEW JERSEY |
| : | LAW DIVISION |
| Plaintiff, : | MONMOUTH COUNTY |
| : | DOCKET NO.: MON-L-002754-20 (CBL) |
| v. : | |
| : | CIVIL ACTION |
| SEQUOIA TRAINING AND NUTRITION : | |
| CONSULTANTS LLC; SUNSHINE STAR, : | |
| LLC, VAN CLEEF PROPERTY & : | |
| FINANCIALS LLC, GOLDEN STAR HOUSE: | |
| LLC, ELENA SARTISON INC., EMERALD : | |
| PEGASUS, AQUILA ALPHA LLC, ELENA : | **FINAL JUDGMENT** |
| SARTISON, NAZARETH DARAKJIAN, : | |
| IVAN SARTISON, GALINA SARTISON, : | |
| JOHN DOE 1-3 : | |
| : | |
| Defendants, : | |

FILED JAN 13 2025 CHAD N. CAGAN, J.S.C.

**THIS MATTER** having come before the court in the presence of plaintiff Ranga Bhoomi,

LLC, represented by Robert J. DeGroot, Esq., and defendants Elena Sartison, Golden Star House,

LLC and Nazareth Darakjian, represented by Albert Dayan, Esq. and Tony Mirvis, Esq., and the court

having heard and considered the plaintiff's first amended complaint, and the court having conducted

a bench trial and considered the testimonial and documentary evidence before it, and the court having

considered argument of counsel, and for those reasons set forth in the attached Trial Decision, and

for good cause having been shown,

**IT IS HEREBY ORDERED AND ADJUDGED ON THIS** 13th day of January, 2025 as

follows:

1. Plaintiff's request for judgment under count one of the first amended complaint alleging

   unjust enrichment is **DENIED with prejudice**.

2. Plaintiff's request for judgment under count two of the first amended complaint alleging

   common law fraud is **DENIED with prejudice**.

3. Plaintiff's request for judgment under count three of the first amended complaint alleging breach of contract is **DENIED with prejudice**.

4. Plaintiff's request for judgment under count four of the first amended complaint alleging conversion is **DENIED with prejudice**.

5. Plaintiff's request for judgment under count five of the first amended complaint alleging promissory estoppel is **DENIED with prejudice**.

6. All other relief sought by plaintiff and not specifically addressed herein is **DENIED with prejudice**.

7. A copy of this Final Judgment shall be served upon the parties via eCourts.

HON. CHAD N. CAGAN, J.S.C.

*See Attached Trial Decision*

2

**NOT TO BE PUBLISHED WITHOUT**
**THE APPROVAL OF THE COMMITTEE ON OPINIONS**

| | | |
|---|---|---|
| RANGA BHOOMI, LLC | : | SUPERIOR COURT OF NEW JERSEY |
| | : | LAW DIVISION |
| Plaintiff, | : | MONMOUTH COUNTY |
| | : | DOCKET NO.: MON-L-002754-20 (CBL) |
| v. | : | |
| | : | CIVIL ACTION |
| SEQUOIA TRAINING AND NUTRITION | : | |
| CONSULTANTS LLC; SUNSHINE STAR, | : | |
| LLC, VAN CLEEF PROPERTY & | : | |
| FINANCIALS LLC, GOLDEN STAR HOUSE: | | |
| LLC, ELENA SARTISON INC., EMERALD | : | **TRIAL DECISION** |
| PEGASUS, AQUILA ALPHA LLC, ELENA | : | |
| SARTISON, NAZARETH DARAKJIAN, | : | |
| IVAN SARTISON, GALINA SARTISON, | : | |
| JOHN DOE 1-3 | : | |
| | : | |
| Defendants, | : | |



Decided: January 13, 2025

Robert J. DeGroot, Esq., on behalf of Plaintiff Ranga Bhoomi, LLC

Albert Dayan, Esq., and Tony Mirvis, Esq., on behalf of Defendants Elena Sartison, Nazareth Darakjian and Golden Star House, LLC

**CAGAN, J.S.C.**

In 2016, Parmjit "Paul" Parmar ("Parmar"), an apparent wealthy and sophisticated businessman, commenced a romantic relationship with Elena Sartison ("Sartison"), an aspiring model from Russia who arrived in New York City two years earlier in 2014 at the age of nineteen on a three-year visa sponsored by a modeling agency. Beginning in 2017, Parmar created numerous entities using Sartison's name as owner, including Sequoia Training and Nutrition Consultants, LLC ("Sequoia"). Through his company, plaintiff Ranga Bhoomi, LLC ("Ranga Bhoomi"), Parmar transferred millions of dollars to Sequoia, which funds he then used to pay his

personal expenses. Parmar controlled all bank accounts and Sartison was prohibited from moving funds unless directed by Parmar.

In May 2018 Parmar was arrested by the United States Federal Bureau of Investigation ("FBI"). Parmar was indicted on December 13, 2018. The romantic relationship between Parmar and Sartison terminated in 2019. In 2020, Parmar initiated this action on behalf of Ranga Bhoomi against defendants primarily seeking the recovery of $10,166,000 under the theory that the funds constituted a loan to Sartison through Sequoia.

For the reasons set forth below, the court finds all causes of action pled in Ranga Bhoomi's complaint to be without merit. Accordingly, all relief sought by Ranga Bhoomi is denied with prejudice.

## **PROCEDURAL HISTORY**

On September 1, 2020 plaintiff filed its initial complaint. On October 13, 2020 defendants Sartison, Nazareth Darakjian ("Darakjian"), and Golden Star House, LLC ("Golden Star") filed their answer to the complaint with affirmative defenses. On December 6, 2021 default was entered against Sequoia, Sunshine Star LLC ("Sunshine"), Van Cleef Property & Financials LLC ("Van Cleef"), Elena Sartison Inc. ("ESI"), Emerald Pegasus, and Aquila Alpha LLC ("Aquila").

On July 24, 2023 plaintiff filed its first amended complaint which revised allegations, asserted new allegations, and added a new cause of action for promissory estoppel against Sartison and defendants Emerald Pegasus and Sequoia. Sartison filed an answer to the first amended complaint on October 1, 2023. Plaintiff failed to serve the amended complaint on the defaulted defendants as required by Rule 1:5-1(a) ["no service need be made on parties who have failed to appear except that pleadings asserting new or additional claims for relief against such parties in default shall be served upon them in the manner provided for service of original process."] Neither

the complaint nor the amended complaint was served on defendants Ivan Sartison and Galina Sartison, Sartison's parents who reside in Europe.

The court conducted a bench trial on October 22, 23, 28, 29, 30, and November 6, 2024, 2024.

A list of the exhibits entered evidence is attached hereto as Schedule A.

## CREDIBILITY

In evaluating the testimony of the witnesses, the court had an opportunity to observe the demeanor and conduct of the witnesses. To evaluate their credibility, the court considered the following factors, among others:

1. The witness' interest, if any, in the outcome of this case;

2. The accuracy of the witness' recollection;

3. The witness' ability to know what he/she is talking about;

4. The reasonableness of the testimony;

5. The witness' demeanor on the stand;

6. The witness' candor or evasion;

7. The witness' willingness or reluctance to answer;

8. The inherent believability of the testimony; and

9. The presence of any inconsistent or contradictory statements.

[Model Civil Jury Charges (Civil), 1.12K. "credibility (short version)" (approved Nov. 1998).]

