# Exhibit C

**RANGA BHOOMI, LLC v. SEQUOIA TRAINING, et al.  --  October 23, 2024**
**Testimony of Paul Parmar**

```
                              SUPERIOR COURT OF NEW JERSEY
                              LAW DIVISION, CIVIL PART
                              MONMOUTH COUNTY
                              DOCKET NO. MON-L-2754-20
                              APP. DIV. NO.

RANGA BHOOMI, LLC,          )
                            )
        Plaintiff,          )
                            )
     vs.                    )
                            )
SEQUOIA TRAINING AND        )
NUTRITION CONSULTANTS       )
LLC, SUNSHINE STAR, LLC,    )
VAN CLEEF PROPERTY &        )         TRANSCRIPT
FINANCIALS LLC, GOLDEN      )            of
STAR HOUSE LLC, ELENA       )         BENCH TRIAL
SARTISON INC., EMERALD      )
PEGASUS, AQUILA ALPHA       )      EXCERPT - TESTIMONY
LLC, ELENA SARTISON,        )            of
NAZARETH DARAKJIAN, IVAN)          PAUL PARMAR
SARTISON, GALINA            )
SARTISON, JOHN DOE 1-3,     )
                            )
        Defendants.         )

                            Place: Monmouth Co. Courthouse
                                   71 Monument Park
                                   Freehold, NJ 07728

                            Date:  October 23, 2024


BEFORE:

    HONORABLE CHAD N. CAGAN, J.S.C.

TRANSCRIPT ORDERED BY:

    BIANCA DIBELLA, ESQ. (Troutman Pepper Locke LLP,
    600 Peachtree St. NE, Ste. 3000, Atlanta, GA 30308)


                            Transcriber Catherine Weigel
                            ELITE TRANSCRIPTS, INC.
                            14 Boonton Avenue
                            Butler, New Jersey  07405
                            (973) 283-0196
                            Audio Recorded
                            Operator, Yesenia Cordero
```

**Elite Transcripts, Inc.**
14 Boonton Avenue, Butler, New Jersey  07405
(973) 283-0196  FAX (973) 492-2927

**RANGA BHOOMI, LLC v. SEQUOIA TRAINING, et al.  --  October 23, 2024**
**Testimony of Paul Parmar**

2

APPEARANCES:   (Continued)

   ROBERT J. DE GROOT, ESQ.
   OLEG NEKRITIN, ESQ.
   (Law Offices of Robert J. DeGroot, Esq.)
   Attorneys for the Plaintiff

   ALBERT Y. DAYAN, ESQ. (Dayan Law LLP)
   Attorney for the Defendants

   TONY MIRVIS, ESQ.
   (The Law Offices of Tony Mirvis, PC)
   Attorney for the Defendants

---

3

I N D E X

| Witness | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|
| FOR THE PLAINTIFF | | | | |
| Paul Parmar | 4 | 66 | 206,236 | 224 |

| Exhibit | | Ident. | Evid. |
|---|---|---|---|
| P-32 | M&T Bank document | 7 | |
| P-36 | Deposit M&T Bank | 9 | |
| P-18A | FRB Statement | 14 | |
| P-18D | FRB Statement 1-1-18 | 16 | |
| P-18F | FRB Statement - 3-1-18 | 17 | |
| P-18E | FRB Statement 2-1-18 | 22 | |
| D-11 | Photographs and test messages | 55 | |
| D-12 | E-mail 10-24-18 | 60 | |
| D-8 | Complaint | 86 | |
| D-9 | U.S. Bankruptcy action | 101 | |
| D-25 | Complaint 9-1-20 | 176 | |
| D-26 | Text messages | 202 | |
| D-13 | Indictment 12-13-18 | 227 | |

**RANGA BHOOMI, LLC v. SEQUOIA TRAINING, et al.  --  October 23, 2024**
**Testimony of Paul Parmar**

4

                    Colloquy / Parmar - Direct
```
1           THE COURT:  All right.  We're back on the
2  record in RANGA BHOOMI VS. -- VS. ELENA SARTISON, ET
3  AL., Docket No. MON-L-2754-20.
4           Mr. Parmar, The Court granted permission, he
5  was escorted to the bathroom from about 8:57 to about
6  9:12.  He's back.  We're going to reconvene his
7  testimony.
8           Mr. Parmar, please raise your right hand.
9  P A U L   P A R M A R,  PLAINTIFF'S WITNESS, SWORN
10          THE COURT:  Please state your full name and
11 spell your last name.
12          THE WITNESS:  Full name Paul Parmar, P, as in
13 Peter, a-r-m, as in Mary, a-r.
14          THE COURT:  All right.  Thank you, sir.
15 Please be seated.  All right, let's continue direct
16 examination.
17          MR. NEKRITIN:  Thank you, Your Honor.
18 DIRECT EXAMINATION BY MR. NEKRITIN:  (Continued)
19      Q    Mr. Parmar, yesterday you testified that you
20 and Ms. Sartison went to Chase Bank to open up an
21 account.  Do you remember that?
22      A    Yes.
23      Q    And you stated that Chase wouldn't open an
24 account, and then you had to go to a different bank to
25 open an account.  Do you remember that?
```

5

                    Parmar - Direct
```
1  A    Not exact --
2       Q    It's a yes or -- it's a yes or no question.
3  A    No, I didn't say that.
4       Q    Okay.  Um, did there come a time that you
5  went to open up -- that you and Elena went to open up a
6  bank account to deposit monies from Ranga Bhoomi that
7  were approximately $10 million?
8  A    Initially I didn't go with her.
9       Q    Okay.
10 A    She went and deposited it in the bank that she has
11 been banking with from before Chase, and it was
12 deposited into her account, but then it was frozen, um,
13 and she wouldn't get any response why is it frozen.
14          MR. DAYAN:  Judge, I object.  We heard all
15 that yesterday.
16          THE COURT:  I -- let's move on.  Objection
17 overruled.  He's just catching up to where we ended.
18          THE WITNESS:  And, um, then, um, since we
19 didn't get any response from -- she couldn't get any
20 response the local bank people that she was contacting,
21 why is the account frozen, then I reached out to the
22 CEO of the bank Jaime Dimon, um, and his office
23 initially said that he would look into it.  Then that
24 took a few more days.  And then finally I ended up
25 speaking to him, that this is a new project, this girl
```

**RANGA BHOOMI, LLC v. SEQUOIA TRAINING, et al. -- October 23, 2024**
**Testimony of Paul Parmar**

6

Parmar – Direct
1  is starting a new project and the accounts are frozen,
2  um, I'm not on the account but I'm calling on her
3  behalf.  So I gave Jaime the whole background.  He
4  said, I'll look into it and get back.
5           Finally he said they will not, uh, allow her to
6  keep the money there.  And I said, okay, then allow her
7  to take the money out.  So they sent her a check.  They
8  said, um, we are sending you a check, a cashier's
9  check, back in the company's name, Sequoia.  So they
10 handed her -- I'm not sure whether it was mailed or she
11 got it physically in her hand.  Um, either way she got
12 it in her hand and then it was taken to a different
13 bank.
14      Q     Now you testified that you weren't a hundred
15 percent sure which bank it was taken to, is that
16 correct?
17 A     Yes.
18           MR. NEKRITIN:  Okay.  Um, Judge, I'm just
19 going to give The Court and -- and Mr. Dayan a copy of
20 Plaintiff's Exhibit 32, that we are going to use to
21 refresh --
22           THE COURT:  Show your adversary first.
23           MR. NEKRITIN:  -- that we're going to use to
24 refresh the recollection of Mr. Parmar.  You can keep
25 the copy of that, Albert.

