**ATTACHMENT A**

**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF NEW YORK**

--------------------------------------------- x

In re:                                                       :    Chapter 11
                                                             :
Orion HealthCorp, Inc., *et al.*,                            :    Case No. 18-71748-67 (AST)
                                                             :    Case No. 18-71789 (AST)
                              Debtors.                        :    Case No. 18-74545 (AST)
                                                             :
--------------------------------------------- x    (Jointly Administered)

Howard M. Ehrenberg in his capacity as Liquidating           :
Trustee of Orion Healthcorp, Inc., *et al.*, CHT             :
Holdco, LLC, and CC Capital CHT Holdco LLC,                  :
                                                             :
                              Plaintiffs,                     :
                        v.                                    :    Adv. Pro. No. 18-08053 (AST)
                                                             :
Parmjit Singh Parmar a/k/a Paul Parmar, *et al.*,            :
                                                             :
                              Defendants.                     :
--------------------------------------------- x

**NOTICE OF MOTION OF PARMAR DEFENDANTS TO CONFORM THE RECORD**

PLEASE TAKE NOTICE that, upon the annexed motion (the "Motion") of Defendant

Parmjit Singh Parmar a/k/a Paul Parmar ("Parmar"), and Defendants Constellation Health LLC,

Constellation Health Investment LLC, First United Health LLC, Naya Constellation Health LLC,

Vega Advanced Care LLC, Pulsar Advance Care LLC, Lexington Landmark Services LLC, 2

River Terrace Apartment 12J, LLC, 21B One River Park LLC, Aquila Alshain LLC, Ranga

Bhoomi LLC, PPSR Partners, LLC, Taira no Kiyomori LLC, Axis Medical Services, LLC, and

The Red Fronted Macaw Trust (the "Parmar Entities" and collectively with Parmar, the "Parmar

Defendants") pursuant to Rule 8009(e) of the Federal Rules of Bankruptcy Procedure, shall move

before the Honorable Alan S. Trust, United States Bankruptcy Judge, at the United States

Bankruptcy Court, Eastern District of New York, Alfonse M. D'Amato U.S. Courthouse, 290

Federal Plaza, Central Islip, New York 11722, on a date and at a time to be set by the Court,

1

pursuant to Fed. R. Bankr. Proc. 8009(e) for entry of an order to conform the trial record to correct errors in the certified trial transcript.

PLEASE TAKE FURTHER NOTICE that, any response to the Motion, or requests for hearing, if any, must be in writing, and be filed with the Court through its ECF system, and served upon counsel for the Movants, Broege, Neumann, Fischer & Shaver, LLC, 25 Abe Voorhees Drive, Manasquan, NJ 08736 (Attn: Timothy P. Neumann and Geoffrey P. Neumann, Esq.). If no response or objection has been properly filed, served and received by the Objection Deadline, the Court may sign the proposed order without a hearing.

Broege, Neumann, Fischer & Shaver, LLC
*Attorneys for Parmar Defendants*

By: *Timothy P. Neumann, Esq.*
        Timothy P. Neumann, Esq.

Dated: March 27, 2026
          Manasquan, NJ

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK

---------------------------------------- x

In re:                                              :   Chapter 11
                                                    :
Orion HealthCorp, Inc., *et al.*,                   :   Case No. 18-71748-67 (AST)
                                                    :   Case No. 18-71789 (AST)
                          Debtors.                  :   Case No. 18-74545 (AST)
                                                    :
---------------------------------------- x          (Jointly Administered)

Howard M. Ehrenberg in his capacity as Liquidating  :
Trustee of Orion Healthcorp, Inc., *et al*., CHT     :
Holdco, LLC, and CC Capital CHT Holdco LLC,         :
                                                    :
                          Plaintiffs,               :
              v.                                    :   Adv. Pro. No. 18-08053 (AST)
                                                    :
Parmjit Singh Parmar a/k/a Paul Parmar, *et al.*,   :
                                                    :
                          Defendants.               :
---------------------------------------- x

**MOTION OF PARMAR DEFENDANTS MOTION OF PARMAR DEFENDANTS TO
SETTLE THE RECORD**

Defendant Parmjit Singh Parmar a/k/a Paul Parmar ("Parmar"), and Defendants
Constellation Health LLC, Constellation Health Investment LLC, First United Health LLC, Naya
Constellation Health LLC, Vega Advanced Care LLC, Pulsar Advance Care LLC, Lexington
Landmark Services LLC, 2 River Terrace Apartment 12J, LLC, 21B One River Park LLC, Aquila
Alshain LLC, Ranga Bhoomi LLC, PPSR Partners, LLC, Taira no Kiyomori LLC, Axis Medical
Services, LLC, and The Red Fronted Macaw Trust (collectively, the "Parmar Entities" and
together with Parmar, the "Parmar Defendants"), by and through their undersigned counsel,
pursuant to  Fed. R. Bankr. Proc. 8009(e) hereby move for entry of an order conforming the trial
record to correct errors in the certified trial transcript.

1.      This adversary proceeding was commenced On April 4, 2018. [Docket No. 1]. On

3

June 4, 2018, the complaint was amended adding additional defendants, facts and counts. [Docket No. 24]. Again, on January 14, 2021, the complaint was again amended realigning certain parties and adding additional counts. [Docket No. 303].

2.      The Complaint alleges various causes of action against numerous defendants related to an alleged fraudulent scheme perpetrated by the Debtors' former management. The Complaint, *inter alia*, seeks to recover funds that were allegedly stolen from and rightfully belong to the Debtors in connection with a "go-private" merger transaction (the "Merger"), pursuant to which CHT Holdco, LLC ("CHT Holdco") acquired the stock of Constellation Healthcare Technologies, Inc. ("CHT"). [Docket No. 303].

3.      The trial in this matter was held on December 2 and 3, 2025.

4.      Annexed hereto as **Exhibit A** is a copy of the certified transcript of the trial proceedings of December 2, 2025.

5.      Annexed hereto as **Exhibit B** is a copy of the certified transcript of the trial proceedings of December 3, 2025.

6.      The transcript has multiple gaps and errors. This Court, to the extent it relies upon the transcript, will be deciding issues based upon incomplete and inaccurate facts.

7.      Defendant Paul Parmar had done his own analysis of that portion of the transcript purporting to depict his own testimony and his affidavit is submitted is support of this motion (the "Parmar Affidavit"). There are probably additional omissions and inaccuracies in the other portions of the transcript. Those have not been analyzed.

8.      The Parmar Defendants respectfully request that the Court settle the record in accordance with the Parmar Affidavit.

9.      Fed. R. Bankr. Proc. 5007 provides that "a certified sound recording or a

4

transcript of a proceeding is admissible as prima facie evidence of the record." This implies

that the record may be corrected. See, *United States v. Smith*, 433 F.2d 149, 151 (5th Cir. 1970):

> This wording clearly implies that the record may be corrected, and at least one court has so held. See, *United States v. Carter*, 2 Cir. 1965, 347 F.2d 220, cert. denied, 382 U.S. 888, 86 S.Ct. 178, 15 L.Ed.2d 124. The appellant has shown no prejudice from the court reporter's error, and in the face of clear and convincing evidence we think it obvious that the presumption of correctness which clothes the court reporter's transcript was overcome. In short, we approve the corrections made in the record by the trial judge.

10.    The Federal Rules of Bankruptcy Procedure provide that the Bankruptcy Court

should resolve any disputes regarding the accuracy of the record. Fed. R. Bankr. Proc. 8009(e).

11.    The errors in the transcript and the resulting prejudice to the Parmar Parties are

described in detail as follows:

**DISCREPANCY 1: CRITICAL DATE ERROR: SEPTEMBER 2016 BECOMES SEPTEMBER 2017, and**
**DISCREPANCY 18: NJ COMPANY "GOING TO BE BOUGHT INTO NORTHSTAR" TRANSCRIBED AS "VERY IMPORTANT TO NORTHSTAR", and**
**DISCREPANCY 17: "ONLY FIRST SIX MONTHS" TRANSCRIBED AS "EVERY SIX MONTHS"**

| Transcript | Audio |
|---|---|
| "AIG **Aipikva (ph.)**" | "AIG **IHIGfa**" |
| "**very important to** Northstar" | "**going to be bought into** Northstar" |
| "why **every** six months -- you're telling the Court about **every** six months" | "why **only first** six months -- you're telling the Court about **only first** six months" |
| "the **first** six months, I bought...and I placed them into those SPACs" | "the **post** six months (second half of 2016 from July 2016 onwards), I bought...and I placed them into those SPACs" |
| "in September of **2017**, three companies were bought" | "in September of **2016**, three companies were bought" |
| "before the **private** merger" | "before the **Go-Private** merger" |
| "The entire debt, the forty-five-million-dollar loan" (year omitted) | "The entire debt **of Orion Healthcorp**, the forty-five-million-dollar loan...paid off in September **(2016 prior to go-private)**" |

5

**A. Location:** Transcript page 159, Line 10 through Page 160 line 5 [1]

**B. The Certified Transcript vs. The Audio Record**

| CERTIFIED TRANSCRIPT | ECRO AUDIO RECORD |
|---|---|
| *"Q. About Northstar, what was Northstar?*<br>*A. Northstar was the SPAC that -- there was a New Jersey company called AIG Aipikva (ph.) that was very important to Northstar. And subsequently, September or October -- you asked Lazzara a very good question which why every six months -- you're telling the Court about every six months. And he gave an answer, which actually didn't make any sense. He said, because that was the problem I investigated. The reason why he said that is, the first six months, I bought ABC (ph.), ACA (ph.), ABA (ph.), and Nynon (ph.), and I placed them into those SPACs. So yes, those SPACs were empty for about a year to year-and-a-half. But before the private merger, all of those assets were in place.*<br>*So if you look at the period -- if you cut it off at June, which is what they have done a beautiful job of doing -- and I think one of the -- if you cut it off at June, then it looks like those SPACs were empty and there were no assets in them...But if you look, in September of 2017, three companies were bought, with no fundraise, with no money from anywhere. The entire debt, the forty-five-million-dollar loan was paid off in September, with the company's money."* | *" Q. About Northstar, what was Northstar?*<br>*A. Northstar was a SPAC that -- there was a New Jersey*<br>*company called AIG IHIGfa that was going to be bought into*<br>*Northstar. And subsequently, in September or October ( 2016 ) –ah ah  -- you asked Lazzara a very good question which is why only first six months --*<br>*you're telling the Court about only first  six months ( financials of only first six months of 2016).And he gave an answer, which actually didn't make any sense. He said, because that was the problem I investigated. The reason why he said that is, the post  six months ( second half of 2016 from July 2016 onwards ) , I bought ABC (ph.), ACA, (ph.), ABA (ph.), and NYNM (ph.), and I placed them into those SPACs ( MDRX and Northstar and Phoenix ). So yes, those SPACs were empty for about a year to a year-and-a-half. But before the Go-Private merger, all of those assets were in place.*<br>*So if you look at the period -- if you cut it off at June ( just show financial Jan – June 2016 ) , which is what they have done a beautiful job of doing -- and I think one of the -- if you cut it off at June ( financial reporting ending June 2016 ) , then it looks like those SPACs were empty and there were no assets in them.*<br>*...But if you look, in September of 2016, three companies were bought, with no fundraise, with no money from anywhere. The entire debt of Orion Healthcorp, the forty-five-million-dollar loan was paid off in September 2016, prior to the go-private merger, with the company's money."* |

**C. Prejudice**

This passage contains five discrete transcription errors that, taken together, render Mr. Parmar's testimony on the central solvency and SPAC defense issues not merely incomplete but internally self-contradictory and chronologically incoherent.

---

[1]   All references to the transcript are to the transcript of the trial proceedings which occurred on December 2, 2025.

**The 2017 Date Error.** This is a one-digit transcription error -- "2017" for "2016" -- that carries significant legal consequences for the solvency analysis at the center of this adversary proceeding. The go-private merger that the Trustee seeks to avoid as a fraudulent transfer closed in January 2017. The certified transcript's "September of 2017" relocates the acquisition of three real operating companies and the full retirement of a $45 million Resource America loan to eight months after the go-private merger had already closed. The critical legal question for the constructive fraudulent transfer claim under § 548(a)(1)(B) is whether CHT was insolvent at or immediately before the time of that January 2017 transfer.

A company that acquires operating businesses without new capital and simultaneously retires $45 million in debt entirely from its own cash in September 2016, four months before the merger, is not a company that was insolvent at the time of the transfer. Evidence of post-merger financial activity cannot establish pre-merger solvency. The certified transcript renders this entire section of Mr. Parmar's testimony legally irrelevant to the critical question, not because the argument was wrong, but because a one-digit transcription error moved the date to the wrong year. The same error also contaminates the immediately following sentence. Because the certified transcript has just placed events in "September of 2017," the sentence "The entire debt, the forty-five-million-dollar loan was paid off in September, with the company's money" is naturally read as September 2017 as well. A single transcription error therefore displaces two consecutive factual statements -- both the acquisitions and the debt retirement -- to the legally irrelevant post-merger period.

