

**U.S. Department of Justice**
*United States Attorney*
*District of New Jersey*

*Kelly M. Lyons*
*George M. Barchini*
*Assistant United States Attorneys*

*970 Broad Street, Suite 700*
*Newark, New Jersey 07102*
*Direct Dial: 973-645-2903*

April 27, 2026

Honorable Madeline Cox Arleo
United States District Judge
Martin Luther King, Jr. Federal Building & U.S. Courthouse
50 Walnut Street
Newark, New Jersey 07102

> Re:  *United States v. Parmjit Parmar*
>       Crim. No. 18-735 (MCA)

Dear Judge Arleo:

The United States submits this brief response to Defendant Parmjit Parmar's April 2, 2026 letter concerning the sentencing hearing in the above-captioned matter. *See* ECF No. 341. Parmar is currently scheduled to be sentenced before Your Honor on **May 5, 2026, at 2:00 p.m.** The Government does not wish to engage in any extensive letter writing campaign beyond the parties' sentencing submissions, but provides this as a succinct response to Defendant's unsupported and untimely positions in the April 2 letter.

First, as to the issue of forfeiture, and as the Court noted in its April 3, 2026 text order, *see* ECF No. 342, the Government's motion for a Preliminary Order of Forfeiture was pending for more than five months without a response from Defendant. This followed several months of the Government repeatedly requesting that the Defendant advise the Government regarding his position on forfeiture to avoid unnecessary motion practice. Yet, the Defendant did not provide any argument or opposition to the Government's motion in his January 26, 2026 and February 11, 2026 sentencing submissions. *See* ECF No. 328; ECF No. 334. And now more than three weeks after the Court instructed Defendant to file a motion to vacate the Order, if necessary, ECF No. 342, Defendant still has not done so. The Government rests on the arguments made in and factual basis supporting the forfeiture motion and submits that any belated attempt by the Defendant to vacate the Preliminary Order of Forfeiture—which is final as to the Defendant—is untimely and should be denied.

Second, the Government addresses Defendant's attempts to manipulate the Court's loss calculation. On the issue of loss, Parmar's contention in his April 2, 2026

1

letter that the Government is required to present evidence regarding the "valuation of CHT at the time of CC Capital's investment or the bank loans" because such a valuation figure is necessary to determine the loss amount under U.S.S.G. § 2B1.1 is wrong and flatly contradicted by case law. ECF No. 341. Indeed, the Defendant in his April 2 letter does not cite a single case in support of this argument. *See id.*

As noted extensively in the Government's previous sentencing submissions, the Government has established that the loss in this case was approximately $212 million, which is the amount investors were fraudulently induced to pay to purchase Parmar's sham company based on Parmar's lies. In the context of an investment-fraud scheme, specifically, loss for purposes of calculating the Guidelines is equal to the total amount of the investors' loss through the scheme. *See*, *e.g.*, *United States v. Georgiou*, 777 F.3d 125, 146 (3d Cir. 2015) (affirming sentence based on calculation of investor losses); *United States v. Snyder*, 762 F. App'x 118, 122 (3d Cir. 2019) (same). The Guidelines describe loss under U.S.S.G. § 2B1.1 as "reasonably foreseeable pecuniary harm." *See* U.S.S.G. § 2B1.1(b)(1), Notes to Table (3)(C)(i). That is, "pecuniary harm that the defendant knew or, under the circumstances, reasonably should have known, was a potential result of the offense." *Id.*, at Notes to Table (3)(C)(iv). In response to Defendant's letter, the Government provides here additional case law in support of this position.

Courts have routinely rejected defendants' arguments that the market value of property sold through fraud schemes should be deducted from the loss calculation under § 2B.1.1. Indeed, courts have repeatedly held that "loss in fraud cases includes the amount of property taken, even if all or part has been returned." *United States v. Lyttle*, 460 F. App'x 3, 10 (2d Cir. 2012) (quoting *United States v. Coriaty*, 300 F.3d 244, 251 (2d Cir. 2002); *see also United States v. Komar*, 529 F. App'x 28, 29 (2d Cir. 2013) (rejecting the defendant's argument that the value of his fraud victim's equity in his partnership should be subtracted from the loss amount, and holding that "[t]he 'loss' was the money that the investors were fraudulently induced to invest . . . irrespective of the value of the [property]."). In *Komar*, the court expressly rejected defendant's argument that the value of the property sold to investors should be deducted from the loss amount because the appropriate loss figure under § 2B1.1 is the money that the investors were fraudulently induced to invest regardless of the value of the underlying property. *Id.* at 29. The court also noted that the United States Sentencing Commission's comments "significantly omit any direction to apply the value of an equity stake as a credit against actual loss." *Id.*

