# Cooley

Andrew Goldstein
T: +1 202 842 7805
AGoldstein@cooley.com

John Hemann
T: 1 415 693 2038
JHemann@cooley.com

May 4, 2026

The Honorable Madeline Cox Arleo
United States District Judge for the District of New Jersey
Martin Luther King Building & U.S. Courthouse
50 Walnut Street
Newark, New Jersey 07101

Re:    *United States v. Parmar* (18-cr-735)

Your Honor:

We write regarding the Government's April 27, 2026 letter (ECF No. 344) regarding the loss amount at issue in this case.  Although elsewhere critical of the timing of Mr. Parmar's filings, this letter came from the Government over three weeks after the April 2, 2026, letter to which it responds.

In that letter, the Government claims that it "has established that the loss in this case was approximately $212 million, which is the amount investors were fraudulently induced to pay to purchase Parmar's sham company based on Parmar's lies."  *Id.* at 2.  The Government contends that it has no obligation to estimate the value that the purchasers of CHT received, because "[c]ourts have routinely rejected defendants' arguments that the market value of property sold through fraud schemes should be deducted from the loss calculation under § 2B1.1."  *Id.*

As counsel for Mr. Parmar will explain at the sentencing hearing on May 5, that is not Mr. Parmar's argument at all.  Mr. Parmar's argument is that the Court must determine the value of the business at the time of the sale in order to determine what the loss is.  The total purchase price argued by the government assumes that the business had no value at all—*which is patently incorrect*—and does not take into account the value received by the buyers when they purchased CHT.

The question for the Court is what investors actually lost, not what they were "induced to pay." *United States v. Banks*, 55 F.4th 246 (3d Cir. 2022). The guidelines contemplate a sentence that takes into

Cooley LLP   55 Hudson Yards   New York, NY   10001-2157
t: +1 212 479 6000  f: +1 212 479 6275  cooley.com

# Cooley

Page Two

consideration the *measurable* pecuniary losses resulting from the offense, *see* USSG § 2B1.1, and as the Third Circuit has "repeatedly emphasized . . . the amount of loss in a fraud case, unlike that in a theft case, often depends on the *actual value received* by the defrauded victim." *United States v. Nathan*, 188 F.3d 190, 210 (3d Cir. 1999) (citing *United States v. Dickler*, 64 F.3d 818, 825 (3d Cir. 1995)) (emphasis added). In other words, the amount paid **minus** the value received.  The question for the Court, and one the government does not answer, is what value was received at the time of the transaction.  Attempting to measure this through a bankruptcy proceeding that did not even commence for over a year after the go-private transaction is not sufficient.  *See, e.g.*, *United States v. Rutkoske*, 506 F.3d 170, 178 (2d Cir. 2007) (considering losses through a date "three months after the end of the charged conspiracy" improperly attributed additional losses to the defendant's conduct).

Here, the investors in the go-private paid $212 million to acquire CHT, an operating business that had over 1,000 employees and nine locations.  Over a year after the go-private transaction, new management decided to put the company into Chapter 11 reorganization, and even though it did not begin liquidating assets until July 2018—*a year and half* after the go-private transaction—it has recovered tens of millions of dollars.  All of this demonstrates that CHT had significant value, which the Government does not even attempt to account for.

This is fundamentally different from the cases the Government cites, where investors received nothing in return for their contributions to the fraudulent enterprise.  *See, e.g.*, *United States v. Lyttle*, 460 F.App'x 3, 10 (2d Cir. 2012) (holding that loss amount in scheme where defendants converted funds immediately upon receipt was equal to the amount paid to defendants); *see also* Indictment, *United States v. Eldridge et al*, 6:05-cr-06116-CJS, ECF No. 1 (W.D.N.Y. Aug. 18, 2005) (explaining that in *Lyttle*, the defendants converted funds solicited from investors for their own use rather than investing them as promised).  The other cases relied upon by the Government are even further afield, insofar as they do not have anything to do with the sale of an operating company.  *See United States v. Georgiou*, 777 F.3d 125 (3d Cir. 2015) (pump and dump scheme); *United States v. Snyder*, 762 F.App'x 118 (3d Cir. 2019) (business for which investments were solicited through false representations had no value).  When there is no

# Cooley

Page Three

underlying asset to value, as the Third Circuit has recognized, the loss can be easily measured by the amount taken from the victims.  *See Nathan*, 188 F.3d at 210.

Here, however, the evidence shows that investors received an operating company in exchange for their $212 million investment.  CC Capital did one year of diligence, visiting all nine offices and interviewing employees.  The company existed for 13 months after the acquisition, operated by CC Capital, not Mr. Parmar; CC Capital itself elected Chapter 11 of the Bankruptcy Code rather than Chapter 7; and the bankruptcy estate has continued to recover assets through orderly sales, with the Trustee's collections to date exceeding $147 million.  The Government does not account for CHT's pre-closing $45 million payment on its loan facility; CHT's $14.6 million contribution of cash to the go-private transaction; or approximately $150.5 million in 2017 revenue, including NYNM, Orion, IPS, Allegiance, and Vachette.  Nor does it account for the pre-bankruptcy offer to purchase CHT for $245 million.  *See* Def's Sentencing Submission, Hemann Decl. Ex. 18.

To make a reasonable estimate of loss that is supported by the record, the Court needs to understand what the value was as of January 30, 2017, before CC Capital ran the company for over a year and then placed it into bankruptcy.  *See Rutkoske*, 506 F.3d at 178.  The Government concedes that it has not engaged in this exercise or provided evidence that would allow the Court to do so, and has thus not sustained its burden of proving loss.  *See United States v. Sponaugle*, 621 F. Supp. 3d 474, 509 (D. Del. 2022) (it is the government's burden to prove loss).

Respectfully Submitted,

*/s/ Andrew Goldstein*
Andrew Goldstein

*/s/ John Hemann*
John Hemann