# PUBLIC VERSION

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

UNITED STATES OF AMERICA,

       Plaintiff,

       v.

PARMJIT PARMAR, a/k/a "Paul Parmar,"

       Defendant.

Crim. No. 2:18-cr-00735 (MCA)

Appeal No. 26-2218 (3d Cir.)

Hon. Madeline Cox Arleo

## EXHIBIT 4

**Causation, Reliance, Reasonable Foreseeability, and Intervening Cause Record**

This is the PUBLIC version of this document. It contains no material concerning Mr. Parmar's medical information or his service to or cooperation with federal law enforcement, and is filed publicly in unredacted form. It is offered solely in support of Mr. Parmar's motion for release pending appeal and alternative stay of surrender.

# EXHIBIT 4

## Causation, Reliance, Reasonable Foreseeability, and Intervening Cause Record

*United States v. Parmjit Parmar, Crim. No. 2:18-cr-00735 (MCA) (D.N.J.)*
*Appeal No. 26-2218 (3d Cir.)*

### Purpose

This exhibit catalogs record evidence showing that the claimed loss and restitution were not automatic consequences of the offense conduct. It identifies evidence relevant to pre-closing knowledge, reliance, reasonable foreseeability, post-closing control, the Chapter 11 reorganization filed more than a year after closing, intervening cause, and the Government's burden to prove Guidelines loss and MVRA restitution causation. Its purpose is limited: it shows why causation and foreseeability required particularized findings before the full investment amount could be attributed as loss. This exhibit is not central to the bail motion. Its function is limited to showing why the appeal is consequential and why restitution and causation issues were not automatic once the amount paid was identified.

This exhibit does **not** contest the guilty plea, relitigate guilt, or assert that no loss occurred. It is offered only to show that causation, reliance, foreseeability, and intervening-cause issues were disputed, record-supported, and required particularized findings before attributing the full investment amount or restitution amount to Mr. Parmar. It assigns no fault to any participant and asserts no bad faith.

# Part A — Executive Summary

1. Guidelines loss and MVRA restitution require causation, not simply proof that money was paid.

2. The record contains pre-closing evidence that sophisticated transaction participants were aware of significant fraud-related risks and diligence issues.

3. KPMG and CC Capital exchanged emails titled "CHT Fraud Related Diligence List," discussing up-coding, cash tracing, transaction testing, overcharging risk, and whether work should be documented "off book" or in a report.

4. DOJ warned Bank of America before closing that the transaction was "setting alarms off," that there was concern someone was attempting to defraud the bank, and that open-source information should be reviewed.

5. CC Capital and its advisors were aware of Financial Times / Alphaville and press scrutiny before closing, including questions about the transaction and public allegations.

6. Bank of America nevertheless continued internal transaction communications immediately before closing, including discussion of BMO, KeyBank, and the status of the deal.

7. Post-closing evidence reflects that the company operated for more than a year, that CC Capital controlled business decisions, that lenders did not foreclose or assume operating control before bankruptcy, and that the bankruptcy was a Chapter 11 reorganization.

8. A January 10, 2018 GSS proposal offered to acquire CHT and repay the secured debt in full, which bears on whether loss was inevitable, foreseeable, or directly caused at closing.

9. Post-closing text messages referenced delays in resuming new business until late February or early March 2018, bearing on post-closing operational decisions and intervening cause.

10. These facts required findings separating transaction inducement from actual loss, proximate causation, reasonable foreseeability, and restitution causation.

---

**Required Findings That Were Missing — Summary**

The full catalog appears in Part F. In summary, the record required, but does not contain, particularized findings on:

- whether the full investment amount was reasonably foreseeable loss;
- whether the transaction-date value received was negligible, given the operating businesses, the going concern, and the later acquisition offer;
- whether post-closing control by the buyer independently caused or increased the loss;
- what portion of the loss was caused by the conspiracy rather than post-closing decisions or the Chapter 11 reorganization; and
- what restitution amount was directly and proximately caused under the MVRA.

