# PUBLIC VERSION

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

UNITED STATES OF AMERICA,

Plaintiff,

v.

PARMJIT PARMAR, a/k/a "Paul Parmar,"

Defendant.

Crim. No. 2:18-cr-00735 (MCA)

Appeal No. 26-2218 (3d Cir.)

Hon. Madeline Cox Arleo

## EXHIBIT 8

**Bankruptcy-Sale Value Is Not Transaction-Date Going-Concern Value**

This is the PUBLIC version of this document. It contains no material concerning Mr. Parmar's medical information or his service to or cooperation with federal law enforcement, and is filed publicly in unredacted form. It is offered solely in support of Mr. Parmar's motion for release pending appeal and alternative stay of surrender.

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

**UNITED STATES OF AMERICA v. PARMJIT PARMAR**
Crim. No. 2:18-cr-00735 (MCA) | Third Circuit Appeal No. 26-2218

# EXHIBIT 8

**Why Bankruptcy-Sale Value Is Not a Substitute for Transaction-Date**
**Going-Concern Value**

Research Survey, Professional Literature Review, and Distress-Valuation Analysis

## PURPOSE AND SCOPE

This Exhibit is not offered to determine the value of Constellation Healthcare Technologies, Inc. ("CHT"). It is not offered to establish a Guidelines loss amount. It is not offered as an expert valuation opinion. It is not offered to relitigate sentencing. This Exhibit explains why the Court need not decide CHT's value to recognize that the missing transaction-date valuation issue is substantial.

This Exhibit is offered solely to demonstrate five propositions, each drawn from the published academic and professional valuation literature:

First, sophisticated valuation professionals recognize a substantial conceptual and empirical difference between the going-concern value of a business as of a transaction date and the price the same business later fetches in a bankruptcy sale.

Second, distress, restructuring, insolvency risk, customer attrition, employee departures, vendor uncertainty, lender pressure, reputational impairment, and the bankruptcy process itself can materially alter value between those two dates.

Third, the professional literature routinely treats bankruptcy value as a distinct analytical concept from transaction-date fair market value, governed by a different premise of value.

Fourth, the documented existence and magnitude of those differences demonstrate why a transaction-date valuation presents a substantial and consequential question.

Fifth, a later bankruptcy-sale price therefore cannot automatically substitute for a transaction-date valuation; the substitution itself requires analysis of whether the later distressed price reliably reflects the earlier transaction-date value.

Part III of this Exhibit presents the question from the perspectives of seven professional disciplines. Those perspectives are analytical syntheses of the published literature identified in Part II, organized by discipline for clarity. They are not statements of any retained expert, and no individual is quoted or identified except through the published works cited.

## PART I — EXECUTIVE SUMMARY

The academic finance literature, the empirical legal literature, and the professional valuation standards converge on a single proposition: the price realized for a business in or near bankruptcy frequently differs materially from the going-concern value of the same business at an earlier transaction date. The direction of any difference is case-specific. The magnitude of any difference is case-specific. But the existence of the distinction is widely recognized.

The recognized mechanisms are well documented. Assets sold under financial distress fetch prices below their value in best use because the natural buyers are often impaired at the same time (Shleifer & Vishny 1992). Distressed sellers of even standardized, mobile assets accept discounts of 10 to 30 percent, deepening to 25 to 35 percent in Chapter 11 and Chapter 7 (Pulvino 1998). Acquirers purchase bankrupt companies at an average 45 percent discount to prices paid for comparable non-bankrupt targets in the same industry (Hotchkiss & Mooradian 1998). Going-concern bankruptcy sales of large public companies recover roughly 35 percent of book value, against fresh-start reorganization values of roughly 80 percent and post-reorganization market values of roughly 91 percent (LoPucki & Doherty 2007). Financial distress itself destroys an estimated 10 to 20 percent of firm value before any sale occurs (Andrade & Kaplan 1998). And even careful, professionally prepared valuations of bankrupt firms disperse from below 20 percent to above 250 percent of realized market value (Gilson, Hotchkiss & Ruback 2000).

