**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

UNITED STATES OF AMERICA,                     Crim. No. 2:18-cr-00735 (MCA)

        Plaintiff,                         Appeal No. 26-2218 (3d Cir.)

        v.                               Hon. Madeline Cox Arleo

PARMJIT PARMAR, a/k/a "Paul Parmar,"

        Defendant.

---

**DEFENDANT'S REPLY IN SUPPORT OF MOTION FOR RELEASE PENDING
APPEAL AND ALTERNATIVE STAY OF SURRENDER**

This document is submitted under seal. ██████████████████████

███████████████████████████████████████████████

████████████████████████████████ It is filed under seal to protect

against public disclosure of that information. The document is offered solely in support of Mr. Parmar's

motion for release pending appeal and alternative stay of surrender, and not to relitigate guilt, sentencing,

valuation, or loss. Unredacted copies will be provided to the Court and the Government.

**PRELIMINARY STATEMENT**

The Government's opposition asks the Court to treat outdated credibility concerns as dispositive of present flight risk, to impugn Defendant's statutory right to seek release pending appeal as a delay tactic, and to read the statutory reduced-sentence pathway in § 3143(b)(1)(B)(iv) out of the statute. None of those positions answers the question the statute actually poses. The Government's invocation of the post-conviction presumption is correct but incomplete: § 3143(b) creates a burden, not a prohibition, and the question is whether this specific record satisfies that burden.

Three points frame this reply. First, the Motion seeks a determination under 18 U.S.C. § 3143(b). Second, seeks a determination of actual loss; not whether the loss exceeded $150,000,

1

but whether the Government proved *any* cognizable actual loss after accounting for the value the victims received. Third, the alternative stay request for a temporary stay is modest and not novel. It allows time for an orderly adjudication prior to terminating Defendant's freedom

This is not a request for trust. It is a request for a statutory determination under conditions stricter, clearer, and more readily verifiable by Pretrial Services than any that have governed Mr. Parmar to date. The Court may remain fully confident in its sentence and still recognize that the appeal presents a substantial question that is fairly debatable for § 3143(b) purposes. The two inquiries are distinct. *See United States v. Messerlian*, 793 F.2d 94, 97 (3d Cir. 1986) (finding the issues "sufficiently substantial" for release while "expressly intimat[ing] no views with respect to the merits").

**The essence of Defendant's position is as follows:**

1.  Whether transaction-date valuation is legally irrelevant is substantial a substantial legal question.

2.  If the value of CHT at the time of merger is relevant, a valuation hearing was required.

3.  A short stay preserves the status quo with no prejudice to the Government.

## I.    The Government's Opposition Does Not Properly Apply the Statutory Criteria

Section 3143(b) makes detention the default but makes release *mandatory* if the statutory criteria are satisfied. The defendant need not show likely success on appeal. The substantial-question standard is whether the issue is "fairly debatable," not whether reversal is probable; the court is "not to be put in the position of 'bookmakers' who trade on the probability of ultimate outcome." *United States v. Miller*, 753 F.2d 19, 23 (3d Cir. 1985); *United States v. Smith*, 793 F.2d 85, 89–90 (3d Cir. 1986). And the "likely to result" element does not ask the court to predict reversal; it assumes that if there is a substantial question, that it is resolved in the defendant's favor. *Miller*, 753 F.2d at 23–24.

## II.   Historical Trust Concerns Do Not Prove Current Flight Risk.

Mr. Parmar does not minimize the Court's 2024 concerns.



Prior Decl. ¶¶ 4–7, 14, 18, 36–

37, 43. [1]Those failures justify tighter and more readily verifiable conditions. They do not establish that Mr. Parmar is likely to flee now. Credibility concerns may justify stricter conditions; they do not answer the statutory question whether current conditions can reasonably assure appearance. The record proves they can.

The declaration also corrects the specific factual premises the opposition repeats. It states that Mr. ██████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████ Prior Decl. ¶¶ 11–13. As to the July 25, 2024 JFK event, the declaration states that he was a passenger returning from a court appearance in the Eastern District of New York, asleep in a vehicle that stopped briefly so another passenger could exit; he did not enter security, board any aircraft, possess or use any travel document, or tamper with his GPS bracelet. Prior Decl. ¶¶ 26–34; 2d Supp. Decl. ¶ 103. The other July 2024 stops the petition referenced were all GPS-recorded, and Mr. Parmar remained on monitoring throughout each. Prior Decl. ¶¶ 38–44; 2d Supp. Decl. ¶¶ 91–93. ██████████████████ ███████████████████████████████████████████████████████ ███████████████████████████████████████████████ Prior Decl. ¶¶ 19–25. The common thread is the opposite of the one the Government draws: in each episode the GPS record disclosed Mr. Parmar's location, Pretrial Services identified the issue, and the conditions were tightened. That is supervision functioning, not supervision failing.

