**UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY**

CHAMBERS OF
MADELINE COX ARLEO
UNITED STATES DISTRICT JUDGE

MARTIN LUTHER KING COURTHOUSE
50 WALNUT ST. ROOM 4066
NEWARK, NJ 07101
973-297-4903

June 9, 2026

VIA ECF
All Counsel of Record

**LETTER ORDER**

Re:    **United States v. Parmjit Parmar
         Criminal Action No. 18-735**

Dear Litigants:

Pending before the Court is Defendant Parmjit Parmar's ("Parmar") Motion for Release Pending Appeal.   See ECF No. 360 (the "Release Motion").   Parmar has also filed a Motion to Expedite consideration of the Release Motion or, if the Court denies the Release Motion, requesting the Court stay Parmar's surrender date to the Bureau of Prisons ("BOP") to permit for an emergent appeal.   See ECF No. 361 (the "Expedite Motion").   The Government opposes Parmar's requested relief.   See ECF No. 368 (the "Opposition").   For the reasons set forth below, the Release Motion and Expedite Motion are each **DENIED**.

I.    **BACKGROUND**[1]

On May 7, 2025, after more than seven years of prosecution, Parmar pleaded guilty to conspiracy to commit securities fraud, contrary to 15 U.S.C. § 78j(b), 15 U.S.C. § 78ff, and 17 C.F.R. § 240.10b-5, in violation of 18 U.S.C. § 371.   See ECF Nos. 296–98.   Parmar was the Chief Executive Officer of a formerly publicly-traded company, Constellation Healthcare Technologies ("CHT").   See ECF No. 300 at 18.   He was charged with, and ultimately admitted to, conspiring to inflate CHT's value, and then fraudulently inducing a group of investors to purchase CHT as part of a go-private transaction at a price far exceeding its actual value.   See ECF Nos. 1, 32; see also ECF No. 300 at 17–19.

As part of this scheme, Parmar was charged with falsifying and fabricating bank records of CHT and its subsidiaries; generating false income streams for CHT and its subsidiaries; creating three shell companies that CHT purportedly acquired in sham acquisitions; and making material

---

[1] The Court assumes the Parties' familiarity with this case's extensive factual and procedural history.   For purposes of this Order, the Court limits its recitation of facts to Parmar's charges, plea, and sentencing.   Specific facts related to this case's procedural history that the Court relies upon to justify its decision in this Order are directly referenced in the Analysis.   See infra § III.

1

misrepresentations and omissions about CHT to the investors. See generally ECF No. 1. Through these actions, Parmar and his associates caused the investors to value CHT at over $300 million and pay approximately $212 million to acquire it. See id. Within nine months of the transaction, the investors began uncovering the lengths of Parmar's and his associates' fraud. See id. And several months later, they were forced to file a petition for Chapter 11 bankruptcy relief. See id. After eight years, CHT has not remerged from bankruptcy. See Case No. 18-71748 (E.D.N.Y. Bank.).

On May 5, 2026, nearly one year after the Court accepted Parmar's guilty plea, the Court conducted his sentencing hearing. See ECF Nos. 348–350. The recommended Sentencing Guidelines' range of incarceration was 324 to 405 months. See ECF No. 350 at 41. The Court sentenced Parmar to sixty months, the statutory maximum. See ECF No. 349. It also continued bail pending a surrender date from the BOP. See ECF No. 350 at 79–80. Thereafter, the BOP gave Parmar a surrender date of June 4, 2026. See ECF No. 357 at 2.

About one week before his surrender date, Parmar filed the Release Motion, the Expedite Motion, and a motion requesting the Court delay his surrender date sixty days to August 3, 2026. See ECF Nos. 355, 360–61. The Court determined, in its discretion, that good cause existed to extend Parmar's surrender date by seven days. See ECF No. 358. Parmar appealed that decision and sought a stay pending appellate review. See ECF No. 359. The Third Circuit denied that appeal. See ECF No. 369. The Court now addresses the Release Motion and Expedite Motion.