### A. Plaintiff's Witnesses

### 1. Parmjit "Paul" Parmer

Plaintiffs called Parmar as its first witness.  Parmar testified as to his wealth and business sophistication.  Parmar, age 55, (DOB 12/19/1969), testified he grew up in India where he worked

in defense research from the eleventh grade. He won a young scientist award. He worked at Paine Webber from approximately 1992-1997 after which he started Pegasus Consulting Group. He testified that he sold one of his businesses, Pegasus Elite Aviation, to Delta for $2.5 Billion from which he received $500,000,000. Parmar testified that he currently owns four companies including nine cancer centers around the United States, and, prior to 2016, owned sixteen companies.

Parmar testified that he met Sartison in 2014 when she accompanied a friend to his birthday party. In or about 2015/2016 he asked Sartison to be his girlfriend. As a condition of being his girlfriend, Parmar prohibited Sartison from pursuing her modeling career and agreed to compensate her $250,000 per year for lost modeling compensation.

Parmar testified that in 2017 he was looking to buy a large property in Colts Neck, New Jersey to operate a horse farm. Parmar testified that on October 10, 2017 banker's checks totaling $10,166,000 were issued out of his company Ranga Bhoomi and then deposited with Sequoia, a company set up in Sartison's name. Parmar prohibited Sartison from using the assets deposited with Sequoia unless directed by him.

Concerned about the legitimacy of the transaction, Chase Bank would not clear the $10,166,000 check for Sequoia's account and froze the account. Parmar called Jamie Diamond, Chief Executive Officer of Chase Bank, to effectuate the deposit but Chase Bank remained concerned. Parmar arranged for the $10,166,000 to be unfrozen and returned. Parmar testified that the funds were deposited at M&T Bank. Then, in November 2017, an account was opened for Sequoia at First Republic Bank.

Parmar admitted that he used the Sequoia account to pay millions of dollars of his personal expenses.

Parmar testified that Van Cleef was established as a subsidiary of Sequoia and an investment vehicle for diamonds, gold, and esoteric assets. Parmar testified that he gets a 30% discount from a diamond dealer with whom he had done tens of millions of dollars of business. Parmar testified that the dealer visited Parmar's house and left three diamonds for the purchase price of $1,200,000 with the understanding Parmar would wire the funds the next day. Parmar testified that Ranga Bhoomi paid the $1.2 Million. Parmar stated he returned one diamond and $350,000 was returned.

Parmar contended the deposit of approximately $10,000,000 with Sequoia constituted a loan to Sartison. Parmar also contended Sartison possessed the two diamonds that he purchased.

Parmar admitted there is no written agreement stating that the payment from Ranga Bhoomi of $10,166,000 to Sequoia was a loan. Parmar admitted there are no documents stating that Sartison possessed the two diamonds purchased by Parmar.

Parmar testified as to a photo depicting Sartison's severely injured face. As testified by Sartison, Parmer allegedly assaulted her by smashing a champagne glass on her face because she refused to engage in a sexual threesome. Parmer contended, without supporting proof, that the photo of Sartison's injured face was embellished using photoshop.

Parmar also testified as to an email dated October 24, 2018 from Parmar's email account in which he stated that payment from Ranga Bhoomi was an investment, not a loan, and that Sartison did not owe him anything. Parmar contended he did not write the email, and without any proof, speculated that Sartison somehow created the email.

Regarding the payment of three $1,000,000 checks issued by Columbia Bank and made payable to First Connect Center Investor Fund, LLP ("First Connect"), upon questioning, Parmar

5

became evasive and failed to provide a straight answer as to whether he knew why $3,000,000 was sent to First Connect.

In May 2018, Parmar was taken into custody by the FBI. Parmar remained incarcerated for 8-9 weeks. Parmar believed the government seized approximately $200,000,000.00 of assets linked to Parmar. Parmar was indicted on December 13, 2018. The criminal matter against Parmar remains pending. Parmar is on house arrest.

The romantic relationship between Parmar and Sartison ended in 2019.

The court finds Parmar's testimony that he, through Ranga Bhoomi, loaned Sartison, through Sequoia, over $10,000,000 is unsupported, refuted by record evidence, and is not inherently believable. The record evidence demonstrates that he created Sequoia under Sartison's name, he used the funds deposited with Sequoia for his personal benefit, and Sartison was prohibited from using the funds. The court finds dishonest his conjecture that a photo of Sartison's facial injuries from his smashing a champagne glass in her face was photoshopped. The court also found untruthful his testimony that he did not write his October 24, 2018 email.

The court finds Parmar to be an incredible witness. Parmar's testimony was conjured, unsupported, refuted or contradicted by record evidence. Parmar testified with convenient, self-serving recollection tailored to fit his position. His testimony appeared scripted and rehearsed. He was not forthright and, at times, was evasive. He was not an honest witness.

## 2. Nazereth Darakjian

Plaintiff called Darakjian as its second witness. Darakjian is an English professor in New York City. Darakjian met Sartison in approximately 2014. They married in 2016. They separated in approximately 2020 and divorced in 2021.

Darakjian testified that he did not know of Sartison's relationship with Parmar. He testified he never met Parmar. Darakjian testified he learned that Sartison lived with Parmar during the testimony in this trial.

Darakjian testified that his marriage to Sartison was bona fide. He did not receive any compensation to marry her. He sponsored Sartison for citizenship.

Darakjian testified that Sartison never expressed an interest to purchase a horse farm. He stated that he was unaware that Sartison had any relationship with any corporations or that she had a company with millions of dollars.

Darakjian testified that Parmar texted him in 2019. Darakjian stated he had no idea who Parmar was. Darakjian stated that Parmar was vague and cryptic and wrote "I want to help you." Darakjian thought Parmar was a creep obsessed with Sartison. Darakjian "blocked" Parmar to prevent further communications from Parmar.

The court finds Darakjian was candid, forthright and sincere. Darakjian had a clear, good memory. He was not evasive. Darakjian knew what he was talking about, was thoughtful in answering questions, and he exhibited no reluctance to answer questions. The court finds Darakjian was honest and inherently believable. The court finds Darakjian to be a credible witness.

### 3. John Petrozza

Plaintiff called John Petrozza ("Petrozza") as its third witness. Petrozza was introduced to Parmar in approximately 2011. Petrozza testified that in 2013 he invested $4,000,000 in companies controlled by Parmar including Constellation Health Care and Orien Health Care. He testified he also had alternative investments with Parmar. In total, Petrozza testified he invested close to $11,000,000 with Parmar. Petrozza would forward funds for investment with Parmar to an escrow account at a law firm Robinson Brog.

Petrozza testified he met Sartison in approximately 2015 at Parmar's residence at 19 Colts Gait Lane, Colts Neck, New Jersey. Petrozza described Parmar's Colts Neck residence as a lavish 65-acre property that included 12 bedrooms.   Petrozza only spoke socially with Sartison.  Petrozza was aware that Parmar and Sartison were dating.