7

Parmar – Direct
1           MR. DAYAN:  Thank you.
2           MR. NEKRITIN:  For The Court.
3           THE COURT:  What is this?
4           MR. NEKRITIN:  It's Plaintiff's Exhibit 32
5  that will be used to potentially refresh the witness's
6  recollection.
7  BY MR. NEKRITIN:
8      Q     Mr. Parmar, I want you to look at Plaintiff's
9  Exhibit 32, second page.  It's Bate stamped MT1383.  I
10 want you to take a look at this document, and when
11 you're done looking at it let me know.
12 A     Yep.
13      Q     Okay.  Just please give me the exhibit.  Does
14 that refresh your recollection which bank that check
15 was deposited to?
16 A     Um, yep.
17      Q     Which bank was that?
18 A     That's M&T Bank.
19      Q     And did you go with -- well, do you know how
20 that check was actually deposited, who deposited it, if
21 you know?
22 A     I think we chose M&T not -- it's not a good bank
23 for, um, small businesses, but we chose M&T as an
24 interim solution to Elena can have a business bank.
25 Chase -- her choice of Chase was a good bank for her,

**Elite Transcripts, Inc.**
14 Boonton Avenue, Butler, New Jersey  07405
(973) 283-0196  FAX (973) 492-2927

**RANGA BHOOMI, LLC v. SEQUOIA TRAINING, et al. -- October 23, 2024**
**Testimony of Paul Parmar**

8

Parmar - Direct

```
 1   but they -- they wouldn't take it.  So M&T was a
 2   relationship that my previous companies had, and we
 3   knew the bank people at M&T.  So they said, we will let
 4   you come here open an account, uh, unless like she's
 5   going to grow that account into a bigger number.  I
 6   said I don't think so that's going to happen, maybe it
 7   will go to 15 max.  Um, we're just looking to acquire
 8   one property and that's it.
 9        So they said, you know, we're doing this for you,
10   so open it and then get yourself into a banking
11   relationship that suits your needs, not -- not us.  So
12   we opened over there temporarily.
13        Q    Okay.  Were you there when the account was
14   opened?
15   A    No, I was not there.
16        Q    Um, to your knowledge who was there when the
17   account was opened?
18   A    I think it was Elena and Sam.
19        Q    Okay.  Now I showed you just now Exhibit P-
20   32, which is from M&T Bank.  Um, the beginning balance
21   is stated as $10,445,988, is that correct?
22   A    Yes.
23        Q    So yesterday you looked at Exhibit P-35, and
24   there was a check issued to -- a cashier's check issued
25   to Ranga Bhoomi -- I'm sorry -- from Ranga Bhoomi to --
```

9

Parmar - Direct

```
 1   A    Sequoia.
 2        Q    -- Sequoia T and N Consultants LLC, and the
 3   check was for $10,166,000.  Do you know what the source
 4   is for the additional monies, the difference between
 5   the 10,4 and the 10,166?
 6   A    Um, I think there was additional $400,000
 7   deposited.  Do you know where the Bate stamp MT --
 8        Q    I'm sorry?
 9   A    What is this Bate stamp MT?
10        Q    It -- it's just a Bate stamp, just a paper
11   numbering, uh --
12   A    Your numbering or their numbering?
13        Q    No, you -- you can't ask questions.  I'm
14   showing you what's marked as Exhibit P-36.  Do you
15   recognize this document?
16   A    Yes.
17        Q    What is this document?  What does this
18   document show?
19   A    Ranga Bhoomi depositing $400,000 in cash.
20        Q    Okay.  And --
21        THE COURT:  Do you have a copy -- did you
22   show your adversary, first off?
23        MR. NEKRITIN:  Judge, it should be in my
24   exhibits but, uh --
25        MR. DAYAN:  It is, Judge.  It's -- it's on
```

**RANGA BHOOMI, LLC v. SEQUOIA TRAINING, et al. -- October 23, 2024**
**Testimony of Paul Parmar**

```
                                                          10
                        Parmar - Direct
 1    consent.  All these documents that he's showing is on
 2    consent.
 3              THE COURT:  Because my exhibit book only goes
 4    to 33.
 5              MR. NEKRITIN:  I apologize, Your Honor.
 6    BY MR. NEKRITIN:
 7         Q    Okay.  So, Mr. Parmar, um, you had stated you
 8    had testified previously that Ranga Bhoomi had, I
 9    guess, put in additional funds, in addition to the
10    $10.1 million.  How does that -- what -- what does --
11    where did this check, the proceeds from this check, go
12    to, if you know?
13         A    Um --
14         Q    To whom, rather?
15         A    To Sequoia.
16         Q    Okay.  Now you had testified that the monies
17    were going for the purposes of opening a horse farm,
18    and you had testified that a horse farm was not opened.
19    To your knowledge why was that horse farms not opened?
20         A    Horse farm.
21         Q    Horse farm.  I apologize.
22         A    Um -- um, we had looked at a few.  Elena had
23    looked at a few in the neighborhood, in Colts Neck and
24    I think in Marl-- Marlboro.  Um, then this whole issues
25    with the banking happened.  Um, like I said, this M&T
```

```
                                                          11
                        Parmar - Direct
 1    Bank was a temporary house, so we got focused on trying
 2    to solve the banking issue for her.
 3              And, um, we found First Republic through a
 4    referral.  First Republic took the -- and opened the
 5    account with the promise that I would put my business
 6    -- give them more business and, um -- which was also in
 7    the works, so I had -- I got engaged with, uh, their
 8    wealth management department, had some girl from their
 9    wealth management office, or wealth advisor, working
10    with me to see if I could give them $50 to $75 million
11    of business.
12              And, um, while that was in the works I had a --
13    um, me and Elena went to India and, uh, um, Dubai, so
14    we were out for -- for almost a month.  We came back
15    and got -- got back onto the banking issues.  But while
16    we were out First Republic started sending e-mails,
17    because we, unbeknownst to us, they were getting bought
18    by the same bank, Chase, and, um, so they started --
19    they also wanted the money out of there.  And then
20    Elena had to come back and focus on moving the money
21    out of there, out of First Republic.  They gave us
22    time, so it wasn't like J.P. Morgan Chase where they
23    just froze the account.  Um, so First Republic was
24    good, and especially they were working with me to get
25    my account.  So -- so they showed leniency, they said,
```