**The "First" for "Post" Substitution -- Manufactured Self-Contradiction.** This is the most damaging single-word error in the passage. The certified transcript records Mr. Parmar stating that "the first six months, I bought ABC, ACA, ABA, and Nynon, and I placed them into those SPACs." The ECRO audio establishes that Mr. Parmar said "the post six months -- the second half of 2016 from July 2016 onwards -- I bought ABC, ACA, ABA, and NYNM, and I placed them into those SPACs." The substitution of "first" for "post" creates a direct internal contradiction within Mr. Parmar's own testimony, within the same paragraph, on the central factual question of the SPAC defense. The same paragraph states that the SPACs were empty for approximately a year to a year and a half. If Mr. Parmar then placed companies into those same SPACs during the first six months, the SPACs could not have been empty during the first six months. In a bench trial, a witness who contradicts himself within the same paragraph on the dispositive factual question of his defense gives the finder of fact an independent basis to discount his entire account. The ECRO audio contains no contradiction: the chronological account is precise and internally consistent, with the SPACs empty in the first half of 2016 and filled during the second half. The certified transcript manufactures that self-contradiction from whole cloth.

**Compounding Destruction of the Lazzara Cherry-Picking Argument.** The "first/post" error and the "2017/2016" error interact to ensure that no coherent, chronologically consistent account of the SPAC defense survives anywhere in the certified transcript of this passage. The cherry-picking argument depends on a specific temporal relationship: Mr. Lazzara cut his analysis off at June 2016, just before the second-half-2016 SPAC-filling activity, and that timing was deliberate. Under the certified transcript, this argument loses its logical coherence simultaneously at two points. If the SPAC-filling occurred in the first half of 2016 as the "first" substitution implies, Lazzara's June 2016 cutoff did not conceal the filling at all, because the filling had already occurred within his analytical window. If the corroborating acquisitions occurred in September 2017 as the "2017" substitution implies, they postdate Lazzara's analysis by sixteen months and bear no

relationship to his analytical choices. The certified transcript makes the cherry-picking argument not merely incomplete but internally incoherent. This matters beyond Mr. Parmar's oral testimony: the post-trial Findings of Fact brief at Docket 721, footnote 5, relies expressly on the same factual premise -- that Lazzara's analysis was limited to the first half of 2016 and that his limitation concealed the second-half-2016 financial activity demonstrating solvency. The transcript errors in this passage undermine the evidentiary foundation on which that post-trial submission was built.

**The "Every Six Months" Error.** Mr. Parmar was challenging Mr. Lazzara's deliberate choice to present only the first-half 2016 financials, and was commending the Court for having identified that limitation as a significant methodological issue. The word "only" is the entire operative concept: it signals that more data was available but was deliberately excluded. The word "every" signals a routine reporting interval and carries no concept of selective truncation. The substitution eliminates from the record the predicate of Mr. Parmar's methodological challenge -- the concept of deliberate exclusion -- and simultaneously converts the Court's perceptive question into one that cannot be understood from the certified transcript.

**The "Going to Be Bought Into" / "Very Important To" and "Go-Private Merger" / "Private Merger" Errors.** Mr. Parmar testified that the New Jersey company "was going to be bought into Northstar," meaning Northstar had a specific, identified acquisition target slated for placement into the vehicle. This directly rebuts the Trustee's fictitious entities theory, which depends on Northstar being a blank vehicle with no real business purpose. "Very important to Northstar" carries no transactional specificity and is entirely consistent with the fictitious entities characterization. Separately, "Go-Private merger" is the defined transaction term for the January 2017 CC Capital buyout that sets the pre-transfer boundary for the § 548 analysis. "Private merger" has no established legal meaning in this context, depriving post-trial submissions and findings of fact of the explicit temporal anchor that Mr. Parmar's testimony expressly provided.

## DISCREPANCY 2: $80 MILLION LIABILITY CAP RENDERED UNINTELLIGIBLE

**A. Location:** Transcript page. 145, Line. 5-22

**B. The Certified Transcript vs. The Audio Record**

| CERTIFIED TRANSCRIPT | ECRO AUDIO RECORD |
|---|---|
| *"THE WITNESS: The Department requests that you send the agreement between me and (indiscernible). MR. NEUMANN: I have a copy of that agreement, Judge...THE COURT: Was it produced in discovery? MR. ORBACH: No. THE COURT: All right. Then I'm not -- UNIDENTIFIED SPEAKER: But I might have used it on cross."* | *"THE WITNESS: Tim, if I can request you to send the court the Subscription agreement between (indiscernible)., which clearly shows even in the event of a material fraud the liability of Parmar parties is limited and capped at $80 million , these agreements are part of the record. This was also discovered by the government and was used as an attachment in their brief and was used in cross...*<br><br>*THE WITNESS: But it was used in the adversary action in this case as an attachment.* |

8

## C. Prejudice

Mr. Parmar was referring to Plaintiff's Exhibit 40, the Subscription Agreement, (Doc. # 665-53), and Plaintiff's Exhibit 39, the Merger Agreement (Doc. # 665-52). The cap on damages appears in the Subscription Agreement on page 19, Section 7.3(b).  This provision must be read in conjunction with the Section 9.18 on page 72 of the Merger Agreement, Plaintiffs' Exhibit 40, which states:

> **No Recourse**. This Agreement may only be enforced against, and any claims or causes of action that may be based upon, arise out of or relate to this Agreement, or the negotiation, execution or performance of this Agreement may only be made against the entities that are expressly identified as parties hereto and no past, present or future, direct or indirect, equity holder, controlling person, Affiliate, director, officer, employee, incorporator, member, manager, partner, shareholder, agent, attorney or representative of any party hereto shall have any liability for any obligations or liabilities of the parties to this Agreement or for any claim based on, in respect of, or by reason of, the Contemplated Transactions.

These contractual limitation of liability operate as a ceiling on any award that this Court may enter against the Parmar Defendant Parties in favor of Plaintiff Ehrenberg. That ceiling is at most $80,000, and arguably zero based upon the language in the Merger Agreement. The record should be corrected so that Mr. Parmar's identification of documents is corrected to refer to the above-mentioned Plaintiffs' exhibits. Plaintiffs should not be heard to complain because the exhibits were their own.

The certified transcript also misidentifies Mr. Parmar as "The Department" -- a governmental entity -- in the opening of this passage. Mr. Parmar is the defendant, not a governmental department. This misidentification creates an additional layer of confusion: a reader of the certified transcript cannot determine who is requesting what document should be sent to the Court. The audio makes clear that Mr. Parmar himself was personally requesting specific documents be brought to the attention of the Court.

In the parallel criminal sentencing proceeding before Judge Arleo, the same contractual cap may be directly relevant to the MVRA restitution calculation. It is unknown whether and to what extent Judge Arleo may rely upon the transcript in determining the amount of restitution owing to identified victims. The certified transcript is therefore prejudicial to Mr. Parmar in both proceedings.

## DISCREPANCY 3: JUDICIAL COLLOQUY DISTORTION: EIGHT-YEAR ALLEGATION CHALLENGE AND COURT COMMENTARY ERASED

**A. Location:** Transcript page. 151 line 8 through page 152 Line 7

**B. The Certified Transcript vs. The Audio Record**

| CERTIFIED TRANSCRIPT | ECRO AUDIO RECORD |
|---|---|
| *THE WITNESS: If Your Honor wants to know, I would like to clarify. ...*<br><br>*THE WITNESS: But Your Honor wants –*<br><br>*MR. NEUMANN: I'll ask the question.*<br><br>*THE WITNESS: You have asked that question? THE COURT: Look, I'm going to let Mr. Neumann finish...* | *THE WITNESS: But Your Honor, aren't you wondering why the trustee did not ask me this question. And rested his case -- he has made these allegations for eight years and rested the case without asking this question, actually skirting away from all allegations based on which this case was brought in this court.*<br><br>*THE COURT: [Two sentences of Court commentary].*<br><br>*THE WITNESS: Tim, I am authorizing you to ask me this question as the court wants to know the answer.*<br><br>*MR. NEUMANN: I'll ask the question.* |

**C. Prejudice** The portion of the trial record omitted from the certified transcript at this location contains what is, by any measure, the most strategically significant observation made by any party during the entire trial. After eight years of litigation -- after filing an adversary proceeding premised on specific allegations of fabricated receivables, fictitious entities, and fraudulent transfers -- the Trustee rested his entire case-in-chief without asking Mr. Parmar a single question about any of those core allegations. Mr. Parmar pointed this out directly to this Court, in open court, in terms that were composed, pointed, and legally precise.

The legal significance of the Trustee's decision to rest without examining Mr. Parmar on the fraud allegations cannot be overstated. The burden of proof in this adversary proceeding rests with the Trustee on each element of the fraudulent transfer claim. The decision to rest without eliciting testimony from the principal defendant about the conduct that forms the basis of the complaint is a meaningful evidentiary choice that should inform the Court's assessment of the sufficiency of the Trustee's evidentiary presentation. Mr. Parmar articulated exactly this point on the audio: the Trustee "rested his case without asking this question" and had been "skirting away from all allegations based on which this case was brought."

The Court's response to this observation -- two sentences of commentary that appear on the audio but are wholly absent from the certified transcript -- further compounds the omission. Judicial commentary during testimony in a bench trial may reflect the Court's evolving assessment of the evidence, a clarifying observation, or a direction to counsel. The structural consequence of this omission is that an appellate court reviewing the trial record will have no indication that the trial judge made any comment at this point -- and therefore no basis for understanding what judicial observation followed Mr. Parmar's challenge to the Trustee's evidentiary choices.

The certified transcript's version of this exchange presents a starkly different picture. Where the audio shows a witness making a composed, strategic, and legally relevant observation that prompted the Court itself to respond, the certified transcript shows a witness who cannot complete a sentence ("But Your Honor wants --") and who responds to counsel with a confused question ("You have asked that question?"). The former reflects a witness who is in command of the legal

10

dimensions of the proceeding; the latter reflects a witness who is confused about basic procedural facts. The credibility implications for Mr. Parmar are direct and severe.

Mr. Parmar's audio statement "Tim, I am authorizing you to ask me this question as the court wants to know the answer" is also legally significant as a standalone matter. It demonstrates affirmatively that Mr. Parmar was not avoiding examination on the core fraud allegations -- he was actively inviting it. In a proceeding where the Court may be asked to draw adverse inferences from Mr. Parmar's responses or from the structure of his examination, the audio record establishes that Mr. Parmar sought examination on the precise issues that the Trustee chose to avoid.

## DISCREPANCY 4: MEANING REVERSAL: 'IDENTIFIED' VS. 'EFFECTED' IN MDRX ACQUISITION STATUS

**A. Location:** Transcript page. 159, line. 1-9

**B. The Certified Transcript vs. The Audio Record**

| CERTIFIED TRANSCRIPT | ECRO AUDIO RECORD |
|---|---|
| *MDRX is a real company in which an acquisition was supposed to be invested. The acquisition was effected. The owners of the acquisition from Ohio came and said that we only want to give you forty-nine percent...The board said no.* | *MDRX is a real company in which an acquisition was supposed to be placed in. The acquisition was identified. The owners of the acquisition from Ohio at the twelfth hour came and said that we only want to give you forty-nine percent of the company...The board of CHT said no.* |

**C. Prejudice**

The substitution of "effected" for "identified" is a single-word error that produces an irreconcilable internal contradiction within Mr. Parmar's testimony as it appears in the certified transcript. "Effected" means accomplished, completed, or consummated. A completed acquisition transaction is a closed deal. But the very next sentences in both the certified transcript and the audio state that the sellers demanded only a 49% stake and the board refused. A board cannot refuse a transaction that has already been completed. These two propositions -- "the acquisition was effected" and "the board said no" -- cannot coexist within a rational, coherent account of events.

The legal consequence of this internal contradiction is severe. In a bench trial, the credibility of witnesses is assessed in part by the internal consistency of their testimony. A witness who testifies that a transaction was completed and then immediately testifies that the board refused to proceed appears either confused or dishonest. Under the certified transcript, Mr. Parmar is precisely such a witness -- his testimony at this passage in the transcript is internally inconsistent. It makes no sense Under the audio, there is no contradiction at all: a target company was "identified" (located, evaluated, and targeted for acquisition), the sellers changed their terms at the last minute ("at the twelfth hour"), and the board declined to proceed on the modified terms because a 49% stake does not meet the GAAP threshold for consolidation.

The omission of "at the twelfth hour" additionally destroys the temporal context essential to Mr. Parmar's defense against the "fictitious entities" theory. The SPAC remained an empty shell not because the acquisition target was nonexistent, but because the deal collapsed at the last possible

11

moment due to a change in the sellers' terms. The funds had already been raised before the last-minute collapse because there was no way to predict, at the time of the equity raise, that the sellers would change their conditions. "At the twelfth hour" is the phrase that explains why the timeline looks the way it does. Without it, the Court has no explanation for why CHT raised funds for an acquisition that did not close.