In *United States v. Bryson*, the Court found that in an investor fraud scheme in which defendants obtained money by wholly misrepresenting the nature of the fund in which the victims invested, "a reasonable estimate of the actual loss attributable to the offense conduct is the total value of their investment." 101 F. Supp. 3d 147, 155–56 (D. Conn. 2015); *see also United States v. Turk*, 626 F.3d 743, 750 (2d Cir. 2010) ("without [defendant's fraudulent conduct], [defendant] could not have

obtained her victim's money. It follows that a potential direct result of [defendant]'s specific fraudulent act was the total loss of the moneys the individual investors had given her."). The Court also noted that where an investment that a defrauded victim made was "fundamentally and materially different than what they actually received," the loss to investors was caused not by any decline in value in the fund in which they invested, but "by their having invested in the first place." *Id*. So too here, Parmar induced his victims to pay approximately $212 million based on his egregious lies about his own company and only obtained that money as a direct result of those lies. The law dictates that the loss amount is thus the total amount of the victims' investment, which was entirely foreseeable to Parmar as the leader and orchestrator of the fraud.

In addition, Defendant is not entitled to offset the loss amount due to any money investors received in the bankruptcy proceeding. The Sentencing Guidelines provide specific and limited exclusions from loss and credits against loss. *See* U.S.S.G. § 2B1.1, App. N. 3(C), 3(D). As relevant here, the Sentencing Guidelines provide that loss "shall be reduced by . . . money returned . . . by the defendant or other persons acting jointly with the defendant, to the victim *before the offense was detected*." U.S.S.G. § 2B1.1, App. N. 3(D)(i) (emphasis added). Parmar is thus not entitled to any "reduction in the loss amount based on a possible recovery by investors in bankruptcy court." *United States v. Kaleil Isaza Tuzman*, No. 15 CR. 536 (PGG), 2021 WL 3284231, at *22 (S.D.N.Y. July 29, 2021); *see also Bryson*, 101 F. Supp. 3d at 156–57 ("[T]he amount received by the victim investors in bankruptcy should not be deducted from the principal invested in calculating actual loss for guideline purposes."). We note also that "the [C]ourt need only make a reasonable estimation of the loss." *See* U.S.S.G. § 2B1.1, App. N. 3(B).

While Parmar also insists that the Government's theory on loss somehow relies on an unrepresentative selection of evidence presented in the bankruptcy adversary proceeding, that is entirely incorrect. The Government's theory on loss depends on one thing: a Go-Private Transaction that took place fourteen months *before* the bankruptcy in which victims indisputably paid $212,502,160.25 for a company in a deal inextricably tainted by Parmar's fraud.

Thus, any evidence regarding the "valuation of CHT at the time of the acquisition," "offers made [*by Parmar*] to purchase the business prior to bankruptcy," and any subsequent "asset sales through a bankruptcy fire sale" are completely irrelevant to the loss amount under § 2B.1.1. And Defendant's request to wait out the bankruptcy proceeding before sentencing in this matter is yet another poorly disguised attempt to delay justice in this case, as evidenced by the fact that Defendant pleaded guilty almost one year ago. We flag for the Court a practical reality: Parmar's sentencing hearing in this criminal matter and Judge Trust's final ruling in the bankruptcy adversary proceeding draw near and on similar timetables. The Government can only surmise that Parmar's insistence that the Government call

multiple individuals, including victims, to testify about the value of his company at the sentencing hearing is driven, in part, by his intention to use the sentencing hearing as part of some sort of litigation strategy in the bankruptcy adversary proceeding. This is the same proceeding in which Parmar submitted a 93-page sworn declaration in opposition to the trustee's summary judgment motion, including headings titled "The Plea I Took and Its Explanation" and "Context of the Plea Admissions." *See* ECF No. 308, Ex. D at 25. We submit that it is entirely inappropriate for Parmar to weaponize the sentencing hearing against the victims of his fraud by demanding their testimony.

Accordingly, the Government submits that any evidentiary hearing on loss is unnecessary and would only serve the purpose of subjecting victims to meaningless cross examination on wholly irrelevant information. Notably, Defendant does not contest the sale price and victims' investment amount of $212,502,160.25, but yet argues that certain witnesses, including victims, should be required to testify about "valuation evidence," which as noted above and in the Government's sentencing submissions, is not a relevant figure under § 2B.1.1. But ultimately, Defendant's argument presents a legal dispute, not a factual one, which does not require any sort of factual findings, and one that moreover finds no support in relevant case law.

To the extent that the Court is nonetheless inclined to hold an evidentiary hearing on loss or any other issue relevant to sentencing, the Government respectfully requests that the Court provide the parties with some parameters on the subject matter of that hearing and allow for the Government to confirm availability of witnesses best suited to testify on those subject matters, potentially on a date separate from the sentencing hearing.

On all other issues, the Government relies on its previous submissions, but is ready and willing to provide additional briefing or submissions should the Court require any. The Government is prepared to proceed to sentencing on May 5, 2026.

Respectfully submitted,

ROBERT FRAZER
United States Attorney

By: Kelly M. Lyons
George M. Barchini
Assistant U.S. Attorneys

cc:    John Hemann, Esq., Counsel to Defendant
       Andrew Goldstein, Esq., Counsel to Defendant

4