## Part B — Master Causation Table

The table below (landscape, following pages) catalogs record evidence with pin cites to the exhibit and Bates numbers of record.

| Date | Document / Ex. | Bates / PageID | Actor(s) | Exact Quote / Record Evidence | Causation / Reliance | Foreseeability / Intervening | Use in Appeal |
|---|---|---|---|---|---|---|---|
| July 20–22, 2016 | Ex. 2 (KPMG) | KPMG-CHT-00002952–56 | Newton; DiBlasi; Truc To; Bertoldo (KPMG) | Subject "CHT Fraud Related Diligence List." KPMG found ~30 transactions where contract rates differed from amounts received (Coastal Pathology, Houston Medical Imaging, EndoChoice, Dept. of Radiology). Newton list: "cash proof vs revenues: tracing cash for the entire year: MOST IMPORTANT," "tie revenue to cash," "journal entry verification," "Any money laundering issues." DiBlasi: "How do you want this work documented? Do you want it 'off book' or in the report? How will the banks react to this in the report?" | Buyer/advisor pre-closing knowledge of fraud-diligence issues | Bears on reliance and foreseeability | Pre-closing knowledge; reliance |
| Oct. 19–20, 2016 | Ex. 3 (KPMG) | KPMG-CHT-00028946–49 | Chu; Newton; DiBlasi; Truc To; Bertoldo | Subject "Revenue coding draft report." Chu asked whether 16 of 19 was "alarming." Truc To: "It's bloody terrifying." Described "high error rate accompanied with units and high dollar value items." KPMG tested high-value invoices and found errors. Newton wrote to Chu re whistleblower law: "all I have is Accretive was large and systemic." | Pre-closing knowledge of revenue-coding / error-rate concerns | Bears on reliance and causation | Pre-closing knowledge |
| Nov. 25, 2016 | Ex. 4 (press) | CCC_PARMAR_0001146–50 | Finsbury; Chu; Newton; DiBlasi | O'Brien wrote that Paul Murphy (FT) intended a market-report mention and possibly a story, focused on Parmar's angle. Finsbury noted FT Alphaville had flagged the Constellation deal. Market commentary: "a very odd company" that "calls for further enquiry." Bloomberg described CHT agreeing to buy Constellation for ~$309.4M. | Pre-closing awareness of public scrutiny | Bears on foreseeability | Pre-closing knowledge |
| Dec. 12, 2016 | Ex. 5 (press) | CCC_PARMAR_0002467–69 | Newton; O'Brien; Parmar | O'Brien wrote the FT U.S. team had been in touch, "slightly odd" suggesting CCH could be more of a focus. Newton forwarded Parmar: "There is a girl here in usa and Paul murphy in london." Newton asked who at the FT had been spoken with. | CC Capital tracking FT inquiries pre-closing | Bears on foreseeability | Pre-closing knowledge |
| Dec. 19–20, | Exs. 6–7 (press) | CCC_PARMAR_ | Newton; | Finsbury reported Alex Scaggs (Alphaville) | Pre-closing awareness of | Bears on | Pre-closing |

| Date | Document / Ex. | Bates / PageID | Actor(s) | Exact Quote / Record Evidence | Causation / Reliance | Foreseeability / Intervening | Use in Appeal |
|---|---|---|---|---|---|---|---|
| 2016 | | 0002460–62; 0001126–28 | Finsbury; Chu | working on a potential story. Sunday Telegraph piece said buyout bids should "set alarm bells ringing"; noted FinnCap forecast 2016 profit $31.6M rising to $41M in 2017; referenced prior statements that the company was worth up to $400M; questioned offer price and shareholder fairness. | public concern and value commentary | foreseeability and value | knowledge; value |
| Jan. 23, 2017 | Ex. 9 (302) | FD-302 dated 01/30/17 | DOJ (Turner); BofA (Witherspoon) | Turner told BofA the "entire transaction was setting alarms off," that there was concern "someone was attempting to defraud Bank of America," referenced open-source information and the Delaware Chancery action, and suggested BofA ensure due diligence. | Direct pre-closing Government warning to lender | Bears on reliance and causation | Government warning; reliance |
| Jan. 27, 2017 | Ex. 10 (302) | FD-302 dated 02/01/17 | BofA (Smith); DOJ (Turner, Hicks, Nguyen, Robeson, Kidd) | DOJ instructed BofA to use its own judgment on the loan and made no recommendation; told Smith he could review public information, including Delaware Chancery C.A. 13006-VCL and the Jan. 25, 2017 preliminary injunction. | Lender left to decide with public-risk information available | Bears on reliance | Government warning |
| Jan. 27, 2017 | Ex. 8 (press) | CCC_PARMAR_0002168 | Ted Stack; Doug Newton | Stack: "Sure you saw this... any truth to the delay?" attaching "The curious case of Constellation Health and Blackstone's former top deal maker." Newton: "No; deal closing Monday, delisting Tuesday." | Decision to proceed despite last-minute press | Bears on reliance and foreseeability | Decision to proceed |
| Jan. 23–28, 2017 | Ex. 11 (BofA) | BANA-DOJ-0003145–48 | Neubauer; Floyd; Paulk; BMO | "Could key bank step in and take out bmo?"; "Not in next 36 hours"; "We aren't underwriting this whole thing"; "I briefed Risk this morning so we are buttoned up on our end"; "BMO is hiding…" | Lenders evaluating risk/syndication immediately pre-closing | Bears on reliance | Lender deliberations |
| Jan. 10, 2018 | Ex. 18 (GSS) | GSS letter at 1–2 | GSS; Chu; CC Capital; lenders | GSS proposed to acquire CHT and repay secured debt; Proposal 1 (entire company), Proposal 2 (majority equity + investment); "In each case, it is contemplated that the Secured Debt would be paid in full." | Post-disclosure willing buyer ~12 months after closing | Bears on whether total / secured-debt loss was inevitable | Intervening cause; value |