From these findings the literature draws the conclusion this Exhibit is offered to establish: a later bankruptcy-sale price generally cannot answer the question of what a business was worth on an earlier transaction date. Answering that question ordinarily requires a transaction-date valuation, under a going-concern premise of value, using the information and market conditions of the transaction date, or specific findings explaining why later distressed values reliably measure earlier going-concern value. The substitution of a later distressed outcome for that analysis is not a shortcut the valuation profession recognizes.

## PART II — RESEARCH SURVEY

The following survey identifies authoritative academic, professional, and court-recognized sources. For each, the survey states the source, the principle it establishes, and its relevance to the distinction between transaction-date going-concern value and bankruptcy-sale value. Quotations are limited and verbatim; all other descriptions are paraphrases of the cited works.

### A. Academic Finance Literature

**Source.** Andrei Shleifer & Robert W. Vishny, Liquidation Values and Debt Capacity: A Market Equilibrium Approach, 47 Journal of Finance 1343 (1992).

**Principle.** When a firm in financial distress must sell assets, the most natural buyers — industry peers — are frequently distressed at the same time, leading to "asset sales at prices below value in best use." This is the foundational model of the fire-sale discount.

**Relevance.** Establishes, at the level of equilibrium theory, that distressed-sale prices are systematically depressed relative to fundamental value. A sale price obtained under distress is not a neutral measurement of what the business was worth before the distress.

**Source.** Todd C. Pulvino, Do Asset Fire Sales Exist? An Empirical Investigation of Commercial Aircraft Transactions, 53 Journal of Finance 939 (1998).

**Principle.** Studying 467 commercial aircraft transactions — standardized, mobile, internationally tradable assets — Pulvino found that financially constrained airlines sold at average discounts on the order of 10 to 20 percent, with discounts of approximately 25 to 35 percent for airlines operating in Chapter 11 and Chapter 7, and discounts of roughly 30 percent on recession-period sales to financial buyers.

**Relevance.** If even fungible hard assets with deep secondary markets sell at double-digit discounts under distress, the discount for an operating service business — whose value resides in customers, contracts, and people — can only be expected to be larger and more volatile.

**Source.** Gregor Andrade & Steven N. Kaplan, How Costly Is Financial (Not Economic) Distress? Evidence from Highly Leveraged Transactions That Became Distressed, 53 Journal of Finance 1443 (1998).

**Principle.** Financial distress itself — separate from any underlying economic deterioration — destroys an estimated 10 to 20 percent of firm value, with conservative bounds up to 23 percent, concentrated in the period after distress begins and before Chapter 11.

**Relevance.** Quantifies the wedge that the distress process drives between pre-distress value and the value available by the time of a bankruptcy disposition. The wedge exists even when the business itself remains economically sound.

**Source.** Edward I. Altman, A Further Empirical Investigation of the Bankruptcy Cost Question, 39 Journal of Finance 1067 (1984).

**Principle.** Combined direct and indirect bankruptcy costs are frequently greater than 20 percent of firm value.

**Relevance.** An independent, earlier quantification of the same wedge: the bankruptcy process consumes a material fraction of enterprise value before any sale price is struck.

**Source.** Stuart C. Gilson, Edith S. Hotchkiss & Richard S. Ruback, Valuation of Bankrupt Firms, 13 Review of Financial Studies 43 (2000).

**Principle.** Comparing professionally prepared cash-flow-based valuations of firms reorganizing in bankruptcy against realized market values, the authors found the estimates generally unbiased but "the dispersion of valuation errors is very wide" — from less than 20 percent to greater than 250 percent of market value — with errors correlated to claimholders' strategic incentives to overstate or understate value.

**Relevance.** Demonstrates that valuation in the bankruptcy environment is uniquely unreliable and incentive-laden. Numbers generated in bankruptcy — whether plan values, sale prices, or litigation positions — are products of a negotiation environment, not neutral measurements of value at an earlier date.

**Source.** Edith S. Hotchkiss & Robert M. Mooradian, Acquisitions as a Means of Restructuring Firms in Chapter 11, 7 Journal of Financial Intermediation 240 (1998).

**Principle.** Across a sample of 55 acquisitions in Chapter 11, bankrupt targets were purchased at an average 45 percent discount relative to prices paid for non-bankrupt targets in the same industry, even where multiple informed bidders competed.