The current-risk record is what governs the § 3143(b)(1)(A) finding, and the Government's chronology stops exactly where that analysis begins. The 2024 issues resulted in stricter conditions; under those stricter conditions Mr. Parmar remained compliant; Pretrial Services then supported moving him from home incarceration to stand-alone monitoring; the Court modified the conditions; and after sentencing the Court continued release and later extended surrender while keeping every condition in force. This is an obvious trend which the Government ignores. That sequence matters because § 3143(b) asks whether **present** conditions can assure appearance, not whether past conduct justified stricter supervision. The record on that question is irrefutable. The Government cites no failure to appear, no revocation motion, and no unauthorized international travel across roughly eight years of supervision. Pretrial Services itself supported relaxing Mr.

---

[1] As used in this reply, "Prior Decl." refers to the Supplemental Declaration of Parmjit Parmar previously filed with the opening Motion, and "2d Supp. Decl." refers to the Second Supplemental Declaration submitted as Exhibit 10 to this reply.

Parmar's conditions: on December 18, 2025, Officer Jenkins stated that Pretrial Services would be amenable to modifying his condition from home incarceration to stand-alone monitoring, noting that he had "remained compliant" while on home incarceration. Prior Decl. ¶¶ 46–47. The Court modified the conditions accordingly on January 13, 2026. Prior Decl. ¶ 49. The Court then continued release at sentencing and, on May 26, 2026, extended surrender to June 11 while ordering that every other condition remain in full force and effect. *See* ECF No. 358. And in the weeks after sentencing, Mr. Parmar sought airport permission in advance, received it, and reported his status before and after each trip. 2d Supp. Decl. ¶¶ 69–78.

That last point deserves emphasis, because it is the neutral supervising agency's real-time answer to the question now before the Court. United States Pretrial Services is the agency charged with assessing and managing Mr. Parmar's risk in real time. After sentencing, with every incentive the Government now invokes already in place, that agency repeatedly authorized Mr. Parmar to travel to an international airport to receive arriving family. On May 15, 2026, the Location Monitoring Unit responded to his written request in a single line: "Approved as requested." 2d Supp. Decl. ¶¶ 69–74. That approval is difficult to reconcile with the Government's present claim that no condition can reasonably assure appearance. It reflects a contemporaneous, considered risk judgment by the very officers charged with making it, and the Court may weigh it for what it is worth alongside the rest of the present-risk record.

Mr. Parmar's conduct on those occasions confirms the soundness of that judgment. He directed each request to the Location Monitoring Unit, including Officers Jenkins and Jimenez and the officer in charge, and supplied the flight details in advance. He proposed his own limits: no more than roughly thirty minutes at the airport, the international-arrivals receiving area only, and a direct return home. He then reported when he left home, when he arrived, and when he returned, though no rule required those updates, and he furnished more than one telephone number and a family contact. He did not enter any departure area, pass through security, or travel. 2d Supp. Decl. ¶¶ 69–78. This is the behavior of a person who treats supervision as something to satisfy in full, not to test. It is not the behavior of a person preparing to flee.

Those facts are concrete evidence that supervised release has remained workable in this Court's own administration of the case. The Government's "increased incentive" argument does not change that. Before the plea, Mr. Parmar faced exposure far greater than the 60-month statutory maximum he faces now, yet he appeared at every stage; and in early 2018, before any release

condition existed, he disclosed his location to the Government from abroad and returned to the United States on schedule. Mot. 7–8. The clear-and-convincing showing the statute requires rests not on prediction or promises but on that tested history, made objectively verifiable by the stricter conditions proposed here: continuous GPS monitoring, home confinement, surrender of all travel documents and a representation that he will seek none (including an OCI card), a third-party custodian, full financial disclosure, a prohibition on any airport, seaport, or border presence absent prior approval, and immediate self-surrender upon any adverse release ruling. Prior Decl. ¶ 63; Mot. 34–36.