## II.    LEGAL STANDARD

"Congress enacted the Bail Reform Act of 1984 to create a presumption of post-conviction detention." See United States v. Douglas, No. 17-544, 2024 WL 195256, at *2 (D.N.J. Jan. 17, 2024) (citing United States v. Miller, 753 F.2d 19, 22–24 (3d Cir. 1985)); see also Miller, 753 F.2d at 22 ("Once a person has been convicted and sentenced to jail, there is absolutely no reason for the law to favor release pending appeal or even permit it in the absence of exceptional circumstances" (quotation marks omitted).). To obtain the extraordinary relief of release pending appeal, a defendant must show: (1) by clear and convincing evidence that he or she is not likely to flee or pose a danger to the community if released; (2) that the appeal is not for purpose of delay; (3) that the appeal raises a substantial question of law or fact; and (4) that if a substantial question is determined in defendant's favor on appeal, that the decision is likely to result in reversal, an order for a new trial, a sentence that does not include a term of imprisonment, or a reduced sentence of imprisonment. See Miller, 753 F.2d at 24; see also 18 U.S.C. § 3143(b)(1).

## III.    ANALYSIS

The Court concludes that the second, third, and fourth prongs of the standard for release pending appeal have not been satisfied. It addresses each of these prongs in turn.

### A.    The Appeal is for the Purpose of Delay

Parmar's Release Motion and Expedite Motion represent the latest effort in a long line of delay tactics that have forestalled this Court from dispensing justice for more than eight years. Parmar's history of delay—based often on fabricated or exaggerated health concerns—cannot be overstated. Indeed, receiving these two Motions in addition to Parmar's request to delay his

surrender on the eve of his BOP surrender date made the Court wonder if it was trapped in Groundhog Day.   To briefly summarize:

- The Court initially set oral argument on pretrial motions for January 13, 2022 and scheduled trial to begin on February 15, 2022.   See ECF No. 125.   What followed was an "unprecedented" torrent of adjournment requests.   ECF No. 235 at 2-3.   The first wave of these requests consistently came on the eve of the date the Court set for the rescheduled oral argument on pretrial motions.   See ECF Nos. 132, 135, 140, 146. After a seven-month delay, the Court finally held oral argument and denied Parmar's pretrial motions.   See ECF No. 152, 154, 158, 167.[2]

- Parmar claimed that he was facing certain serious medical conditions.   Initially, he told the Court (through counsel) that he was potentially suffering from metastatic brain cancer and other serious neurological ailments.   See, e.g., ECF Nos. 132, 140, 235 at 5, 8–9.   He provided scant medical records to support these claims.   See, e.g., ECF No. 140.1; 235 at 5.   Subsequent developments gave the Court reason to doubt the veracity of Parmar's claimed condition.   See infra.   But based on his then-representations, after disposing of the pretrial motions, the Court gave Parmar the benefit of the doubt and did not initially set a trial date; instead, it scheduled a status conference for March 2023.   See ECF Nos. 172; Docket Entry dated January 13, 2023. Then, the second wave of adjournment requests poured in, again often being filed on the eve of the scheduled conference.   See, e.g., ECF No. 180; Docket Entries dated January 18, 2024; April 3, 2024.   These requests often cited fatigue, dizziness, lethargy, and an inability to focus based on his neurological ailments as justifications to further delay trial.   See ECF No. 235 at 3–4; ECF No. 282 at 5–7.   After granting these requests, a status conference was ultimately rescheduled for about one year later, on April 4, 2024.   See Docket Entry dated April 3, 2024.

- Shortly before the April 2024 status conference, Parmar's counsel requested the Court schedule a Rule 11 plea hearing.   See Docket Entry dated April 5, 2024.   The Court set the plea hearing for April 25, 2024.   See id.   But on the eve of the plea hearing, Parmar fired his attorneys.   See ECF No. 211.   On May 14, 2025, the Court held a hearing and granted his counsel's motion to withdraw.   See ECF Nos. 216–17.   It permitted Parmar sixty days to find new representation, and set a status conference for July 16, 2024.   See ECF Nos. 225, 232 at 1.