Petrozza testified that he told Parmar that it was not a good idea to get Sartison involved in their business dealings. Petrozza knew that Sartison was a model who had no business experience. Petrozza described her as unimpressive and unsophisticated in business. To mollify Petrozza's concern, Parmar told Petrozza that he can control Sartison. Petrozza was persuaded to allow Parmar to involve Sartison in their business dealings because Parmar exhibited brilliance.

Petrozza testified that he did not know who formed Sequoia.  He was merely an investor in Ranga Bhoomi from approximately 2015 – 2017.   Petrozza testified that after Parmar was indicted in 2018, he fired Parmar from Ranga Bhoomi and Petrozza became managing partner of Ranga Bhoomi. No documentary proofs were offered by Petrozza to establish that he had any membership interest in Ranga Bhoomi or that he became the managing partner. Petrozza had no idea of the identities of the original or current members of Ranga Bhoomi. Petrozza later admitted he did not have authority to fire Parmar.  Petrozza also later testified that he believed he became managing member of Ranga Bhoomi in late 2020, again without any documentary support. Petrozza did not even know if he was a signatory for Ranga Bhoomi.[1]

---

[1] On January 9, 2023 Maryam Hadden, Esq. filed a motion to be relieved as counsel for Ranga Bhoomi.  In her supporting certification, Ms. Hadden certified in part that Ranga Bhoomi is an LLC "managed by Paul Parmar" and in or about June 2020 Parmar asked her law firm to commence the instant action on Ranga Bhoomi's behalf.   The motion to be relieved was unopposed and granted by order dated January 20, 2023.  The uncontested representations by counsel that Parmar commenced this lawsuit in 2020 and Parmar managed Ranga Bhoomi at least through January 9, 2023 run counter to Petrozza's testimony that he fired Parmar in 2018 and that Petrozza became the managing member of Ranga Bhoomi.

Petrozza also invested in diamonds with Parmar. Petrozza acknowledged he had no personal involvement in purchasing diamonds. Petrozza testified that Parmar is a self-proclaimed expert in diamonds. Petrozza described himself as a passive investor.

Regarding the diamonds that were purchased by Parmar raised in this action, Petrozza testified that he understood the diamonds were in Parmar's or Ranga Bhoomi's safety deposit box. Petrozza stated that Parmar spoke as if the diamonds were in his possession.

Petrozza acknowledged that he testified in a federal bankruptcy court proceeding on July 25, 2024 at which time he acknowledged statements he made in a deposition in 2020 including that Sartison was not the beneficiary of LLCs opened by Parmar, Sartison was a pawn to create bogus companies, and Parmar was just using her name to create companies that he controlled to funnel monies.

Petrozza had no first-hand knowledge of funds transferred from Ranga Bhoomi to Sequoia. Petrozza was informed that Parmar used millions of dollars from the Sequoia account to pay Parmar's personal expenses.

After Parmar was indicted, Petrozza became very concerned about funds he transferred to Robinson Brog to invest with Parmar. Petrozza demanded his money back from Parmar and threatened to sue Parmar.

The court finds believable Petrozza's testimony that he is a wealthy businessman, he was a passive investor with Parmar, he transferred funds for investment with Parmar to an escrow account with the law firm Robinson Brog, he believed Sartison was unsophisticated in business, he demanded his money back from Parmar after Parmar was indicted, and he testified in a bankruptcy matter that Sartison was a pawn and that Parmar used her name to create companies and funnel money.

The court finds, however, Petrozza's testimony regarding Ranga Bhoomi and Sequoia to be incredible. While purporting to be the managing member of Ranga Bhoomi, Petrozza could not identify any document purporting to make him a member of Ranga Bhoomi let alone a managing member. He could not identify any original or current members of Ranga Bhoomi. Petrozza did not know if he even had signing authority for Ranga Bhoomi. He changed his testimony to admit he had no authority to fire Parmar from Ranga Bhoomi. He searched for answers as to how and when he became involved as a member of Ranga Bhoomi and failed to give good explanations.

Petrozza also had no first-hand knowledge regarding the establishment of Sequoia or Parmar's deposit of funds with, or transfer of funds from, Sequoia. All of Petrozza's knowledge regarding Sequoia was provided by Parmar. Petrozza's testimony regarding Ranga Bhoomi and Sequoia appeared rehearsed and scripted to align with Parmar's testimony.

In sum, while the court believes Petrozza lost millions of dollars investing with Parmar, the court finds Petrozza's testimony regarding Ranga Bhoomi and Sequoia to be incredible, inherently unbelievable, and of no value due to his complete lack of first-hand knowledge.

## B. Defendant's Witness

### 1. Elena Sartison

Defendants called Sartison as a witness. She is currently 29 years of age. A model from Russia, traveling alone, she arrived in New York City in 2014 at the age of 19 on a three-year visa sponsored by the modeling agency Wilhelmina International, Ltd. She was housed in an apartment provided by the modeling agency. She is a German and Russian citizen. Sartison began modeling at age 14 and, accompanied by her parents, modeled in countries around the world including Vietnam, Japan and England.

Sartison testified that she met Darakjian, an English professor. Darakjian taught her the English language. They began dating and then married.

Sartison testified that she met Parmar at a party at his Colts Neck, New Jersey residence in February 2015. She did not know him. She was invited to the party by a friend who was dating Parmar's acquaintance Tomar Vardi.

In May 2016 Sartison bought an apartment in Guttenberg, New Jersey with money provided by her family in Moscow, Russia. At the recommendation of the real estate agent, she opened Golden Star House LLC to purchase the apartment.

In or about 2016 Sartison and Parmar started meeting for lunches, and later for dinner. She thought Parmar was charming. Parmar showed a common love for animals. Parmar claimed that he worked for the United States Central Intelligence Agency. Parmar appeared to be a powerful person. He had two personal drivers and five housekeepers. She thought he was impressive. She became intimate with Parmar in August/September 2016. She periodically began staying at Parmar's Colts Neck residence.

She testified as to acts of domestic violence by Parmar.

While traveling in India with Parmar in January 2017, Parmar, who was drunk, beat her up badly and dragged her on the floor by her hair.

On June 8, 2017, while vacationing in Hawaii, Parmar, after extensive drinking, called Sartison an "ungrateful bitch" and smashed a champagne glass on her face because she refused to have a sexual threesome with Parmar and her girlfriend Dasha from Russia. Her facial injuries and bloody dress are depicted in photos. (D11)

Sartison obtained a Temporary Restraining Order against Parmar in 2020 which remained in effect for slightly less than 3 years until discussed in 2023 at which time Parmar was under house arrest due to his federal indictment.

Sartison underwent approximately 15 medical procedures to treat her facial injuries. Parmar directed Sartison to falsely say her facial injuries were caused by a diving accident. Parmar later paid Sartison $250,000 to compensate her for the facial injuries.

In October 2017, Parmar opened several companies in Sartison's name including Sequoia, Van Cleef and Sunshine. All these companies were named by Parmar. Parmar directed Sartison to open numerous bank accounts at several banks which she thought was weird. Parmar controlled all funds and prohibited her from moving any funds without Parmar's direction and authorization. She testified as to how Parmar's associate, Sam Zaharis ("Zaharis"), sometimes arranged the issuance of checks that she signed. She testified that she was a puppet.

Regarding the approximate $10,000,000 deposited into Sequoia, she recalled the funds were initially frozen by the bank and that Parmar called the CEO of Chase Bank to release the funds.