**RANGA BHOOMI, LLC v. SEQUOIA TRAINING, et al. -- October 23, 2024**
**Testimony of Paul Parmar**

```
                                                              12
                          Parmar - Direct
 1    listen, we'll give you 30 days, get -- get this account
 2    out of here, we're getting bought by Chase, Chase
 3    doesn't want this account.
 4                MR. DE GROOT:  Judge, I object.  That was
 5    non-response.  The question was specific, why didn't
 6    you open the ba-- the -- the horse farm.
 7                THE WITNESS:  This is responsive, Your Honor.
 8                MR. DE GROOT:  No, there's nothing pending.
 9                MR. NEKRITIN:  No, don't talk, don't talk.
10                MR. DAYAN:  So I object to that colloquy that
11    it's repetitive from his prior testimony.
12                THE COURT:  The -- all right, overruled.
13    Sir, get to -- let's get to the point.
14    BY MR. NEKRITIN:
15         Q    Mr. Parmar, you had stated that -- that an
16    account was opened with First Republic Bank.  Who
17    opened the account?
18         A    I -- I went with Elena.  It was me, Elena and Sam.
19         Q    And do you remember the date that the account
20    was opened?
21         A    No, not at all.
22                THE COURT:  When you say -- Sam, you said?
23                THE WITNESS:  Sam was my CFO in one of my
24    companies.
25                THE COURT:  What's Sam's last name?
```

```
                                                              13
                          Parmar - Direct
 1                THE WITNESS:  Sam Zaharis, Z-a-h-a-r-i-s.
 2                THE COURT:  So it was you, Elena and Sam
 3    Zaharis.
 4                THE WITNESS:  Right.
 5                THE COURT:  That opened the account at First
 6    Republic.
 7                THE WITNESS:  I just went with her.  I didn't
 8    open the account, she opened the --
 9                THE COURT:  You -- you were there with Sam.
10                THE WITNESS:  Yeah, the -- the referral --
11                THE COURT:  And you said he's CFO of -- of --
12    of what?
13                THE WITNESS:  Of one of my companies, yes.
14                THE COURT:  What's the name of the company?
15                THE WITNESS:  He was the CFO of Pegasus Blue
16    Star Fund and Constellation Health Group.
17                THE COURT:  All right.  I'm just trying to
18    make sure I understand everybody's names as I'm hearing
19    them.
20                THE WITNESS:  The only reason we went --
21                MR. NEKRITIN:  There's no question pending.
22                THE COURT:  All right.
23                MR. NEKRITIN:  No question pending.  We'll
24    get to that.
25                THE WITNESS:  But I never finished your
```

**Elite Transcripts, Inc.**
14 Boonton Avenue, Butler, New Jersey 07405
(973) 283-0196 FAX (973) 492-2927

**RANGA BHOOMI, LLC v. SEQUOIA TRAINING, et al.  --  October 23, 2024**
**Testimony of Paul Parmar**

14

Parmar - Direct

```
 1    previous question.  He stopped me.
 2              THE COURT:  All right, please move on,
 3    counsel.
 4              MR. NEKRITIN:  So, Mr. Parmar, I when we --
 5    we left off I was just simply asking you if you
 6    remember the date that the account was opened.  You
 7    said you did not.
 8              Judge, I'm showing to Mr. Dayan an exhibit
 9    that's been marked 18A.  I believe it's in The Court's
10    possession.
11    BY MR. NEKRITIN:
12         Q    Mr. Parmar, I just want you to take a look at
13    this exhibit, it's been marked 18A, and please advise
14    if it refreshes your recollection as to when that
15    account was opened with First Republic Bank?
16              THE WITNESS:  Your Honor, I can hear them
17    talking.
18              THE COURT:  All right.  Everybody, please, I
19    -- I -- if you have notepads you can write notes to
20    each other.  I don't want the witness distracted.
21              MR. DAYAN:  Sure.
22    BY MR. NEKRITIN:
23         Q    Just look at the first page.
24         A    Yeah, I -- I did.
25         Q    And does that refresh your recollection when
```

15

Parmar - Direct

```
 1    the account was opened?
 2         A    Yes.
 3         Q    And when was the account opened?
 4         A    I see Elena's signature on November 17th.
 5              MR. DE GROOT:  What year?
 6    BY MR. NEKRITIN:
 7         Q    Of what -- what year?
 8         A    2017.
 9         Q    And that refreshes your recollection as to
10    when it was opened, that account?
11         A    Potentially, yes.
12         Q    Okay.  Now, Mr. Parmar, when that account was
13    opened were -- to your knowledge were you a signatory
14    on that account?
15         A    No, I couldn't.
16         Q    Were any monies from that account used for
17    your own personal -- for your own personal expenses,
18    for example, legal fees, attorney fees?
19         A    Yes.
20         Q    Okay.  Um, one moment, sir.
21              THE COURT:  Did I hear that correct, you --
22    you asked if monies from this account were used for his
23    personal expenses?
24              MR. NEKRITIN:  Yes.  Yes, sir.
25              THE COURT:  For his personal attorney's fees?
```

**RANGA BHOOMI, LLC v. SEQUOIA TRAINING, et al. -- October 23, 2024**
**Testimony of Paul Parmar**

16

Parmar - Direct

```
 1              MR. NEKRITIN:  Yes.
 2              THE COURT:  Okay.  I want to make sure I
 3    heard it right.
 4              MR. NEKRITIN:  Yes, sir.  Judge, I'm showing
 5    Mr. Dayan an exhibit that's been marked 18D,
 6    Plaintiff's 18D.
 7    BY MR. NEKRITIN:
 8         Q    Mr. Parmar, I'm showing you a statement from
 9    First Republic Bank.  The statement is from January
10    1st, 2018 to January 31st of 2018.  There is a
11    description of a withdrawal for a law firm -- I'm
12    sorry, there's a description for a withdrawal for a
13    payee Baker, Tilly Virchow Krause, LLP.  It's for
14    $25,000.  Was that -- do you -- can you -- was that
15    transaction in any way related to you personally?
16              THE COURT:  I don't -- I don't see it on 18B,
17    sir.
18              THE WITNESS:  D as in David.
19              THE COURT:  Oh, D as in David.
20              MR. NEKRITIN:  Yes, sir.  God bless you.
21              THE COURT:  Bless you.
22              MR. DE GROOT:  Thank you.
23              THE WITNESS:  What was the question?
24    BY MR. NEKRITIN:
25         Q    Sure.  The -- the notation for Baker Tilly,
```