## DISCREPANCY 5:  LAZZARA'S NEW JERSEY ADMISSION OF CHT VIABILITY OBLITERATED BY PRONOUN SUBSTITUTION, and

## DISCREPANCY 19: IDENTITY OBLITERATION: LAZZARA'S ADMISSIONS VS. PARMAR'S CONDUCT

## A.  Location:  Transcript page 152, line 11–16

## B.  Certified Transcript vs. The Audio Record

| CERTIFIED TRANSCRIPT | ECRO AUDIO RECORD |
|---|---|
| *Then he said that the parent company, this should literally -- his testimony should be given to the CPA associate, because the parent company is responsible for his subsequent liabilities.  He went to extreme lengths, which he admitted in New Jersey court, that CHT was a viable corporation when that 8.7 million dollars was funded. Then from that day, he realized the mistakes, and he made CHT a nonviable corporation by a magical financial transaction called contingent liability based on future. You show me an accounting method where, in 2015, 2016, you can actually put contingent liabilities on the book based on 2018. And we had the attorneys stand here and actually say that is actually accurate, that Bank of America --.* | *Then he (Lazzara) said that the parent company (CHT), this should literally – his (Lazzara's) testimony should be given to the CPA association, because he (Lazzara) stated that a parent company is responsible for a subsidiaries liabilities.  He (Lazzara) went to extreme lengths, which he (Lazzara) admitted in New Jersey court, that CHT was a viable corporation with a substantial 8.7 million dollars in balance after the $3.7 million dollars was funded.  Then from that day, he realized the mistakes, and he made CHT a nonviable corporation by a magical financial transaction called contingent liability based on future. You show me an accounting method where, in 2015, 2016, you can actually put contingent liabilities on the book based on 2018. And we had the attorneys stand here and actually say that is actually accurate, that Bank of America --* |

## C.  Prejudice

Mr. Parmar was testifying that Mr. Lazzara -- a Certified Public Accountant who holds himself out as a forensic accounting expert -- testified under oath that a parent company bears liability for its subsidiary's debts. This is patently untrue and the transcript obscures the actual testimony.

The substitution of "his subsequent liabilities" for "a subsidiaries liabilities" also produces a grammatically incoherent passage. "His subsequent liabilities" points to no identified person. The Court reading the certified transcript cannot determine whose liabilities the parent company is supposedly responsible for, who the "he" is who went to extreme lengths, or how any of this

12

connects to the New Jersey proceeding referenced. The referential chain breaks immediately because the anchor word -- "subsidiaries" -- has been removed.

More critically, the certified transcript destroys Mr. Parmar's identification of Mr. Lazzara's prior inconsistent statement. A prior inconsistent statement by a party's own expert witness, made under oath in a separate judicial proceeding, is among the most powerful forms of impeachment available in civil litigation. Mr. Parmar testified that Mr. Lazzara admitted in New Jersey court that CHT was a viable corporation -- not an insolvent one -- at the time the $8.7 million was funded. This directly contradicts Mr. Lazzara's insolvency opinion in this proceeding, calling into question whether his opinion has changed with the litigation winds rather than remaining anchored in the financial data. The audio version of this testimony establishes the prior inconsistent statement with precision: the speaker is identified (Lazzara), the forum is identified (New Jersey court), and the substantive content is identified (CHT was viable, with a balance of $8.7 million after the $3.7 million funding). The certified transcript preserves the dollar figures but strips away every element of context that makes those figures meaningful.

The audio version also includes testimony -- entirely absent from the certified transcript -- that Mr. Lazzara subsequently reversed course and "made CHT a nonviable corporation by a magical financial transaction called contingent liability based on future." This phrase -- whether or not a reviewing court finds it rhetorically artful -- communicates a specific, legally cognizable accusation: that Mr. Lazzara's retroactive contingent liability methodology is not an accounting analysis but a post hoc litigation tool, constructed after the fact to produce a desired conclusion. The accusation that an expert "made" a company nonviable through a "magical financial transaction" is a lay witness's formulation of the argument that Mr. Lazzara's methodology violates GAAP. This accusation does not exist in the certified transcript.

The certified transcript's destruction of pronoun clarity renders the dollar figures ($8.7 million and $3.7 million) meaningless, as their contextual relationship -- a positive balance remaining after funding -- is obliterated. The numbers appear in the transcript but carry no probative weight because the referential framework that gave them meaning has been removed. Any post-trial brief, proposed finding of fact, or judicial analysis premised on the certified transcript therefore rests on an incomplete and misleading record as to this central argument.

Mr. Parmar was critiquing of Mr. Lazzara's testimony.  He was saying that Mr. Lazzara had stated that a parent company is liable for a subsidiary's debts, which is clearly wrong.  Parmar  was also telling the Court that in a separate New Jersey court proceeding, Mr. Lazzara himself admitted CHT was a viable corporation with $8.7 million in balance after the $3.7 million funding.  The certified transcript substitutes "his subsequent liabilities" for "a subsidiaries liabilities" and makes the passage grammatically incoherent by removing the identification of Mr. Lazzara as the subject.

## DISCREPANCY 6: PRONOUN IDENTITY SWAP: "WE/CHT" BECOMES "HE/LAZZARA" IN PRESS RELEASE ARGUMENT

**A. Location:** Transcript age. 155, Line. 11-15

**B. The Certified Transcript vs. The Audio Record**

| CERTIFIED TRANSCRIPT | ECRO AUDIO RECORD |
|---|---|

13

| | |
|---|---|
| *"But then his own affidavit says that he made a press release that he only spent twenty-eight million dollars to buy MDRX. So according to him, then, should he return the nine million dollars to somebody?* | *But then his (Lazzaras) own affidavit says that WE (Parmar and CHT) made a press release stating that WE only spent twenty-eight million dollars to buy MDRX. So according to him (Lazzara), then, should WE (Parmar and CHT) return the nine million dollars to somebody?* |

## C. Legal Analysis and Judicial Impact

The pronoun substitution in this passage produces a factual impossibility that, if the certified transcript is credited, reflects adversely on Mr. Parmar's coherence and truthfulness. Under the certified transcript, Mr. Lazzara -- a forensic accountant engaged by the Trustee in late 2018 -- appears to have issued a press release stating that he spent $28 million on MDRX, and the question is whether Mr. Lazzara should return $9 million to shareholders. Mr. Lazzara was not a party to any CHT transaction, issued no press releases, spent no company funds, and holds no fiduciary obligations to shareholders. The certified transcript's version of this passage is factually impossible, and any reader would immediately recognize that something has gone wrong -- but would have no way to determine what, because the key pronoun has been changed.

The prejudice to the Parmar Defendants relates to both  the fraudulent intent element under § 548(a)(1)(A) and the constructive fraud element under § 548(a)(1)(B). On the fraudulent intent question, the absence of any shareholder complaint following a public press release disclosing a purchase price lower than the amount raised strongly undermines the inference that the equity raise was a scheme to defraud investors. Defrauded investors typically complain; investors who received exactly what the public disclosures described typically do not. On the contingent liability question, the absence of any demand letter, arbitration claim, or litigation arising from the $9 million 'difference' between the amount raised and the amount disclosed is direct evidence that no contingent liability existed as a cognizable obligation.

## DISCREPANCY 7: CONTINUED PRONOUN CORRUPTION: CORPORATE IDENTITY ERASED ACROSS SIX LINES

**A. Location:** Transcript page. 155, line 16-23

**B. The Certified Transcript vs. The Audio Record**

| CERTIFIED TRANSCRIPT | ECRO AUDIO RECORD |
|---|---|
| *So his own statement says he only spent -- he told the public that he bought it for twenty-eight. Meanwhile, we received thirty-seven million dollars. He does not say what we did with the remaining nine million dollars...which is a completely cooked cockamamie story.. , if that is true, then he should show that the nine million was owed immediately back to the shareholders, right? Because according to him, they gave it to me for MDRX..* | *So his (Lazzara's) own statement says WE (Parmar and CHT) only spent -- WE told the public that WE bought it for twenty-eight. Meanwhile, we (Parmar and CHT) received thirty-seven million dollars. He (Lazzara) does not say what we (Parmar and CHT) did with the remaining nine million dollars...which is a completely cooked up cockamamie story.. , if that is true, then he (Lazzara) should show that the nine million was owed immediately back to the* |

14

| | *shareholders, right?  Because according to him (Lazzara), they gave it to me (Parmar / CHT) for MDRX.* |
|---|---|

## C. Prejudice

This discrepancy is a direct continuation of Discrepancy 3 and the two must be analyzed collectively. Discrepancies 3 and 4 obliterate a ten-line argument -- spanning two contiguous passages of transcript -- in which Mr. Parmar systematically dismantled Mr. Lazzara's contingent liability theory using Mr. Lazzara's own evidence. The pronoun substitutions persist throughout: where Mr. Parmar said "we", referring to Parmar and CHT (the public company that made the disclosure and received the funds), while  the certified transcript attributes all of these actions to "he" -- a pronoun that, in context, would most naturally refer to Mr. Lazzara, who performed none of these actions.

The structure of the argument in the audio version follows a classic theory-of-the-case logic: if Mr. Lazzara's theory is correct, then his theory must account for all of the known facts. Mr. Lazzara cannot simultaneously assert (a) that $37 million was raised for the specific purpose of buying MDRX (his own testimony), and (b) that the $28 million purchase price disclosed in CHT's own press release was the fraudulent product of misappropriation. If the full $37 million was owed to shareholders for the stated MDRX purpose, then CHT's disclosure of a $28 million purchase price would have provoked immediate shareholder demand for the $9 million difference. Mr. Lazzara found no such demand. Ergo, Mr. Lazzara's theory is internally incoherent. The certified transcript makes this syllogism entirely invisible.

The omission of the word "UP" from the phrase "cooked UP cockamamie story" merits specific attention in a fraud proceeding. "Cooked up" is a specific idiomatic expression meaning deliberately fabricated or falsely manufactured -- it is an accusation of intentional intellectual dishonesty, a fraud characterization applied to the methodology of the Trustee's expert. "Cooked" alone has no established idiomatic meaning in the relevant context. In a bench trial where the credibility of the principal expert witness is the decisive issue, the difference between an accusation of deliberate fabrication and an ambiguous phrase without clear meaning is not trivial. The word "up" carries the accusatory force of the critique.

The cumulative effect of Discrepancies 3 and 4 is the complete erasure of Mr. Parmar's most analytically structured rebuttal of the contingent liability theory -- a two-passage, ten-line argument built entirely from the adversary's own evidence and testimony. This argument does not exist in the certified transcript and therefore cannot be considered in any post-trial findings of fact.

The corporate attribution error -- assigning to "he" (Lazzara) the press release and the fund receipts that belong to "WE" (CHT/Parmar) -- additionally has implications for the Court's assessment of the documentary evidence. The CHT press release is a corporate document issued by a publicly listed AIM company in compliance with its disclosure obligations. The certified transcript's misattribution of that document to Mr. Lazzara personally is not merely a pronoun error -- it fundamentally mischaracterizes the source and nature of the disclosure, which is relevant to the question of whether CHT's public disclosures were consistent with legitimate business conduct.

15

## DISCREPANCY 8 — RETROACTIVE CONTINGENT LIABILITY ARGUMENT WHOLESALE REPLACED

**A. Location:** Transcript page 155, lines 5-10

**B. The Certified Transcript vs. The Audio Record**

| CERTIFIED TRANSCRIPT | ECRO AUDIO RECORD |
| --- | --- |
| *I think his testimony, that he did not -- like, even taking any belief in me, he testified here today that the funds raised, thirty-seven million dollars, were for the specific purpose of buying MDRX. He testified that. And then he said that MDRX was not purchased and conditioned by the relationship we put in. He testified that.* | *I think his testimony, that even if without taking any belief in me (Parmar), he (Lazzara) testified here today that the funds raised, thirty-seven million dollars, were for the specific purpose of buying MDRX. He (Lazzara) testified that. And then he (Lazzara) said that now looking at the situation in 2025 when MDRX was not purchased in 2016 a Contingent Liability should be put on the books retroactively for 2016. He (Lazzara) testified that.* |

## C. Prejudice

I said "even if without taking any belief in me"— meaning even if the Court did not believe my version of events, the argument stood on its own from Mr. Lazzara's admissions. The last two sentences of my argument were replaced in the certified transcript with "MDRX was not purchased and conditioned by the relationship we put in," which is not language Parmar used and does not describe any accounting concept or argument made. This distortion eviscerates the intended meaning of the testimony.