| Date | Document / Ex. | Bates / PageID | Actor(s) | Exact Quote / Record Evidence | Causation / Reliance | Foreseeability / Intervening | Use in Appeal |
|---|---|---|---|---|---|---|---|
| Nov. 27, 2017 – early 2018 | Ex. 19 (texts) | Ex. 19, pp. 2–3 | "misha/chinh" thread | "Big guy said the company should be able to resume taking on new business around the end of February or early March. The pressing issues should be cleared by then."; "Yes. Late Feb."; "Anything changes I will update you ASAP." | Post-closing operational control / strategy | Bears on intervening cause | Post-closing control |
| Jan. 26, 2026 | Doc. 328 | at 4–5 | Defense | Government did not adduce evidence of CHT value at the time of the offense; did not account for offers to buy CHT before bankruptcy; defense argued Parmar tried to stop the transaction but CC Capital and lenders proceeded; Government had not proven loss causation. | Preserves causation / value objection | Bears on foreseeability | Preservation |
| Feb. 11, 2026 | Doc. 334 | at 1–2 | Defense | "The Government has not proven any loss"; no evidence of CHT value at the purchase transaction; reliance on bankruptcy a year later; "The Government has not proven loss causation"; CC Capital and lenders knew of accounting problems and proceeded. | Preserves loss-causation / reliance | Bears on foreseeability | Preservation |
| Apr. 2, 2026 | Doc. 341 | at 3–6 | Defense | Government submitted no evidence of CHT valuation at the time of CC Capital's investment or the bank loans; company "run by CC Capital" from closing to mid-2018, Parmar without control; CHT contributed $14,519,935.90 of its own cash to closing; BofA received two DOJ warnings; transaction "was setting alarms off." | Preserves proximate-cause / intervening-cause / value | Bears on foreseeability and intervening cause | Preservation |
| Apr. 27, 2026 | Doc. 344 | PageID 2844–47 | Government | Valuation at acquisition, pre-bankruptcy purchase offers, and bankruptcy asset sales "completely irrelevant" to § 2B1.1 loss; loss depends on the Go-Private Transaction and $212,502,160.25 paid; opposed an evidentiary hearing. | Government position that causation/value evidence did not matter | Creates preserved legal/procedural issue | Government position |
| May 4, 2026 | Doc. 347 | PageID 2857–59 | Defense | Government claimed no obligation to estimate value received; defense argued the Court must determine business value at the | Preserves value-received (Banks) distinction | Separates inducement from loss | Value received |

| Date | Document / Ex. | Bates / PageID | Actor(s) | Exact Quote / Record Evidence | Causation / Reliance | Foreseeability / Intervening | Use in Appeal |
|---|---|---|---|---|---|---|---|
| | | | | time of sale; "The question for the Court is what investors actually lost, not what they were induced to pay." | | | |
| Aug. 28, 2025 | Doc. 306 (PSR) | ¶¶ 58–60, 89–90; PageID 2375, 2380 | Probation | Actual loss $212,502,160.25 (+26); relies on transaction amount and bankruptcy claims rather than transaction-date valuation | Loss enhancement rested on investment amount | Bears on foreseeability / causation findings | Guidelines loss |

# Part C — Pre-Closing Knowledge and Reliance

### A.  CC Capital and KPMG Fraud-Related Diligence

The record reflects a KPMG diligence workstream titled "CHT Fraud Related Diligence List" (Exs. 2–3), addressing revenue-to-cash tracing, up-coding, overcharging risk, and a high error rate, and including the question whether the work would be documented "off book" or in the report and how the banks would react. A later "Revenue coding draft report" exchange reflects the characterization "bloody terrifying" and a discussion of testing high-value invoices.