**Relevance.** Direct empirical measurement of the bankruptcy discount at the whole-company level: the identical kind of asset — an operating company — transacts at roughly half price once it carries the bankruptcy label, competition notwithstanding.

**Source.** David T. Brown, Christopher M. James & Robert M. Mooradian, Asset Sales by Financially Distressed Firms, 1 Journal of Corporate Finance 233 (1994).

**Principle.** Asset sales by financially distressed firms are heavily influenced by creditor pressure; creditors significantly shape liquidation decisions, and shareholder returns are lower when proceeds repay debt.

**Relevance.** Shows that distressed-sale outcomes reflect the priorities and time horizons of creditors — speed and certainty of recovery — rather than maximization of enterprise value, further severing the link between sale price and earlier going-concern value.

**Source.** Joshua Coval & Erik Stafford, Asset Fire Sales (and Purchases) in Equity Markets, 86 Journal of Financial Economics 479 (2007).

**Principle.** Forced sales by constrained sellers depress prices by roughly 8 to 10 percent even in highly liquid public equity markets.

**Relevance.** Confirms that the fire-sale phenomenon operates even where liquidity is greatest; its force in the sale of an entire private operating company is correspondingly greater.

**Source.** Aswath Damodaran, Valuing Declining and Distressed Companies (NYU Stern working paper, 2009); Damodaran on Valuation ch. 17 (2d ed. 2006).

**Principle.** Conventional valuation is "built on the presumption that firms are going concerns"; once distress intervenes, going-concern methods and distressed outcomes diverge, and distress-sale proceeds cannot be assumed equal to the present value of expected cash flows. Distress-sale value is treated throughout as a separate analytical input, typically estimated as a fraction of going-concern or book value.

**Relevance.** The leading academic valuation reference treats going-concern value and distress-sale value as different quantities requiring different analyses. One cannot be read off the other.

### B. Empirical Legal Literature

**Source.** Lynn M. LoPucki & Joseph W. Doherty, Bankruptcy Fire Sales, 106 Michigan Law Review 1 (2007); LoPucki & Doherty, Bankruptcy Vérité, 106 Michigan Law Review 721 (2008).

**Principle.** Comparing going-concern bankruptcy sales of 25 large public companies with reorganizations of 30 comparable companies (2000–2004), and controlling for asset size and EBITDA, the authors found that companies sold in bankruptcy yielded on average approximately 35 percent of book value, against fresh-start reorganization values of approximately 80 percent and post-reorganization market capitalizations of approximately 91 percent; reorganization recoveries were more than double sale recoveries.

**Relevance.** The most prominent empirical study of whole-company bankruptcy sales concludes that the bankruptcy sale process itself — even for going concerns — systematically realizes a fraction of the value the same enterprises command outside that process.

**Source.** James J. White, Bankruptcy Noir, 106 Michigan Law Review 691 (2008); B. Espen Eckbo & Karin S. Thorburn, Automatic Bankruptcy Auctions and Fire-Sales, 89 Journal of Financial Economics 404 (2008).

**Principle.** Professor White contested LoPucki and Doherty's magnitudes using a different valuation methodology. Eckbo and Thorburn, studying Sweden's automatic bankruptcy-auction system, found evidence consistent with fire-sale discounts when the auction leads to piecemeal liquidation, but not when the bankrupt firm is acquired as a going concern within that mandatory-auction regime.

**Relevance.** Cited here for a limited and important point: the relationship between bankruptcy-sale prices and underlying value is the subject of live, sophisticated professional debate. Scholars dispute the size of the discount and the process conditions under which it appears; none of them treats a bankruptcy-sale price as an automatic proxy for value at an earlier date. The existence of the debate is itself evidence that the question is substantial, and the process-dependence of the Eckbo-Thorburn result confirms that any inference from a bankruptcy price requires case-specific analysis.

### C. Professional Restructuring and Advisory Practice

The major restructuring advisory and valuation firms maintain dedicated distressed-valuation practices and methodologies that distinguish going-concern value from distressed and liquidation value as a matter of course. The recovery studies published in this field track creditor recoveries as a function of process and timing precisely because realized bankruptcy values are understood to depend on the disposition process, not solely on the underlying business.