### III.   The Government Identifies No Current Danger That Conditions Cannot Eliminate.

The opposition is directed almost entirely at flight, delay, and loss. It does not argue danger in any meaningful sense, and the record supports none. The offense of conviction is a nonviolent conspiracy under 18 U.S.C. § 371. Across roughly eight years of supervision there has been no violence, no weapons, no threats, no prohibited victim or witness contact, no new charge, and no revocation motion alleging financial misconduct.

The only danger the offense conduct implicates is economic, and the proposed conditions disable the mechanisms of that conduct directly: no investor solicitation, no fundraising, no lending or securities-related business, no new entities, no officer, director, or signatory role, no transfer exceeding $5,000 without prior written approval, and monthly financial disclosure subject to verification. Mot. 34–35 & previously filed Motion Ex. AA. If the Court were to deny release on danger grounds, Mr. Parmar respectfully requests a specific finding identifying what danger remains and why these conditions cannot reasonably mitigate it.

### IV.   A Prompt Appeal From Preserved Sentencing Issues Is Not Delay.

The relevant question under § 3143(b)(1)(B) is the purpose of *this* appeal, not the history of pre-judgment scheduling. On that question the record is clear. The notice of appeal was filed promptly from judgment; the present Motion was filed promptly; and the issues were litigated and preserved before sentencing through successive PSR objections, sentencing submissions, an April 2, 2026 letter brief and sealed attachment requesting an evidentiary hearing and identifying witnesses, the Government's April 27, 2026 response, and oral argument on May 5, 2026. Mot. 5–7, 12–13 & previously filed Motion Ex. Z. The appeal accepts the guilty plea and the conviction and challenges only unstipulated sentencing determinations. To remove any doubt about purpose,

Mr. ███████████████████████████████████████

███████████████████████████████

The Government's delay argument proves too much, and it conflates merits and delay. But § 3143(b) separates those inquiries. If every defendant with prior adjournments were categorically barred, the statute's case-specific inquiry would disappear. The question is not whether the Court was rightly frustrated by pre-judgment scheduling. It is whether this appeal, filed promptly from judgment and directed to preserved sentencing issues, is for delay. It is not. A procedural request to prevent surrender before the release motion is decided is sequencing, not delay. The appeal would exist on the same terms if surrender were set for tomorrow, because it challenges the lawfulness of the sentencing framework itself, not the timing of custody.

## V.    The Appeal Presents Substantial Questions Under Miller and Smith.

A substantial question is one that is fairly debatable or "debatable among jurists of reason"; it does not require a showing that the Court was wrong. *Smith*, 793 F.2d at 89. A district judge may adhere fully to her ruling and still find the question substantial for appellate purposes. The Government's opposition repeatedly equates "the Court rejected it" with "not substantial." That the Court considered and rejected the loss argument does not make the appellate question frivolous.

The central issue on appeal is whether actual loss under U.S.S.G. § 2B1.1 may be calculated from the gross transaction amount without any finding on the transaction-date value the victims received in a negotiated going-private acquisition of an operating company. The Third Circuit has "repeatedly emphasized that the amount of loss in a fraud case . . . often depends on the actual value received by the defrauded victim." *United States v. Nathan*, 188 F.3d 190, 210 (3d Cir. 1999); *accord United States v. Dickler*, 64 F.3d 818, 825 (3d Cir. 1995); *United States v. Kopp*, 951 F.2d 521, 528–31 (3d Cir. 1991); *United States v. Banks*, 55 F.4th 246 (3d Cir. 2022); *United States v. Yeaman*, 194 F.3d 442, 457 (3d Cir. 1999); *see also United States v. Kousisis*, 66 F.4th 406, 424–25 (3d Cir. 2023) (loss is the contract's face value less the fair market value of what the victim received), *aff'd on other grounds*, 145 S. Ct. 1382 (2025). The Government's own April 27, 2026 letter framed the dispute as "a legal dispute, not a factual one," and called transaction-date valuation "completely irrelevant." ECF No. 344 at 3–4. That characterization confirms the issue is appellate in character, and because no controlling Third Circuit decision resolves this acquisition, value-received fact pattern, the issue is fairly debatable.