- As the July 2024 status conference approached, Parmar reverted to seeking adjournments based on asserted medical conditions.   This time, in a letter to the Court, he stated he was facing a "substantial life-threatening medical emergency" and needed an "impending critical medical procedure" to treat a cardiovascular condition.   ECF No. 282 at 8–9.   He stated the recovery period would be six to ten weeks, and that he was experiencing significant pain and was on bedrest.   See id. at 10–11.   These medical representations, however, were entirely inconsistent with travel documented by Pretrial Services in a report informing the Court that Parmar had violated the conditions of his bail.   Parmar's confinement was amended from home incarceration

---

[2] Many of Parmar's adjournment requests were not publicly filed.   This recounting focuses on the requests that can be discerned from filings that are publicly available on the docket.

to permit for limited travel while wearing a 24/7 GPS-monitoring bracelet.  See ECF No. 71, 72, 220.  Pretrial Services' violation report stated, among other things, that just days after Parmar's "critical medical procedure" that confined him to bedrest—which was later revealed to be a coronary angioplasty, i.e., the insertion of two stents in his heart for which he was discharged the same day—he spent countless hours on separate days at the Edgewater Beach & Cabana Club in Sea Bright, New Jersey, and the Paradise Island Tiki Bar in Staten Island, New York.  See ECF No. 235 at 3–4; ECF No. 282 at 10–14.

- The Court scheduled a hearing on Parmar's bail violations for August 22, 2024.  Now having significant reason to doubt Parmar's medical representations, the Court ordered that he receive independent neurological and cardiovascular medical evaluations by Government-retained doctors.  See ECF No. 235 at 11–12, 16–18.  Parmar also failed to retain representation by the Court's ordered deadline.  It ordered him to do so by September 3, 2024 and warned that if he did not, it would appoint counsel (that he would be required to repay) or require him to proceed pro se.  See id. at 12–13.  It set a subsequent status conference for October 3, 2024.  See id. at 33.  And so began a new, parallel tactic: forestalling trial by delaying the retention of new counsel.

- At the October 3, 2024 status conference, under the threat of having independent medical evaluations conducted, Parmar indicated that his health was now stable and he was willing to proceed pro se.  See ECF Nos. 243 at 3–4, 244 at 6.  This undermined previous claims about his serious neurological conditions and the symptoms they induced, which had apparently abated.  See id.; see also ECF No. 282 at 14.  He separately indicated he was considering three separate law firms, but there were complications retaining the firms because his previous counsel had not provided him with his full case file and the Government's disclosed discovery.  See ECF No. 243 at 5.  The Court took steps to facilitate the provision of these documents to Parmar expeditiously.  See generally ECF Nos. 243–44.  It scheduled a trial date for March 10, 2025, and informed Parmar that it would either appoint counsel or require him to proceed pro se if he failed to retain representation by that date.  See ECF Nos. 243 at 19, 244 at 6.  It held six additional status conferences between October and January repeating its offer to appoint counsel, but Parmar continued to represent that he was still working on retaining counsel and reiterated the he was "almost there."  See ECF Nos. 244, 248–50, 259.  Finally, with the walls closing in and trial nearing, in February 2025 (ten months after he fired his prior attorneys), Parmar retained Cooley LLP to represent him.  See ECF No. 260–62, 267.  The Court granted a three-month adjournment to the trial date to permit Cooley to prepare, scheduling trial for June 10, 2025.  See ECF No. 265, 267–68.  It denied subsequent requests to adjourn this trial date.  See ECF Nos. 276, 280, 282.

- Simultaneous to delaying court proceedings, Parmar delayed paying Pretrial Services the required monthly fee for his GPS-monitoring bracelet.  By August 2024, his outstanding amount owed had accrued to $8,000.  See ECF No. 235 at 24–35, 34.  At the August 22, 2024 bail violation hearing, he represented he had a check for $5,000.  See id.  The Court ordered him to pay the remaining $3,000 by August 30, 2024.  See id. at 34.  It later learned that he did so through a credit card, but that the payment was voided shortly thereafter.  See ECF No. 282 at 15–16.  In response, the Court ordered

him to pay this balance in a hand-delivered check to the Clerk of Court, which he did the same day as the Court's imposed deadline.   See id.

- On the eve of trial, Parmar entered a plea agreement with the Government.   See ECF Nos. 296–98.   He then returned to his prior strategy of filing adjournment requests—now for his sentencing hearing—as that date approached.   See ECF Nos. 309, 316, 322, 328, 336, 339.   Many of these were graciously granted in response to significantly belated opposition filings that challenged, for example, the asserted loss amount stemming from Parmar's fraud or the Government's motion for forfeiture.   See, e.g., ECF Nos. 305, 314, 328, 338, 339, 342.   His sentencing was ultimately delayed seven months.   Compare ECF No. 296 with ECF Nos. 348–49.