She testified that Parmar directed her to pay millions of dollars from Sequoia to pay his criminal defense lawyers. She believed there were payments of millions of dollars for Parmar's credit cards, real estate taxes, Parmar's drivers, and housekeepers.

To her knowledge remaining funds in the Sequoia account are frozen by the federal government. She recalled receiving a notice of forfeiture. (P6). She never made a claim on the forfeited funds on behalf of herself or Sequoia. She did nothing to oppose the forfeiture.

Regarding the diamonds, Sartison testified that she has no knowledge of the diamonds. She did not receive the diamonds.

She testified there were no payments to her parents or her husband Darakjian.

Sartison testified as to her receipt of Parmar's email dated October 24, 2018 in which Parmar wrote "You don't owe me anything…. I will never ask for anything from you." (D12)

Sartison also testified that she was at the bankruptcy proceeding on July 25, 2024 where Petrozza testified that Parmar used Sartison as a pawn.

Regarding other entities named in this action, Sartison testified that in 2014 she opened Sartison, Inc for modeling and the company was closed in 2015. Sartison testified that Emerald Pegasus is not a company but was the name of her thesis when she took on-line courses with an Italian University.

The court finds Sartison to be a credible witness. She demonstrated a strong, accurate recollection of her experience with Parmar. In particular, the court finds her testimony that she was a twenty-one-year-old model from Russia, who was showered by Parmar with a lavish lifestyle, and seduced by his charm, influence, and power, to be inherently believable. The court finds credible her testimony that she was used as a puppet - in particular, Parmar established, in her name, Sequoia and the other companies, and that Parmar controlled the bank accounts and used the funds to pay his expenses. Her testimony is corroborated by record evidence. There were no contradictions or inconsistencies in her testimony, she was willing to answer questions and she did not avoid answering questions. She was sincere, honest, genuine, convincing, and credible.

## FINDINGS OF FACT

The court makes the following findings of fact based on the documentary and credible testimonial evidence adduced at trial.

13

1. In 2014 Sartison, a Russian and German citizen, traveled from Russia to New York City at the age of nineteen on a three-year visa sponsored by the modeling agency, Wilhelmina International Limited.

2. Sartison was housed in an apartment in New York City provided by the modeling agency.

3. Sartison began modeling at age 14 and, accompanied by her parents, modeled in countries around the world including Vietnam, Japan and England.

4. Parmar, age 55, (DOB 12/19/1969) grew up in India where he worked in defense research from the eleventh grade. He won a young scientist award. Parmar worked at Paine Webber from approximately 1992 through 1997, after which he started a company named "Pegasus Consulting Group."

5. Parmar is an apparent wealthy and sophisticated businessman. He testified that he sold one of his businesses, Pegasus Elite Aviation, to Delta for $2,500,000,000 from which he received $500,000,000.

6. Parmar claims that he currently owns four companies including nine cancer centers around the United States, and, prior to 2016, he owned sixteen companies.

7. Sartison met Parmar at a party at his Colts Neck, New Jersey residence in February 2015. She was invited to the party by a friend who was dating Parmar's acquaintance, Tomar Vardi. She was 19 years old when she met Parmar.

8. In or about 2015/2016, Parmar asked Sartison to be his girlfriend. At this time, it was believed that Sartison was close to being selected as a Victoria Secret model. As a condition to being his girlfriend, Parmar prohibited Sartison from pursuing her modeling career. Parmar agreed to compensate her $250,000 per year for lost modeling compensation.

9. In May 2016 Sartison bought an apartment in Gutenberg, New Jersey with funds provided by her family in Europe. At the recommendation of the real estate agent Sartison opened Golden Star House LLC to purchase the apartment.

10. In or about 2016 Parmar and Sartison starting meeting for lunches then dinners. Sartison thought Parmar was charming. Parmar showed a common love for animals. Parmar claimed he worked for the United States Central Intelligence Agency. Parmar appeared to be a powerful person. Parmar had two personal drivers and five housekeepers. Sartison thought he was impressive. Sartison became intimate with Parmar in August/September of 2016. Sartison began periodically staying at Parmar's Colts Neck residence.

11. Sartison testified as to acts of domestic violence committed by Parmar.

12. While traveling in India in January 2017, Parmar, drunk, beat her up badly and dragged her across the floor by her hair.

13. On June 8, 2017, while vacationing in Hawaii, Parmar, after extensive drinking, called Sartison an "ungrateful bitch" and smashed a champagne glass on her face because she refused to engage in a sexual threesome with Parmar and her girlfriend Dasha from Russia. Her facial injuries and bloody dress are depicted in photos (D11 and D11(a)).

14. Sartison obtained a Temporary Restraining Order against Parmar on May 22, 2020. The restraining order remained in effect for slightly less than three years until dismissed in 2023 at which time Parmar was under house arrest due to the pending federal criminal indictment against him.

15. Sartison underwent approximately fifteen medical procedures to treat her facial injuries.

16. Sartison testified that Parmar compensated her $250,000 for her facial injuries. Her testimony is corroborated by a check from Sequoia's account at M&T Bank dated

November 16, 2017 in the amount of $250,000 made payable to Elena Sartison. (P32, p15). That same day, there was a deposit of $250,000 into her Chase account No…9036 (P26).

17. Sartison testified that Parmar directed her to falsely claim that her facial injuries were caused by a diving accident.

18. Her testimony is supported by record evidence. In a text to Sartison dated June 13, 2017 Parmar wrote "diving accident, you dive from boat thinking water is deep but the coral reef was shallow and hit you face. You tried to turn and still hit." (D11a, p3) (D11, p3)

19. In 2017, Parmar opened several corporations in Sartison's name. Parmar controlled all bank accounts and prohibited Sartison from moving any funds unless directed by him.

20. Parmar had his associate Zaharis assist in opening the companies and bank accounts.

21. In a text dated June 13, 2017 Parmar wrote "Sam pl connect Elena to Jonathan to open her bank accounts today. Also send Elena the company papers for her record. Pl let me know when the account is opened and instruct Steve to send $500,000 to this account." In response Zaharis wrote back "I will send Elena the papers for the new company and then connect and help her with Jonathan to open a new account." (D11, p3)

22. In an email dated June 13, 2017 regarding Sunshine, Zaharis wrote "hi Elena, can you please print off this document and sign it. I need for you to sign in the one place on page 4. I can get the document from Paul." (D11, p4)

23. In another email dated June 13, 2017 Zaharis wrote "when will you be able to have the forms needed to open the bank accounts ready for signature? I can have Elena go and visit the closest branch which is at 1168 State Route 34, Matawan, NJ to sign the paperwork and pick up temporary checks to speed up the process. Can you also send me the account details as we want to process two incoming wires to fund the account. Can you please have

the mailing address for statements and check books at 19 Colts Gait Lane, Colts Neck, NJ 07722." (D11, p5)

24. In October 2017 Parmar opened additional companies in Sartison's name including Aquila, Sequoia, and Van Cleef. (P6, P8 and P8a) All of these companies were named by Parmar. Parmar maintained full control of their bank accounts. Sartison was not permitted to move any funds without Parmar's direction and authorization.