17

Parmar - Direct

```
 1    was that transaction in any way related to you
 2    personally?
 3    A    Not personally, but it was not -- it was related
 4    to another business, yes.
 5         Q    Were you associated with that business?
 6    A    Yes.
 7              MR. NEKRITIN:  Judge, I am showing Mr. Dayan
 8    an exhibit that's been marked 18F, Plaintiff's Exhibit
 9    18F.  It's a First Republic Bank account statement.
10    BY MR. NEKRITIN:
11         Q    Mr. Parmar --
12              MR. DE GROOT:  Does The Court have that, sir?
13              MR. NEKRITIN:  Yes, the judge has it.
14    BY MR. NEKRITIN:
15         Q    Mr. Parmar, I'm showing an exhibit that's
16    been marked 18F, statement period March 1st, 2018 to
17    March 31st, 2018.  And specifically I direct your
18    attention to a transaction for $10,000 to payee Saul
19    Ewing LLP, remaining escrow.  Can you advise if that
20    transaction was in any way related to you or any of
21    your businesses?
22    A    Um, no.
23         Q    Do you know what -- if you know, do you know
24    what that transaction for $10,000 to Saul Ewing was
25    related to?
```

**Elite Transcripts, Inc.**
14 Boonton Avenue, Butler, New Jersey 07405
(973) 283-0196 FAX (973) 492-2927

**RANGA BHOOMI, LLC v. SEQUOIA TRAINING, et al.  --  October 23, 2024**
**Testimony of Paul Parmar**

18

Parmar – Direct

```
 1   A    It was, uh, the attorney that Elena hired for her
 2   green card.  So she had a temporary green card because
 3   of her fake marriage and, um, she was trying to get it
 4   into a permanent green card, so that $10,000 went to
 5   this law firm, so that she could get her permanent
 6   green card.
 7        Q    Now did she have your permission to make that
 8   transaction of $10,000, by you or -- I mean you or
 9   anybody from Ranga Bhoomi?
10   A    She didn't, but when I looked at it she explained
11   to me what it was.
12        Q    And were you okay then with that transaction?
13   A    And when I spoke with John it was not okay, but we
14   understood as a par-- we can -- we could chalk it down
15   to compensation for her.
16        MR. NEKRITIN:  Now, Mr. Parmar, in front of
17   you is Exhibit 32.  I believe Mr. Dayan has a copy of
18   it, Your Honor, and so does Your Honor.
19   BY MR. NEKRITIN:
20        Q    I want you to turn to page that's been marked
21   MT1390 -- 1391.
22        THE COURT:  I'm sorry, which one?
23        MR. NEKRITIN:  Sure, Judge.  Exhibit
24   Plaintiff's Exhibit 32.  There's a Bate stamp 1391.
25        THE COURT:  Bless you.  Everybody's sneezing
```

19

Parmar – Direct

```
 1   today.
 2        MR. DE GROOT:  Yeah, it's a good pollen day.
 3   BY MR. NEKRITIN:
 4        Q    And Mr. Parmar -- Mr. Parmar, I'll represent
 5   to you that your previous firm had Bate stamped these
 6   or the vendor did in response to a subpoena response.
 7   So I just want you to turn to Page 1391 in Exhibit 32.
 8   A    Page who?
 9        Q    1391, it's the bottom right.
10        THE COURT:  Are you all right there, Mr.
11   DeGroot?
12        MR. DE GROOT:  Yes, just the allergies,
13   Judge.
14        THE COURT:  Okay.
15   BY MR. NEKRITIN:
16        Q    So did you find it yet or do you need help?
17   A    Yes.
18        Q    Now it's -- it purports to be an official
19   check in the amount of $1 million to Wendels Marx Lane
20   and Mittendorf, LLP.  Was this transaction in any way
21   related to you personally, or any of your businesses?
22   A    Yes.  I needed, uh, for one of the businesses $12
23   million.  I spoke to John, and we -- and decided to
24   lower my interest in Ranga Bhoomi by close to $3
25   million, and John said you can withdraw $3 million --
```

**RANGA BHOOMI, LLC v. SEQUOIA TRAINING, et al. -- October 23, 2024**
**Testimony of Paul Parmar**

20

Parmar – Direct
```
 1    up to $3 million -- for your interest, and we can
 2    figure out how to top it up later on.  So once I got
 3    the clearance from John I told Elena to write that
 4    check.
 5         Q     And that check is dated 11-16-2017, correct?
 6               THE COURT:  This -- this is a $1 million
 7    check.  Am I looking at the right check?
 8               MR. NEKRITIN:  Yes.
 9               THE WITNESS:  Yes.  I needed $12 million but
10    I was falling short by about $3 million.
11               THE COURT:  Wait for the question.
12               THE WITNESS:  Okay.
13    BY MR. NEKRITIN:
14         Q     So, Mr. Parmar, that check is dated 11-16-
15    2017?
16    A    Yes.
17         Q     And it's in the amount of $1 million?
18    A    Yes.
19         Q     Okay.  Now I want you to look at the last
20    page of the same exhibit, Plaintiff's Exhibit 32.  It's
21    Bate stamped 1399.  There's another check with a
22    different number -- and, again, 734, dated 11-16-17, in
23    the amount of $1 million, it's to the order of Wendels
24    Marx Lane and Mittendorf, LLP.  That's the same payee
25    as the prior check.  Um, was this check issued for the
```

21

Parmar – Direct
```
 1    benefit of you or any of your businesses.
 2               THE COURT:  I'm sorry, counsel, what Bate
 3    stamp?
 4               MR. NEKRITIN:  It's the last page, Judge,
 5    1399 --
 6               THE WITNESS:  1399.
 7               MR. NEKRITIN:  -- of this exhibit.
 8               THE WITNESS:  1-3-9-9.
 9               THE COURT:  Okay, what's the question again?
10               MR. NEKRITIN:  Sure.
11    BY MR. NEKRITIN:
12         Q     Was that check issued for the benefit of you
13    or any of your entities or companies that you may have
14    any association with?
15    A    Yes, it's part of the $3 million John approved
16    that I could take.  And you stated incorrectly before.
17               MR. DE GROOT:  Well, objection.
18               MR. NEKRITIN:  If he wants to clear up his
19    tes-- his testimony, Judge.
20               THE WITNESS:  Yes.
21               MR. DE GROOT:  No, he said you stated
22    incorrectly before.
23               MR. NEKRITIN:  Well, okay.
24    BY MR. NEKRITIN:
25         Q     Is -- was any -- was the question I just
```