## DISCREPANCY 9: IDENTITY LOSS AND REGULATORY TERM CORRUPTION: LONDON AIM SECURITIES LAW DEFENSE

**A. Location:** Transcript page 155 line. 24 - page. 157 line 1

**B. The Certified Transcript vs. The Audio Record**

| CERTIFIED TRANSCRIPT | ECRO AUDIO RECORD |
| --- | --- |
| *... And then he comes up with this circular, that was circulated in December, stating that MDRX is being purchased. I wouldn't have known that that is going to happen in December. And if you go to the London market, I was never allowed to actually name the company. So it was always, what are you going to do with the money? I'm going to use it for the company purpose. I have a few acquisitions in mind, that I would buy a few* | *...And then he ( Lazzara ) comes up with this shareholder circular, that was circulated in December, stating that MDRX is being purchased. I wouldn't have known that that is going to happen in December. And if you go to the London market, I was never allowed to actually name the company. So it was always, what are you going to do with the money? I'm going to use it for the company purpose. I have a few acquisitions in* |

| *acquisitions. By law, I was not allowed to actually have a pinned down acquisition because, if I tried to pin down an acquisition, now that person decided not to say, which is the same law in the U.S. If a public company wants to buy, they can either buy in a blind vehicle SPAC, where you don't declare what you're going to buy, which, as you know, SPACs are very popular right now. So you get the money and all you say is I'm going to buy a company, and the money goes into the SPAC, and then you go and buy that company using the SPAC. You can use the equal amount, you can use more than that amount, or you can use less than that amount. The shareholders have bought shares. They bought the shares at this company. If I say I'm going to buy MDRX, MDRX would be then audited by the public monitor. I could not buy MDRX without it. The same law applies in the U.S. as well. So if you say I'm going to buy XYZ Corporation, then all the books and records of XYZ have to be made public. Then the shareholders make a vote to say whether you can buy that company or not. So I couldn't have ever said that I'm buying MDRX. So he lied about that.* | *mind, that I would buy a few acquisitions. By law, I was not allowed to actually have a pinned down acquisition because, if I had a pinned down acquisition, now that particular detail he ( Lazzara )  decided not to say here, which is the same law in the U.S. If a public company wants to buy, they can either buy in a blind vehicle SPAC, where you don't declare what you're going to buy, which, as you know, SPACs are very popular right now. So you get the money and all you say is I'm going to buy a company, and the money goes into the SPAC, and then you go and buy that company using the SPAC. You can use the equal amount, you can use more than that amount, or you can use less than that amount. The shareholders have bought shares. They bought the shares at this company. If I say I'm going to buy MDRX, MDRX would be then audited by the public rules and process. I could not buy MDRX without it. The same law applies in the U.S. as well. So if you say I'm going to buy XYZ Corporation, then all the books and records of XYZ have to be made public. Then the shareholders make a vote to say whether you can buy that company or not. So I couldn't have ever said that I'm buying MDRX. So he (Lazzara)  lied about that.* |

| Transcript | Audio |
|---|---|
| "this **circular**" | "this **shareholder circular**" |
| "if I **tried** to pin down an acquisition" | "if I **had** a pinned down acquisition" |
| "now **that person** decided not to say" | "now **that particular detail he (Lazzara)** decided not to say **here**" |
| "audited by the **public monitor**" | "audited by the **public rules and process**" |

## C. Prejudice

This passage contains Mr. Parmar's regulatory disclosure defense -- the legal reason why CHT could not have pre-announced MDRX as an acquisition target at the time of the equity raises, which undermines Plaintiffs' allegations of fraudulent intent. Mr. Lazzara's theory of actual fraud under § 548(a)(1)(A) depends on the proposition that the proceeds were never truly intended for the stated purpose. That theory implicitly assumes that if the acquisition were legitimate, CHT would have disclosed MDRX as the target at the time of the raise. Mr. Parmar's audio testimony directly refutes this assumption by explaining the legal prohibition that prevented such disclosure.

17

Mr. Parmar articulated this defense on the audio by referring to "public rules and process" -- a lay formulation of the regulatory disclosure regime that governs publicly listed acquisition activities. The certified transcript's substitution of 'public monitor' for 'public rules and process' is highly prejudicial. 'Public monitor' is not a recognized regulatory body. A federal bankruptcy judge reading 'public monitor' would have no way to connect this phrase to an existing regulatory obligation. The entire defense -- that the legal framework under which CHT operated affirmatively prohibited the pre-announcement that Mr. Lazzara's theory assumes should have occurred -- is stripped of its meaning.

The identity error – "that person" replacing "he" (Lazzara) -- compounds the harm by removing the accusation from its target. Mr. Parmar was making a specific, directed argument: Mr. Lazzara, in formulating his fraudulent intent opinion, deliberately omitted the legal prohibition on pre-announcement that would have exonerated Mr. Parmar.

## DISCREPANCY 10: '(INDISCERNIBLE)' SUBSTITUTIONS FOR AUDIBLE, SUBSTANTIVE TESTIMONY: SPAC DEFENSE OBLITERATED, and

## DISCREPANCY 11 , 'ASSETS' TRANSCRIBED AS 'SHARES'; FOUR COMPANY NAMES OMITTED

**A. Location:** Transcript p. 160, ll. 6-8

**B. The Certified Transcript vs. The Audio Record**

| CERTIFIED TRANSCRIPT | ECRO AUDIO RECORD |
|---|---|
| *"I had forty-five-million dollars of loan from Resource America. It was paid off in September. That's why they want to keep it from January to June to show where the (indiscernible). They don't want to show that (indiscernible) with real assets. Those -- those assets are listed as debtor's at this point, ABC, ACA, where did those funds came from? ABC, ACA, ABA, Nynon, four companies I bought, and I put them into those SPACs. Q. Okay. A. Those SPACS were created to include the shares. So – Q. I think you've answered the question. MR. NEUMANN: One more question? THE COURT: Phoenix? THE WITNESS: Phoenix, Northstar, and MDRX. THE COURT: I'm asking him. BY MR. NEUMANN: Q. Phoenix? A. Phoenix, Northstar, and MDRX. Q. Are all -- A. That's the SPACs that we raised funds for. And you can see -- so Phoenix and Northstar was September of 2016 -- sorry, '15. So a year later. So I was late by a year. But I didn't have a timeline back then. I didn't go raise any more funds. I bought companies. Then MDRX. I was late by* | *" I had forty-five-million dollars of loan from Resource America. It was paid off in September ( 2016 ) . That's why they want to keep it from January to June (the financial reports of Orion healthcorp from Jan to June 2016) to show the SPAC's were empty shells (first half of 2016 ). They don't want to show that Shells were filled later on ( second half of 2016 ) with real assets. Those -- those assets are listed as debtor's at this point, ABC, ACA, where did the funds to buy these assets come from? ABC, ACA, ABA, NYNM, four companies I bought, and I put them into those SPACs. Okay. A. Those SPACS were created to include these assets ( ABC, ACA, ABA, NYNM )- Q. I think you've answered the question. MR. NEUMANN: One more question? THE COURT: Phoenix? THE WITNESS: Phoenix, Northstar, and MDRX. THE COURT: I'm asking him. BY MR. NEUMANN: Q. Phoenix? A. Phoenix, Northstar, and MDRX. Q. Are all -- A. That's the SPACs that we raised funds for. And you can see -- so Phoenix and Northstar was September of 2016* |

18

| *about ten months. And I bought Nynon, with no additional funds raised. Nynon was, like, a 100-million-dollar company. Meanwhile, MDRX was supposed to be only a thirty-million-dollar company. So I -- I put in an asset which was three times as large as the asset that was initially contemplated. THE COURT: Thank you, Mr. -- A. Northstar and Phoenix, they were on the books as totaling seventeen million. ABC, ACA, ABA, all three totaled around that same number. THE COURT: Thank you, sir. A. So -- THE COURT: Thank you Mr. Parmar. You can step down. You can step down, Mr. Parmar. All right. THE WITNESS: Thank you, Your Honor.* | *-- sorry, '2015. So a year later. So I was late by a year. But I didn't have a timeline back then. I did not go raise any more funds. I bought companies ( ABC, ABA, ACA ). Then MDRX. I was late by about ten months. And I bought NYNM, with no additional funds raised. NYNM was, like, a 100-million-dollar company. Meanwhile, MDRX was supposed to be only a thirty-million-dollar company. So I -- I put in an asset which was three times as large as the asset that was initially contemplated. THE COURT: Thank you, Mr. -- A. Northstar and Phoenix, they were on the books as totaling seventeen million. ABC, ACA, ABA, all three totaled around that same number. THE COURT: Thank you, sir. A. So -- THE COURT: Thank you Mr. Parmar. You can step down. You can step down, Mr. Parmar. All right. THE WITNESS: Thank you, Your Honor.* |

| Transcript | Audio |
|---|---|
| "paid off in September" (no year) | "paid off in September **(2016)**" |
| "show where the **(indiscernible)**" | "show **the SPACs were empty shells** (first half of 2016)" |
| "**(indiscernible)** with real assets" | "**Shells were filled later on (second half of 2016)** with real assets" |
| "where did those funds came from?" | "where did the funds **to buy these assets** come from?" |
| "created to include **the shares**" | "created to include **these assets (ABC, ACA, ABA, NYNM)**" |
| "Nynon" throughout | "NYNM" throughout |

**C. Prejudice** The notation "(indiscernible)" in a certified trial transcript carries a specific and important evidentiary meaning: it signals to every reader -- including this Court, any appellate court, and the criminal sentencing court -- that the speaker was inaudible or incomprehensible at that point in the proceedings. Courts, appellate panels, and sentencing judges rely on this notation as a representation that the audio record at that location is defective or unavailable. Here, that representation is false. The audio record at this location is clear and comprehensible. The words "SPACs were empty shells" and "Shells were filled later on" are plainly audible. Their replacement with "(indiscernible)" falsely signals a gap in the audio record where none exists.

The substantive content replaced by these two "(indiscernible)" notations is the conceptual spine of Mr. Parmar's SPAC defense. Mr. Parmar was rebutting Mr. Lazzara's methodology -- specifically, Mr. Lazzara's choice to analyze financial data covering only the first six months of 2016. Mr. Parmar's argument was that this choice was deliberate and misleading: by terminating

19

the analysis at June 2016, Mr. Lazzara captured the SPAC vehicles at their inception, when they were still empty acquisition shells. By continuing the analysis through the second half of 2016, as any complete and honest analysis would, the record shows that those same SPACs received real, identified, operating companies with genuine revenues and business operations. The Lazzara analysis was, as Mr. Parmar testified, a deliberate cherry-pick of the period least favorable to Mr. Parmar's defense.

With both key phrases replaced by "(indiscernible)," the argument's logical structure collapses. The certified transcript preserves only the frame -- the statement that "they" wanted to keep the analysis from January to June, and the statement that "they" did not want to show something "with real assets" -- without any content in between. The Court cannot know from the certified transcript what "they" wanted to show about January to June, or what "they" wanted to hide. The argument reads as a half-formed accusation without a substantive core. The Court is left to speculate, rather than to find, what Mr. Parmar was asserting.

The Trustee's post-trial proposed findings of fact -- which rely on the certified transcript -- correctly identify that Mr. Lazzara analyzed a specific time period but do not address the accusation that this time period was deliberately selected to present a misleading picture. This is because the accusation, as captured in the certified transcript, consists of two '(indiscernible)' placeholders. Mr. Parmar's methodological critique of his adversary's expert does not exist in the certified record.

The substitution of "shares" for "assets" in this passage is not a semantic variation -- it is a legally dispositive alteration of Mr. Parmar's testimony about the fundamental nature and purpose of the SPAC structures. Plaintiffs allege that MDRX, Northstar, and Phoenix were shells with no legitimate business purpose and fabricated accounts receivable. The audio version of this testimony directly rebuts this theory by establishing that the SPACs were created to receive specific, identified, real operating companies -- designated by name -- which were subsequently acquired and placed into those vehicles. Mr. Parmar named the four specific companies -- ABC, ACA, ABA, and NYNM -- that were placed into the SPACs. These companies are real, identifiable, and their acquisition into the SPACs is a not disputed. Moreover, the transcript's version eliminates the four operating company names, removing the only specific corroborating details that distinguish a legitimate SPAC acquisition program from an empty-shell fraud.