### B.  Awareness of Press and Public Allegations

The record also reflects pre-closing awareness of press scrutiny—including Financial Times / Alphaville interest and a January 27, 2017 exchange in which a press article was circulated and the response was that the deal was "closing Monday, delisting Tuesday" (Exs. 4–8). This material bears on reliance and reasonable foreseeability only insofar as it shows the transaction participants proceeded with knowledge of public questions about the deal.

### C.  DOJ Warned Bank of America Before Closing

The record reflects that DOJ contacted Bank of America before closing and stated the transaction was "setting alarms off," with concern that "someone was attempting to defraud Bank of America." Ex. 9 (Jan. 23, 2017). A follow-up directed the bank to use its own judgment and pointed to the Delaware Chancery preliminary injunction. Ex. 10 (Jan. 27, 2017).

### D.  Buyers and Lenders Proceeded

Internal lender communications reflect deliberation about syndication and the decision to proceed, including "Could key bank step in and take out bmo?" and "We aren't underwriting this whole thing." Ex. 11. The transaction closed January 30, 2017.

### E.  Legal Significance

These facts do not eliminate guilt or negate the plea. They bear on reliance, loss causation, reasonable foreseeability, and whether the full investment amount can be attributed as actual loss or restitution without particularized findings.

# Part D — Post-Closing Control and Intervening Cause

### A.  CC Capital / Equity Control After Closing

The defense has represented that the company was run by CC Capital from the January 2017 closing until mid-2018 and that Mr. Parmar had no control during that period. Doc. 341 at 6.

### B.  Lender Enforcement

The reviewed record does not identify a foreclosure, debt-control instrument, or lender takeover before the Chapter 11 filing. The exhibit does not ask the Court to decide why no such document appears; it identifies the absence only because it bears on causation and intervening-cause findings.

### C.  The Bankruptcy Was a Chapter 11 Reorganization

The record reflects a Chapter 11 reorganization filed more than a year after closing, with the company operating during the interim. Doc. 341 at 6; Tr. 24. The exhibit takes no position on who authorized the filing or why; it identifies only that the proceeding was a Chapter 11 reorganization commenced more than fourteen months after the transaction closed.

### D.  January 2018 GSS Proposal

A January 10, 2018 GSS proposal contemplated acquisition of CHT and repayment of the secured debt in full under either alternative. Ex. 18. This bears on whether the full secured-debt loss was inevitable or directly caused at closing.

### E.  Post-Closing Operational Decisions

Text messages indicate post-closing decisions about when the company would "resume taking on new business" (Ex. 19), bearing on post-closing operational control during the period the company was under the buyer's control.

### F.  Legal Significance

These facts required findings about whether post-closing control, business decisions, sale strategy, financing choices, or bankruptcy decisions independently caused or increased the loss.

# Part E — Legal Significance for Guidelines Loss and MVRA Restitution

For Guidelines loss, the Government had to prove reasonably foreseeable pecuniary harm resulting from the offense conduct. U.S.S.G. § 2B1.1, cmt. n.3(A). For MVRA restitution, the Government had to prove direct and proximate causation. 18 U.S.C. § 3663A.

The record evidence summarized here bears on: (1) pre-closing knowledge of fraud-related risk by CC Capital, KPMG, and BofA; (2) whether sophisticated parties proceeded despite warnings; (3) whether lenders relied after DOJ warnings; (4) whether the full investment amount was reasonably foreseeable loss; (5) whether bankruptcy-related losses resulted from post-closing decisions or from the Chapter 11 reorganization commenced more than a year after closing; (6) whether restitution required a particularized causation analysis; and (7) whether the Court was required to distinguish transaction inducement from actual pecuniary harm.