Mercer Capital, a court-recognized business valuation firm, summarizes the professional consensus on the premise of value in restructuring: the premise of value — going concern versus orderly or forced liquidation — is the "swing consideration" for distressed businesses, because the

same enterprise carries materially different values under different premises. (Mercer Capital, Premise of Value: Why It Is a Critical Aspect of Business Continuity and Financial Restructuring.)

## D. Court-Recognized Valuation Standards and Treatises

**Source.** Shannon P. Pratt, Valuing a Business: The Analysis and Appraisal of Closely Held Companies (5th ed. 2008).

**Principle.** The leading treatise in the field, repeatedly relied upon by federal courts, distinguishes premises of value and describes liquidation value and going-concern value as conceptual opposites: liquidation value measures the net amount realizable if the business is terminated and its assets sold off, while going-concern value measures the enterprise as a continuing operation.

**Relevance.** The foundational professional text places going-concern value and liquidation-type value at opposite analytical poles. A valuation conclusion under one premise does not answer a question posed under the other.

**Source.** International Valuation Glossary — Business Valuation (2021), adopted jointly by the American Society of Appraisers, the American Institute of Certified Public Accountants, the CBV Institute, the National Association of Certified Valuators and Analysts, and the Royal Institution of Chartered Surveyors.

**Principle.** Defines going-concern value as a premise of value assuming "an ongoing commercial enterprise with a reasonable expectation of future earning power," and separately defines orderly liquidation value and forced liquidation value, with forced liquidation — sale as quickly as possible, often by auction — generally the lowest of the three.

**Relevance.** The profession's joint standard-setting bodies codify the distinction at issue: the premise of value is an explicit, threshold analytical choice, and forced or expedited dispositions occupy the bottom of the value hierarchy by definition.

**Source.** AICPA Statement on Standards for Valuation Services No. 1 (VS Section 100); ASA Business Valuation Standards.

**Principle.** Both governing professional standards require the appraiser to identify the premise of value and the valuation date as threshold elements of any conforming engagement, because conclusions of value are valid only as of a specific date and under a specified premise.

**Relevance.** Under the standards governing every credentialed appraiser in the United States, "value" is meaningless without a date and a premise. A figure generated in a later forced disposition does not, and under the standards cannot, answer a question about fair market value on an earlier date under a going-concern premise.

## PART III — THE VALUATION QUESTION FROM SEVEN PROFESSIONAL PERSPECTIVES

**The framing question.** If a service business with few hard assets sells in bankruptcy for $50 million, can one conclude that it was worth only $50 million eighteen months earlier?

The perspectives below address that question from seven professional disciplines. Each is an analytical synthesis of the published literature surveyed in Part II, organized by the discipline whose published work it reflects. No perspective is the statement of a retained expert, and none values CHT or any actual company.

**1. The strategy-consulting restructuring perspective. Restructuring practice treats value as path-dependent.** Between a transaction date and a bankruptcy disposition, the enterprise typically passes through stages — covenant pressure, vendor tightening, management turnover, customer flight — each of which destroys value the business possessed at the start of the path. The Andrade-Kaplan finding that financial distress alone consumes 10 to 20 percent of firm value, concentrated before Chapter 11 even begins, reflects what restructuring practitioners observe operationally: by the time a sale occurs in bankruptcy, the asset being sold is no longer the asset that existed eighteen months earlier. The $50 million answer therefore measures the endpoint of a value-destruction path, not the starting point.

**2. The corporate-turnaround perspective. Turnaround practice distinguishes economic distress from financial distress precisely because financially distressed businesses are often economically sound.** A company can carry positive operating margins into distress, as the firms in the Andrade-Kaplan sample did, and still suffer forced asset sales, capital-expenditure cuts, and managerial paralysis that depress its realizable price. Inferring earlier worthlessness, or earlier low value, from a later distressed price conflates the two forms of distress — the precise analytical error the turnaround literature exists to correct.