The Government's reliance on *Georgiou* and *Kirschner* does not eliminate the question. *United States v. Georgiou*, 777 F.3d 125 (3d Cir. 2015), arose from market manipulation of microcap stock the defendant himself controlled, where the only "asset" was the rigged instrument; it did not address the transaction-date value-received offset for a real, operating, revenue-generating company that changed hands. *United States v. Kirschner*, 995 F.3d 327, 336–37 (3d Cir. 2021), addresses burden-shifting of production but leaves the ultimate burden of proving loss on the Government and does not resolve the methodological question presented here. The Government identifies no Third Circuit decision holding that, in a negotiated acquisition of an operating company, the gross purchase price may be treated as actual loss without any finding on the transaction-date value the victims received. The Court itself recognized that the loss inquiry is "fact sensitive," Tr. 9:9–10, and observed that there are "no cases that deal with this kind of securities fraud" on these facts, Tr. 13:13–17. That is the very definition of fairly debatable.

A second important and separate question is whether the sharply-disputed valuation record required findings under Federal Rule of Criminal Procedure 32(i)(3)(B) or a hearing under U.S.S.G. § 6A1.3 before the single largest enhancement in the calculation was adopted. The Third Circuit enforces Rule 32 strictly, and a failure to comply is grounds for vacating the sentence. *United States v. Electrodyne Sys. Corp.*, 147 F.3d 250, 255 (3d Cir. 1998). The defense sought a limited hearing on transaction-date value received and identified specific witnesses; the Government opposed any hearing, taking the position that the dispute required no factual findings at all. Previously filed Motion Ex. N. This Court held that transaction-date valuation was legally irrelevant and quantified the loss simply as the amount invested minus the amount received years later after bankruptcy and other intervening events. The Court's methodology question is  a substantial issue on appeal. If transaction date value is relevant, the Court was required to make findings or hold a hearing on a disputed material fact. Either way, the question is fairly debatable. Procedural and evidentiary issues of this kind may supply a substantial question. *Messerlian*, 793 F.2d at 96–98.

*United States v. Kopp,* 951 F.2d 521, 525–26 (3d Cir. 1991), is the closest procedural analogue, and it answers the Government's opposition on its own terms. There, as here, the defendant challenged a fraud-loss methodology that treated the face value of the fraudulent transaction as the loss. The district court—sitting in this District—found the defendant not dangerous, unlikely to flee, and the appellate grounds substantial, and it granted bail pending

appeal on that basis.. The Third Circuit then vacated the sentence, holding that "the district court should have calculated the 'loss' as actual loss" rather than fixing it at the face value of the fraudulent transaction, and remanding because the court "made no findings on actual or intended loss." *Id.* at 523. Mr. Parmar does not cite *Kopp* to argue that this Court must predict reversal. He cites it for the narrower § 3143(b) point: a preserved Third Circuit fraud-loss methodology challenge that materially alters the Guidelines framework is exactly the kind of issue a district court in this Circuit may treat as substantial for release purposes without predicting the ultimate appellate result. Mr. Parmar does not ask the Court to agree now that the loss was zero. He asks only that the Court recognize the appeal as substantial and potentially consequence-producing.

## VI.    A Favorable Ruling Is Likely To Produce A Qualifying Result.

The "likely to result" inquiry is a materiality inquiry. Assuming a favorable appellate ruling, the question is whether the consequence would be a qualifying one under § 3143(b)(1)(B). Here it would, because the loss enhancement drove the entire framework. The adopted offense level of 41 produced an advisory range of 324 to 405 months, capped at the 60-month statutory maximum, and the Court imposed sentence "at the highest end of the range as possible." Tr. 77:18–19. The 26-level loss enhancement alone exceeds the sum of every other enhancement; remove it and the offense level is 15, with an advisory range of 18 to 24 months.

Critically, this is not an independent same-sentence case. The Court did not announce that it would impose 60 months regardless of any Guidelines error, and it did not pronounce a freestanding variance under § 3553(a) untethered to the adopted range. It used the capped Guidelines framework as the benchmark and selected the highest sentence available within it. Under controlling law, a Guidelines error is harmless only where the record shows a "high probability" that the same sentence would have been imposed under a correct range, and "in most cases a defendant who has shown that the district court mistakenly deemed applicable an incorrect, higher Guidelines range has demonstrated a reasonable probability of a different outcome." *Molina-Martinez v. United States*, 578 U.S. 189, 198–201 (2016); *United States v. Raia*, 993 F.3d 185, 195–96 (3d Cir. 2021); *United States v. Langford*, 516 F.3d 205, 216 (3d Cir. 2008). Even an express same-sentence statement does not cure the error unless the alternative is itself the product of the full sentencing process from a correctly determined range. *United States v. Smalley*, 517 F.3d 208, 214–16 (3d Cir. 2008); *United States v. Wright*, 642 F.3d 148, 153–54 (3d Cir. 2011).