- The BOP scheduled Parmar's surrender for June 4, 2026.   See ECF No. 357 at 2.   As that date approached, Parmar reverted to his previous practice and sought to delay his surrender sixty days.   See ECF No. 355.   He also appealed this Court's sentencing determination and filed the Release Motion and Expedite Motion to delay his incarceration pending that appeal.   See ECF Nos. 360–61.[3]

As this recounting reveals, Parmar has used misrepresentation, exaggeration, and outright fabrication to delay this case's resolution by an extraordinary degree.   He prolonged retaining new representation, after firing his prior counsel, to delay trial.   He used a serial pattern of adjournment requests, filed on the eve of scheduled hearings and conferences, to delay trial.   And he used a similar pattern of adjournment requests to delay sentencing.   Prior to his guilty plea, his adjournment requests were primarily based on allegedly serious neurological and cardiovascular conditions, but the Court has reason to doubt the veracity of those representations.   When threatened with independent medical evaluation, he backed away from asserting these conditions to justify any further delays—until his motion seeking to extend his surrender date (which was based, in part, on a request to conduct certain tests that he did not indicate were medically necessary).   He also took advantage of the Court's leniency by violating the conditions of his bail and failing to timely pay the fees associated with that privilege.

In light of his consistent pattern of conduct throughout this case's long history, the Court can only view Parmar's appeal of this Court's sentencing decision—accompanied with his filing of the Release Motion and Expedite Motion—as a further attempt to delay justice.   See, e.g., United States v. Mayo, No. 96-202, 2000 WL 190573, at *3 (E.D. Pa. Feb. 3, 2000) (holding an appeal was "for the purpose of delay" where the case had "a long history of significant delay at each stage of the criminal proceedings" caused by the defendant's conduct).   Parmar can hardly argue otherwise.   In fact, he notably emphasizes that he fully "accepts the guilty plea and the conviction" and has only filed his appeal to be "resentenced under a corrected Guidelines framework."   See Release Mot. at 6, 17–18.   After eight long years, the Court can translate this obfuscation for those less familiar with this Defendant: Parmar's appeal only seeks to further delay this case's final resolution.   The Court will no longer tolerate the postponement of justice.

---

[3] On June 5, 2026, Parmar filed a supplemental declaration that attempts to explain or justify certain representations or conduct that is recounted in this summary.   See ECF No. 367.   The Court finds this self-serving, eleventh-hour filing to be an unpersuasive, last-ditch effort to stall the commencement of Parmar's sentence.

### B.       The Appeal Does Not Raise a Substantial Question of Law or Fact

Separately, Parmar's appeal does not raise a substantial question of law or fact.   To raise a "substantial question" on appeal, the issue presented must be "significant in addition to being novel, not governed by controlling precedent, or fairly doubtful."   United States v. Smith, 793 F.2d 85, 88 (3d Cir. 1986).   To assess novelty or doubtfulness, the court assess whether defendant has raised a question that is "fairly debatable" or is "debatable among jurists of reason."   Id. at 89 (quotation marks omitted).   Courts assess whether a question is substantial on a case-by-case basis.   See id.

The Parties agree that Parmar's objection to the calculated Sentencing Guidelines' range presents a question of law.   See Release Mot. at 20; Opp. at 5–7.   Their dispute centers on how "actual loss" must be estimated under the Sentencing Guidelines.   Before this Court, the Government argued that actual loss is the total loss the private investors incurred based on the fraudulent scheme.   It contended that this was the amount the private investors were induced to pay for CHT, or $212 million.   In contrast, Parmar argued that actual loss is the price the private investors paid for the company less the actual value of the company.   He contended that the Government failed to calculate the value of CHT at the time it was sold to the private investors, and therefore failed to carry their burden of determining the investors' actual loss.   He also requested the Court postpone sentencing to hold an evidentiary hearing on this issue.   The Court concluded that the Government's interpretation was correct under Third Circuit precedent, denied Parmar's request for an evidentiary hearing, and adopted a recommended Sentencing Guidelines' range of 324–405 months.   See ECF No. 350 at 24–25, 41.   It stands by that decision.