25. As reflected in a series of text messages beginning on or about October 5, 2017 Parmar directed Sartison to open numerous bank accounts including accounts at Columbia, Santander and Garden State Community for Sequoia, Sunshine, Van Cleef and Aquila. (D14, p1) Sartison believed it was weird that Parmar directed her to open so many bank accounts.

26. In or around 2017, Parmar attempted to deposit $10,166,000.00 into an account at Chase Bank in Sequoia's name. Concerned about the legitimacy of the transaction, Chase Bank froze the funds. Parmar telephoned Jaime Diamond, Chief Executive Officer of Chase Bank, to have the funds unfrozen and returned to Parmar.

27. There is a deposit dated October 10, 2017 for the customer, Ranga Bhoomi, at M&T Bank in the amount of $10,166,000. (P20a)

28. There is a bank check from M&T Bank dated October 10, 2017 made payable to Sequoia in the amount of $10,166,000. (P20(c)). The check specifically references "Gramercy East." There is no reference to any loan.

29. Parmar used the Sequoia funds at M&T Bank to pay his personal expenses, including his lawyers.

30. Parmar directed Sartison to pay the law firm Wendels Marx Lane and Mittendorf, LLP a total of $2,000,000 from M&T Bank which was paid in two $1,000,000 checks on November 16, 2017. (D5, p2)

31. An account was opened at First Republic Bank for Sequoia beginning on November 20, 2017. (P18(a)-(i)). The opening statement shows total deposits of $8,195,671.96. (P18b)

32. Parmar used the Sequoia funds deposited with First Republic Bank to pay his personal expenses.

33. The Sequoia bank account statement for December 2017 at First Republic Bank showed total withdrawals and debits of $1,501,307.80 and no deposits. (D10, p13) (P18c)

34. The Sequoia bank account statement for January 2018 at First Republic Bank showed total withdrawals and debits of $200,766.54 and no deposits. (D10, p6) (P18d)

35. The Sequoia bank account statement for February 2018 at First Republic Bank showed total withdrawals and debits of $188,166.64 and no deposits. (D10, p9) (P18e)

36. The First Republic bank account statement for Sequoia for March 2018 shows total withdrawals and debits of $6,301,804.98 and no deposits. (P18f)

37. As of March 31, 2018, Sequoia's First Republic bank account had an ending balance of $0. (P18f)

38. Sartison's testimony that Parmar used the Sequoia funds to fund other companies and pay his personal expenses is corroborated by record evidence.

39. First Republic bank records reflect the following transfers, among others, (i) on December 4, 2017 $192,500 from Sequoia to Aquila; (ii) on December 4, 2017 $235,000 from Sequoia to Van Cleef; (iii) on December 4, 2017 $165,750 from Sequoia to Sunshine; (iv) on December 5, 2017 $863,150 from Sequoia to an entity named SMMD LLC; (v) on

December 15, 2017 $2,000 from Sequoia to an entity MPK Investment Group, Inc.; (vi) on

December 18, 2017 $11,500 from Sequoia to Rana Consulting, LLC; (vii) on January 4,

2018 $15,000 from Sequoia to Rana; (viii) on January 5, 2018 $25,000 from Sequoia to

the law firm Baker Tilly Virchow Krause, LLP; (ix) on January 19, 2018 $31,060 from

Sequoia to 1 Riverside Park condominium; (x) on January 9, 2018 $1,000 to Sequoia to

MPK Investment Grouping, (xi) on February 6, 2018 $75,000 to Fisher Boyles; and (xii)

on March 1, 2018 $10,000 from Sequoia to the law firm Saul Ewing. (P18g)

40. Sartison recalled, at the direction of Parmar, there were payments of millions of dollars for
Parmar's credit card debt, real estate taxes, personal drivers, motor vehicles and
housekeepers. Again, Sartison's testimony is supported by record evidence.

41. As examples of Parmar's use of the companies to pay his credit card debt, on February 5,
2018, Sequoia paid $72,840 to American Express (D10, p9); on February 20, 2018,
Sequoia paid $1,149.00 and $11,461.00. to American Express (D10, p11); on April 16,
2018, Sunshine paid $150,000 to American Express. (D10, p1) and on April 16, 2018,
Aquila paid $15,000 to American Express. (D10, p3)

42. Parmar directed Sartison to pay an entity named First Connect a total of $3,000,000 which
was paid in three $1,000,000 checks on March 20, 2018. (D5, p1)

43. A bank account was opened at Wells Fargo under Sequoia's name in or about April 14,
2018. (P19(a-f)). The April 2018 statement shows a deposit of $366,000 on April 16, 2018
and a transfer to Aquila of $100,000 on April 23, 2018.

44. On June 4, 2018 Parmar directed Sartison to pay the law firm Fisher Broyles, LLP the sum
of $1,099,000 as follows: (i) check dated June 4, 2018 from TD Bank in the amount of
$440,000, check number 53567282-2; (ii) check dated June 4, 2018 from TD Bank in the

amount of $216,000, check number 53567292-3; (iii) cashier's check dated June 4, 2018 in the amount of $258,000; (iv) cashier's check dated June 4, 2018 in the amount of $99,000; (v) cashier's check dated June 4, 2018 in the amount of $8,000 from Sunshine; (vi) check dated June 4, 2018 in the amount of $3,000 from Aquila and (vii) $75,000 wire transfer from First Republic Bank. (D5, pp2-6)

45. Examples of other payments made for Parmar's personal expenses include on January 30, 2018 Sequoia paid Colts Neck Township $35,209.90 (P18d, p3), and on February 20, 2018 Sequoia paid BMW financial services $16,122.39 (P18e, p3).

46. Parmar admitted that he withdrew millions of dollars from Sequoia to pay his expenses.

47. None of the record evidence establishes a loan of $10,166,000 from Ranga Bhoomi to Sartison through Sequoia.

48. There is no record evidence of any payments by Ranga Bhoomi to Sartison's parents or her husband Darakjian.

49. In May 2018, Parmar was taken into custody by the FBI. Parmar remained incarcerated for 8-9 weeks. The United States government seized funds held in Sequoia's account. In total, Parmar believes the government seized approximately $200,000,000.00 linked to Parmar. On December 13, 2018 Parmar was indicted in a case entitled United States of America vs. Parmjit Parmar a/k/a Paul Parmar et al., United States District Court, District of New Jersey, Criminal No. 18-735. (D13)

50. On July 2, 2018, Wells Fargo issued a letter to Sequoia advising it was served with a legal order and that required them to deduct $3,686.76 from the account. (D6, p3)

51. On July 2, 2018, Wells Fargo issued a letter to Aquila advising that it was served with a legal order that required them to deduct $798,899.45 from the account. (D6, p4)

52. Parmar's contention that Ranga Bhoomi loaned funds to Sartison is refuted by an email written by Parmar.

53. In an email dated October 24, 2018 Parmar wrote to Sartison in part,

> "Dear Elena, I am sorry about our relationship, I have to truly advise you to move on in your own benefit. I am not the type of guy you should be with. You will never be happy with me…but I want to assure you of the following:

> 1. I will not contact you, track you, or try to look at anything you are doing, including your emails, facebook, Instagram or photos or any other digital or physical communication, if you find that I am doing any of those, you can take this as my word and press for violation of your privacy and considerate as a harassment.