**Elite Transcripts, Inc.**
14 Boonton Avenue, Butler, New Jersey 07405
(973) 283-0196 FAX (973) 492-2927

**RANGA BHOOMI, LLC v. SEQUOIA TRAINING, et al.  --  October 23, 2024**
**Testimony of Paul Parmar**

22

                         Parmar - Direct
 1    asked, if you disagree with the premise of it?
 2    A    Yes, you started by saying the Bate stamps were
 3    from your previous attorney.
 4         Q    Yes.
 5    A    The Bate stamps are from the Government of the
 6    United States.  It's DOJ Bate stamps.
 7         MR. NEKRITIN:  Okay, thank you, Mr. Parmar.
 8         Judge, I'm showing Mr. Dayan Plaintiff's
 9    Exhibit 18E.  That's a statement from First Republic
10    Bank --
11         THE COURT:  E as in Edward?
12         MR. NEKRITIN:  E as in Edward, yes, dated
13    February the 1st, 2018 to February the 28th of 2018.
14    BY MR. NEKRITIN:
15         Q    Mr. Parmar, I direct your attention to the
16    page before last of this document, specifically the
17    notation FisherBroyles LLP, $75,000.  Was that
18    transaction in any way related to you or any of your
19    businesses, or businesses you may have a relationship
20    or affiliation with?
21    A    It was a law firm that provided me with services,
22    but Elena needed help on getting the citizenship and
23    permanent green card.
24         THE COURT:  Sir, I don't see the payment
25    you're referring to.

---

23

                         Parmar - Direct
 1         MR. NEKRITIN:  I apologize, Your Honor?
 2         THE COURT:  I -- I'm looking at 18E, as in
 3    Edward.
 4         THE WITNESS:  Yes, it's 3 of 4, first line.
 5         THE COURT:  Shows a $75,000 --
 6         THE WITNESS:  Yes.
 7         THE COURT:  -- funds debit to FisherBroyles.
 8         THE WITNESS:  Yes.
 9    BY MR. NEKRITIN:
10         Q    What is that transaction related to, Mr.
11    Parmar?
12    A    Um, since I didn't have any expertise in fake
13    marriages, or getting green cards under the guise of
14    fake marriages, I consulted with my attorney at
15    FisherBroyles, and he said they know somebody that he
16    went to school with, and she is very, very good.  So,
17    um, he facilitated it, so this was a deposit for that.
18         Q    After taking into account all of these
19    transactions, uh, to your knowledge what, if anything,
20    were the remainder of the monies to be used for in the
21    Sequoia account?
22    A    It was the understanding that the cash belongs to
23    the investors until a transaction happens.
24         Q    I'm sorry, what transaction?
25    A    Until a horse farm is purchased, and, um,

**Elite Transcripts, Inc.**
14 Boonton Avenue, Butler, New Jersey  07405
(973) 283-0196 FAX (973) 492-2927

**RANGA BHOOMI, LLC v. SEQUOIA TRAINING, et al. -- October 23, 2024**
**Testimony of Paul Parmar**

```
                                                              24
                        Parmar - Direct
 1   accessory business is started.
 2         Q    You're saying a horse farm was purchased?
 3   A    Until a horse farm.
 4         Q    Okay.  You're saying that a horse farm was
 5   purchased.
 6              MR. DE GROOT:  No, until a horse farm --
 7              THE WITNESS:  No, I said until.
 8              MR. NEKRITIN:  Oh, until a horse farm.
 9              THE COURT:  Until, until.
10              MR. NEKRITIN:  Yeah, I -- I couldn't hear
11   him.
12   BY MR. NEKRITIN:
13         Q    Okay.  To get back to that question.  Why
14   wasn't the horse farm purchased, to your knowledge?
15   What happened?
16   A    So after we went through the whole debacles of the
17   bank account not opening, um, we advised Elena that
18   maybe it's a better idea to -- to break it down into
19   smaller pieces.  Nobody's willing to accept that you
20   can have $10 million, even though coincidentally a year
21   before --
22              MR. DE GROOT:  Objection as to coincidental,
23   Judge.
24              THE COURT:  Overruled.
25              THE WITNESS:  It was coincidentally.
```

```
                                                              25
                        Parmar - Direct
 1   BY MR. NEKRITIN:
 2         Q    Okay, just keep going.
 3   A    A year before me and Elena were in India, and
 4   there was this very gifted, very well-known, very, very
 5   popular guy who could read your future, and he had told
 6   Elena that you're going to --
 7              MR. DE GROOT:  Objection as to what he told
 8   Elena, Judge.
 9              THE COURT:  That's sustained, hearsay.
10              MR. NEKRITIN:  Yeah, you can't say what
11   somebody else told you about Elena.
12              THE WITNESS:  I was sitting there.
13              MR. NEKRITIN:  Hearsay.  The judge is
14   ordering you to move on.
15              THE WITNESS:  Okay.
16              MR. DE GROOT:  It's in the presence of the
17   defendant so it can be permitted, Judge, and it's not
18   offered for its truth, it's offered for the statement
19   being made --
20              THE COURT:  It's an out-of-court statement.
21              MR. DE GROOT:  -- and state of mind.
22              THE COURT:  Sir, Mr. DeGroot.
23              MR. DE GROOT:  Yes.
24              THE COURT:  First off, counsel is conducting
25   the examination.
```

**RANGA BHOOMI, LLC v. SEQUOIA TRAINING, et al. -- October 23, 2024**
**Testimony of Paul Parmar**

26

Parmar - Direct
1          MR. DE GROOT:  Yes.
2          THE COURT:  But -- but -- but, more
3    importantly, regarding the substance of the objection,
4    it's based on hearsay based on what a fortune teller
5    said in India.  That person's not here to testify.
6    It's an out-of-court statement.  It's not permissible,
7    it's hearsay.
8          MR. DE GROOT:  However, there is the
9    exception if it's in the presence of the defendant, and
10   it is in the presence of the defendant.
11         THE CLERK:  But it's a -- you're suggesting
12   it's a statement by a party opponent.  It's not.  The
13   defendant --
14         MR. DE GROOT:  I'm not saying that.  I'm
15   saying that the statement was made in the presence of
16   the defendant, you know, and -- and it was made to her
17   for her benefit, so it's a -- it is an exception to the
18   hearsay rule.  We disagree, you make a ruling, and I
19   accept it, Judge.
20         THE COURT:  State-- statements by a fortune
21   teller in India are -- are --
22         MR. DE GROOT:  All right.
23         THE COURT:  -- are not going to be admitted.
24   Let's go.
25         MR. NEKRITIN:  That was from --