**DISCREPANCY 12: IDENTITY SUBSTITUTION: "JOHN ALTORELLI" REPLACED BY 'RONALD (PH.)'**

**A. Location:** Transcript page. 147 line 11 – Page 150 Line 19

**B. The Certified Transcript vs. The Audio Record**

| CERTIFIED TRANSCRIPT | ECRO AUDIO RECORD |
|---|---|
| *"Then he said as to Ms. Dolan -- I'm forgetting the question. I didn't even know that -- he said somebody who made payables did not have access to this account. And this is a common practice that* | *"Then he (Lazarra ) said at CHT level  ah ah ah Ms. Dolan -- I'm forgetting her first name. I didn't even know that a accountant can make such a allegation – he (Lazarra ) said somebody who* |

20

*Ehrenberg has done in this case. They come into a court, they talk about Orion, but they don't say they're talking about Orion. They imply to the Court as if they're talking about CHT. So he said Dolan was writing checks and did not have access to the bank accounts. Dolan was writing checks from Orion. She was an employee of Orion. She was not even at the level of -- she was an accounts payable person, and she had full access to all of Orion accounts. And to my knowledge, up to September of 2017, there was not one employee that was not paid, not one rent payment that was not made, not one loan payment that was not made. But two months from me leaving, rent payments were stopped, lease payments were stopped, employees stopped getting bonuses. All of that happened in two months. I have Ronald (ph.) on recording saying to me, while we are paying our attorneys and the fees for the attorneys are coming straight from the top of the company, two million dollars every month. So he goes, I guess we won't be making any rent payments. I have it on recording if you want to listen. So he said Dolan does not have access to CHT accounts. Dolan never look for CHT. He said -- sitting here, he said Dolan worked for CHT. Dolan never worked for CHT. CHT had only one employee, me. CHT did not have any other employees. All other employees belonged to Orion. I was the only employee of CHT. The whole reason why CHT was created was this little boys' club, that gave me the money, said you have to be the CEO. And I said, I'm not a CEO. I can never run operations. And they said, but that is why. So we created CHT to satisfy them. CHT did no operations, none whatsoever. So when Lazzara sat here and said that those -- I called that. He goes, it's off-balance sheet accounts. Those accounts were opened in the name of CHT. They were owned by CHT. I'm not really sure what is the -- if he would have said, you know what, I discovered an account where you were storing CHT money, and it was called Ranga Bhoomi, I would have called that an off-balance sheet account. But if an account is opened with CHT's tax ID number, with CHT's corporate documents, how does that account become an off balance sheet? So these are, like, the statements -- like my name is an a/k/a. How can he have the name Paul? So he has changed his name to Paul Parmar. He's a/k/a. Every one of their documents.*

*made payables did not have access to this account (CHT account that Lazzara described as in his own terms off-balance sheet account). And this is a common practice that Ehrenberg has done in this case. They come into this court, they talk about Orion, but they don't say they're talking about Orion. They imply to the Court as if they're talking about CHT. So he said Dolan was writing checks and did not have access to the bank accounts. Dolan was writing checks from Orion Healthcorp ( a subsidiary of CHT – so she cannot have access to another companies accounts, her books are Orion books accounts payables that has to make checks from Orion accounts). She was an employee of Orion. She was not even at the level of -- she was an accounts payable person, and she had full access to all of Orion accounts. And to my knowledge, up to September of 2017, there was not one employee ( of Orion ) that was not paid, not one rent payment ( of Orion )  that was not made, not one loan payment ( of Orion )  that was not made. But two months from me leaving, rent payments ( of Orion ) were stopped, lease payments ( of Orion ) were stopped, employees ( of Orion ) stopped getting bonuses. All of that happened in two months ( of parmar leaving in Sept 2017 ). I have John Altorelli  on recording saying to me, while we ( CC capital ) are paying our attorneys and the fees for the attorneys are coming straight from the top of the company (Orions Cash), two million dollars every month. So he (John Altorelli)  goes, I guess we won't be making any rent payments (of Orion). I have it on recording if you want to listen. So he (Lazarra) said Dolan does not have access to CHT accounts. Dolan never worked for CHT ( Dolan was accounts payable at Orion Healthcorp a subsidiary a diffent company than CHT ). He said -- sitting here, he (Lazarra) said Dolan worked for CHT. Dolan never worked for CHT. CHT had only one employee, me. CHT did not have any other employees. All other employees belonged to Orion. I was the only employee of CHT. The whole reason why CHT was created was this little boys' club, that gave me the money, said you have to be the CEO. And I said, I'm not a Good CEO. I can never run operations. And they ( Investors of CHT ) said, but that is what we want. So we created CHT to satisfy them. CHT did no operations, none whatsoever. So when Lazzara sat here and said*

*They have it right here. So -- but they want to make a complaint. So -- THE COURT: Mr. Parmar? A. -- what Lazzara said –*

*THE COURT: All right. Hang on. Mr. Parmar, you are agreeing then with Mr. Lazzara when he said that the accounts payable person, Ms. Dolan, did not have access to those CHT off-balance sheet accounts? Because I heard you say -- THE WITNESS: I'm saying she –*

*THE COURT: I heard -- hang on. I heard you say she worked for Orion, and she had full access to Orion accounts. She didn't work for CHT. The thirty-four million dollars was at the CHT level. And so I thought you said she didn't have access to the CHT accounts because she worked for Orion, which is not exactly why Mr. Lazzara said she didn't have access to that money. But I thought I just heard you say she didn't have access to that money because it was a –*

*THE WITNESS: No, she did not have access*

*THE COURT: Okay. So you agree with Mr. Lazzara on that point?*

*THE WITNESS: No, I did not agree with the way he phrased it. He said Dolan was writing accounts payable and she did not have access to CHT accounts. Dolan was never the accounts payable person of CHT. There was no accounts payable person at CHT. If Orion needed funds, I would wire it to Orion. So once it gets to Orion, then it becomes Orion's property. And then Dolan you can write checks out of them. And Dolan was not the CFO, was not the comptroller, was not the bookkeeper. She was an accounts payable person that was writing checks. So he's right about that she was writing checks. But I cannot recall, in September of 2017, that Dolan never had money to make payments. I cannot recall one time that that has happened. If funds were required, funds were wired. And you can call whoever from Orion, that worked for Orion, from the time I took over Orion until the time I resigned. I -- I was never working at Orion. I was working at CHT."*

*that those -- I called them he (Lazzara) goes this is my (Lazzara)  term it's off-balance sheet accounts. Those accounts were opened in the name of CHT. They were owned by CHT. I'm not really sure what is he talking about -- if he would have said, you know what, I discovered an account where you were storing CHT money, and it was called Ranga Bhoomi, I would have called that an off-balance sheet account. But if an account is opened with CHT's tax ID number, with CHT's corporate documents, how does that account become an off balance sheet? So these are, like, the statements -- like my name is an a/k/a. How can he have the name Paul? So he has changed his name to Paul Parmar. He's a/k/a. Every one of their documents. They have it right here. So -- but they want to make it look like I use alias like criminal ( stereo types). So -- but they want to make a complaint. So –*

*THE COURT: Mr. Parmar? A. -- what Lazzara said –*

*THE COURT: All right. Hang on. Mr. Parmar, you are agreeing then with Mr. Lazzara when he said that the accounts payable person, Ms. Dolan, did not have access to those CHT off-balance sheet accounts? Because I heard you say -- THE WITNESS: I'm saying she –*

*THE COURT: I heard -- hang on. I heard you say she worked for Orion, and she had full access to Orion accounts. She didn't work for CHT. The thirty-four million dollars was at the CHT level. And so I thought you said she didn't have access to the CHT accounts because she worked for Orion, which is not exactly why Mr. Lazzara said she didn't have access to that money. But I thought I just heard you say she didn't have access to that money because it was a –*

*THE WITNESS: No, she did not have access*

*THE COURT: Okay. So you agree with Mr. Lazzara on that point?*

*THE WITNESS: No, I did not agree with the way he phrased it. He said Dolan was writing accounts payable and she did not have access to CHT accounts. Dolan was never the accounts payable person of CHT. There was no accounts payable person at CHT. If Orion needed funds, I would wire it to Orion. So once it gets to Orion, then it becomes Orion's property. And then Dolan you can write checks out of them. And Dolan was not the CFO, was not the comptroller, was not the*

|  | *bookkeeper. She was an accounts payable person that was writing checks. So he's right about that she was writing checks. But I cannot recall, till September of 2017 ( from June 2013 ) , that Dolan never had money to make payments. I cannot recall one time that that has happened. If funds were required ( by Orion to make payment ) , funds were wired ( to Orion from CHT, the bank records show payment records of all payments going from CHT's so called off balance sheet accounts to Orion, any payment that did not go to Orion trustee has filed avoidable expense claims against those funds, so this court is aware of all such claims they do not even total 300K over 4 years, that tells you all funds were used for company activities only ) . And you can call whoever from Orion, that worked for Orion, from the time I took over Orion until the time I resigned ( 2013 to Sept 2017). I -- I was never working at Orion. I was working at CHT."* |
|---|---|

| Transcript | Audio |
|---|---|
| "I'm forgetting **the question**" | "I'm forgetting **her first name**" |
| "I didn't even know that -- he said somebody..." | "I didn't even know that **a accountant can make such a allegation** – he said somebody..." |
| "They come into **a** court" | "They come into **this** court" |
| "**Ronald (ph.)**" | "**John Altorelli**" |
| "Dolan never **look** for CHT" | "Dolan never **worked** for CHT" |
| "I'm not **a** CEO" | "I'm not **a Good** CEO" |
| "that is **why**" | "that is **what we want**" |
| "what is **the** --" | "what is **he talking about** --" |
| *(phrase absent)* "but they want to make a complaint" | "but they want to **make it look like I use alias like criminal**. So -- but they want to make a complaint" |
| "I cannot recall, **in** September of 2017" | "I cannot recall, **till** September of 2017 **(from June 2013)**" |

## C. Prejudice

John Altorelli is an attorney for Chinh Chu and CC Capital -- the successor management team that assumed control of Orion Healthcorp following the January 2017 go-private merger. Mr. Parmar's testimony that he has a recording of Mr. Altorelli admitting that CC Capital was diverting two million dollars per month from Orion's operating funds to pay its own attorneys is evidence of

23

post-merger mismanagement by the CC Plaintiffs and thus relevant to whether any loss to the Plaintiffs was caused by the Parmar Parties or self-inflicted. The certified transcript's replacement of "John Altorelli" with an unidentified "Ronald" strips this testimony of its relevance. A recorded admission by the successor management team, about the diversion of specific funds, from a specific source, at a specific rate, is highly relevant.

The alternative causation argument embedded in this testimony is legally material to the damages analysis in this proceeding. The Trustee's damages theory holds that Orion's post-merger financial deterioration was a consequence of the fraud perpetrated by Mr. Parmar. Mr. Parmar's alternative theory is that Orion's post-merger deterioration was caused by CC Capital's conduct, including the systematic diversion of Orion's operating revenues to pay the legal fees of the successor management team at a rate of two million dollars per month. If CC Capital's own attorney admitted on recording that $2 million per month was being drawn from Orion's revenues for legal fees -- revenue that was not being used to meet Orion's operational obligations -- then the cause of Orion's eventual financial failure is at least partly CC Capital's own conduct. This is an alternative causation defense that, if credited, reduces or eliminates the Trustee's ability to attribute Orion's losses to the conduct of the Parmar Parties.

The certified transcript also garbles "Dolan never worked for CHT" as 'Dolan never look for CHT.' Ms. Dolan was an Orion Healthcorp employee, not a CHT employee, and therefore never had reason to have access to CHT-level accounts. Mr. Lazzara's argument about Dolan's access to CHT accounts presupposes that she worked for CHT. Mr. Parmar's testimony that she did not is a clean, factual rebuttal. The transcript's garbled phrase 'never look for CHT' is grammatically nonsensical and cannot convey this factual rebuttal to any reader.

Mr. Parmar's offer on the audio -- 'I have it on recording if you want to listen' -- is itself legally significant. An offer to play a recording to the Court, in open court, is an offer to present what would be, if played, direct evidence of the admission. The offer's absence from the certified transcript means that the Court has no record that Mr. Parmar indicated he possessed specific audio evidence of Mr. Altorelli's admission, and had offered to produce it, during the trial. This offer and its potential acceptance or rejection are relevant to the completeness of the evidentiary record in this proceeding.

## DISCREPANCY 13: SUBJECT IDENTITY SUBSTITUTION: "CHINH" (CHINH CHU) REPLACED BY "SHE" THREE TIMES

**A. Location:** Transcript page. 150 Line 20 – page 151 Line 1

**B. The Certified Transcript vs. The Audio Record**

| CERTIFIED TRANSCRIPT | ECRO AUDIO RECORD |
|---|---|
| *From the time I was at CHT, the day I resigned not one person's even bonus payment wasn't our payment. She never even paid Elizabeth Kelly's payment. She never paid -- two people died of a heart attack...and she never paid them their* | *From the time I was at CHT, till the day I resigned, not one person's even bonus payment or even earnout payment was never paid. Chinh never even paid Elizabeth Kelly's earnout payment. Chinh never paid -- two people died of a* |

| | |
|---|---|
| *payment. He preferred paying his attorneys. He had, like, 100 attorneys under him that company funds were used to pay his attorneys. His own attorney told me that, because I had a very surprise question for him. I met him and I said, how does this happen that I leave, in one month, two months, I start hearing you're not paying rent payments. How does that happen? I said I had a forty-five- million-dollar loan at twenty-one percent interest rate, never missed a payment.* | *heart attack...and Chinh never paid them their earnout payment. He preferred paying his attorneys. He had, like, 100 attorneys working for him -- that company funds were used to pay his attorneys. He had, like, 100 attorneys working for him , that company funds were used to pay his attorneys. He had, like, 100 attorneys working for him ( building this massive lawsuit, the allegations on which it was brought to this court, trustee rested his case without asking a single question to Parmar on stand about those allegations – the very reason we are in court. The Judge had to request my attorney to ask me the questions regarding the allegations of Chinh Chu ) that company funds were used to pay his ( Chinh Chu's ) attorneys. His ( Chinh Chu's attorney John Altorelli ) own attorney told me that, because I had a very surprise question for him (John Altorelli ). I met him ( John Altorelli ) and I said, how does this happen that I leave, in one month, two months, I start hearing you're ( Orion is ) not paying rent payments. How does that happen? I said I had a forty-five- million-dollar loan at twenty-one percent interest rate, never missed a payment.* |

## C. Prejudice

Chinh Chu is the principal of Plaintiff CC Capital. He led the acquisition of Orion Healthcorp through the go-private merger and thereafter assumed de facto control of Orion's operations as the controlling shareholder of the successor entity. The three instances of "Chinh" in Mr. Parmar's testimony have been replaced in the certified transcript by the pronoun "she" -- a pronoun that misidentifies a named, specific, male individual as an unidentified woman. The certified transcript then switches to "he" when referring to the attorney-payment preference, creating a passage in which an unnamed woman failed to make payments to individuals who died of heart attacks, and an unnamed man preferred to pay attorneys. A Court reading this passage cannot attribute the described conduct to any identified party in this proceeding.