*This exhibit does not ask the Court to decide those issues. It shows they were disputed, record-supported, and required findings.*

## Part F — Required Findings That Were Missing

| Issue | Record Evidence | Finding Required | Made? | Appellate Significance |
|---|---|---|---|---|
| What did CC Capital and KPMG know before closing? | KPMG Exs. 2–3 | Knowledge / reliance | No | Bears on reliance and foreseeability |
| What did BofA know after DOJ warnings? | Exs. 9–11 | Knowledge / reliance | No | Bears on loan-loss foreseeability |
| Did BofA proceed on independent judgment after warnings? | Exs. 10–11 | Reliance | No | Reliance element |
| Did CC Capital proceed despite press and Chancery allegations? | Exs. 4–8; Ex. 10 | Reliance | No | Reliance / foreseeability |
| Did the Court make findings addressing reliance or causation after the warnings? | Exs. 9–11 | Reliance finding | No | Element of loss theory |
| Was the full investment amount reasonably foreseeable loss? | Value indicators; going concern | Foreseeability | No | § 2B1.1 requirement |
| Was the company worth zero / value received negligible? | D&P; segment financials; GSS offer | Value finding | No | Value-received element |
| Did post-closing CC Capital control affect loss? | Doc. 341 at 6 | Intervening-cause | No | Attribution of post-closing loss |
| Did lenders foreclose or take control before bankruptcy? | No foreclosure doc identified | Intervening-cause | No | Bankruptcy causation |
| Was Chapter 11 caused by default, enforcement, strategy, or voluntary election? | Ch. 11 reorganization (Doc. 341; Tr.) | Causation | No | Distinguishes offense loss |
| What portion of loss was caused by the conspiracy vs. post-closing decisions? | Operating year; GSS offer; recoveries | Apportionment | No | Core Guidelines question |
| What restitution amount was directly and proximately caused? | Recoveries; restitution figures | Proximate-cause | Not particularized | MVRA requirement |
| Did the Court distinguish inducement from loss causation? | Tr. 23–28 ruling | Methodological | No (alt. finding only) | Central preserved issue |
| Did the Court make MVRA proximate-cause findings? | Restitution order | Proximate-cause | Not particularized | MVRA requirement |

## Part G — Quotation Appendix

### A.  KPMG / CC Capital Fraud-Diligence Emails

*"How do you want this work documented? Do you want it 'off book' or in the report? How will the banks react to this in the report?"*
Ex. 2 (R. DiBlasi), KPMG-CHT-00002952–55 (July 2016). [Pre-closing knowledge]

*"It's bloody terrifying."*
Ex. 3 (Truc To), KPMG-CHT-00028946–49 (Oct. 2016). [Pre-closing knowledge] [Reliance]

### B.  Press / Financial Times

*"No; deal closing Monday, delisting Tuesday."*
Ex. 8 (D. Newton), CCC_PARMAR_0002168 (Jan. 27, 2017). [Reliance] [Reasonable foreseeability]

### C.  DOJ / BofA Warnings

*"the entire transaction was setting alarms off, and there was a concern that someone was attempting to defraud Bank of America."*
Ex. 9 (Witherspoon 302, Jan. 23, 2017). [Government warning] [Reliance]

### D.  BofA Internal Communications

*"Could key bank step in and take out bmo?"*
Ex. 11; BANA-DOJ-0003145 (Jan. 28, 2017). [Reliance] [Reasonable foreseeability]

### E.  GSS Proposal

*"In each case, it is contemplated that the Secured Debt would be paid in full."*
Ex. 18 (GSS letter, Jan. 10, 2018). [Intervening cause] [Reasonable foreseeability]

### F.  Post-Closing Texts

*"the company should be able to resume taking on new business around the end of February or early March. The pressing issues should be cleared by then."*
Ex. 19 (text thread, Nov. 27, 2017). [Post-closing control] [Intervening cause]

### G.  Defense Sentencing and Loss Filings

*"a company worth nothing on January 30, 2017 somehow funded its own $14.5 million closing contribution that same day; attracted a $240 million acquisition offer fourteen months later; operated for over a year after the closing, controlled by CC Capital …"*
Doc. 341 at 6 (Apr. 2, 2026). [Post-closing control] [Guidelines loss causation]

### H.  Government Position

*"any evidence regarding the 'valuation of CHT at the time of the acquisition' … [is] completely irrelevant to the loss amount under § 2B.1.1."*
Doc. 344 at 3, PageID 2846. [Government burden]

## Part H — Limitations

1. This exhibit does not contest Mr. Parmar's guilty plea.

2. This exhibit does not deny that false statements occurred.

3. This exhibit does not ask the Court to find that no loss occurred.

4. This exhibit does not assign fault to CC Capital, KPMG, Bank of America, the lenders, or post-closing management.

5. This exhibit does not rely on speculation; each item is tied to a cited source of record.

6. This exhibit is limited to identifying record evidence bearing on causation, reliance, reasonable foreseeability, intervening cause, Guidelines loss, MVRA restitution, and the need for particularized findings before attributing the full investment amount or restitution amount to Mr. Parmar.