**3. The restructuring-practice-leadership perspective. Process design drives realized price.** The empirical legal literature — LoPucki and Doherty's finding that bankruptcy sales realized roughly 35 percent of book value while reorganizations of comparable companies realized 80 to 91 percent — shows that two dispositions of similar enterprises in the same period yield prices differing by a factor of two or more depending solely on the exit route chosen. Where the route, the timing, and the marketing process determine half or more of the outcome, the outcome cannot be attributed to the intrinsic value of the business at an earlier date.

**4. The forensic restructuring-advisory perspective. Numbers generated inside a bankruptcy are advocacy artifacts.** Gilson, Hotchkiss, and Ruback documented that even professionally prepared valuations in bankruptcy range from below 20 percent to above 250 percent of realized value, and that the errors track the strategic incentives of the parties sponsoring them. Senior creditors benefit from low values; junior claimants and equity from high ones; buyers from low ones. A sale price negotiated in that environment embeds those incentives, plus the debtor-in-

possession financing pressures and timeline constraints of the case. Treating such a figure as a neutral measurement of value at a prior date is contrary to the empirical record of how bankruptcy values are produced.

**5. The restructuring-valuation (investment banking) perspective. Buyer universe determines price, and bankruptcy shrinks the buyer universe.** Strategic buyers who would pay for synergies and control at a healthy company's auction frequently will not bid on a Chapter 11 asset — because of diligence constraints, successor-liability concerns, employee and customer flight risk, and the stigma of the process — leaving financial buyers who price to a distressed return threshold. Hotchkiss and Mooradian's 45 percent average discount for bankrupt targets, observed even with multiple bidders, is the measured consequence. Pulvino's aircraft data show the same dynamic for assets far more liquid than an operating company: when constrained sellers meet a thinned buyer pool, prices fall 10 to 35 percent below value even for fungible hard assets.

**6. The academic distressed-M&A perspective. The theoretical foundation is Shleifer and Vishny: distressed sales occur at prices below value in best use because the highest-value users are unavailable as buyers at exactly the moment of sale.** The empirical literature — Pulvino on aircraft, Coval and Stafford on equities, Campbell, Giglio, and Pathak on forced real-estate sales, Hotchkiss and Mooradian on whole companies — confirms the prediction across every asset class studied, with discounts ranging from roughly 8 percent in the most liquid markets to roughly 45 percent for bankrupt operating companies. The direction and size of any particular discount are case-specific, which is precisely why the literature requires a valuation as of the relevant date rather than an inference from a later forced outcome.

**7. The forensic-accounting perspective. Professional standards make the inference impermissible as a matter of method.** Every conforming valuation must specify a valuation date and a premise of value; going-concern value and forced-liquidation value are defined as distinct premises, with the treatise literature describing them as antithetical. A forensic accountant asked to opine on transaction-date value who instead reported a later bankruptcy-sale price would not have performed a defective valuation; he would not have performed a valuation at all. The standards do not permit a conclusion under one premise and date to be re-labeled as a conclusion under another.

### Synthesis of the seven perspectives

Each discipline reaches the same answer to the framing question by a different route: no. A $50 million bankruptcy-sale price for a service business establishes what a distressed process, a thinned buyer pool, and a creditor-driven timeline yielded at the moment of sale. It does not establish — and under professional standards cannot establish — what the business was worth as an operating going concern eighteen months earlier. Customer attrition, employee departures, vendor uncertainty, market rumors, distress and liquidity discounts, bankruptcy stigma, forced-sale dynamics, debt overhang, management distraction, the loss of strategic buyers, DIP-process effects, and credit impairment each intervene between the two dates, and each is documented in the literature surveyed in Part II.