No such alternative analysis exists here. A statutory cap limits the sentence the Court may impose; it does not erase the Guidelines error that told the Court where to begin. The difference between a 324-to-405-month range capped at 60 and an 18-to-24-month range is not formal; it changes the entire § 3553(a) frame within which the Court selected the "highest end." The Court did not begin with a 57-to-71-month or an 18-to-24-month range and then decide that 60 months was independently necessary. It began with a 324-to-405-month range capped at 60, stated that it was imposing sentence at the highest end available, and weighed the mitigation it expressly said it considered from that starting point. A materially lower correct range would not merely change the arithmetic; it would change the starting point from which the Court evaluated every mitigating factor. Exhibit 7 illustrates the point using only the Court's own Guidelines figures: under the adopted 324-to-405-month anchor, even extraordinary mitigation is absorbed by the statutory cap; under the Court's own 57-to-71-month alternative, the same mitigation becomes outcome-changing. Ex. 7.[2] Exhibit 9 collects those authorities and shows why the Government's harmless-error theory is not dispositive: the Government must show that where a Guidelines error changes the sentencing anchor, the record must show more than that the same sentence was possible; it must show that the same sentence would have been imposed from the correct framework. Ex. 9.[3]

Because the sentence was framework-driven rather than independently selected, a favorable ruling on the loss methodology would likely require resentencing from a materially lower range and a fresh § 3553(a) analysis. On the clean qualifying paths, the corrected range of 18 to 24 months would satisfy § 3143(b)(1)(B)(iv), particularly given the offer of expedited briefing and an eighteen-month status review. Mot. 30–33 & previously filed Motion Ex. V. The qualifying-result showing does not depend on the appeal eliminating loss entirely. Even if the Court of Appeals did not direct a zero-loss calculation, a ruling that transaction-date valuation findings or a hearing were required would likely vacate the sentence and compel resentencing from a corrected or materially reconsidered framework. That consequence is enough, because § 3143(b)(1)(B) asks whether the question is consequential to the sentence imposed, not whether it

---

[2] Exhibit 7 does not calculate loss or advocate any Guidelines outcome. Using only the Court's adopted calculations and findings, it shows that the challenged loss enhancement supplied the overwhelming majority of the offense level and set the advisory framework, so that a favorable appellate ruling is likely to produce a qualifying sentencing consequence under § 3143(b)(1)(B). It is offered for that limited materiality purpose only.

[3] Exhibit 9 does not ask this Court to decide the appeal. It shows only that the Government's harmless-error argument is itself fairly debatable, because Third Circuit and Supreme Court authorities require a meaningful same-sentence analysis from the correct Guidelines range, not a post hoc assertion that the sentence could remain the same.

guarantees a particular number. Restitution must also be revisited, because the MVRA limits recovery to losses directly and proximately caused by the offense. *See* 18 U.S.C. § 3663A(a)(2); *United States v. Fallon*, 470 F.3d 542, 548–50 (3d Cir. 2006).

## VII.    The Government's Reading Of § 3143(b)(1)(B)(iv) Is Textually Wrong.

The Government's final statutory argument is that, because Mr. Parmar seeks resentencing rather than reversal, a new trial, or a non-custodial sentence, "bail pending appeal is simply not an available remedy." Opp. 7. That argument cannot be reconciled with the text the Government quotes. Section 3143(b)(1)(B)(iv) expressly covers an appeal likely to result in "a reduced sentence to a term of imprisonment less than the total of the time already served plus the expected duration of the appeal process." The provision exists precisely to authorize release where the appeal challenges the length of a custodial sentence. That reading also tracks *Miller*'s treatment of the "likely to result" inquiry, which looks to sentencing consequences and does not require reversal of the conviction. 753 F.2d at 23–24.