For purposes of sentencing, "loss" for an offense of fraud "is the greater of actual loss or intended loss."   U.S.S.G. § 2B1.1(b)(1)(A).   Actual loss means "the reasonably foreseeable pecuniary harm that resulted from the offense."   Id. § 2B1.1(b)(1)(C)(i).   The Court must make a "reasonable estimate" of the actual loss based on a preponderance of the evidence.   Id. § 2B1.1, App. Notes (3)(B); United States v. Kirschner, 995 F.3d 327, 337 (3d Cir. 2021).   The Government bears the burden of proof when analyzing the Guidelines' applicability, but that burden may shift if the Government presents prima facie evidence of a given loss figure. Kirschner, 995 F.3d at 337.

In this Circuit, in a securities fraud case a court may estimate actual loss as the total loss incurred by investors.   See United States v. Georgiou, 777 F.3d 125 (3d Cir. 2015).   In Georgiou, the Third Circuit affirmed a sentence that estimated actual loss as the total loss experienced by investors based on the defendants' scheme to fraudulently inflate certain stock prices (i.e., inflate the company's value).   Id. at 146.   In doing so, it rejected the defendant's argument that the Court needed to account for the impact of other market forces on the stock's value that could impact the total loss the investors actually experienced.   Id.[4]   Here, similar to the facts in Georgiou, Parmar

---

[4] The Second Circuit has taken a similar approach.   For example, in United States v. Komar, 529 F. App'x 28 (2d Cir. 2013), the Court affirmed a sentence that was based on "the total amount invested by victims in [the defendant's] partnership," which was procured because of the defendant's fraud.   Id. at 29.   It rejected the defendant's argument that the actual loss amount should be "offset" to account for the investors equity value in the partnership.   The "loss," as the Court recognized, "was the money the investors were fraudulently induced to invest in the partnership."   Id.

6

participated in a scheme to fraudulently inflate the value of a public company, CHT.  Under Georgiou, the Court was not required to estimate actual loss by reducing the total loss experienced by the private investors for CHT—the $212 million they agreed to pay for a company that quickly receded into an endless bankruptcy proceeding—by the amount it was worth at the time it was purchased to determine the loss the investors actually experienced.  See 777 F.3d at 146.[5]

The cases Parmar relies on are inapposite.  See Release Mot. at 23–25.  As this Court previously explained, both United States v. Nathan, 188 F.3d 190 (3d Cir. 1999) and United States v. Nagle, 803 F.3d 167 (3d Cir. 2015), were fraudulent procurement cases involving government contracts.   In those cases, even though the defendants procured the contracts by fraud, by fulfilling the contracts, they provided some value to the government.   The Sentencing Guidelines explicitly contemplate offsetting that specific type of value from the total loss induced by the fraud.  See U.S.S.G. § 2B1.1, App. Notes 3(D)(i) (stating that a "credit" against the estimated actual loss should be provided for the "fair market value of . . . services rendered").

Simply put, Parmar's appeal will ask the Third Circuit to change the guidance its current caselaw provides on how actual loss may be estimated in securities fraud cases involving schemes to fraudulently inflate a public company's value.  In this specific context, Georgiou represents controlling precedent; the cases Parmar continues to rely on do not.   He therefore has not presented a "novel" issue ungoverned "by controlling precedent" sufficient to overcome the presumption of detention pending appeal.  Smith, 793 F.2d at 88.[6]

### C.      A Favorable Determination Would Not Impact Parmar's Sentence

Finally, even if Parmar's appeal were found to raise a substantial question of law or fact, the Court remains unconvinced that a favorable determination on that question would reduce Parmar's sentence.   To satisfy the fourth prong of the release pending appeal standard, the defendant must show that his or her appeal is "likely to be outcome-determinative."  See United States v. Colletta, 602 F. Supp. 1322, 1325 (E.D. Pa. Feb. 21, 1985) (citing Miller, 753 F.2d at 23).