> …

> 3. **About the investment you received in Ranga Bhoomi LLC, which is now frozen by the govt.** I will take full responsible of it and you have nothing to worry about it, I will complete the tax information for you to have to file next year for those entities, I will handle and take responsibility of all work on that front as and when it is required to be done.

> …

> 6. **You do not owe me anything. I will never ask for anything from you.**

> You can consider this as a sworn statement from me and if I violate any of these then I am responsible for the damages it brings you."

> (D12) (emphasis added).

54. Parmar's October 24, 2018 email characterized funds transferred from Ranga Bhoomi as an "investment", not a loan. (D12). Parmar also acknowledged Sartison "did not owe him anything." (D12).

55. Parmar also admitted at trial there was no written loan agreement between Ranga Bhoomi and Sequoia in which Ranga Bhoomi purportedly loaned Sequoia $10,166,000.

56. The romantic relationship between Parmar and Sartison ended in 2019.

57. On March 19, 2020, the United States Department of Justice issued a Notice of Seizure of Property and Initiation of Administrative Forfeiture Proceedings to Sequoia. (D6) The

Notice described the seized property as $401,305.99 from Wells Fargo Bank Account No.: 6616837693 in the name of Sequoia. (D6)

58. There is no evidence that Sartison possesses diamonds purchased by Parmar.

59. Parmar admitted there are no documents stating that Sartison possesses diamonds purchased by Parmar.

60. Darakjian is an English professor in New York City.  Darakjian met Sartison in approximately 2014. Darakjian taught Sartison the English language.  They married in 2016.  They separated in approximately 2020 and divorced in 2021.

61. Darakjian did not know of Sartison's relationship with Parmar.  Darakjian never met Parmar.

62. Parmar texted Darakjian in 2019.  Darakjian stated he had no idea who Parmar was.  Parmar was vague and cryptic and wrote "I want to help you."  Darakjian thought Parmar was a creep obsessed with Sartison.  Darakjian "blocked" Parmar to prevent further communications from Parmar.

63. Petrozza was introduced to Parmar in approximately 2011.  In 2013 Petrozza invested $4,000,000 in companies controlled by Parmar including Constellation Health Care and Orien Health Care.  Petrozza also had alternative investments with Parmar.  In total, Petrozza invested close to $11,000,000 with Parmar.

64. To invest with Parmar, Petrozza would forward funds to be held in an escrow account at a law firm Robinson Brog.

65. Petrozza met Sartison in approximately 2015 at Parmar's residence at 19 Colts Gait Lane, Colts Neck, New Jersey.  Petrozza only spoke socially with Sartison.  Parmar advised Petrozza that Parmar and Sartison were dating.

66. Petrozza told Parmar that it was not a good idea to get Sartison involved in their business dealings. Petrozza knew that Sartison was a model who had no business experience. Petrozza described her as unimpressive and unsophisticated in business.

67. To mollify Petrozza, Parmar stated that he can control Sartison.   Petrozza was persuaded to allow Parmar to involve Sartison in their business dealings because Parmar exhibited brilliance.

68. Petrozza did not know who formed Sequoia.  He was merely an investor in Ranga Bhoomi from approximately 2015 – 2017.  After Parmar was indicted in 2018, he testified he fired Parmar from Ranga Bhoomi and Petrozza became managing partner of Ranga Bhoomi. No documentary proofs were offered by Petrozza to establish that he had any membership interest in Ranga Bhoomi or that he became the managing partner. Petrozza had no idea of the identities of the original or current members of Ranga Bhoomi. Petrozza later admitted he did not have authority to fire Parmar.  Petrozza also later testified that he believed he became managing member of Ranga Bhoomi in late 2020, again without any documentary support.  Petrozza did not even know if he was a signatory for Ranga Bhoomi.

69. Petrozza also invested in diamonds with Parmar. Petrozza acknowledged he had no personal involvement in purchasing diamonds. According to Petrozza, Parmar is a self-proclaimed expert in diamonds.

70. Regarding the diamonds that were purchased by Parmar referenced in this matter, Petrozza understood that the diamonds were in Parmar's or Ranga Bhoomi's safety deposit box. Parmar spoke to Petrozza as if the diamonds were in Parmar's possession.

71. Petrozza had no first-hand knowledge regarding the establishment of Sequoia or Parmar's deposit of funds with, or transfer of funds from, Sequoia. All of Petrozza's knowledge regarding Sequoia was provided to him by Parmar.

72. Petrozza acknowledged that he testified in a federal bankruptcy court proceeding on July 25, 2024 at which time he acknowledged statements he made in a deposition in 2020 including that Sartison was not the beneficiary of LLCs opened by Parmar, Sartison was a pawn to create bogus companies, and Parmar just used her name to create companies that he controlled to funnel monies.

## ANALYSIS

Ranga Bhoomi's first amended complaint alleges causes of action for unjust enrichment, fraud, breach of contract, conversion, and promissory estoppel. At trial, Ranga Bhoomi primarily sought relief against Sartison contending that she failed to repay a loan from Ranga Bhoomi more than $10,000,000 and that Sartison unlawfully possesses two diamonds purchased by Parmar. Sartison denied ever receiving a loan and denied possession of any alleged diamonds.

At closing, Ranga Bhoomi argued that approximately $12.74 million was transferred to Sartison. Ranga Bhoomi contended that $4,560,000 was allocated for Parmar's expenses. Ranga Bhoomi argued that $802,000 was seized and that Sartison owes approximately $7,382,000 to Ranga Bhoomi. Plaintiff argued that Sartison is not a "babe in the woods" and that she is a sophisticated individual who successfully opened Parmar's pocketbook. Plaintiff argued that Sartison was the sole signatory for the bank account for Sequoia. Plaintiff argued that no-one had an interest in horses other than Sartison. Plaintiff argued that Parmar was the source of the money for the lifestyle that Sartison wanted, and she sought to live an upscale life at Parmar's dime.

Plaintiff argued that Sartison kept benefits without justification and that she provided no reasonable accounting for the funds.

Sartison argued that Parmar and Petrozza are not credible witnesses. Sartison argued there was no loan. She argued that she did not pocket any money. Sartison highlighted Parmar's evasiveness in failing to respond to questions as to the entity, First Connect, that received $3,000,000. Sartison argued she was used as a pawn in Parmar's effort to disguise movement of money. She argued all the evidence demonstrates that Parmar controlled all companies and bank accounts, and these companies were alter egos of Parmar. Sartison contended that if she were a crook as falsely argued by Parmar, she could have taken the $10,000,000 and returned to Russia without extradition. She argued that she was used as a puppet by Parmar and is a victim.

The court will address in turn the causes of action alleged in plaintiff's first amended complaint.

### A. Count 1 – Unjust Enrichment Against All Defendants

To establish unjust enrichment, a plaintiff must show both that defendant received a benefit and that retention of that benefit without payment would be unjust. VRG Corp. v. GKN Realty Corp., 135 N.J. 539, 554 (1994) citing Associates Commercial Corp. v. Wallia, 211 N.J. Super. 231, 243 (App. Div. 1986) (other citations omitted). The unjust enrichment doctrine requires that plaintiff show that it expected remuneration from the defendant at the time it performed or conferred a benefit on defendant and that the failure of remuneration enriched defendant beyond its contractual rights. VRG Corp. v. GKN Realty Corp., 135 N.J. 539, 554 (1994) citing Associates Commercial Corp., 211 N.J. Super. at 244 (other citations omitted).