27

Parmar - Direct
1          THE WITNESS:  I was just citing color so I'll
2    just withdraw all of that.
3          MR. NEKRITIN:  Okay.
4          THE WITNESS:  Just to complete it, the
5    fortune teller told her that she would get a business
6    of $10 million, that's it.  Um --
7          THE COURT:  That -- I'm going to strike that
8    testimony from the record.  I prohibited the testimony.
9    He said it, anyway.
10   BY MR. NEKRITIN:
11        Q     All right, Mr. Parmar, continue.
12   A    I lost my train of thought.
13        Q    Sure.  I -- I had asked you, um, why the
14   horse farm was not purchased.
15   A    So and then in, uh, May of 2018, um, I get a call
16   from a friend of mine in the Anti-Terror Unit at FBI
17   saying, um, I would like to have some of my colleagues
18   meet with you.  I said, yes, send them to my house.
19        THE COURT:  Sir, did you say 2019?
20        THE WITNESS:  18.
21        THE COURT:  18, okay.  I just want to make
22   sure I have the dates correct.
23        THE WITNESS:  May of 2018.
24        THE COURT:  Thank you.
25        THE WITNESS:  And I said, yeah, sure, send

**Elite Transcripts, Inc.**
14 Boonton Avenue, Butler, New Jersey  07405
(973) 283-0196  FAX (973) 492-2927

**RANGA BHOOMI, LLC v. SEQUOIA TRAINING, et al. -- October 23, 2024**
**Testimony of Paul Parmar**

28

```
 1   them, uh, to the house.  And he said, no, I think, um,
 2   there is a 7 -- no, there is a Dunkin' Donuts on Route
 3   34, right by Colts Neck, right by Delicious Orchards,
 4   why don't we have a breakfast meeting with the FBI guys
 5   at this Dunkin' Donuts.
 6            THE COURT:  Who was the person who called
 7   you?  I'm sorry, I thought you said the FBI called you.
 8            THE WITNESS:  Uh, yeah, he's the national
 9   head of Anti-Terror William McMurray.  He's in D.C.
10            THE COURT:  So is he with the FBI?  Because I
11   want to make sure I understood what you said.
12            THE WITNESS:  Yes.
13            THE COURT:  Okay.  So the national --
14            THE WITNESS:  He's the head of Anti-Terror.
15            THE COURT:  National head of Anti-Terror of
16   the FBI called you to have a meeting.
17            THE WITNESS:  Yes.
18            THE COURT:  Okay.
19            THE WITNESS:  Um --
20            THE COURT:  I -- I just want to make sure I
21   hear you clearly.
22            THE WITNESS:  Yes, yes.  He -- he may be the
23   national head of Anti-Terror and Patriot Act, both
24   things together.
25            THE COURT:  Patriot Act.
```

29

```
 1            THE WITNESS:  Patriot.
 2            THE COURT:  Okay.  And just --
 3            THE WITNESS:  Enforcing internationally.
 4            THE COURT:  All right.  Just for the record,
 5   I don't need to repeat, but --
 6            THE WITNESS:  I know, I don't --
 7            THE COURT:  -- I -- I -- and I don't think
 8   there's a language barrier.
 9            THE WITNESS:  I'm from India, I get it.
10            THE COURT:  Okay, you have -- I have an
11   accent from New Jersey, you have an accent from your
12   native country, and I just want to make sure.
13            THE WITNESS:  I -- I don't take offense at
14   all.
15            THE COURT:  And -- and I -- and I mean no
16   offense.  I just want to make sure I understand you.
17            THE WITNESS:  Yes, thank you.  Thank you,
18   Your Honor.
19            THE COURT:  All right, thank you.
20            THE WITNESS:  So his name is William
21   McMurray.  He called me and he said, um --
22            MR. DAYAN:  Objection as to what he said,
23   Judge.
24            THE COURT:  Sustained.  Sir, again,
25   hearsay --
```

**RANGA BHOOMI, LLC v. SEQUOIA TRAINING, et al.  --  October 23, 2024**
**Testimony of Paul Parmar**

30
```
                        Parmar - Direct
 1            THE WITNESS:  He said to me.
 2            THE COURT:  No, I understand that.
 3            MR. DE GROOT:  Uh, no, The Court has ruled
 4      against us.
 5            THE COURT:  But hearsay is an out-of-court --
 6      hearsay is an out-of-court statement made by somebody
 7      else.  They're not here to -- to be questioned
 8      regarding their statements.  They're not subject to
 9      cross-examination.  Their testimony is deemed hearsay.
10      They have to be here to testify.  Just like you can't
11      introduce a document and cite, here, here is what
12      somebody said.  That person's not subject to cross-
13      examination because they're not here.  That statement
14      is a hearsay document unless otherwise admissible.
15            THE WITNESS:  So how do I say the story?
16            MR. DAYAN:  And so moreover, Judge --
17            THE COURT:  What's that?
18            MR. DAYAN:  Moreover -- moreover, the
19      question was very simple, why not?  He doesn't have to
20      explain all the background.
21            THE COURT:  I'm going to have -- sir, please
22      have a seat.  I'm going to have counsel repeat his
23      question, but I'm trying to inform because now this is
24      the second or third time we're going over this hearsay
25      issue.
```

31
```
                        Parmar - Direct
 1            All right, Mr. Parmar, again, you can't
 2      testify as to what some other person may have said to
 3      you outside of this courtroom, unless it was one of the
 4      defendants, okay?
 5            THE WITNESS:  I'll rephrase it.
 6            THE COURT:  All right.  Sir, ask -- counsel,
 7      ask your question.
 8      BY MR. NEKRITIN:
 9         Q    Sure.  Mr. Parmar, to your knowledge why was
10      the horse farm not opened?
11         A    So, as I was saying, I receive a call.  I was --
12            MR. DAYAN:  Objection.
13            THE COURT:  He said he received a call, he
14      didn't say what he was told.
15            MR. DAYAN:  Okay, okay.
16            THE WITNESS:  I was instructed to -- as a --
17      as a conclusion of that call I had to go for a
18      breakfast meeting to Dunkin' Donuts on Route 34 to meet
19      with a bunch of FBI officers.  I drive down with my
20      driver the next day.  It was arranged over a week, so
21      it wasn't the next day.  Sorry, my apologies.  Um, the
22      -- the specified day that I was supposed to be at
23      Dunkin' Donuts I drive down, and the meeting started
24      off just catching up on previous businesses, and then a
25      new set of FBI officers showed up.  Then the FBI
```