The substantive content of this testimony is legally material. Mr. Parmar was testifying that from the day he resigned from CHT until the company's collapse, not one person received even a bonus payment or earnout payment that was owed to them -- and that this failure was attributable to Chinh Chu personally. "Earnout payment" is a specific, performance-linked, documented obligation to former business owners who sold their companies as part of the Orion acquisition program. The failure to pay earnout obligations is a specific, verifiable breach of contractual commitments.

The human dimension of this testimony matters to the Court's equitable assessment. Mr. Parmar testified that specific individuals -- sellers who had sold their companies and earned the right to receive earnout payments -- died of heart attacks before receiving the compensation they were

25

contractually owed, because Chinh Chu chose to direct company resources to paying attorneys instead. The contrast between 100 attorneys being paid from company funds and earnout creditors dying without receiving their contractual rights is not rhetorical flourish -- it is factual testimony about the priorities of the successor manager, Chinh Chu, that bears directly on how this Court should assess the equities of the case.

The audio also includes testimony, absent from the certified transcript, that Mr. Chu had "like, 100 attorneys working for him" and that "company funds were used to pay his attorneys." When read together with Discrepancy 14 (Altorelli's recorded admission that $2M/month was being drawn from Orion for legal fees), these two discrepancies together describe a coherent pattern: Chinh Chu deployed approximately 100 attorneys funded by Orion's operating revenues, as acknowledged by his own attorney on recording, while leaving earnout obligations to deceased sellers unpaid.

## DISCREPANCY 14: MEANING REVERSAL: "ZERO PUBLIC COMPANY" BECOMES "ZERO-PROFIT COMPANY"

**A. Location:** Transcript page. 147, Line. 1-10

**B. The Certified Transcript vs. The Audio Record**

| CERTIFIED TRANSCRIPT | ECRO AUDIO RECORD |
|---|---|
| *He said there is an 8-K filing requirement, and he said it with extreme confidence, as if he actually knew. And he said it has to be filed. And it's a public company, so it had to be filed. We are a zero-profit company. We are not a profit company. We have maybe ten shareholders. All of them were fund managers. So it was like a boys' club. That was the bonus. The aim is like pink slips market of U.S. It's not the same 8-K filing requirement that he was claiming here that he knew about has to be done.* | *He ( Lazzara ) said there is an 8-K filing requirement ( for CHT being public company on AIM exchange in London, Lazzara failed to inform the court 1. AIM companies are not regulated by London stock exchange but by investment banks and self regulations similar to pink slips markets of USA ) , and he ( Lazzara )  said it with extreme confidence, as if he ( Lazzara ) actually knew. And he ( Lazzara ) said it ( 8-K ) has to be filed. And it's a public company, so it had to be filed. we were a zero public company, we were not at all like a public company. We had maybe 10 shareholders. All of them were fund managers ( large institutions not individuals, writing small play money checks as investments ). So it was like a private boys' club. That was the bonus. The AIM ( exchange of London )  is like pink slips market of U.S. It's not the same 8-K filing requirement that he ( Lazzara ) was claiming here that he ( Lazzara ) knew about has to be done.* |

**C. Prejudice**

This discrepancy is a complete reversal of meaning, not a variation in phrasing. "Zero public company" -- what Mr. Parmar said -- is a descriptive characterization of the practical nature of CHT's AIM listing: a company with characteristics so far removed from those of a conventional

public company that it might as well be private. "Zero-profit company" -- what the certified transcript records -- is a financial performance statement asserting that the company generated no earnings.

The legal significance of the distinction is significant. Mr. Parmar was not making a statement about CHT's earnings. He was making a regulatory and jurisdictional argument directly rebutting Mr. Lazzara's testimony about 8-K filing obligations. Mr. Lazzara testified that CHT, as a public company, was subject to 8-K-equivalent disclosure requirements and that CHT's failure to comply with those requirements was evidence of fraudulent concealment. Mr. Parmar's rebuttal was that this testimony was factually and legally wrong: CHT's AIM listing made it subject to AIM-specific disclosure rules governed by its Nominated Adviser (NOMAD), not the SEC. With only ten institutional fund-manager shareholders, no retail investor participation, and no active trading activity, CHT's AIM listing was, as Mr. Parmar described, "like a private boys' club" -- functionally a sophisticated private placement rather than a regulated public market listing.

The parties contractually recognized the AIM Rules I their merger agreement (See Plaintiff's Exhibit 39 at pgs. 3, 24, 58) expressly governed the merger. The AIM Market of the London Stock Exchange is specifically and deliberately designed as a market for smaller, growth-oriented companies with lighter regulatory requirements than those of the Main Market. AIM companies are not subject to the same disclosure obligations as Main Market companies, they are not subject to FCA regulation in the same way, and their disclosure obligations are substantially different from those imposed on NYSE or NASDAQ-listed companies by the SEC. Mr. Lazzara's testimony that CHT was subject to 8-K equivalent obligations as a public company conflated the regulatory regimes applicable to U.S. exchange-listed companies with the substantially different regime applicable to AIM-listed companies. Mr. Parmar's audio testimony was a direct, accurate, and legally significant refutation of this conflation.

Under the certified transcript, Mr. Parmar's testimony reads as an admission that CHT was a "zero-profit company" -- which Mr. Lazzara and the Trustee could use as direct support for the insolvency finding that is the predicate for the § 548(a)(1)(B) claim. Under the audio, Mr. Parmar's testimony is an argument that Mr. Lazzara's regulatory premise was factually and legally wrong, undermining one of the pillars of his analysis. The certified transcript version is potentially self-incriminating; the audio version is affirmatively exculpatory. This is a meaning reversal of the most consequential kind.

## DISCREPANCY 15: SIX-POINT COMPOUND CORRUPTION: JUDICIAL ESTOPPEL ARGUMENT AND COURT INTEGRITY CLAIMS DESTROYED

**A. Location:** Transcript pp. 128-132

**B. The Certified Transcript vs. The Audio Record**

| CERTIFIED TRANSCRIPT | ECRO AUDIO RECORD |
|---|---|
| *"...Q. Okay. Now, the funds used to purchase the Riverside apartment were proceeds from the merger, correct?* | *" Q. Okay. Now, the funds used to purchase the Riverside apartment were proceeds from the merger, correct?* |

27

A. I -- I have to see where the payment went from.
Q. Okay. Well, if we turn to volume 1 -- if you look at volume 1, part 2, Exhibit 46. Here we go. I'm sorry, Exhibit 43.
 A. Yes.
 Q. This is a document that's titled -- if you turn to about the third page, where there's not fully redacted, Wells FargoIOLA noninterest account, quick report; do you see that?
 A. Yes.
Q. Are you familiar with this document?
A. I think it is the -- it's my personal escrow account at Robinsons Brog. Okay.
Q. And if you look on page 3, you see that there's a heading, "Constellation Health/CHT closing"at the very top.
A. Yes.
Q. And do you see that there are a number of deposits, on February 3rd, 2017, from Capita Registrars Ltd.?
A. Where am I looking?
Q. Directly under "Constellation Health-CHT closing".
A. Yes.
 Q. You see that there are a number of deposits, on February 3rd, 2017, from Capita Registars Ltd.; do you see that?
A. Yes.
Q. Capita was the exchange agent in the merger, correct?
A. Capita would be the London Stock Exchange, yes.
Q. And these deposits represent deposits of merger proceeds, correct?
A. I'm not able to find that.
Q. Page 3.
A. I think I'm on the wrong page. I'm on page 4. Sorry. My mistake. I was on page 4. Page 3 –
Q. If you look at the top.
A. So it doesn't have -- oh, it has "CHT closing".
Q. Right. And do you see that there's a number of deposits, on February 3rd, 2017, from Capita Registrars?
A. Yes.
Q. And those are deposits of merger proceeds, correct?
A. Probably.
Q. Well, Capita was the exchange agent in the merger, correct?
A. Yes.

*Q. And so Capita was responsible for distributing proceeds of the merger to the shareholders, correct?*

*A. Right.*

*Q. And so that's exactly what Capita was doing here in depositing merger proceeds into this attorney escrow account, correct?*

*A. So this heading, "CHT closing", what is that?*

*Q. I'm not the one answering questions. And so –*

*A. Okay.*

*Q. I –*

*A. So -- so that I can be clear about what I'm looking at.*

*Q. Okay.*

*A. Because I've never seen that heading.*

*Q. Well, this is referring to Constellation Health/CHT closing, and it's showing deposits around the time that the merger closed, correct?*

*A. So it would imply Constellation had pieces of Parmar entity. And CHT closing Parmar entity's shares -- I -- I'm just making an assumption.*

*Q. Okay.*

*A. -- Parmar entity's shares sold coming into this –*

*Q. Okay.*

*A. I see that's correct. I'm guessing the same thing you are guessing.*

*Q. These represent –*

*A. Because -- the reason why I say this is you guys represented in this very court, to the same judge, that this was a debtor's account. And if you go down, there is a wire transfer to Abruzzi for 250-. But you saw in a row that this account had nothing to do with Parmar. MS. ROSE: I'm going to move to strike that nonresponsive portion of his answer. THE WITNESS: It if -- it is –*

*THE COURT: Sustained.*

*THE WITNESS: -- there in your answer. They represented to you, Your Honor, that this very account now they are saying is mine, they told you it was their discovery.*

*THE COURT: All right. The objection is sustained. Mr. Parmar, just try to keep to answering the question that you're asked.*

*THE WITNESS: Okay. I'm just trying to tell you that, in your very book, there are two versions of this very account. That's why I wanted clarification from her what does she mean by Constellation closing? And they just verified, it's from our sale of shares. But if you go back and*

*Q. And so Capita was responsible for distributing proceeds of the merger to the shareholders, correct?*

*A. Right.*

*Q. And so that's exactly what Capita was doing here in depositing merger proceeds into this attorney escrow account, correct?*

*A. So this heading, "CHT closing", what is that?*

*Q. I'm not the one answering questions. And so –*

*A. Okay.*

*Q. I –*

*A. So -- so that I can be clear about what I'm looking at.*

*Q. Okay.*

*A. Because I've never seen that heading.*

*Q. Well, this is referring to Constellation Health/CHT closing, and it's showing deposits around the time that the merger closed, correct?*

*A. So it would imply Constellation Health which is a Parmar entity. And CHT closing Parmar entity's shares -- I -- I'm just making an assumption.*

*Q. Okay.*

*A. -- Parmar entity's shares sold coming into this account—*

*Q. Okay. A. I see that's correct. I'm guessing the same thing you are guessing.*

*Q. These represent –*

*A. Because -- the reason why I say this is you guys represented in this very court, to the same judge, that this was a debtor's account. And if you go down, there is a wire transfer to Abruzzi for 250-. But you swore under oath that this account had nothing to do with Parmar parties.*

*MS. ROSE: I'm going to move to strike that nonresponsive portion of his answer.*

*THE WITNESS: It if -- it is --.*

*THE WITNESS: -- it is there in your case files. They represented to you, Your Honor, that this very account now they are saying is mine, they told you that it was debtors property. THE COURT: All right. The objection is sustained. Mr. Parmar, just try to keep to answering the question that you're asked.*

*THE WITNESS: Okay. I'm just trying to tell you that, in your very Court, there are two versions of this very account. That's why I wanted clarification from her what does she mean by Constellation Health / Closing? And they just verified, it's from Parmar parties sale of shares. But if you go back and read, in your court case,*