## PART IV — DISTRESS-DISCOUNT RESEARCH: SUMMARY TABLE

The table below compiles the principal empirical findings surveyed in Part II. Ranges are as reported in the cited works or in published syntheses of them; the figures illustrate the documented magnitude of distress effects and are not applied to any company in this case.

| Research Source | Observed Effect | Typical Range | Comments |
|---|---|---|---|
| Shleifer & Vishny (1992), J. Fin. | Fire-sale prices below value in best use when industry buyers are constrained | Theoretical foundation | Equilibrium model underlying the empirical literature |
| Pulvino (1998), J. Fin. | Distressed airlines' aircraft sale discounts | 10–20% avg.; 25–35% in Ch. 11/7; ~30% to financial buyers in downturns | Standardized, liquid hard assets; operating businesses are less liquid |
| Hotchkiss & Mooradian (1998), J. Fin. Intermediation | Purchase-price discount for bankrupt whole-company targets vs. same-industry non-bankrupt targets | ~45% average | Observed even with multiple informed bidders |
| LoPucki & Doherty (2007), 106 Mich. L. Rev. 1 | Bankruptcy going-concern sale recoveries vs. reorganization values, large public companies | Sales ~35% of book value vs. ~80–91% in reorganization | Reorganization recoveries more than double sale recoveries, controlling for size and EBITDA |
| Andrade & Kaplan (1998), J. Fin. | Value destroyed by financial distress itself (direct + indirect) | 10–20% of firm value (≤23%) | Concentrated after distress onset, before Ch. 11 filing |
| Altman (1984), J. Fin. | Combined direct and indirect bankruptcy costs | Frequently >20% of firm value | Early, independent quantification |
| Coval & Stafford (2007), J. Fin. Econ. | Forced-sale price impact in liquid public equity markets | ~8–10% | Floor case: maximum liquidity, minimum discount |
| Campbell, Giglio & Pathak (2011), 101 Am. Econ. Rev. 2108 | Forced-sale discount, foreclosed residential real estate | ~27% average | Forced-sale effect in a broad, active asset market |
| Gilson, Hotchkiss & Ruback (2000), Rev. Fin. Stud. | Dispersion of professional valuations of bankrupt firms vs. realized values | <20% to >250% of market value | Errors correlated with claimholders' strategic incentives |
| Eckbo & Thorburn (2008), 89 J. Fin. Econ. 404 | Fire-sale discounts in Sweden's automatic bankruptcy auctions | Discounts in piecemeal liquidations; none found in going-concern acquisitions | Shows the discount is process- and case-specific; cited to evidence live professional debate |

Three features of this body of research bear emphasis. First, the discount appears in every asset class studied, from the most liquid (public equities) to the least (whole operating companies), and grows as liquidity falls. Second, the largest measured discounts attach to exactly the category at issue in the framing question: entire businesses sold in bankruptcy. Third, the literature also documents going-concern premiums, control premiums, and strategic-synergy value available outside distress — components of transaction-date value that the bankruptcy process forfeits by construction. The bankruptcy price is therefore not a noisy estimate of earlier going-concern value; it is an estimate of a different quantity.

## PART V — WHY SERVICE BUSINESSES ARE UNIQUELY SENSITIVE TO DISTRESS

The empirical findings above understate the distress effect for service businesses, for reasons the literature identifies directly.

**The assets walk out the door.** A service company's value resides principally in intangibles: customer relationships and contracts, a trained workforce, institutional knowledge, vendor relationships, and reputation. The professional glossaries define going-concern value by reference to exactly these elements — a trained workforce, operational systems, licenses, and procedures in place. Unlike aircraft or real estate, these assets cannot be repossessed, warehoused, or sold piecemeal at a modest discount. They attrite.

**Distress is self-reinforcing for service firms.** Once distress becomes known or rumored, customers with continuing service needs begin migrating to stable providers; the strongest employees — the most marketable — leave first; vendors tighten terms, draining liquidity precisely when it is scarcest; and counterparties discount the firm's future performance into every renewal negotiation. Each departure of a customer or key employee lowers the value of what remains, accelerating the next departure. The expectation of bankruptcy can therefore destroy service-business value before any filing occurs, which is consistent with the Andrade-Kaplan finding that distress costs concentrate in the pre-petition period.

**Future revenue is the value, and distress taxes future revenue.** Going-concern value for a service business is overwhelmingly the present value of expected future revenue from relationships in place. Distress attacks that expectation directly: it shortens the assumed customer life, raises the discount rate, and removes the growth assumptions a healthy-company buyer would pay for. The same EBITDA stream commands a different multiple from a strategic acquirer of a stable platform than from a financial buyer of a distressed asset.