The Government's reading would nullify subsection (iv) and would mean that the one category of appeal Congress singled out for release is the one category for which release is unavailable. If accepted, it would mean that no defendant seeking a reduced sentence could ever obtain release pending appeal, even though Congress expressly included that category. The statute's direction that "the judicial officer shall order the detention terminated at the expiration of the likely reduced sentence" confirms the point: it presupposes that release is available in the reduced-sentence posture and supplies the mechanism for administering it. That textual error alone warrants caution before denying relief on the Government's theory, and it gives the Court a basis to reject the Government's position without revisiting any aspect of the sentence. If the Court were to deny release on the Government's reading, Mr. Parmar respectfully requests that the Court say so expressly, so that the legal premise may be reviewed.

## VIII.    The Government's $150,000 Argument Misstates the Preserved Appellate Question.

The Government's remaining argument is that, even if value received mattered, any loss above approximately $150,000 would sustain an offense level of 25, a range of 57 to 71 months, and therefore the capped 60-month sentence. Opp. 6 (citing Tr. 26:5–16). That argument is not harmless-error analysis. It is an assumption that some positive loss must exist. But the preserved appellate issue is whether the Government proved *any* cognizable loss after accounting for value

received. The record contained substantial indicators of enterprise value and no professional transaction-date valuation. If the value received equaled or exceeded the price paid, the actual loss is zero, the loss enhancement falls away, the offense level falls from 41 to 15, and the advisory range becomes 18 to 24 months. That is a qualifying result under § 3143(b)(1)(B)(iv).

The $150,000 figure assumes the answer to the question on appeal rather than supplying it. The actual preserved issue is antecedent: whether the Government proved positive actual loss at all after the value-received offset the Third Circuit's actual-loss cases require. On this record, multiple value indicators make it at least fairly debatable that the company was not worthless at closing. The defense identified, and the parties' April–May 2026 letter briefs and the bankruptcy record reflect, that the company contributed approximately $14.5 million of its own cash at closing; that an approximately $45 million loan was retired and the operating assets unencumbered months before the transfer; that the business operated for thirteen-plus months under the buyer's control with roughly 1,000 employees across nine locations; that a funded acquisition offer of approximately $240 to $245 million followed about a year later; and that the bankruptcy returned well over $100 million to creditors. Previously filed Motion Ex. Y. A buyer and its advisors conducted roughly a year of diligence before paying for the company. Exhibit 7 shows why the $150,000 threshold is not harmless-error analysis: it is a different Guidelines anchor, and the record contains no independent same-sentence ruling from that corrected anchor. Ex. 7.

Bankruptcy recoveries realized more than a year after closing cannot substitute for transaction-date value, and that is true whether later events increased or decreased the company's worth. A post-closing owner in control could improve operations, add assets, or preserve value; it could equally impair operations, halt new business, or pursue a bankruptcy strategy. The legal question does not turn on which occurred. The Guidelines inquiry required a transaction-date value-received finding, not a bankruptcy-date reconstruction; the value indicators are offered to show that the transaction-date question was open and consequential, not to fix any figure as of the petition date. Exhibit 8 explains why that point is not merely case-specific advocacy but a recognized valuation principle: bankruptcy-sale value and transaction-date going-concern value

are different analytical concepts, measured at different dates, under different premises of value, and affected by distress, process, buyer universe, liquidity, and operational deterioration. Ex. 8.[4]

This is a burden-of-proof point, not a merits claim. The defense did not bear the burden to prove that the company was worth $212 million. The Government bore the burden to prove that the victims received less than the price they paid, and by how much. *See Kirschner*, 995 F.3d at 336–37. Where value received is legally relevant, the absence of a transaction-date valuation is not a defense failure; it is the Government's failure of proof. *Kopp* makes the point concrete: the Third Circuit vacated precisely because the sentencing court fixed loss at face value and "made no findings on actual or intended loss." 951 F.2d at 523. A record with no transaction-date valuation cannot support the assumption that the difference between price and value was more than $150,000, much less $212 million.

The "reasonable estimate" doctrine does not fill that gap. A court may make a reasonable estimate only where precise calculation is impractical; here the calculation was feasible. As defense counsel explained, a valuation expert can take the operating business's revenue, apply the appropriate industry multiple, and value the company as of January 30, 2017—"does every day." Tr. 13:21–25. The Court itself acknowledged that "Revenue is one way to value a company," Tr. 14:4, while observing that the specific transaction-date valuation evidence was not in the record, Tr. 14:3. A reasonable estimate must still rest on evidence; an estimate that equates the loss with the entire purchase price, in the face of uncontradicted indicators of substantial value and the absence of any valuation, assumes harm rather than proving it. The burden of proving loss rested on the Government, and the one form of proof that could carry it on this record was never developed.