---

[5] Parmar contends that the Court conceded at the sentencing hearing that there is no controlling precedent.  See Release Mot. at 17–18.   That misrepresents that Court's statements.   The Court stated that there was no case that presented factual circumstances comparable to the unique, complex, and extensive fraud that occurred here.   See ECF No. 350 at 9–11, 13.   But those facts present the same general circumstances seen in Georgiou—a fraudulent scheme to inflate the value of a public company.   Georgiou's legal analysis is therefore on point.

[6] Parmar argues that the Court's decision to reject his request to hold a factual hearing to determine CHT's value on the date of the go-private transaction presents an "independent[]" substantial question as to whether the Court abused its discretion.   See Release Mot. at 27–28.   Abuse of discretion "occurs only where the district court's decision is arbitrary, fanciful, or clearly unreasonable—in short, where no reasonable person would adopt the district court's view."  United States v. Foster, 891 F.3d 93, 107 n.11 (3d Cir. 2018) (quotation marks omitted).   The Court declined to hold an evidentiary hearing on this issue because it was unnecessary to estimate actual loss under the applicable legal standard.  See Georgiou, 777 F.3d at 146.   It also declined to hold such a hearing because, based on the record before it, there was no basis to conclude such a hearing could have any impact on Parmar's sentence given the limitations imposed by the statutory maximum.  See ECF No. 350 at 25–28.   Neither justification strikes as "arbitrary, fanciful, or clearly unreasonable."  Foster, 891 F.3d at 107 n.11.   Thus, this "independent" issue also fails to raise a substantial question on appeal.  Smith, 793 F.2d at 88.

As the Court explained at Parmar's sentencing hearing, even if actual loss must be reduced to account for CHT's value at the time of the go-private transaction, there is sufficient evidence in the record to conclude that such an offset would have no impact on Parmar's sentence. See ECF No. 350 at 25–28. Parmar was sentenced to the statutory maximum of sixty months. Pursuant to the Sentencing Guidelines, a sixty-month sentence corresponds to a loss amount greater than $150,000. See U.S.S.G. § 2B1.1(b); ECF No. 308 at 21–23. That is 0.71 percent of the $212 million the private investors were induced to pay for CHT. Therefore, Parmar's argument for release pending appeal hinges on whether it was reasonable for the Court to conclude that CHT's value was inflated by more than approximately 0.1 percent of the amount the investors paid for it. Parmar argues that the Government failed to make this showing. The Court disagrees and, as it stated at his sentencing hearing, it finds two particular forms of evidence support the reasonable conclusion that Parmar's conduct inflated CHT's value by more than $150,000.

First, Parmar pleaded guilty to an intricate scheme to inflate CHT's value. Evidence compiled by the Government indicates that this scheme included "fabricated bank records, financial accounts, customer contracts and receipts, and the creation and acquisition of at least three shell companies." See ECF No. 350 at 28; see also, e.g., ECF No. 314.2, Aff. of J. Wolfe, ¶¶ 24–59. It is entirely unreasonable to conclude that Parmar (and his associates) would go to such lengths to fabricate a de minimis increase in CHT's value.

Second, within about six months of discovering Parmar's (and his associates') fraudulent conduct (and just over a year removed from the go-private transaction), the private investors were forced to file a Chapter 11 bankruptcy petition. See Case No. 18-71748 (E.D.N.Y. Bank.); ECF No. 1 at 19. It has been more than eights years and CHT has failed to remerge from that bankruptcy proceeding. As such, it is reasonable to conclude that its value was inflated more than $150,000 and that it never had any value approaching the significant sum the investors were fraudulently induced to pay for it.

In short, the record before the Court provides no basis to reasonably conclude that the actual loss experienced by the private investors would be less than $150,000. There is thus no reason to believe that calculating actual loss under Parmar's proposed standard would be "outcome-determinative" of his sentence. Colletta, 602 F. Supp. at 1325. Release pending appeal is therefore also unwarranted on this separate basis.

## IV.    CONCLUSION

For the foregoing reasons, the Release Motion, ECF No. 360, and the Expedite Motion, ECF No. 361, are each **DENIED**. Parmar has held off the reach of justice for far too long. It is time that justice be served. Parmar shall surrender to the BOP on June 11, 2026.

**SO ORDERED**.

*s/ Madeline Cox Arleo*

**MADELINE COX ARLEO**
**UNITED STATES DISTRICT JUDGE**

8