Ranga Bhoomi's first amended complaint alleges that all defendants were unjustly enriched by receiving multiple benefits at Ranga Bhoomi's expense including a loan more than $10,000,000 to Emerald Pegasus/Sequoia.

The court finds Parmar's testimony that Ranga Bhoomi loaned approximately $10,000,000 to Emerald Pegasus or Sequoia or Sartison is without any supporting documentation, belied by the testimonial and documentary evidence, and without merit.

Extensive record evidence, and the absence of evidence, militates against finding a loan from Ranga Bhoomi to Sequoia. There is no written loan agreement. There is no oral loan agreement. There is no evidence as to any duration of a repayment period or interest rate for a loan. Parmar's testimony that he provided an approximate $10,000,000 undocumented loan to Sartison through Sequoia was inherently unbelievable. Refuting any notion Parmar gave Sartison a loan, in his October 24, 2018 email, Parmar characterized funds transferred from Ranga Bhoomi as an "investment," not a loan. (D12). Parmar also acknowledged Sartison "did not owe him anything." (D12). The bank check from M&T Bank dated October 10, 2017 made payable to Sequoia in the amount of $10,166,000 specifically references "Gramercy East" – there is no reference to a loan. (P20(c)). Sartison was not benefitted by the funds. The record evidence unequivocally demonstrates that Parmar used the funds, not Sartison. By his own admission, Parmar controlled the Sequoia account and used millions of dollars for the payment of his personal expenses. Sartison was prohibited from using the Sequoia account unless directed by Parmar. As stated by Petrozza during his testimony in bankruptcy court, Sartison was not the beneficiary of LLCs opened by Parmar, Sartison was a pawn to create bogus companies, and Parmar just used her name to create companies that he controlled to funnel monies.

The court finds Ranga Bhoomi failed to meet its burden of proving by a preponderance of the evidence that any defendant was unjustly enriched. There is simply no record evidence to establish that defendants have been unjustly enriched at the expense of Ranga Bhoomi. Ranga Bhoomi has not shown that it expected remuneration from any defendant at the time it performed or conferred a benefit on any defendant and that the failure of remuneration enriched defendant beyond its contractual rights. The court finds Ranga Bhoomi's cause of action for unjust enrichment to be without merit. As such, Ranga Bhoomi's cause of action for unjust enrichment shall be, and is hereby, denied with prejudice.

### B. Count 2 - Common Law Fraud Against Defendants Sartison, Sequoia, Emerald, Pegasus and Darakjian

"In order to prevail on a common law fraud claim, plaintiff must show that defendant: (1) made a representation or omission of a material fact; (2) with knowledge of its falsity; (3) intending that the representation or omission be relied upon; (4) which resulted in reasonable reliance; and that (5) plaintiff suffered damages. DepoLink Court Reporting & Litigation Support Services v. Rochman, 430 N.J. Super. 325, 336 (App. Div. 2013) citing Jewish Ctr. of Sussex Cnty. v. Whale, 86 N.J. 619, 624 (1981). Plaintiff must prove each element by "clear and convincing evidence." Id. at 336 quoting Stochastic Decisions, Inc. v. DiDomenico, 236 N.J. Super. 388, 395 (App. Div. 1989).

Here, Ranga Bhoomi's first amended complaint alleged that Sartison, Sequoia, Emerald Pegasus and Darakjian materially misrepresented Sartison's past, present, and future earnings as a model to convince Parmar that loans would be repaid in a timely fashion. The allegation in the complaint is refuted by Parmar's trial testimony wherein he testified that, as a condition of being his girlfriend, she was prohibited from pursuing a modeling career and he agreed to compensate her $250,000 per year for lost modeling compensation. Thus, not only is the allegation that Ranga

Bhoomi loaned funds to Sartison refuted by the record evidence, but the allegation that the loan was made in reliance on her earnings as a model is contradicted by Parmar's testimony.

The court finds plaintiff failed to meet its burden of demonstrating fraud by clear and convincing evidence. Ranga Bhoomi did not establish at trial any alleged representation or omission of a material fact by Sartison or Darakjian, made with knowledge of its falsity, intending the representation or omission be relied upon and which resulted in reasonable reliance, and that plaintiff suffered damages. The cause of action is wholly without merit. As such, Ranga Bhoomi's cause of action for fraud shall be, and is hereby, denied with prejudice.

### C. Count 3 – Breach of Contract against Sartison, Emerald, Pegasus, and Sequoia

To prevail on a claim for breach of contract, our law imposes on a plaintiff the burden to prove four elements: first, that "[t]he parties entered into a contract containing certain terms"; second, that "plaintiff[s] did what the contract required [them] to do"; third, that "defendant[s] did not do what the contract required [them] to do[,]" defined as a "breach of contract"; and fourth, that "defendant[s'] breach, or failure to do what the contract required, caused a loss to the plaintiff[s]." Globe Motor Co. v. Igdalev, 225 N.J. 469, 480 (2016) citing *Model Jury Charge (Civil),* § 4.10A "The Contract Claim-Generally" (May 1998); see also Coyle v. Englander's, 199 N.J. Super. 212, 223 (App. Div. 1985).

Here, Ranga Bhoomi failed to meet its burden of proving by a preponderance of the evidence a breach of contract by any defendant. Ranga Bhoomi's first amended complaint alleged that Ranga Bhoomi and defendants Sartison and Emerald Pegasus/Sequoia had an oral contract setting forth the terms of the $10,166,000 advance to Sequoia. Not a shred of credible evidence was marshalled during this trial to establish any agreement, verbal or written, was entered between Ranga Bhoomi and Sartison for Ranga Bhoomi to advance Sequoia $10,166,000. To the contrary,

the record evidence demonstrates that Parmar created companies in Sartison's name and controlled the movement of all monies. The record evidence established the funds were never loaned to Sartison. Rather, the evidence demonstrated that Parmar used the funds for his benefit including the payment of millions of dollars for his criminal defense lawyers and the payment of certain personal expenses.

The court finds Ranga Bhoomi has not established any element to prevail on a claim for breach of contract. Succinctly, there is no contract containing certain terms and there is no basis to find Sartison did not do what a contract required her to do. Ranga Bhoomi's cause of action for breach of contract is without merit. As such, Ranga Bhoomi's cause of action for breach of contract shall be, and is hereby, denied with prejudice.

### D. Count 4 – Conversion against Sartison

"Conversion consists of the wrongful exercise of dominion and control over property owned by another inconsistent with the owners' rights." Sun Coast Merchandise Corp. v. Myron Corp., 393 N.J. Super. 55, 84 (App. Div. 2007) citing Port-O-San Corp. v. Teamsters Local Union No. 863 Welfare & Pension Funds, 363 N.J. Super. 431, 440 (App. Div. 2003) (other citations omitted). "Therefore, the property allegedly converted 'must have belonged to the injured party.'" Id. quoting Commercial Ins. Co. of Newark, 111 N.J. Super. 108, 115 (Law Div. 1970).