**RANGA BHOOMI, LLC v. SEQUOIA TRAINING, et al. -- October 23, 2024**
**Testimony of Paul Parmar**

```
                                                                    32
                              Parmar - Direct
 1     officers that were meeting with me they said --
 2     BY MR. NEKRITIN:
 3           Q     You -- well, you could just say as a result
 4     of the meeting what -- what happened?
 5     A     Yes.  So the initial group of FBI officers said,
 6     oh, we have bad news for you.
 7           Q     You --  you can't say what they said.
 8     A     Okay.
 9           Q     You could only say what happened as a result
10     of the meeting.
11     A     They said -- I was informed, or I under--
12           THE COURT:  So what did you do as a result of
13     the meeting?  I'm just following up on what counsel
14     just instructed you.
15           THE WITNESS:  Um, new set of -- two new guys
16     showed up, and they said we have to take you with us,
17     there's an arrest warrant for you.  And --
18           THE COURT:  So you were taken into custody at
19     this meeting at the Dunkin' Donuts?
20           THE WITNESS:  I was taken into custody at the
21     Dunkin' Donuts.
22     BY MR. NEKRITIN:
23           Q     Do you remember what date that was?
24     A     It was either May 16th or May 18th.  I cannot
25     remember.
```

```
                                                                    33
                              Parmar - Direct
 1           Q     Okay.  So middle of May 2018 this occurs.
 2     A     Yes.
 3           Q     I'm sorry, continue.
 4     A     I was, um -- um, my driver was there, so I went to
 5     my driver and I told him that I'm going with these
 6     people for breakfast and lunch meeting, you go back
 7     home, and I will call you in the evening to come pick
 8     me up.  And my driver left, and I went and sat in these
 9     two new guys' car, and we started driving.  Um, they
10     allowed me to make a phone call to Jeff Hoffman from
11     Wendels.
12           Q     And please don't tell us what you and Mr.
13     Hoffman spoke about.
14     A     Yeah, I will not.  I will not.
15           Q     Protected by attorney-client privilege.
16     A     So then, um, um, I was informed that I'll be back
17     by 4 o'clock, and -- but I didn't have my passport, and
18     I had some other very sensitive things on me.
19           MR. DAYAN:  Judge, I object as to relevance.
20     He -- he got -- he got arrested on that day.
21           THE COURT:  All right, let -- let's move on.
22     I -- I -- unless any of this is pertinent --
23           MR. DE GROOT:  Yes.
24           THE WITNESS:  It is.
25           THE COURT:  He gets arrested at Dunkin'
```

**Elite Transcripts, Inc.**
14 Boonton Avenue, Butler, New Jersey  07405
(973) 283-0196  FAX (973) 492-2927

**RANGA BHOOMI, LLC v. SEQUOIA TRAINING, et al.  --  October 23, 2024**
**Testimony of Paul Parmar**

34

Parmar – Direct

```
 1    Donuts.
 2    BY MR. NEKRITIN:
 3         Q     So how was the arrest relevant to your
 4    inability to purchase -- or how was the arrest relevant
 5    to the failure to purchase the horse farm?
 6    A     So one of the things that happened as a result of
 7    arrest -- and I, for the first time in my life, learned
 8    the statement do not kick a dog when he's lying down,
 9    or kick a dog when he's lying down, whichever way it
10    plays.  In my case it played as kick a dog when he's
11    down.  I learned that most of the people that had taken
12    monies from me basically thought this was the biggest
13    excuse for which they would not return the monies.
14    Even that's the reason why we are in this court.
15         But, besides this, there are several other
16    instances where --
17              MR. DAYAN:  Judge, it's non-responsive, I
18    object.
19              THE WITNESS:  It is responsive.
20              THE COURT:  Sir, I'm going to direct you to
21    answer the question.  The question -- and -- and I'm
22    going to sustain that objection -- the question is what
23    -- why did the horse farm not go forward?
24              MR. DE GROOT:  Judge, if I may --
25              THE COURT:  That's -- that's how I understood
```

35

Parmar – Direct

```
 1    the question.
 2              MR. DE GROOT:  I need Mr. Parmar's keys.  He
 3    left something in the -- in his vehicle, and Mr.
 4    Petrozza's going to go remove it, you know.
 5              MR. PETROZZA:  It's exhibits, Judge.
 6              MR. DE GROOT:  He -- he took our exhibits to
 7    review them and he left them in the car.
 8              THE CLERK:  There's his key fob.
 9              MR. DE GROOT:  Thank you.
10              THE COURT:  All right.  Mr. Petrozza, you're
11    excused, sir.
12              MR. PETROZZA:  Thank you.
13              THE COURT:  And, counsel, you're consenting
14    to proceed, correct?
15              MR. DAYAN:  Yes.
16              THE COURT:  And Mr. DeGroot, we're going to
17    continue while he goes to the car, correct?
18              MR. DE GROOT:  Oh, that's fine, yes.
19              THE COURT:  Let's continue.
20              THE WITNESS:  Your Honor, I need to go to the
21    bathroom.  I think I'm going to throw up.
22              THE COURT:  Pause the record.
23         (Off the record.  Back on the record.)
24              THE COURT:  All right, we're back on the
25    record in RANGA BHOOMI VS. ELENA SARTISON, ET AL., MON-
```

**Elite Transcripts, Inc.**
14 Boonton Avenue, Butler, New Jersey 07405
(973) 283-0196 FAX (973) 492-2927

**RANGA BHOOMI, LLC v. SEQUOIA TRAINING, et al. -- October 23, 2024**
**Testimony of Paul Parmar**

36

Parmar – Direct

```
 1    L-2754-20.  We're back from a inconvenience break.  I
 2    was informed that Mr. Parmar did not vomit, but
 3    everyone's back.  Mr. Parmar's back on the stand.  All
 4    right, let's continue.
 5    BY MR. NEKRITIN:
 6         Q    Mr. Parmar, before we left there was a
 7    question pending, specifically to your knowledge why
 8    was the horse farm not opened?  You had concluded
 9    testifying about you being arrested.  Pick up from
10    there and try to answer that question to the best of
11    your ability.
12    A    Um, Elena was visiting me, I think, almost
13    everyday in jail, when I was in jail.  Needless to say
14    I didn't get bail that day.  A very high bail amount
15    was set a few weeks later by Judge Vasquez, and it
16    could not be from any of my properties or any of my
17    family, so raising the $5 million from strangers became
18    a nightmare, and it took us another three weeks to
19    arrange the $5 million the bail was set at, and then I
20    finally came out.  But during those visits I kept
21    asking her about the horse farm that we had looked at,
22    and she kept giving me answers like we will look at it
23    once you're out of jail.  And then when I came out of
24    jail --
25         Q    And when was that, just to interrupt you
```