29

| | |
|---|---|
| *read, in your time, with Abruzzi, they said that it was debtor's account, and the money to Abruzzi went from the debtor's account. And you can see three lines below in the same account –* <br> *THE COURT: Again, Mr. Parmar –* <br> *THE WITNESS: -- the money went to Abruzzi –* <br> *THE COURT: Mr. Parmar, just stick to the question you're asked. If there's something that your lawyer wants to follow up on, that's germane to this trial, he can do so. But let's try to stay to what you're being asked.* <br> *THE WITNESS: I believe it is germane to this topic, Your Honor, because they are saying that I'm the one that is lying and misrepresenting. I can show you right in your Code that they are continuously lying in this circumstance.* <br> *THE COURT: Well, the lawyers aren't on trial, Mr. Parmar, so I have to make a credibility assessment about your credibility as well as the witnesses who testified earlier today. And I will do that. But you need to answer the questions that you're asked.* <br> *THE WITNESS: Okay. I'm talking Lazzara and Ehrenberg testified today are the people who said this is the debtor's account.* <br> *THE COURT: Again, Mr. Parmar, keep to the question that you're asked.* <br> *THE WITNESS: Okay."* | *with Abruzzi, they said that it was debtor's account, and the money to Abruzzi went from the debtor's account. And you can see three lines below in the same account –* <br> *THE COURT: Again, Mr. Parmar –* <br> *THE WITNESS: -- the money went to Abruzzi –* <br> *THE COURT: Mr. Parmar, just stick to the question you're asked. If there's something that your lawyer wants to follow up on, that's germane to this trial, he can do so. But let's try to stay to what you're being asked.* <br> *THE WITNESS: I believe it is germane to this trial, Your Honor, because they are saying that I'm the one that is lying and misrepresenting. I can show you right in your Court that they are continuously lying in this circumstance.* <br> *THE COURT: Well, the lawyers aren't on trial, Mr. Parmar, so I have to make a credibility assessment about your credibility as well as the witnesses who testified earlier today. And I will do that. But you need to answer the questions that you're asked.* <br> *THE WITNESS: Okay. I'm talking Lazzara and Ehrenberg testified today are the people who said this is the debtor's account.* <br> *THE COURT: Again, Mr. Parmar, keep to the question that you're asked.* <br> *THE WITNESS: Okay.."* |

| Transcript | Audio |
|---|---|
| "Wells FargoIOLA" | "Wells Fargo-IOLA" |
| "Constellation closing" | "Constellation Health / Closing" |
| "Constellation had pieces of Parmar entity" | "Constellation Health which is a Parmar entity" |
| "they told you it was their discovery" | "they told you that it was debtors property" |
| "you saw in a row" | "you swore under oath" |
| "in your very book" | "in your very Court" |
| "in your time, with Abruzzi" | "in your court case, with Abruzzi" |
| "I can show you right in your Code" | "I can show you right in your Court" |
| "germane to this topic" | "germane to this trial" |

## C. Prejudice

This discrepancy involves six distinct errors concentrated within a single cross-examination exchange, each of which independently alters the legal meaning of Mr. Parmar's testimony, and which together eviscerate the most cogent argument Mr. Parmar made during the entire trial: a judicial estoppel argument based on prior sworn representations made to this same Court by the

30

Trustee's own witnesses in a prior docketed proceeding, and a direct rebuttal to the Trustee's Riverside property fraudulent transfer claim grounded in the ownership character of the funds at issue.

**The Source of the Riverside Funds -- "Parmar Parties Sale of Shares" versus "Our Sale of Shares."** The Trustee's Riverside property fraudulent transfer claim depends entirely on establishing that the Capita deposits into the Robinson Brog escrow account constituted debtor property, not personal shareholder proceeds. Mr. Parmar testified that those deposits were from "Parmar parties sale of shares" -- an unambiguous identification of the source as his own equity proceeds from the sale of his personal CHT shareholding, not diverted estate assets. The certified transcript records him saying "our sale of shares." In the context of cross-examination by the Trustee's counsel, the word "our" is fatally ambiguous: it is equally susceptible to being read as referring to the debtors' shares, which is precisely the Trustee's theory. That ambiguity is not neutral. It leaves open the very interpretation Mr. Parmar was directly rebutting, and does so by replacing an explicit ownership identification with a pronoun that the Trustee can read as corroborating his own position. The source of the funds flowing through the Robinson Brog account is the central factual dispute underlying the Riverside claim. The certified transcript converts the most direct testimonial rebuttal to that claim in the trial record into testimony susceptible to the Trustee's preferred reading.

**The Corporate Structure Error -- "Constellation had pieces of Parmar entity" versus "Constellation Health, which is a Parmar entity."** This substitution mischaracterizes the direction of the ownership relationship in a proceeding where corporate structure, the identity of entities holding accounts, and the attribution of those entities to Mr. Parmar are all disputed issues. "Constellation Health which is a Parmar entity" accurately conveys that Constellation Health LLC is an entity owned and controlled by Mr. Parmar -- establishing the source of the Capita deposits as his own equity proceeds. "Constellation had pieces of Parmar entity" inverts that relationship entirely, suggesting that Constellation owned a fractional interest in some unnamed Parmar vehicle, language that could support alter ego, veil-piercing, or commingling theories that favor the Trustee but is not what Mr. Parmar said.

**The Three-Element Judicial Estoppel Argument.** The three most significant errors in this passage do not operate independently. They are the three necessary and sequential elements of a single unified judicial estoppel argument, and the certified transcript destroys each element independently and simultaneously, ensuring that no version of the argument survives in the record even in partial form.

The first element is the sworn character of the prior representation. Mr. Parmar said "you swore under oath" -- a precise legal assertion that the Trustee's witnesses had made sworn representations to this Court that are directly contradictory to their current litigation position. The certified transcript renders this as "you saw in a row," which is simply incoherent. No legal significance of any kind attaches to a party's representative having "seen" something "in a row," and the sworn character of the prior representation -- the element that makes the inconsistency legally cognizable rather than merely argumentative -- disappears entirely.

The second element is the tribunal identification. Mr. Parmar said "in your very Court" -- a specific identification of this court, in this proceeding as the forum in which the prior sworn representation was made. Judicial estoppel under *New Hampshire v. Maine*, 532 U.S. 742, 749 (2001), requires

31

that the prior inconsistent position have been successfully asserted before the same tribunal. "In your very Court" is the phrase that satisfies that requirement: it tells this Court that it personally received the prior representation, making the inconsistency judicially noticeable and the estoppel doctrine directly applicable. The certified transcript renders this as "in your very book," which has no legal meaning in any judicial context. No reader of the certified transcript could reconstruct from that phrase that Mr. Parmar was making a tribunal-specific estoppel argument to the judge who had personally received the prior inconsistent representation.

The third element is the substantive content of the prior representation. Mr. Parmar testified that the Trustee's witnesses had previously represented to this Court that the Wells Fargo escrow account was "debtors property" -- property of the bankruptcy estate, a legal characterization directly and irreconcilably inconsistent with the Trustee's current position that the same account contains Parmar's personal merger proceeds subject to fraudulent transfer avoidance. The certified transcript renders this as "their discovery," converting a specific legal characterization of account ownership into an ambiguous reference to an unidentified item with no probative content.

A party that has made sworn representations to a court and then takes an inconsistent position in a subsequent proceeding before the same court is subject to the doctrine of judicial estoppel. New *Hampshire v. Maine, Id*. The ECRO audio version of this passage establishes all three required elements with precision: a sworn prior position, made before this same tribunal, with specific legal content directly contradicting the current position. The certified transcript destroys each element through an independent substitution. A court reading the certified transcript encounters three incoherent fragments. A court reviewing the ECRO audio encounters a complete, precisely stated judicial estoppel argument that, if credited, would undermine the evidentiary foundation of the Trustee's characterization of the Robinson Brog account in both the Riverside property claim and the broader merger proceeds recovery theory.

**The Relevance Argument -- "Germane to this Trial" versus "Germane to this Topic."** The substitution of "germane to this topic" for "germane to this trial" replaces a legal relevance standard with a conversational phrase. "Germane to this trial" invokes the standard for relevance under Fed. R. Ev. 401 -- whether the evidence has a tendency to make a material fact more or less probable -- and asserts that Mr. Parmar's point about the prior inconsistent sworn position satisfied that standard. "Germane to this topic" reduces that legal argument to a personal observation about the immediate subject of examination, a materially narrower and legally weaker formulation that carries none of the admissibility weight Mr. Parmar was asserting in real time.

## DISCREPANCY 16: OMISSION OF JUDICIAL COMMENTARY FROM CERTIFIED RECORD

**A. Location:** Transcript page 143, Line. 8-25

**B. The Certified Transcript vs. The Audio Record**

| CERTIFIED TRANSCRIPT | ECRO AUDIO RECORD |
|---|---|
| *[The certified Transcript records a continuous examination exchange with no judicial commentary between lines 16 and 17 of page 143.]* | *[The ECRO audio recording at this passage includes at least two sentences spoken by the Court and at least one statement by an additional* |

| | |
|---|---|
| | *participant, all occurring between the points corresponding to Transcript lines 16 and 17 of page 143, and none of which appear in the certified Transcript.  The specific words of the Court's remarks are difficult to isolate with certainty from the audio using the equipment available to me.]* |

## C. Prejudice

The specific context of this omission is the examination of Mr. Parmar regarding the forfeiture language in the plea agreement -- a subject directly related to the criminal proceedings before Judge Arleo and potentially to the scope of any award in this adversary proceeding. The Court's commentary at this point -- whatever its specific content -- occurred in the context of testimony that is directly relevant to both proceedings. Its omission means that neither this Court in its deliberations, nor any appellate court reviewing the record, nor possibly Judge Arleo in the sentencing proceeding, will know what the trial judge observed, questioned, or assessed at this juncture.

The structural consequence of omitting judicial commentary from a certified transcript extends beyond the immediate content of the omitted remarks. An appellate court reviewing the record will see a seamless examination exchange with no indication that the trial judge intervened. If the omitted remarks reflected skepticism, support, or a clarifying observation about the evidence, the appellate court will have no basis for understanding what the trial judge understood at that point and when. This informational gap may affect the appellate standard of review -- particularly on questions of clear error and abuse of discretion, where the trial court's in-court reactions to evidence are relevant to the assessment of factual findings.

The Court is in a unique position to remedy this omission. The ECRO audio is this Court's own administrative record, maintained by this Court's own electronic system. The Court may, on its own motion or in response to this application, listen to the audio at the relevant timestamp and supplement the certified transcript with the commentary that was omitted.

## DISCREPANCY 17:  "ONLY FIRST SIX MONTHS" TRANSCRIBED AS "EVERY SIX MONTHS"

**A. Location:** Transcript page 152, line. 11-22

**B. Certified Transcript vs. Audio Record**

| CERTIFIED TRANSCRIPT | ECRO AUDIO RECORD |
|---|---|
| *...you asked Lazzara a very good question which why every six months -- you're telling the Court about every six months.  And he gave an answer, which actually didn't make any sense.* | *...you asked Lazzara a very good question which is why only first six months — you're telling the Court about only first six months.  And he gave an answer, which actually didn't make any sense.* |

## C. Prejudice

Mr. Parmar was referring to cross examination of Mr. Lazzara about why his analysis covered only the first six months of 2016.  Parmar said "only first six months" — emphasizing the limitation of Mr. Lazzara's analytical window, which was a deliberate and misleading choice.  "Every six months" is meaningless in this context and does not describe any analytical window or methodology that was at issue.

**DISCREPANCY 18:  NJ COMPANY "GOING TO BE BOUGHT INTO NORTHSTAR"TRANSCRIBED AS "VERY IMPORTANT TO NORTHSTAR"**

**A. Location:** Transcript p. 152, ll. 11-22

**B. Certified Transcript vs. Audio Record**

| CERTIFIED TRANSCRIPT | ECRO AUDIO RECORD |
|---|---|
| *...there was a New Jersey company called AIG Aipikva (ph.) that was very important to Northstar.* | *...there was a New Jersey company called AIG IHIGfa that was going to be bought into Northstar.* |

**C. Prejudice**

Mr. Parmar was testifying that the Northstar SPAC had a specific, identified acquisition target — a real New Jersey company that CHT intended to acquire and place into the Northstar vehicle.  The phrase he used was "going to be bought into Northstar," meaning this company was slated for acquisition.  "Very important to Northstar" says nothing about any acquisition intention and does not convey the same meaning. This is crucial because it addresses the accusation that Northstar was a sham company.

**DISCREPANCY 19: IDENTITY OBLITERATION: LAZZARA'S ADMISSIONS VS. PARMAR'S CONDUCT**

**A. Location:** Transcript p. 152, ll. 11-16

**B. Certified Transcript vs. Audio Record**

| CERTIFIED TRANSCRIPT | ECRO AUDIO RECORD |
|---|---|
| *...the parent company is responsible for his subsequent liabilities. He went to extreme lengths, which he admitted in New Jersey court, that CHT was a viable corporation when that 8.7 million dollars was funded.* | *...he (Lazzara) stated that a parent company is responsible for a subsidiary's liabilities. He (Lazzara) went to extreme lengths, which he (Lazzara, in a separate litigation) admitted in New Jersey court, that CHT was a viable corporation with a substantial 8.7 million dollars in balance after the $3.7 million dollars was funded. Then from that day, he realized the mistakes, and he made CHT a nonviable corporation by a magical financial transaction called contingent liability based on future.* |

**C. Prejudice**

Mr. Parmar was testifying that Mr. Lazzara -- a Certified Public Accountant who holds himself out as a forensic accounting expert -- testified under oath that a parent company bears liability for its subsidiary's debts. This is patently untrue and the transcript obscures the actual testimony.

The substitution of "his subsequent liabilities" for "a subsidiaries liabilities" also produces a grammatically incoherent passage. "His subsequent liabilities" points to no identified person. The Court reading the certified transcript cannot determine whose liabilities the parent company is supposedly responsible for, who the "he" is who went to extreme lengths, or how any of this connects to the New Jersey proceeding referenced. The referential chain breaks immediately because the anchor word -- "subsidiaries" -- has been removed.