**Consequence.** For a service business with few hard assets, the gap between transaction-date going-concern value and later bankruptcy-sale value is at its widest, because nearly everything a healthy-company buyer pays for — the workforce, the customer base, the expectation of future earning power — is what distress consumes first. The framing question of Part III is therefore at its strongest in precisely the service-business setting.

## PART VI — WHY THIS MATTERS TO THE APPEAL

This Exhibit does not contend that CHT was worth any particular amount. It contends only that the question the defense preserved — what value was received as of the January 30, 2017 transaction date — is real, consequential, and professionally recognized, and that it cannot be answered by pointing to later bankruptcy outcomes.

**The question is real.** An entire professional and academic apparatus — premises of value, valuation-date requirements, distressed-valuation methodologies, fire-sale and bankruptcy-discount research — exists because transaction-date going-concern value and later distressed value are different quantities. This is not a distinction invented for litigation; it is codified in the standards governing every credentialed appraiser.

**The question is consequential.** The documented gaps are not rounding error. Whole bankrupt companies transact at an average 45 percent discount to comparable non-bankrupt targets; bankruptcy sales of large public companies realize roughly a third of book value where reorganizations realize 80 to 91 percent; distress alone consumes 10 to 20 percent of value before any sale. Differences of this magnitude span multiple Guidelines loss brackets. A methodology indifferent to them is indifferent to the variable that drives the offense level.

**The question is professionally contested terrain, not a frivolous quibble.** Leading scholars actively debate the size and conditions of bankruptcy discounts — LoPucki and Doherty against White; Eckbo and Thorburn against the fire-sale consensus for going-concern auctions. Where the academy itself debates how far bankruptcy prices depart from underlying value, the proposition that a court may treat the relationship as requiring no analysis at all is, at minimum, fairly debatable.

**The question cannot be answered by the later bankruptcy.** That conclusion is not only the uniform teaching of the literature surveyed here; it is consistent with the observation of the bankruptcy court in the related proceedings that the post-bankruptcy auction did not determine the value of the entities' assets at the time of the going-private transaction. (Feb. 27, 2025 defense letter brief at 5, filed as an attachment to the April 2, 2026 defense letter brief, ECF No. 341, quoting Hr'g Tr., Ex. 17, at 84:15–18.) The bankruptcy judge's observation and the professional literature say the same thing: the later price answers a different question.

It follows that the preserved appellate issue — whether the Government was required to prove transaction-date value received before the full purchase price could be treated as actual loss, and whether the district court was required to make findings on that question — is substantial within the meaning of the governing release-pending-appeal standard. This Exhibit supplies the professional-literature foundation for that conclusion; it supplies nothing else.

This Exhibit operates in concert with its companions: Exhibit 3 shows why the transaction-date valuation issue is substantial; Exhibit 7 shows why it is consequential; this Exhibit explains why bankruptcy-sale value cannot substitute for the missing transaction-date valuation.

## PART VII — LIMITATIONS

This Exhibit does not determine CHT's value. It does not determine a Guidelines loss amount. It does not offer an expert opinion, and no statement in it is the opinion of a retained or testifying expert. It does not resolve the appeal, and it does not ask any court to find any valuation fact.

The figures reported in Parts II and IV are the published findings of the cited studies, reported for the proposition that material differences between transaction-date going-concern value and bankruptcy-sale value are documented and professionally recognized. The direction and magnitude of any difference in any particular case — including this one — are case-specific and would require a transaction-date valuation to determine. That is the point.

## FINAL SYNTHESIS

Professional valuation literature overwhelmingly recognizes that bankruptcy-sale value and transaction-date going-concern value are different analytical concepts, governed by different premises of value, measured as of different dates, and produced by different market processes. The empirical record documents discounts ranging from roughly 10 percent for liquid hard assets sold under constraint to roughly 45 percent or more for whole companies sold in bankruptcy, alongside 10 to 20 percent of value consumed by the distress process itself before any sale. The magnitude and direction of any difference is case-specific, but the existence of the distinction is widely accepted and codified in the profession's governing standards. Consequently, a later bankruptcy-sale price cannot automatically answer the transaction-date valuation question that underlies the preserved appellate issue in this case. Answering that question requires the valuation that was never performed.