The $150,000 observation does not change the analysis, because a threshold comment is not a Rule 32 finding. It was not a corrected Guidelines calculation, not a transaction-date valuation finding, and not an independent same-sentence ruling under a lower lawful range. It assumed that some positive actual loss must exist. Tr. 26:5–16. Rule 32 does not permit a nine-figure enhancement—or even a ten-level enhancement—to rest on an assumed floor without resolving the disputed value-received issue. If the Court now relies on the $150,000 alternative, Mr. Parmar

---

[4] Exhibit 8 is not offered to value CHT or calculate loss. It is offered only to show why a later bankruptcy-sale price cannot automatically answer the earlier transaction-date value question, and why treating the two as interchangeable presents a substantial valuation and Guidelines issue.

12

respectfully requests a specific finding identifying the evidence and methodology that prove actual loss above $150,000 after offsetting the transaction-date value received at closing. That request forces the choice Rule 32 requires: make the factual finding, or preserve a clean appellate issue.

Nor can the Government have it both ways. At sentencing it argued that transaction-date valuation was "completely irrelevant." ECF No. 344 at 3–4. If that is the governing premise, the appeal presents a clean legal question reviewed de novo, and it is substantial. If instead valuation was relevant but the Court believed the record showed loss above $150,000, then § 6A1.3 and Rule 32 required findings identifying the evidence and methodology behind that figure. The Government cannot defeat release by treating valuation as legally irrelevant for the merits and factually self-evident for the threshold. Either branch of the fork is fairly debatable under *Miller* and *Smith*.

The appendix submitted with this reply is offered for that limited purpose: to show the materiality of the preserved question and why the Government's opposition does not defeat substantiality. It is not offered to reargue the sentence. The point is narrow and statutory: because the loss finding set the offense level, the range, and the "highest end" against which the Court weighed every mitigating factor, the unresolved loss and value questions are material to the sentence and likely to produce a qualifying result under § 3143(b)(1)(B)(iv). These materials are submitted in reply to the Government's contention that the appeal presents no substantial question and that the release record does not satisfy § 3143(b); they are not offered to enlarge the original motion or to relitigate sentencing.

The accompanying exhibits are offered for a limited purpose. Exhibits 1 and 2 show that the defense preserved the transaction-date valuation issue for years and that valuation-related inputs existed in the record. Exhibit 3 shows that the Government opposed valuation not because it was impossible, but because it claimed valuation was legally irrelevant and no findings were required.[5] Exhibit 4 shows that causation, reliance, foreseeability, and restitution issues were also record-supported and disputed. The illustrative valuation-feasibility analysis is not a valuation opinion or loss calculation. It uses Duff & Phelps only as a methodology anchor, derives

---

[5] Exhibit 3 compiles the Government's own sentencing positions that transaction-date valuation was "completely irrelevant" to loss, that no evidentiary hearing was required, and that no factual findings were necessary, together with the sentencing-hearing exchanges showing that the defense requested a value-received determination and preserved the issue. It is offered solely to show why the valuation question is a preserved, concrete, and substantial appellate issue under § 3143(b), not to relitigate the merits of the sentence.

illustrative revenue multiples from D&P's QofE-adjusted DCF range, and applies those multiples to bankruptcy-professional operating inputs, including the $150.5M+ 2017 revenue/billings reference and the $184M 2018 annualized revenue reference. It is offered only to show that value received was concrete, record-based, and capable of analysis. The pre-arrest and supervised-compliance chronology supports the present-risk showing only. Exhibit 8 explains why bankruptcy-sale value is not a substitute for transaction-date going-concern value, and Exhibit 9 shows why, under controlling harmless-error and remand authorities, the Government cannot defeat § 3143(b) merely by asserting that the same statutory-maximum sentence could be imposed again. Together, the exhibits show that the appeal is preserved, concrete, fairly debatable, and consequential under § 3143(b).

## IX.    At Minimum, A Temporary Stay Is Necessary To Preserve Rule 9(b) Review.

The Government characterizes any extension of surrender as an end-run around the Bail Reform Act. Opp. 7. That mischaracterizes the alternative request. The stay motion does not seek release pending appeal as a merits ruling. It seeks sequencing, so that the Court can decide the release motion before Mr. Parmar surrenders, and, if release is denied, a short stay sufficient to permit orderly application to the Third Circuit under Federal Rule of Appellate Procedure 9(b). *See* Fed. R. App. P. 9(b); Fed. R. Crim. P. 38(b)(1).