Here, Ranga Bhoomi's complaint alleged that Sartison assumed and exercised ownership over Ranga Bhoomi's assets including loose diamonds. As an initial matter, Ranga Bhoomi's allegation runs counter to Parmar's testimony that he created Van Cleef as the vehicle for alternative investments including diamonds, not Ranga Bhoomi. In any event, Sartison credibly testified she did not possess diamonds purchased by Parmar. No credible evidence of any nature was offered by Ranga Bhoomi to support a finding that Sartison maintained control of diamonds

purchased by Parmar. Even Petrozza, the purported managing member of Ranga Bhoomi, testified that Parmar informed him the diamonds were in Parmar's possession. In short, there is no evidence that the diamonds were given to Sartison or that she is wrongfully exercising dominion or control over property belonging to Ranga Bhoomi. As such, Ranga Bhoomi's cause of action for conversion shall be, and is hereby, denied with prejudice.

### E. Count 5 – Promissory Estoppel against Sartison, Emerald, Pegasus, and Sequoia

"Promissory estoppel is made up of four elements: (1) a clear and definite promise; (2) made with the expectation that the promisee will rely on it; (3) reasonable reliance; and (4) definite and substantial detriment." GoldFarb v. Solimine, 245 N.J. 326, 339-340 (2021) quoting Toll Bros., Inc. v. Bd. of Chosen Freeholders of Burlington, 194 N.J. 223, 253 (2008); see *Model Jury Charges (Civil), 4.10k "Promissory Estoppel."*

Here, Ranga Bhoomi's first amended complaint alleges that a loan totaling $10,166,000 was distributed from Ranga Bhoomi to Emerald Pegasus and is a valid oral contract under the doctrine of promissory estoppel. No evidence was adduced at trial to demonstrate an alleged oral agreement between Ranga Bhoomi and Emerald Pegasus. Rather, the evidence demonstrated that Emerald Pegasus is a fictitious entity. As testified by Sartison, Emerald Pegasus was the name of her thesis paper that she prepared while attending an on-line college.

The court finds Ranga Bhoomi failed to prove by a preponderance of the evidence any of the elements of the cause of action from promissory estoppel. The record evidence showed no clear and definite promise from Emerald Pegasus to Ranga Bhoomi. As such, Ranga Bhoomi's cause of action for promissory estoppel shall be, and is hereby, denied with prejudice.

## CONCLUSION

Based on the foregoing, final judgment shall be entered as follows. Plaintiff's request for judgment under count one of the first amended complaint alleging unjust enrichment is denied with prejudice. Plaintiff's request for judgment under count two of the first amended complaint alleging common law fraud is denied with prejudice. Plaintiff's request for judgment under count three of the first amended complaint alleging breach of contract is denied with prejudice. Plaintiff's request for judgment under count four of the first amended complaint alleging conversion is denied with prejudice. Plaintiff's request for judgment under count five of the first amended complaint alleging promissory estoppel is denied with prejudice.

**SCHEDULE A**

CASE TITLE: RANGA BHOOMI LLC VS SEQUOIA TRAINING & NUTRITION CONSULTANTS LLC ET AL.

Docket #: MON-L-2754-20 (CBL)

**Plaintiff's Exhibits:**

P-3:   Certified Formation Documents- Golden Star House LLC dated May 17, 2016

P-4:   Certified Change of Registered Address- Golden Star House, LLC dated May 10, 2021

P-5:   Certified Formation Documents- Sunshine Star, LLC dated June 12, 2017

P-6:   Certified Formation Documents- Aquila Alpha, LLC dated October 3, 2017

P-7:   Certified Certification of Dissolution Aquilia Alpha LLC dated February 10, 2020

P-8:   Certified Formation Documents Sequioa Training and Nutrition Consultants LLC dated October 4, 2017

P-8A:  Certified Formation Documents Van Cleef Property and Financials LLC dated October 5, 2017

P-9:   Certified Dissolution Documents Sequioa Training and Nutrition Consultants LLC dated February 10, 2020

P-10:  Account/Payroll records from Wihelmina International, LTD for Elena Sartison, various dates 2014 thru 2017

P-13:  Chase Bank Statements for Elena Sartison dated September and October 2024

P-14:  Deed to Golden Star LLC (7004 Boulevard East, Unit 6B Guttenberg, N.J.) dated May 17, 2016

P-15:  Deed to Golden Star LLC (7002 Boulevard East, Unit 7P, Guttenberg, N.J.) dated January 8, 2020

P-16:  Deed from Golden Star LLC (7004 Boulevard East Unit 6B, Guttenberg, N.J.) dated October 1, 2020

P-17:  Deed to Golden Star, LLC (7004 Boulevard East, Unit 21E, Guttenberg, N.J.) dated February 22, 2021

P-18A:  Sequoia Bank record with First Republic Bank dated November 17, 2017

P-18B:  First Republic Bank Statement 11/2017

P-18C:  First Republic Bank Statement 12/2017

P-18D:  First Republic Bank Statement 1/2018

P-18E:  First Republic Bank Statement 2/2018

P-18F:  First Republic Bank Statement 3/2018

P-18G:  First Republic Bank Wires

P-18H:  First Republic Bank Withdrawal/Cashier's Checks

P-18I:   Checks

P-19A: Wells Fargo Bank Account Application dated April 14, 2018

P-19B:  April 2018 Bank Statement for Sequioa Training (Wells Fargo)

P-19C:  May 2018 Bank Statement for Sequioa Training (Wells Fargo)

P-19D:  June 2018 Bank Statement for Sequioa Training (Wells Fargo)

P-19E:   July 2018 Bank Statement for Sequioa Training (Wells Fargo)

P-19F:   August 2018 Bank Statement for Sequioa Training (Wells Fargo)

P-20A:  M&T Bank transaction 10/11/2017

P-20B:  M&T Bank transaction 10/11/2017

P-20C:  M&T Bank transaction 10/10/2017

P-21:  Chase Account statement ending in 2305

P-22:  Chase Account statement for January 2020 ending in 2305

P-23:  Chase Account statement for October/November 2013 account ending in 0019

P-24:  Chase Account statement for July/August 2014 ending in 0019

P-26:  Chase Account statement for November 2017 ending in 036

P-27:  Chase Account statement for September 2018 ending in 036

P-28:  Chase Account statement for January 2020 ending in 036

P-32:  Sequioa's M&T Records

P-34:  Wire to Sunshine Star dated June 29, 2017

P-48:   Letter from Elena Sartison dated late 2019

P-56:  Text messages and photos

**Defendant's Exhibits:**

D-5:   Columbia Checks, etc.

D-6:   U.S Department of Justice Notice of Seizure of Property and Initiation of Administrative Forfeiture Proceedings dated March 19, 2020

D-10:  Banks statements from TD Bank and Bank of America

D-11:  Photo of Elena Sartison's facial injuries and text messages

D-11A: Photo with Meta data and text messages

D-12:  Email from Paul Parmar to Elena Sartison dated October 24, 2018

D-13:  Indictment filed December 13, 2018 in matter entitled United States of America vs. Parmjit Parmar a/k/a "Paul Parmar" et al., United States District Court, District of New Jersey, Criminal No. 18-735

D-14:  Whatsapp Text messages

D-16:  Chase Account Statements dated December 2015

D-16A:  Chase Account Statements November to December 2014

D-27:  Audio Tape of Petrozza Testimony in Bankruptcy Court