37

Parmar – Direct

```
 1    briefly?
 2    A    July -- July some date, I can't remember.
 3         Q    2018?
 4    A    2018, like --
 5         Q    Continue.
 6    A    -- like in eight or nine weeks.  It took us a
 7    couple of weeks to get the bail order.  We had to --
 8    the magistrate judge denied it, the next judge denied
 9    it, and Judge Vasquez granted it.  So it took us a
10    couple of weeks going through those hoops.  Then it
11    took us another three to four weeks to arrange the
12    money.  So once the $5 million was arranged I was out,
13    so I -- somewhere in July, I can't remember the date, I
14    was out, and, um, Elena was waiting at the house.
15         And not necessarily the same day, but during the
16    course of the next few days I started discussing about
17    the business, and, um, I was not getting positive
18    answers, let's put it that way, that I was not getting
19    the --
20         Q    Well, what answers were you getting?
21    A    We'll do it after all this dust settles.  And at
22    that point I was not indicted, so I was picked up on a
23    complaint.  So I didn't even know like how far this is
24    going to go, uh, and I had -- I definitely had the
25    impression that if the complaint is not resolved I will
```

**RANGA BHOOMI, LLC v. SEQUOIA TRAINING, et al. -- October 23, 2024**
**Testimony of Paul Parmar**

```
                                                              38
                        Parmar - Direct
 1    get indicted at some point.  Um, and then, uh, when I
 2    was not getting positive answers -- well, I say
 3    positive meaning positive for the business.  They
 4    weren't positive answers.  I understand her logic, like
 5    you need to take care of this situation before you even
 6    think about this.
 7         And, um, then came a time when I said I think you
 8    need to return the money, and that's when she said no.
 9    And I said, return the diamonds, and she said no.  To
10    the diamonds she said I will return them when I'm in a
11    good earning position.
12         Q    Let me stop you right there, briefly.  This
13    is the first time in your direct testimony that you're
14    referencing the diamonds.  Was there any transaction at
15    all with Ms. Sartison related to diamonds?  If so, what
16    was it?
17    A    One of the subsidiaries of Sequoia is Van Cleef.
18    Van Cleef was going to be holding esoterical assets
19    like diamonds, gold, or even crypto.  My other partners
20    are into crypto, even though I'm not.  So Van Cleef was
21    set up by Elena to hold those esoterical assets.
22              THE COURT:  You said esoterical?
23              THE WITNESS:  Yeah.  Non -- non-core assets.
24    Um, and diamond has been the investment vehicle that
25    I've used in the past, I continue to use, John has
```

```
                                                              39
                        Parmar - Direct
 1    used.  Same platinum, gold are -- are good investments,
 2    so we have used that in the past, so we bought three
 3    diamonds worth, a little bit over a million dollars,
 4    and those --
 5    BY MR. NEKRITIN:
 6         Q    Who is we?
 7    A    Um, Sequoia.
 8         Q    Okay.
 9    A    Um, the diamond guy, who knows me very well, came
10    from New York with the diamonds to the house.  Me and
11    Elena looked at the three diamonds.  He brought a lot
12    of diamonds.  We narrowed it down to three diamonds.
13    They were worth about $1.2 million.  They were like
14    five to six carats each, color Grade B or less, and
15    flawless.  So -- so I said -- and we -- I was getting
16    30 percent discount to market Rap -- based on the Rap
17    report pricing.  So I said we'll buy these three.  And
18    since I've done tens of millions of dollars of business
19    with this guy he's -- he never asks for money, we send
20    it to him later on.  So he left the three diamonds.  I
21    gave it to Elena, and I was going to wire him the money
22    next day and, um, I spoke to John that night.  I said I
23    like two of the diamonds, not really a hundred percent
24    sure about one of the diamonds.  It had, um, what is --
25    what is that called?  The blue shade in it.  When --
```

**Elite Transcripts, Inc.**
14 Boonton Avenue, Butler, New Jersey 07405
(973) 283-0196 FAX (973) 492-2927

**RANGA BHOOMI, LLC v. SEQUOIA TRAINING, et al. -- October 23, 2024**
**Testimony of Paul Parmar**

40

Parmar - Direct

```
 1    when you enter a black light the diamond will glow
 2    blue.  A lot of people don't like it so it doesn't have
 3    that much of a popularity in terms of re-sale, and this
 4    was an investment grade, so John said, Paul, if you
 5    don't like it let's get rid of it, even if it is 30
 6    percent discounted.
 7         And so next day I told Elena we're going to get
 8    rid of one of the diamonds, keep two of them.  We're
 9    going to get rid of one of the diamonds.  So I called
10    the guy, he sent a messenger, he picked up the diamond.
11    But by that time we had already paid him the $1.2.  So
12    he -- he said, okay, who's the owner of the diamonds.
13    We said it's Ranga, maybe, then Ranga meets Van Cleef,
14    so, uh, he said, okay, so right away send -- send the
15    report to.  I said send it to -- oh, I'm sorry, Sequoia
16    and under Sequoia Van Cleef.  So I said sent the report
17    to Sequoia.  So you would see in their bank records,
18    Elena's bank records, there is $350,000 for that one
19    returned diamond coming back into her accounts from
20    Diamond Cut Corporation.
21    Q     So how much money was used to purchase the
22    diamonds?
23    A     About 1.2.
24    Q     I'm sorry?
25    A     $1.2 million.
```

41

Parmar - Direct

```
 1    Q     $1.2 million.  And what was the source of
 2    those monies?
 3    A     Ranga Bhoomi.
 4    Q     Okay.  And who received the diamonds?
 5    A     Elena.
 6    Q     Okay.  So getting back to, um, the question I
 7    had asked --
 8         THE COURT:  Hang -- hang on, I need to
 9    understand this.  You say -- you -- you -- Van Cleef is
10    a subsidiary of Sequoia, is what your testimony was.
11         THE WITNESS:  Yes, yes.
12         THE COURT:  And -- and Van Cleef purchased
13    the investment.
14         THE WITNESS:  Yes.
15         THE COURT:  That's what I thought I heard you
16    say.
17         THE WITNESS:  Yes.  But the funding was from
18    Ranga Bhoomi, the investors.  So it adds to the amount
19    that has been given to.
20         THE COURT:  No, but when you said the
21    $350,000 then it was returned to Elena, was it returned
22    to Van Cleef?
23         THE WITNESS:  Yes, yes.  Yes, Your Honor, to
24    Sequoia's bank account, Van Cleef's parent.
25         MR. NEKRITIN:  Van Cleef is a defendant, Your
```

**Elite Transcripts, Inc.**
14 Boonton Avenue, Butler, New Jersey  07405
(973) 283-0196 FAX (973) 492-2927