More critically, the certified transcript destroys Mr. Parmar's identification of Mr. Lazzara's prior inconsistent statement. A prior inconsistent statement by a party's own expert witness, made under oath in a separate judicial proceeding, is among the most powerful forms of impeachment available in civil litigation. Mr. Parmar testified that Mr. Lazzara admitted in New Jersey court that CHT was a viable corporation -- not an insolvent one -- at the time the $8.7 million was funded. This directly contradicts Mr. Lazzara's insolvency opinion in this proceeding, calling into question whether his opinion has changed with the litigation winds rather than remaining anchored in the financial data. The audio version of this testimony establishes the prior inconsistent statement with precision: the speaker is identified (Lazzara), the forum is identified (New Jersey court), and the substantive content is identified (CHT was viable, with a balance of $8.7 million after the $3.7 million funding). The certified transcript preserves the dollar figures but strips away every element of context that makes those figures meaningful.

The audio version also includes testimony -- entirely absent from the certified transcript -- that Mr. Lazzara subsequently reversed course and "made CHT a nonviable corporation by a magical financial transaction called contingent liability based on future." This phrase -- whether or not a reviewing court finds it rhetorically artful -- communicates a specific, legally cognizable accusation: that Mr. Lazzara's retroactive contingent liability methodology is not an accounting analysis but a post hoc litigation tool, constructed after the fact to produce a desired conclusion. The accusation that an expert 'made' a company nonviable through a 'magical financial transaction' is a lay witness's formulation of the argument that Mr. Lazzara's methodology violates GAAP. This accusation does not exist in the certified transcript.

The certified transcript's destruction of pronoun clarity renders the dollar figures ($8.7 million and $3.7 million) meaningless, as their contextual relationship -- a positive balance remaining after funding -- is obliterated. The numbers appear in the transcript but carry no probative weight because the referential framework that gave them meaning has been removed. Any post-trial brief, proposed finding of fact, or judicial analysis premised on the certified transcript therefore rests on an incomplete and misleading record as to this central argument.

## DISCREPANCY 20: WHOLESALE TESTIMONIAL SUBSTITUTION: CONTINGENT LIABILITY ARGUMENT DESTROYED

**A. Location:** Transcript p. 155, ll. 5-10

**B. The Certified Transcript vs. The Audio Record**

| CERTIFIED TRANSCRIPT | ECRO AUDIO RECORD |
|---|---|
| *...that he did not -- like, even taking any belief in me, he testified here today that the funds raised, thirty-seven million dollars, were for the specific purpose of buying MDRX. He testified that. And then he said that MDRX was not purchased and conditioned by the relationship we put in. He testified that.* | *...that even if without taking any belief in me (Parmar), he (Lazzara) testified here today that the funds raised, thirty-seven million dollars, were for the specific purpose of buying MDRX. He (Lazzara) testified that. And then he (Lazzara) said that now looking at the situation in 2025 when MDRX was not purchased in 2016 a Contingent Liability should be put on the books retroactively for 2016. He (Lazzara) testified that.* |

## C. Prejudice

This discrepancy involves two distinct but related errors that together obliterate what is, in substance, a cogent legal and accounting argument -- one that Mr. Parmar constructed entirely from Mr. Lazzara's own admissions, without requiring the Court to credit anything Mr. Parmar himself asserted about the underlying facts.

The first error concerns the introductory phrase. The certified transcript reads 'even taking any belief in me,' while the audio establishes that Mr. Parmar said "even if without taking any belief in me." The audio version employs the rhetorical structure of a concession-cum-refutation: "even if you do not believe a single word I say, look at what Lazzara's own testimony reveals." This requires the factfinder to accept only what the adversary has already admitted. The transcript's version -- "even taking any belief in me" -- reverses this structure entirely, converting an argument that stands on its own without crediting Mr. Parmar into an argument that depends on the Court believing Mr. Parmar. The logical weight of the argument is fundamentally diminished by this single word substitution.

## IV. CUMULATIVE IMPACT OF TRANSCRIPT ERRORS

The twenty transcriptional errors identified herein do not operate in isolation. They form a pattern of transcript failure that undermines many of the principal elements of Mr. Parmar's defense. The record upon which this Court must base its decision must be as accurate as possible. The transcript is anything but.

The omissions are numerous. First, the impeachment of Mr. Lazzara through prior inconsistent statements (Discrepancy 1) does not even appear in the certified record. Second, Mr. Parmar's challenge to the retroactive contingent liability methodology (Discrepancy 2) also does not appear in the certified record. Third, the logical syllogism -- built entirely from Mr. Lazzara's

36

own evidence -- demonstrating that no shareholder made any demand following CHT's $28 million press release (Discrepancies 3 and 4) does not appear in the certified record. Fourth, the securities law defense establishing that regulatory disclosure rules prohibited pre-announcement of MDRX as an acquisition target (Discrepancy 5) does not appear in the certified record. Fifth, the internally consistent account of why MDRX remained a SPAC shell -- because sellers changed terms at the twelfth hour -- does not appear in the certified record; instead, the certified record shows an internally contradictory account (Discrepancy 6). Sixth, the September 2016 evidence of pre-merger solvency (three acquisitions, $45M debt retirement) does not appear in the legally relevant pre-merger time period (Discrepancy 7). Seventh, the SPAC defense -- that the shells were filled with real operating companies in the second half of 2016 -- does not appear in the certified record in any coherent form (Discrepancies 8 and 9). Eighth, Mr. Parmar's observation that the Trustee rested without asking him about the core fraud allegations after eight years of litigation does not appear in the certified record (Discrepancy 10). Ninth, the $80 million contractual liability cap does not appear in the certified record (Discrepancy 11). Tenth, the Court's own in-trial commentary does not appear in the certified record (Discrepancies 10 and 12). Eleventh, Chinh Chu's earnout payment failures and attorney fee diversions are unattributable to any identified person in the certified record (Discrepancy 15). Twelfth, John Altorelli's recorded admission about $2M/month in CC Capital legal fee diversions from Orion revenues is unattributable to any identified person in the certified record (Discrepancy 14). Thirteenth, the judicial estoppel argument -- Mr. Parmar's invocation of prior sworn inconsistent representations to this Court -- does not appear in the certified record (Discrepancy 16).

This is not a list of marginal arguments or peripheral observations. It is a list of the principal elements of the defense: the insolvency defense (Discrepancies 1, 2, 7, and 13), the fictitious

entities defense (Discrepancies 5, 6, 8, 9), the damages-limiting defense (Discrepancy 11), the alternative causation defense (Discrepancies 14 and 15), and the evidentiary integrity argument (Discrepancy 16). The certified transcript, taken as a whole, presents a version of Mr. Parmar's trial testimony from which virtually every substantive defense has been erased, distorted, or rendered incoherent.

The Parmar Defendants filed their Proposed Findings of Fact and Conclusions of Law  on December 17, 2025 ["Proposed Findings", Docket No. 721] nine days after trial, necessarily relying on the certified transcript as the authoritative, court-produced record of Mr. Parmar's testimony. That submission would have been far more robust if its preparation had been informed by an accurate transcript. They testimonial foundation for the submission is largely absent from the certified transcript. The prejudice is fourfold.

First, the solvency defense to the 548 claims are at paragraphs 56 and 57 of the Parma Proposed Findings. Those challenge Lazzara's reliance on so-called contingent liabilities. The ECRO audio establishes that Mr. Parmar testified that Lazzara's analytical window covered only the first six months, that the SPAC vehicles were filled during the second half of 2016, and that three operating companies were acquired and a $45 million Resource America debt was retired in September 2016 using company funds, four months before the merger. Had the correct transcript been available, the post-trial submission would have included references to the record establishing that Lazzara's own exhibit confirmed the July 2016 $45 million debt retirement and unencumbering of all assets, that Lazzara himself conceded he had no second-half quarterly statements, and that Mr. Parmar testified from the stand that those missing second-half months were precisely when the operating acquisitions and debt retirement occurred, making Lazzara's analytical window not merely incomplete, but demonstrably disingenuous. Instead, because the certified transcript substituted "first" for "post" six months and displaced September 2016 to September 2017, the proposed findings were drafted against a testimonial record that placed the SPAC-filling in the first half of 2016 and the corroborating acquisitions eight months after the merger had closed, making the cherry-

picking argument internally incoherent and the footnote 5 citation legally orphaned from any witness testimony capable of supporting it.

Second, the contention of the Parmar Parties that the SPACs were legitimate at paragraphs 178 through 182 of the Proposed Findings would have been significantly buttressed by the ECRO audio which establishes that Mr. Parmar testified that the New Jersey company "was going to be bought into Northstar." That was a direct testimonial evidence that Northstar had a specific, identified, named acquisition target slated for corporate placement into that SPAC. That testimony would have illuminated Lazzara's failure to account for the identified acquisition targets when characterizing the SPAC's as sham. The certified transcript's substitution of "very important to Northstar" for "going to be bought into Northstar" stripped that corroboration from the record entirely, leaving paragraph 178 to rest on documentary and accounting analysis alone, without the testimonial foundation that would have been significant in evaluating the credibility of Lazzara's testimony.

Third, the: Proposed Findings at paragraphs 88 through 95 rely on Lazzara's concessions regarding CHT's pre-transfer bank balance and the complete absence of investor complaints as the twin factual pillars for rejecting his reliance on contingent liabilities. The ECRO audio establishes that Mr. Parmar testified from the stand that Lazzara admitted in New Jersey court proceedings that CHT retained a substantial $8.7 million balance after the specific $3.7 million Colts Neck disbursement at issue, and that Lazzara's theory that parent companies bear joint and several liability for subsidiary's debts profoundly erroneous. Had counsel possessed that correctly rendered testimony, proposed paragraphs 91 and 93, which are currently grounded exclusively in cross-examination concessions, would have been reinforced by Mr. Parmar's own sworn identification of Lazzara's New Jersey admission as a prior inconsistent statement made under oath in a separate judicial proceeding, transforming a cross-examination point into a fully developed impeachment finding with a specific dollar figure, a specific forum, and a specific prior sworn acknowledgment of corporate solvency directly contradicting the insolvency opinion advanced by Plaintiffs in this proceeding. The certified transcript's substitution of "when" for "after," its deletion of the $3.7 million figure, and its conversion of "CPA association" to "CPA associate" stripped every element of that

39

testimonial impeachment from the record, leaving the proposed findings to rely on cross-examination excerpts alone without the corroborating witness-stand narrative that would have given those concessions their full evidentiary weight.

Fourth, the Riverside property fraudulent transfer defense and the judicial estoppel argument: the Trustee's proposed findings at Docket 720, paragraph 117, assert that the Robinson Brog escrow account contained $45 million in debtor merger proceeds that Parmar concealed from public shareholders, and paragraphs 118 through 121 characterize the Riverside property purchase as a fraudulent deployment of those proceeds through an elaborate web of LLCs and trusts. The ECRO audio establishes that Mr. Parmar testified with precision to two facts that together constitute a complete answer to both claims: that the Capita deposits were from "Parmar parties sale of shares," identifying the source as his own personal shareholder equity proceeds rather than diverted estate assets, and that the Trustee's own witnesses, Lazzara and Ehrenberg, had previously sworn to this same Court, before this same judge, in a prior docketed proceeding involving Abruzzi, that that very account was debtor property, establishing a three-element judicial estoppel argument grounded in the Trustee's own prior inconsistent sworn representation to Judge Trust. Had counsel possessed the correct transcript, the Parmar Defendants' opposition to Docket 720's Riverside findings would have supported an argument that Plaintiffs were judicially estopped from characterizing the Robinson Brog account as Parmar's personal Riverside funding vehicle when their own witnesses previously represented to this Court that the same account was estate property. That argument, fully developed and grounded in live trial testimony, would have placed the Trustee in the position of either conceding the prior inconsistent representation or explaining to the Court why its own witnesses swore to two irreconcilable characterizations of the same account in proceedings before the same judge. Instead, because the certified transcript converted "you swore under oath" to "you saw in a row," "in your very Court" to "in your very book," "debtors property" to "their discovery," and "Parmar parties sale of shares" to "our sale of shares," the Proposed Findings did not highlight Mr. Parmar's testimony. That testimony was rendered incomprehensible by four simultaneous transcription failures in a single cross-examination exchange.

40

The Parmar Defendants prepared their Proposed Findings based upon a materially inaccurate transcript – a transcript that eviscerated much of the substantive content of Mr. Parmar's testimony. That transcript is self-contradictory, incoherent, garbled, and incomplete. It is fundamentally unfair to the parties and the Court that the Court is being asked to render a decision based upon this very flawed record.

## RELIEF REQUESTED

For the foregoing reasons, the Parmar Defendant Parties respectfully request that this Court conform the record by adopting the corrections specified above as the trial record in this adversary proceeding and base its adjudication on the record as so corrected.

Respectfully submitted,

Broege, Neumann, Fischer & Shaver, LLC
*Attorneys for Parmar Defendants*

By: *Timothy P. Neumann, Esq.*
        Timothy P. Neumann, Esq.

Dated: March 27, 2026
        Manasquan, NJ

41