The balance of interests favors that modest relief. Without a stay, Rule 9(b) review is functionally impaired, because the very harm the appeal seeks to avoid – loss of freedom - will have occurred before the Court of Appeals can act. The Government identifies no prejudice from a brief period under the existing, soon-to-be-stricter conditions, while the prejudice to Mr. Parmar from surrendering before the motion and any review are decided is severe and irreversible. The requested relief is bounded and court-controlled: decide before June 11; if not, hold surrender in abeyance until the motion is decided; and if release is denied, a fourteen-day stay for Rule 9(b) review, or any shorter period the Court deems sufficient to permit emergency Third Circuit review.

If the Court is not prepared to grant release, the narrowest relief is also the safest. A short stay would not decide the statutory question, would not alter the sentence, would not require the Court to revisit any sentencing ruling, and would not require any prediction that Mr. Parmar will prevail. It would do one thing only: preserve the Court of Appeals' ability to review the release determination before surrender materially changes the status quo that Rule 9(b) is designed to

review. Because Rule 9(b) review is imminent if release is denied, a generalized denial would not meaningfully permit it; the order should state what was denied and why.

One clarification forecloses the Government's strongest emotional argument. Mr. ████ ████████████████████████████████████████████ ██████ ████████████████████████████████ ████████████████████████████████████████ ██████████████████████████████████

## X.     If Relief Is Denied, Specific Findings Are Necessary For Appellate Review.

If the Court denies release or a stay, meaningful Rule 9(b) review will require knowing the basis for the ruling, because a generalized denial would not permit the Court of Appeals to evaluate it on the expedited schedule that surrender makes necessary. Mr. Parmar therefore respectfully requests findings sufficient for Rule 9(b) review identifying:

1. which § 3143(b) element the Court finds not satisfied;

2. if the denial rests on flight risk or danger, whether the Court finds by clear and convincing evidence that no condition or combination of conditions can reasonably assure appearance, and which proposed conditions are insufficient and why, including whether the Court treats the JFK event as an attempted flight notwithstanding the continued GPS monitoring and the absence of any boarding, security entry, or use of a travel document;

3. if the denial rests on substantiality or likely result, whether the Court views transaction-date valuation as legally irrelevant, factually unresolved, or immaterial, and whether Rule 32 and § 6A1.3 required no further findings or hearing;

4. whether the denial rests on the Government's interpretation of § 3143(b)(1)(B)(iv); and

5. whether the Court would impose the same 60-month sentence under a corrected Guidelines framework and, if so, the corrected range and § 3553(a) basis for that alternative ruling, including, if the denial rests on the $150,000 alternative, the factual finding that supports loss above that amount after accounting for value received.

**CONCLUSION AND RELIEF REQUESTED**

The Court can deny resentencing today and still preserve review; it cannot treat a preserved, consequential Guidelines question as immaterial without making the findings the record presently lacks.

For the foregoing reasons, Mr. Parmar respectfully requests, in descending order of preference, that the Court:

1. grant release pending appeal under 18 U.S.C. § 3143(b) and Rule 46(c), subject to the stricter Tier 1 conditions proposed in the Motion and any additional conditions the Court deems appropriate;

2. alternatively, decide the release motion before June 11, 2026;

3. alternatively, temporarily stay surrender until the Court decides the release motion;

4. alternatively, if release is denied, stay surrender for fourteen days to permit orderly Rule 9(b) review in the Third Circuit; and

5. alternatively, stay surrender for any shorter period the Court deems sufficient to permit emergency Third Circuit review.

The Court may remain fully confident in its sentence and still recognize that this appeal presents a substantial question fairly debatable for § 3143(b) purposes. The relief requested is stricter, verifiable, bounded, and court-controlled.

Respectfully submitted,

/s/ Timothy P. Neumann
Timothy P. Neumann, Esq.
[NJ Bar ID # 005081973]
BROEGE, NEUMANN, FISCHER &
SHAVER, LLC
25 Abe Voorhees Drive
Manasquan, NJ 08736
Tel: (732) 581-7142
Email: timothy.neumann25@gmail.com

*Co-Counsel for Defendant Parmjit Parmar*

*Dated: June 7, 2026*

16